1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE JOHN A. KRONSTADT, JUDGE PRESIDING

4  UNITED STATES OF AMERICA,          )
                                      )
5                                     )
                                      )
6                    Plaintiff,       )
                                      )
7                                     )
                                      )
8          Vs.                        )    No.
                                      )    LACR18-00050(B)-JAK
9                                     )
                                      )
10  YI-CHI-SHIH,                      )
                                      )
11                                    )
                                      )
12                   Defendant.       )
                                      )
13  _____  )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               JURY TRIAL, DAY 8

18                  VOLUME II

19            LOS ANGELES, CALIFORNIA

20            THURSDAY, MAY 30, 2019

21

22

23            MIRIAM V. BAIRD, CSR 11893
         OFFICIAL U.S. DISTRICT COURT REPORTER
24        411 WEST FOURTH STREET, SUITE 1-053
             SANTA ANA, CALIFORNIA 92701
25               MVB11893@AOL.COM

1                              **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**        MELANIE ANN HANSON SARTORIS
     **UNITED STATES OF AMERICA:**          JUDITH HEINZ
4                                           JAMES HUGHES
                                            WILLIAM ROLLINS
5                                           AUSA - OFFICE OF US
                                            ATTORNEY
6                                           UNITED STATES DISTRICT
                                            COURTHOUSE
7                                           312 NORTH SPRING STREET
                                            12TH FLOOR
8                                           LOS ANGELES, CA 90012
                                            - AND -
9                                           KHALDOUN SHOBAKI
                                            AUSA - OFFICE OF US
10                                          ATTORNEY
                                            CYBER AND INTELLECTUAL
11                                          PROPERTY CRIMES SECTION
                                            312 NORTH SPRING STREET
12                                          SUITE 1500
                                            LOS ANGELES, CA 90012
13

14
     **IN BEHALF OF THE DEFENDANT,**        JAMES W. SPERTUS
15   **YI-CHI SHIH:**                       JOHN HANUSZ
                                            CRISTA CULVER
16                                          SPERTUS LANDES AND UMHOFER
                                            LLP
17                                          1990 SOUTH BUNDY DRIVE
                                            SUITE 705
18                                          LOS ANGELES, CA 90025

19

20

21

22

23

24

25

1                                 **INDEX**

2    **WITNESS:**                                      **PAGE:**

3
      **CROSS-EXAMINATION RESUMED**                        4
4     **REDIRECT EXAMINATION**                            11
      **RECROSS-EXAMINATION**                             22
5     **Kiet Mai, Government's witness, sworn**           33
      **DIRECT EXAMINATION**                              34
6     **Jeffrey Brian Barner, Government's witness,**     56
      **previously sworn**
7     **EXAMINATION BY MR. ROLLINS**                      74

8                               * * * * *

9

      **EXHIBITS:**
10
       Exhibit 258 received                               38
11
                                * * * * *
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    LOS ANGELES, CALIFORNIA; THURSDAY, MAY 30, 2019; 11:57 A.M.

2                              ---

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.  All 15 jurors are

5    back.

6              Mr. Barner, would you please restate your name.

7              THE WITNESS:  Jeffrey Brian Barner.

8              THE COURT:  Do you understand that you remain under

9    oath?

10             THE WITNESS:  Yes, I do.

11             THE COURT:  Please proceed.

12             MR. SPERTUS:  Your Honor, I reached a stipulation

13   with the government as to the authenticity of eight exhibits.

14   Their only objection is relevance.  I'd like to read the

15   exhibit numbers:  3600, 3602, 3604, 3610, 3611, 3612, 3613,

16   and 3633.

17             THE COURT:  All right.  All of those exhibits are

18   marked for identification.  And what -- these are e-mails?

19             MR. SPERTUS:  Yes.  And I placed a stack in front

20   of Dr. Barner, which I won't seek to admit yet.

21                    CROSS-EXAMINATION RESUMED

22   BY MR. SPERTUS:

23   Q.   Dr. Barner, before I direct your attention to exhibits,

24   were you very focused on the quarterly revenue coming out of

25   the foundry business at Cree?
```

1    A.    Yes.  It's a major objective.

2    Q.    I couldn't hear you.

3    A.    Yes.  It's a major objective.

4    Q.    And the timing of runs impacted quarterly revenue

5    because one run could be pushed to another quarter and hurt

6    estimates, right?

7    A.    That's correct.

8    Q.    And some of the internal Cree planning is based on the

9    anticipated lot runs coming in the future during a quarter,

10   right?

11   A.    That's correct.

12   Q.    What does it means for Cree to book revenue?

13   A.    It means a customer has placed an order.  We've entered

14   it into our system and formally acknowledged that we will

15   complete that order.  Then we provide a delivery date in

16   development runs.

17          This includes various milestones throughout

18   execution of that service project, and those dates are given.

19   And then we do our very best to execute to that schedule.

20   Q.    And are Cree's projected earnings dependent on

21   successful execution of its plan schedules?

22   A.    Could you repeat that question, please.

23   Q.    When Cree projects its revenue and its earnings, are

24   those projections that Cree makes about its financial

25   performance dependent on meeting the schedules for production

1    that Cree puts in place based on customer orders?

2    A.    They are very loosely tied.

3    Q.    How are they not directly tied?  Can you explain that?

4    A.    Simply because I may not know all of the foundry

5    projects until the order is actually placed.  Sometimes

6    there's development activities on the customer part.  There

7    may be delays in the design activity.  There may be delays in

8    placing the purchase order.

9          There's a variety of things that go in there, and

10   what I do is I provide an overall guidance of the amount of

11   foundry business I expect to have and execute during a

12   quarter.  It may be directly tied to individual orders, and

13   it may be my estimate of orders that I anticipate coming in

14   based on discussions with my customers.

15   Q.    Okay.  And for all of these questions, I'm directing

16   your attention only to the portion of the Cree business that

17   you manage.  Okay?  Do you understand that?

18   A.    Yes, I do.

19   Q.    During the time that Cree came back to you in

20   December 2014 to discuss doing a second run of wafers --

21          THE COURT:  Could you -- you said Cree.  Did you

22   mean it?

23          MR. SPERTUS:  I'm sorry.  Can I ask the question

24   over and strike that?

25          THE COURT:  Yes.

1    BY MR. SPERTUS:

2    Q.    Dr. Barner, in December 2014 did MicroEx come back to

3    you for a second run?

4    A.    Yes.

5    Q.    And during that time were you very focused on how well

6    the foundry business was doing?

7    A.    I'm always focused on how well the foundry business is

8    doing.

9    Q.    How much of your attention is devoted to how well the

10   foundry business is doing?

11   A.    Sorry.  Didn't you just ask that question?

12   Q.    You said always.  Did you mean to suggest that

13   100 percent of your attention is focused on how well the

14   foundry business is doing?

15   A.    In all aspects, yes.

16   Q.    Okay.  So that is what dominates your attention as the

17   manager of the foundry business, right?

18   A.    How well we are executing projects, doing design work,

19   testing wafers, producing wafers, and having highly satisfied

20   customers is a hundred percent of my focus.

21          MR. SPERTUS:  Your Honor, I think I just have one

22   more area.

23   BY MR. SPERTUS:

24   Q.    Can you describe the difference again between Gallium

25   Arsenide wafers and Gallium Nitride wafers?

A.   The Gallium Arsenide in general terms is technology that
has been applied towards microwave circuitry since the '60s,
maybe even earlier in terms of actually integrated circuits.
It certainly started to take place in the '60s and '70s.

         It basically is a more narrow bandgap material,
which means it doesn't support high voltages.  It doesn't
support high voltages with high current.

         Gallium Nitride on silicon carbide is a wide
bandgap semiconductor material.  It supports very high
voltages and very high currents, which, in terms of very
simple analysis, voltage times amperage is power, and it
enables you to make very powerful devices, in particular
amplifiers for microwave application.

Q.   So are the -- and are the manufacturing processes for
Gallium Nitride different than the manufacturing processes
for Gallium Arsenide?

A.   Yes.

Q.   And if somebody is trying to build a Gallium Arsenide
foundry, is it of any benefit to them to order a Gallium
Nitride wafer other than just testing amplifiers and
transistors and things like that?

A.   Yeah.  While there are differences, there's a tremendous
amount of commonality as well.

Q.   Because they both are wafers?

A.   No.  I mean, you use very similar metallization.

```
1   Typically both processes use gold interconnect or

2   transmission line.  Media on the wafer, they're fabricated,

3   which we refer to metal 1 and 2.  These are transmission

4   lines, and they can be made into inductors and interconnects.

5   They connect to the field of transistors, the capacitors, the

6   resistors, the substrate vias, all of which is used to

7   fabricate these integrated circuits.

8   Q.   You can't determine a manufacturing process by having a

9   finished product wafer, correct?

10  A.   You can gain a tremendous amount of insight, especially

11  if you have the analytical tools to basically chemically and

12  physically bore down into that substrate to see how the

13  layers, what materials are used there.

14         That gives you tremendous insight in terms of how

15  that device might be manufactured.  It would not tell you

16  everything.

17  Q.   Okay.  And if you didn't have those tools, how much does

18  a wafer purchase tell you about the manufacturing process?

19         MS. HEINZ:  Objection, Your Honor.  Relevance.

20  Calls for speculation.

21         THE COURT:  Sustained.

22  BY MR. SPERTUS:

23  Q.   When you use the term tools, are they very expensive

24  machines?

25  A.   Not necessarily.  They could be a very inexpensive
```

microscope.

Q.    Okay.  So using a microscope on a chip can tell you about the manufacturing processes used to make that chip?

A.    It will give you insight, yes.

Q.    So by analogy if I went to a book store and bought a book off a shelf, I'll be able to, for example, determine what glue was used, but I would not be able to determine anything beyond visual inspection of the book I purchased, right?

MS. HEINZ:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. SPERTUS:

Q.    Is your testimony on direct designed in any manner to communicate somehow that Dr. Shih learned about the design processes at Cree because he ordered a wafer?

MS. HEINZ:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

BY MR. SPERTUS:

Q.    Well, when you were describing how important Cree's technology is during your direct exam -- I just want clarity -- did you intend to communicate somehow that Dr. Shih figured out Cree's manufacturing processes when he bought a wafer?

MS. HEINZ:  Objection.  Relevance.  Misstates the direct.

```
1              THE COURT:  Sustained as framed.

2              MR. SPERTUS:  Can I have a moment, Your Honor?

3              THE COURT:  Yes.

4              (Pause in proceedings)

5              MR. SPERTUS:  Your Honor, I don't believe I have

6    any further questions.  If I can just have one moment to

7    confer.

8              THE COURT:  That's fine.  Thank you.

9              MR. SPERTUS:  Your Honor, I just would move for

10   admissibility of the exhibits I enumerated at the start based

11   on the testimony of Dr. Barner.

12             THE COURT:  Can we go over that later?

13             MR. SPERTUS:  Yes.

14             THE COURT:  Thanks.

15             MR. SPERTUS:  No further questions, Your Honor.

16             THE COURT:  Thank you.

17             Thank you, Mr. Spertus -- subject to potential

18   recall, correct?

19             MR. SPERTUS:  Actual recall is definite, yes.

20             THE COURT:  That's fine.  Thank you.

21             Redirect?

22             MS. HEINZ:  Yes, Your Honor.

23             THE COURT:  Please.

24                     REDIRECT EXAMINATION

25
```

1    BY MS. HEINZ:

2    Q.   Dr. Barner, could you please look at Exhibit 6.  This is

3    admitted.

4              MS. HEINZ:  Can we publish Exhibit 6, please.

5              THE COURT:  You may.

6              MS. HEINZ:  I'd like to publish attachment one.  I

7    believe the numbers end in 5344.

8              THE COURT:  That's fine.  Thank you.

9    BY MS. HEINZ:

10   Q.   Dr. Barner, could you please look at paragraph number

11   six on the exhibit in front of you.

12   A.   (Witness complies.)  Yes.

13   Q.   The letters there where it says N back slash A, do you

14   see that?

15   A.   I do.

16   Q.   What did you interpret that to mean?

17   A.   As a customer saying it was not applicable.

18   Q.   And did you also interpret it to mean that the product

19   was not going to be shipped outside the United States?

20   A.   Yes, I did.

21   Q.   Do customers that purchase Cree's custom designed

22   foundry services attempt to design MMICs that operate as they

23   are designed?

24   A.   Yes.

25   Q.   Why?

1    A.    Because it is an expensive process to go through this

2    development activity.  It can cost hundreds of thousands of

3    dollars.  So they want their design to meet the requirements

4    the first time they do that.

5    Q.    How can a MMIC designer -- what can a MMICs designer do

6    before the MMICs are actually made to see if the MMICs will

7    work as they're designed?

8    A.    They would use the design kit.  Do very careful

9    analysis.  They may employ many other design tools including

10   thermal analysis, electromagnetic analysis, which is

11   basically a tool that does -- it divides up the problem into

12   a variety of finite element analysis that predicts how the

13   electric and magnetic fields will propagate through the

14   circuit.

15          And this is in addition to what the design kit

16   tools like ADS and Microwave Office will do.  If you do all

17   of those things and you get all of it right, then in

18   principle the circuit will perform as designed.

19   Q.    Can an experienced MMIC designer predict the power level

20   of what the design will generate?

21   A.    Generally, yes.

22   Q.    How?

23   A.    By using tools, by using the models we provide, the

24   design kit.  And through all of that careful analysis, they

25   would be able to predict under the appropriate conditions,

1    the thermal conditions, the applied bias conditions.  And

2    then the environment that the chip is intended to be placed

3    in, it would pretty accurately predict the output power and

4    performance of that circuit.

5    Q.    Based on those same factors, can an experienced MMIC

6    designer accurately predict the frequency range that the MMIC

7    will generate or operate at?

8    A.    Generally speaking, yes, but it's a much more difficult

9    aspect in that it's very difficult to get all of those

10   potential factors correct the first time.  And sometimes the

11   very best thing you can do is come close, see the factors

12   that push it towards one frequency higher or lower, use those

13   factors, and adjust the design on the second iteration in

14   order to produce a circuit that hits all of the targets.

15   Q.    Now, on cross-examination you talked about how you, you,

16   when we were talking to the FBI, that you estimated the

17   performance of the MMIC power amplifiers that Cree made for

18   MicroEx.  And I'm specifically talking about batch one.

19           How were you able to come to that estimation?

20   A.    Well, I looked at the layout of those chips, determined

21   how many, what we refer to as, millimeters of periphery in

22   the actual transistor.  That's basically the number of

23   fingers, if they're each .1 millimeter long and there's ten

24   fingers.  Ten times .1 would be one millimeter size.

25           We know that our processes at 28 volts or 40 volts,

1    depending on which process he was using, would produce

2    anywhere from about four, four and a half watts per

3    millimeter and as much as six and a half watts per millimeter

4    at temperatures, at the conditions that these chips would

5    typically be operated at, and use that to establish what

6    power level it was.

7           And then I also looked at the relative size of the

8    inductors and transmission passive element aspects that were

9    on the circuit to determine potentially how long they were,

10   how much loss, and what frequency they might potentially

11   operate.

12          And just from general perspective, you know, a one-

13   or three-gigahertz signal versus a ten-gigahertz signal will

14   be -- the ten-gigahertz signal will be substantially smaller.

15   And I observed that in those chips.

16   Q.   And would an experienced MMIC designer be able to do in

17   essence what you did?

18   A.   Yes.

19   Q.   Now, Cree tested two of the MMICs, MMIC power wafers --

20   sorry, two of the MMIC power amplifiers that were on the

21   wafer that FBI provided to Cree; is that correct?

22   A.   That is correct.

23   Q.   And one -- and Cree determined that one of those was

24   export controlled; is that correct?

25   A.   Based on the performance on wafer into a 50 ohm load,

1    yes, that's correct.

2    Q.    Now, there were other MMICs on the wafer that Cree did

3    not test; is that correct?

4    A.    That's correct.

5    Q.    I'm going to ask you some questions about on-wafer

6    testing.  Is on-wafer testing, can it be performed on diced

7    wafers?

8    A.    Generally not.  But quite often someone may attach that

9    diced die to a shim or other metal structure that enables it

10   to be thermally sunk.  Then they could do full test on those

11   MMICs using the same type of probes that come down and touch

12   the various contact pads of the circuit.

13   Q.    Is it more typical to conduct on-wafer testing on

14   undiced wafers?

15   A.    Yes.

16   Q.    And with respect to on-wafer testing on an undiced

17   wafer, what kind of test would be done?

18   A.    There can be a variety of DC tests where you basically

19   apply a DC voltage and see how much current goes through that

20   particular part of the circuit.

21          You can also come in with what we refer to as a

22   ground signal, ground RF probe that basically can be

23   contacted to the input and output of the RF pass.  And then

24   you can apply DC bias to the actual MMIC so that it is

25   activated.  Then you can put input power and see how much

1    output power comes in.

2           When you do an on-wafer test, because you do not

3    have a substantial thermal sink -- after all, these are very

4    high-power devices that can generate many hundreds of watts

5    of heat, and so it's very important that you also do pulse

6    testing during those RF tests.

7           So we actually turn the device on and off very

8    quickly.  It's only on a very short period of time, and then

9    you can determine the RF performance when the RF pulse is on.

10   Q.   Now, I believe you already testified that an undiced

11   wafer will contain the PCMs?

12   A.   That's correct.

13   Q.   So if someone were to try to reverse engineer a Cree

14   wafer in China, would it be helpful for them to have the PCM?

15   A.   Yes.

16   Q.   Why?

17   A.   Because there's a variety of inline tests that we do

18   there as well, including things that are not part of our

19   overall goodness PCM specifications.

20          But there are aspects of the circuit process that

21   we test in those structures to ensure that, say, for example,

22   M-1 or the lower metal layer is connecting to the top metal

23   layer where it's supposed to, and those interconnects are

24   actually functioning to the performance and the reliability

25   and the quality that we intend to put into our wafers.

1    Q.    So having the PCMs would help someone reverse engineer

2    the actual layered structure of the wafer; is that correct?

3    A.    It would give them further insight, yes.

4    Q.    And is that something that is particularly proprietary

5    to Cree, the way that the wafer is layered?

6    A.    Yes.

7    Q.    I want you to look at an exhibit that was introduced

8    during the -- by the defense, which is 4281.

9          THE COURT:    4281 is the presentation?

10          MS. HEINZ:    Yes, Your Honor.

11    BY MS. HEINZ:

12    Q.    I'm showing on the monitor page 5 of this exhibit.    Do

13    you see that?

14    A.    Yes, I do.

15    Q.    Okay.    And do you see there where it says market

16    segments?

17    A.    Yes, I do.

18    Q.    Does that include military?

19    A.    Yes, it does.

20    Q.    Now I'm going to turn to page 14 of this exhibit.    I

21    believe you testified previously about the meaning of COTS?

22    A.    Yes.

23    Q.    And I forgot the exact meaning.    Can you refresh my

24    recollection on that?

25    A.    Commercial off the shelf.

1   Q.   The MMICs that we've been discussing that were

2   manufactured by Cree for MicroEx, was there anything about

3   those that was commercial off the shelf?

4   A.   No.

5   Q.   If someone were trying to reverse engineer Cree's

6   process in China, would it be helpful for them to have

7   undiced wafers?

8   A.   Yes.

9   Q.   If you had known that MicroEx and Kiet Mai or Kiet Mai

10  was providing his login information to the PDK to someone

11  else, would Cree have entered into any kind of agreement with

12  him and given him access?

13  A.   No.  In fact, I'd cut off his access immediately.

14  Q.   Directing your attention to the YouTube videos that were

15  briefly discussed in your cross-examination, do these YouTube

16  videos that you know about, did they contain any proprietary

17  information belonging to Cree?

18  A.   No.

19  Q.   And turning again to the question of harm to Cree, would

20  you explain the harm Cree would have suffered if the Cree

21  export controlled MMICs were exported to China?

22  A.   I'm sorry.  Could you repeat the question?

23  Q.   Yes.  I'll repeat that.

24       Would you explain -- let me start here.  If the

25  Cree -- if the MMICs that we're talking about --

1           MR. SPERTUS:  Calls for speculation.

2           THE COURT:  Just a minute.

3           Would you read the question, please.

4           (Record read)

5           THE COURT:  Do you understand the question?

6           THE WITNESS:  Yes.

7           MR. SPERTUS:  Assumes facts not in evidence.  It is

8    speculative and assumes facts not in evidence.

9           THE COURT:  I understand.  Well, overruled.

10          Ladies and gentlemen, sometimes questions are asked

11   that ask a witness to assume certain facts.  The fact that

12   they -- that doesn't mean that those assumed facts have been

13   established.

14          Do you have the question in mind?

15          THE WITNESS:  Yes.

16          THE COURT:  You may answer.

17          THE WITNESS:  So, one, I mean, if we have anything

18   to do with that illegal export of that, essentially at that

19   point in time if we do not have an export license, then we

20   would have to immediately declare that to the government so

21   that it could be properly investigated.

22          That can include penalties, substantial financial

23   penalties, including stop a business.  So it's very important

24   for us to make sure that we comply with export law.  The fact

25   that those MMICs are getting delivered to China may enable

1    them to produce systems that they would not be able to

2    produce without those MMICs.

3              That's a very serious impact, as well as, you know,

4    they would see if they -- whoever designed those MMICs, they

5    could see how they were designed, which is again intellectual

6    property associated with those chips.  So it could be very

7    detrimental.

8    BY MS. HEINZ:

9    Q.   And could it result in loss of millions of dollars of

10   business to Cree?

11             MR. SPERTUS:  Your Honor, this is entirely

12   speculative.

13             THE COURT:  Sustained.

14   BY MS. HEINZ:

15   Q.   You just testified about the importance of export,

16   following export regulations to Cree.  Is there any

17   relationship between Cree's need to follow export regulations

18   and the priority they give that and Cree's financial bottom

19   line?

20   A.   No.  I mean, we will conduct business legally.  If that

21   means that we need to push out orders, we do that in order to

22   make sure that we've got compliance, whether or not it be an

23   export license or an assessment that has not been -- that the

24   jurisdiction has not been determined yet what classification

25   it is.  We don't ship that material even if it in fact

```
 1    impacts our revenue.

 2              MS. HEINZ:  No further questions.

 3              THE COURT:  Any recross?

 4              MR. SPERTUS:  Yes, Your Honor.

 5              THE COURT:  Briefly.

 6              MR. SPERTUS:  Within the scope.

 7                      RECROSS-EXAMINATION

 8    BY MR. SPERTUS:

 9    Q.   With regard to your testimony about the undiced wafer

10    and testing and the ability to see something from the PCMs

11    that are on the undiced wafer, do you recall those questions

12    on redirect?

13    A.   Yes.

14    Q.   Okay.  If I were to put the undiced wafer that you sold

15    to MicroEx in your hand, will you be able to look at it and

16    determine whether any of those tests were done on that wafer?

17              MS. HEINZ:  Objection.  Relevance.  Beyond the

18    scope of the redirect.

19              THE COURT:  You may answer.

20              THE WITNESS:  These would have been tested at our

21    site before we shipped them, so it would be very difficult to

22    tell whether or not they had further tests done.

23    BY MR. SPERTUS:

24    Q.   But on-wafer testing is visible by looking at the

25    undiced wafer, right?
```

1    A.    It can be.

2    Q.    I mean, you can hold it up to the light and see if there

3    were probes or anything inserted in it, right?

4    A.    In some cases, yes.  Not always.  We've had customers

5    actually bring to our attention, it doesn't look like you

6    tested this wafer, because we did it in such a gentle manner

7    that there were no probe marks.

8          So it doesn't always leave probe marks, but in fact

9    the tests did occur.

10   Q.    All right.  So most MMIC testing involves destruction of

11   the MMIC during the testing process?

12   A.    Well, not at all.  That would be very bad for business

13   if every time you tested a device, it was destroyed.  No.  It

14   sometimes leaves minor marks on the bond pads or the

15   connection pads.  But it can be very, very gentle also.

16   Q.    Okay.  And I guess the more skilled a tester you are,

17   the more gentle you would be, right?

18   A.    It could go both ways.

19   Q.    Okay.  But if I put that one undiced wafer that Cree

20   sold to MicroEx that was the subject of your redirect

21   testimony in your hand, will you be able to tell me whether

22   or not that wafer poses some threat to Cree if that -- that

23   you just testified could happen if the wafer went anywhere?

24         MS. HEINZ:  Objection.  Asked and answered.

25         THE COURT:  Sustained.  I don't understand the

1   question.

2   BY MR. SPERTUS:

3   Q.   Well, okay.  Without objection you heard you testified

4   about some harm that could befall Cree by selling an undiced

5   wafer.  Do you recall that?

6   A.   Yes.

7   Q.   Okay.  And you sold one undiced wafer to MicroEx, right?

8   A.   That's what I recall.

9   Q.   Okay.  And the threats that you just testified result

10   from certain types of testing activity, right?

11   A.   Test and inspection, being able to see those wafers and

12   see what's on them, yes.

13   Q.   And if I put an undiced wafer in your hand, would you be

14   able to tell me whether or not the testing on that undiced

15   wafer happened?  Yes or no?

16         MS. HEINZ:  Objection.  Asked and answered.

17         MR. SPERTUS:  It's not been answered.

18         THE COURT:  Do you understand the question?

19         THE WITNESS:  Yes, I do.

20         THE COURT:  You may answer.  And you're not limited

21   to yes or no.

22         THE WITNESS:  Yes.  And I can tell you that those

23   structures would have been tested as part of the fabrication

24   process before we shipped the wafers.  The difficulty is

25   determining whether or not they had been retested or further

1  tested.

2  BY MR. SPERTUS:

3  Q.   But I'm talking about tested by somebody other than

4  Cree.  Do you understand that to be part of my question?

5  A.   Yes.  I understand that completely.

6  Q.   Okay.

7  A.   We would have tested it before we shipped it.  If, you

8  know, by luck the probes came back down in exactly the same

9  spot and the same type of denting structure on it, then I

10  would not have been able to tell if it had been retested

11  after we tested it.

12  Q.   Because somebody could have -- what do you mean by

13  denting?

14  A.   Well, when you come in with those probes and you apply

15  pressure to make actual electrical contact between the probe

16  tip and that pad, you're going to dent the gold, if you will.

17  You scratch the gold surface, and you will leave a mark from

18  that probe.

19  Q.   Okay.  And if I handed you the undiced wafer, will you

20  be able to determine whether that testing was done?

21          MS. HEINZ:  Asked and answered.  Objection.

22          THE COURT:  Yes.  Sustained.

23  BY MR. SPERTUS:

24  Q.   Now, with regard to the line of questioning that began

25  your redirect, you were asked a series of questions about

1     customers try to create MMICs that meet designs.  Do you

2     recall that testimony?

3     A.   Yes.

4     Q.   Okay.  And I think you said, well, customers can do very

5     careful analysis before the wafers are made to try to realize

6     their design goals.  Is that what you meant to say?

7                MS. HEINZ:  Objection.  His testimony speaks for

8     itself.

9                THE COURT:  Sustained.

10               MR. SPERTUS:  I'm asking is my summary accurate.

11               THE COURT:  Sustained.

12    BY MR. SPERTUS:

13    Q.   Is your point that when you were describing the careful

14    analysis that customers can do before placing an order, is

15    your point that careful analysis could be done to help the

16    customer realize and performance the design goals?

17               MS. HEINZ:  Objection.  Relevance as to his point.

18               THE COURT:  I don't understand the question.

19               Do you understand the question?

20               THE WITNESS:  Yes.

21               THE COURT:  You may answer.

22               THE WITNESS:  I apologize.  Could you please repeat

23    the question.

24               THE COURT:  Could you read the question, please.

25               (Record read)

```
 1              THE WITNESS:  Yes.
 2    BY MR. SPERTUS:
 3    Q.   Yet you determined as a matter of fact in this case in
 4    the MicroEx production that the manufactured wafers did not
 5    in fact meet the design goals, right?
 6              MS. HEINZ:  Objection.  Asked and answered.  This
 7    is cumulative.
 8              THE COURT:  This is cumulative.
 9              MR. SPERTUS:  Addressing your redirect only --
10              THE COURT:  We've covered the issues, all of the
11    e-mails and so on.  So let's move to a new area, please.
12              MR. SPERTUS:
13    BY MR. SPERTUS:
14    Q.   Why does Cree bother offering testing services when it
15    sells wafers?
16              MS. HEINZ:  Objection.  Relevance.
17              THE COURT:  It's overbroad.
18              Next question, please.
19    BY MR. SPERTUS:
20    Q.   Why are -- what are testing services offered by Cree?
21    A.   These are on wafer tests in which we will test custom
22    circuits, and that comes in conjunction with the fabrication
23    lot.  We would never actually just test circuits as a service
24    alone.  In other words, this is actually tied to actually
25    where the customer has developed a custom chip.  We put it on
```

```
 1    a custom mask set.
 2              THE COURT:  Can you spell mask set?
 3              THE WITNESS:  M-a-s-k, space, s-e-t.
 4              THE COURT:  Thank you.
 5              THE WITNESS:  And when we do both the fabrication
 6    of those custom circuits, then we could do custom tests of
 7    those circuits.
 8    BY MR. SPERTUS:
 9    Q.   And Cree charges money to do that, right?
10    A.   That's correct.
11    Q.   And if careful testing could help a customer accomplish
12    its design goals, why does Cree offer a testing service?
13              MS. HEINZ:  Objection.  Relevance.
14              THE COURT:  Sustained.
15    BY MR. SPERTUS:
16    Q.   Didn't you just testify on redirect that careful
17    analysis and modeling allows customers to realize their
18    design goals?  Isn't that the focus of the redirect that you
19    just testified to?
20              MS. HEINZ:  Objection.  The testimony speaks for
21    itself.
22              THE COURT:  Sustained.
23    BY MR. SPERTUS:
24    Q.   Can you -- so just tell me.  Is it true that I can tell
25    you the design, give you the design of a MMIC, and you could
```

1    tell me what the actual outputs were?

2            MS. HEINZ:  Objection.  His testimony speaks for

3    itself.

4            THE COURT:  Do you understand the question?

5            THE WITNESS:  Yes.

6            THE COURT:  You may answer.

7            THE WITNESS:  So if you had just given me a MMIC,

8    okay, I could look at it and make estimates of what its

9    performance will be.  Ultimately if you test that under a

10   variety of conditions, you would know the performance of that

11   chip under those conditions.

12   BY MR. SPERTUS:

13   Q.   And you yourself in connection with the MicroEx wafers

14   determined that your estimates based on the design did not

15   match actual performance, correct?

16   A.   They were very simple estimates.  They was no analysis,

17   no reverse engineering of that particular design circuit.  So

18   it's just a very simple estimate.

19   Q.   And you were wrong?

20   A.   No.  I was quite reasonable.

21   Q.   I'm not asking whether you were reasonable or

22   unreasonable.  I'm saying your predicted outputs were not

23   actual outputs?

24           MS. HEINZ:  Objection, Your Honor.  This is

25   cumulative.  Asked and answered.

1          THE COURT:  Agree.  It's -- we've covered this

2     already.

3     BY MR. SPERTUS:

4     Q.    No dispute there's a lot of legitimate engineering tests

5     to be done on on-wafer testing, right?  You're not implying

6     -- strike that.  I'll ask another question.

7          You're not implying that when a customer asks for

8     an undiced wafer to do on-wafer testing, there's anything

9     wrong with that; are you?

10    A.    No.

11    Q.    When you were asked -- when you were just now testifying

12    about the damages Cree could suffer, you were describing

13    fines and penalties and things like that, right?

14    A.    Yes.

15    Q.    But you -- Cree suffered no damages related to anything

16    connected to MicroEx in the category of fines or penalties,

17    right?

18          MS. HEINZ:  Objection.  Calls for speculation.

19          THE COURT:  Do you know?  Do you understand the

20    question?

21          THE WITNESS:  Yes, I do.

22          THE COURT:  All right.

23          Restate the question with a foundational basis.

24    BY MR. SPERTUS:

25    Q.    Are you aware of any fine ever imposed on Cree for

1    anything that Cree did in connection with MicroEx in any

2    manner?

3    A.    No.

4    Q.    Are you aware of any penalty imposed on Cree for

5    anything Cree may have done ever in connection with its work

6    for MicroEx?

7    A.    No.  We were not aware of any export that had taken

8    place.

9    Q.    What makes you think an export ever took place?

10    A.    I don't.

11    Q.    So when you described on redirect cutting off Mai's

12    access immediately, what were you talking about?

13    A.    If he was providing his user name access to another

14    person, yes, we'd cut that off if someone does that.  We

15    gladly would give a legitimate user a user name and password

16    to get access.

17    Q.    Has MicroEx ever come back to you to ask for a run

18    number three?

19    A.    No.

20    Q.    And the work on run number two was fully completed

21    wafers delivered and paid for, right?

22              MS. HEINZ:  Objection.  This is cumulative.

23              THE COURT:  It is.  Sustained.

24              MR. SPERTUS:  Your Honor, can I have a moment?

25              THE COURT:  Yes.

```
 1                (Pause in proceedings)

 2                MR. SPERTUS:  No further questions.

 3                THE COURT:  All right.  Thank you, Mr. Spertus.

 4                Just a moment.  Let me talk to counsel for a

 5      moment, please.

 6                (Begin sidebar conference)

 7                THE COURT:  Before I thank and excuse him, I want

 8      him to come back.  I'd like to know whether you can agree on

 9      a process to ask him to return, please, at 2:40.  By then the

10      jurors will be gone.

11                MR. SPERTUS:  I respectfully request that the Court

12      not excuse him.

13                THE COURT:  I am excusing him.  I'm thanking him

14      and excusing him.  You have the ability to recall him.  I'm

15      talking about a mechanical issue here.

16                MR. SPERTUS:  I misunderstood.  Yes.

17                THE COURT:  I want to advise him to return at 2:40.

18      I don't want to do that in front of the jury.

19                MR. SPERTUS:  I will follow him out and tell him.

20                THE COURT:  Is that okay?

21                MS. HEINZ:  Actually, if we're going to tell him

22      that, I would prefer that Your Honor do it to --

23                THE COURT:  I'm going to.

24                MS. HEINZ:  No.  I don't want you to do it in front

25      of the jury.
```

```
 1              THE COURT:  We have to let the jury leave.

 2              MR. SPERTUS:  I'm happy to accept the

 3   responsibility.

 4              MS. HEINZ:  Then I would prefer that both of us

 5   tell him at the same time.

 6              THE COURT:  Tell him to come back at 2:40, please.

 7              MS. HEINZ:  Yes, Your Honor.

 8              THE COURT:  Thank you.

 9              MR. SPERTUS:  Thank you.

10              (End sidebar conference)

11              THE COURT:  Mr. Barner, thank you for your

12   testimony.  You may step down at this time.  We may be having

13   you return at a later time to provide further testimony later

14   in the case.  Thank you.

15              THE WITNESS:  Thank you.

16              THE COURT:  The government will call the next

17   witness, please.

18              MS. HEINZ:  Your Honor, the government calls Kiet

19   Mai.

20         **Kiet Mai, Government's witness, sworn**

21              THE CLERK:  Please state your full name and spell

22   it for the record.

23              THE WITNESS:  My full name is Kiet --

24              THE COURT:  Could you speak into the microphone,

25   please.
```

1      Thank you.

2           THE WITNESS:  Sorry.  My name is Kiet Anh Mai.

3      First name is K-i-e-t.  Middle name is A-n-h.  Last name is

4      M-a-i.

5           THE COURT:  Good afternoon, Mr. Mai.

6           THE WITNESS:  Good afternoon, Your Honor.

7           THE COURT:  Please proceed, Ms. Heinz.

8           MS. HEINZ:  Thank you, Your Honor.

9                          **DIRECT EXAMINATION**

10     BY MS. HEINZ:

11     Q.   Mr. Mai, good afternoon.

12     A.   Good afternoon, AUSA Heinz.

13     Q.   Do you hold a degree in electrical engineering?

14     A.   Yes.

15     Q.   Please describe briefly your college education.

16     A.   I have a bachelor of science in electrical engineering

17     from the University of Hawaii and a master's degree in

18     electrical engineering at California Institute of Technology.

19     Q.   California Institute of Technology in Pasadena?

20     A.   Yes.

21     Q.   Could you please briefly describe your employment as an

22     electrical engineer.

23     A.   Well, I worked at Boeing company in Everett for one

24     year.  And then I came out to California in Los Angeles, and

25     I worked for Hughes Aircraft company maybe two years.  Then I

```
 1   worked at, at that time called TRW, for another several
 2   years.  Yes.
 3          And then I worked -- and then Dr. Shih and I came
 4   out and established a company called MMCOMM, which is
 5   M-M-C-O-M-M, in 1997.  And then in 2007 the company MMCOMM
 6   was bought by Honeywell International in Torrance.  That's
 7   when we then went to work for Honeywell.
 8   Q.   Have you received any training in United States export
 9   regulations?
10   A.   Yes, I did, for my -- for my company Honeywell via
11   online training courses.
12   Q.   And do you know a person by the name of Yi-Chi Shih?
13   A.   Yes.  Dr. Shih was my supervisor.
14   Q.   And where was he your supervisor?
15   A.   Well, he was my supervisor when we started out at
16   MMCOMM.  And then he was my supervisor when we worked for
17   Honeywell.
18   Q.   Do you see Yi-Chi Shih in the courtroom?
19   A.   Yes.
20   Q.   Could you please describe where he is sitting and what
21   he is wearing.
22   A.   Dr. Shih is sitting right there in the gray suit with, I
23   think, brown tie and white shirt.
24          MS. HEINZ:  Your Honor, may the record reflect that
25   the witness has identified the defendant.
```

```
 1              THE COURT:  Yes.
 2    BY MS. HEINZ:
 3    Q.    Mr. Mai, approximately how long have you known the
 4    defendant?
 5    A.    Well, probably around 12 years or a little more.
 6    Q.    Would you describe that relationship as a social one?
 7    A.    Practically I think it's more like professional than
 8    social.
 9    Q.    And you mentioned already, you testified that at MMCOMM
10    he was your supervisor.  What -- what did he supervise you
11    doing?
12    A.    Oh, actually we -- I was -- when we first started out, I
13    mostly attended the reception desk.  There's only two us.
14    And I was doing engineering, which is basically a lot of
15    testing and working with technicians to do assembly and
16    tests, yeah.
17    Q.    And at Honeywell what were you doing when he was your
18    supervisor?
19    A.    Well, I was tasked to do technical procurement and
20    mostly testing.
21    Q.    And what is MicroEx Engineering?
22    A.    MicroEx Engineering is my company that I created to do
23    the engineering for, you know, for -- I guess for jobs I get.
24    Q.    How many employees does MicroEx Engineering have?
25    A.    It is myself and my partner, Ed Lightner.
```

1    Q.    Are there any other employees at MicroEx Engineering?

2    A.    No.

3    Q.    When you have worked with the defendant at MMCOMM, did

4    you purchase MMIC power amplifiers for MMCOMM?

5    A.    My recollection is very early on I might have, but

6    eventually it was not my job to do the purchasing.

7    Eventually we had somebody else to do all that.

8    Q.    And at Honeywell did you handle any purchasing of MMICs

9    or other kinds of equipment?

10   A.    Oh, yeah.  Oh, yes.

11   Q.    At Honeywell?

12   A.    Yes.

13   Q.    And then have you also purchased MMICs for the defendant

14   through MicroEx?

15   A.    MMICs, does it include wafers?

16   Q.    Yes.

17   A.    Yes, I did.

18   Q.    I'd like you to look now at government's Exhibit 258.

19   That is in Volume 3.

20   A.    (Witness complies.)  Yes, I have it here.

21   Q.    Could you describe, looking at it, Exhibit 258, what it

22   is?

23   A.    This is an e-mail between myself and Dr. Shih.

24         MS. HEINZ:  Your Honor, move to admit Exhibit 258.

25         THE COURT:  Any objection?

1          MR. SPERTUS:  No, Your Honor.

2          THE COURT:  Thank you.

3          Exhibit 258 is admitted.

4          **(Exhibit 258 received.)**

5          MS. HEINZ:  Could we go down to the bottom of the

6    e-mail and publish.

7          THE WITNESS:  Yes.

8          THE COURT:  Page?

9          MS. HEINZ:  That would be page 3, which would be

10   the numbers ending in 8636.

11         THE WITNESS:  Okay.  Yes.

12   BY MS. HEINZ:

13   Q.   So, Mr. Mai, you can either use the binder or look at

14   the screen.

15   A.   Yes.

16   Q.   Looking at the scene, this is an e-mail?

17   A.   Yes.

18   Q.   And the subject of it says TGA2572.  Do you see that?

19   A.   Yes.

20   Q.   And this e-mail is signed by Ed Lightner.  Do you see

21   that?

22   A.   Yes.

23   Q.   Who wrote this e-mail?

24   A.   I did.

25   Q.   And why is it signed Ed Lightner?

1    A.    Oh, because I was trying to ask about this particular

2    MMIC from Jane, whom I know because I would buy MMICs from

3    her for my company Honeywell.  And I didn't want them to, you

4    know, to let her know that I also have a company on the side.

5    Q.    So when you're corresponding with Jane in this e-mail,

6    you're not working for Honeywell?  You're not working in your

7    capacity for Honeywell?

8    A.    No.  This particular one was for MicroEx.

9    Q.    Okay.  I'd like to turn your attention to the next -- to

10   the previous page, which is page 2, which ends in 8635.

11   A.    Yes.

12   Q.    And I'm looking at the bottom e-mail there.

13   A.    Yes.

14   Q.    So did you receive that response from Jane at RFMW?

15   A.    Yes.

16   Q.    What is RFMW?

17   A.    It's a distributor for many companies selling MMICs.

18   Q.    So I'd like to direct your attention to the next e-mail

19   in this chain, which is dated February 3rd, 2012?

20   A.    Yes.

21   Q.    Now, there's an address there on Hill Street?

22   A.    Yes.

23   Q.    Can you tell us what was actually at that address?

24   A.    Oh, that is my art gallery.  The address is for my art

25   gallery.

1  Q.   And did you use that address as the address for MicroEx

2  Engineering?

3  A.   Yes, I did.

4  Q.   I'd like to look at the next e-mail which is at the

5  first page which ends with 8634.

6  A.   Yes.

7  Q.   And did you receive this e-mail even though it's

8  addressed to Ed?

9  A.   Yes.

10  Q.   And then I'd like to turn now to the top two e-mails.

11  So looking at the e-mail that's dated February 3rd, 2012, do

12  you see that?

13  A.   Yes.

14  Q.   That is an e-mail that's to you; is that correct?

15  A.   Let me see.  You're talking about 2/3/12 at 9:22 -- I'm

16  sorry, 9:24 p.m.?  Is that what you're referring to?

17  Q.   No.  I'm going down below there.

18        MS. HEINZ:  Actually if you can highlight a little

19  bit more.  I mean, if you could show a little bit more of the

20  e-mail down there which include where it says forwarded

21  message.

22        THE WITNESS:  Okay.  Let me see.

23        MS. HEINZ:  Go up a little more.

24        THE COURT:  You can also circle that on the screen.

25        MS. HEINZ:  The problem is there isn't enough on my

```
 1    screen.
 2              THE WITNESS:  Oh, yes.
 3    BY MS. HEINZ:
 4    Q.   I didn't circle that very well, but I want to direct
 5    your attention to where it says forwarded message.  Do you
 6    see that?
 7    A.   Yes.  Yes.
 8    Q.   So did you forward this e-mail to the defendant, the
 9    e-mail where it says:  Hi, Ed?
10    A.   Let me see.  To -- from Jane.  Let me think...
11    Q.   I'm specifically directing your attention to where it
12    says Saturday, February 4 --
13    A.   Oh, yes.  I'm sorry.  The line above that.  Yes.  Yes, I
14    did.
15    Q.   And then do you see above where it says:  Please send me
16    the spec and application notes?
17    A.   Yes.  Yes.
18    Q.   And what is a spec and application note?
19    A.   Basically when you buy a MMIC, they will provide you the
20    specifications for the performance of the device, of the
21    MMIC.  And the other one is notes.  Application notes
22    basically would show you how to use it pretty much, how to
23    basically, you know, make it to work for this, for it to
24    perform like it is supposed to.
25    Q.   And then looking at the top e-mail?
```

1   A.   Yes.

2   Q.   Do you see that?

3   A.   Yes.

4   Q.   All right.  So that says, Yi-Chi, this part is ITAR.  Do

5   you see that?

6   A.   Yes.

7   Q.   And it says:  TriQuint wants to review declaration.  Do

8   you see that?

9   A.   Yes.

10  Q.   What did you understand or what did you mean by the term

11  ITAR?

12  A.   Oh, basically when -- ITAR means export control part.

13  So therefore, you -- when you buy it, they want to know if

14  you're going to export it and who will be the end user.

15  Q.   And where you say TriQuint wants to review the

16  declaration, what did you mean by that?

17  A.   Oh, before they actually sell it to you, they will send

18  you a form and you have to declare whether or not you're

19  going to export the part or who will be the end user.

20  Q.   And then in the next sentence you say:  See if someone

21  can get a sample because I have to ask Ed to do it, and I'm

22  not quite sure yet.

23       What did you mean by that when you said:  Because I

24  have to ask Ed to do it and I'm not quite sure?

25  A.   Well, basically I didn't really want to do it, so it's

1   my way of -- my way of saying I don't really want to do it

2   but, you know, kind of a nice way of saying so.

3   Q.    Directing your attention to government's Exhibit 259.

4   A.    Okay.

5   Q.    What is government's Exhibit 259?

6   A.    The first page -- yeah, the first page is -- it's the

7   e-mail from Dr. Shih to me.  So it basically is the -- yeah,

8   from Dr. Shih to me, and then from me to Dr. Shih.

9              MS. HEINZ:  Your Honor, I think one of the jurors

10  is trying to get your attention.

11             THE COURT:  Do you need a break?  Sure.  We'll stop

12  here for a moment.

13             MS. HEINZ:  Yes.

14             THE COURT:  Well, can we break for ten minutes?

15  Let's break for ten minutes and then we'll resume.  Please

16  don't discuss the case during the break.

17             Sorry I didn't see you originally.

18             THE CLERK:  All rise.

19             (Open court - jury not present)

20             THE COURT:  Please be seated.  We'll resume in

21  about ten minutes.

22             You may step down, Mr. Mai, if you wish.  Also,

23  Mr. Mai, there are times when you're so close to the

24  microphone that it's making it a little loud.  So if you

25  could just be a couple of inches away.

1          THE WITNESS:  Thank you, Your Honor.

2          (Recess taken from 1:02 p.m. until 1:16 p.m.)

3          MR. SPERTUS:  Your Honor, one thing before I

4     forget.  Before the jury comes out, I do have a pending

5     motion to move -- I have a pending motion to move in the

6     series of exhibits I identified when Dr. Barner was on the

7     stand.

8          THE COURT:  No.  I understand.  By the way, would

9     you let me know -- it's been a day or two.  There's a

10    reference to the search warrant that was executed in this

11    case, and there was testimony about a judge signing the

12    warrant.  Do you recall that?

13         MS. HEINZ:  Vaguely, although I don't remember.

14         MS. SARTORIS:  I do remember that.

15         MR. SPERTUS:  I remember that.  Agent Miller

16    mentioned it.

17         THE COURT:  Are they ready?

18         (Court and clerk conferring)

19         THE COURT:  The juror who asked for the break is

20    still not quite feeling well, so I want to have Ms. Kiefer

21    communicate to the juror that we don't want to rush her.  We

22    want her to be feeling right.  So we'll just wait.

23         Okay.  The question that I have for you is whether

24    in light of that testimony, you think I should instruct the

25    jury that the judge -- that I'm not the judge who signed the

1    search warrant.

2            MR. SPERTUS:  I do not think so, no.

3            THE COURT:  That's fine.

4            MS. SARTORIS:  Your Honor, I would support if

5    there's any corrective instruction that you think is

6    appropriate, especially if defense -- I would defer to the

7    Court and the defense.

8            THE COURT:  No.  I just wanted to make sure.

9            Second question.  There was some testimony today

10   concerning Exhibit 3566, which is the contract.

11           MR. SPERTUS:  Yes, Your Honor.

12           THE COURT:  Do you recall that?  And there was some

13   questions about what the contract means.  Do you recall that?

14           MR. SPERTUS:  I don't think that's what the

15   question was, but I remember the subject matter of the

16   Court's testimony.  He said his lawyers drafted it.

17           THE COURT:  Not -- I didn't testify.

18           MR. SPERTUS:  I meant Dr. Barner, of course.

19           THE COURT:  I wanted to make sure you confer about

20   this.  It's not about the testimony.  It's just that to the

21   extent there's a dispute about what a contract means, that's

22   generally not an issue for the jury.  It's an issue for the

23   Court.

24           MR. SPERTUS:  I disagree that that instruction

25   should be given, and I don't think that that's the law in

1     this case.  This is not a contract interpretation case.

2              THE COURT:  I'm just -- I didn't say that -- that

3     wasn't what I said.  What I said is there was testimony

4     elicited concerning the contract and its words.  So let's

5     just leave it at that.  I'm just asking -- I'm not making any

6     determination except that the issue is whether anything more

7     needs -- anything needs to be done eventually in the manner

8     concerning interpreting the contract.

9              MR. SPERTUS:  I do not think anything more needs to

10    be done.

11             THE COURT:  That's fine.

12             Do you agree?  And I don't need to resolve this

13    right now.  I'm raising issues because the jury is not here

14    yet.

15             MS. SARTORIS:  Your Honor, I would like to, if I

16    could, go back to the reference to the judge signing a search

17    warrant, during any discussion along those lines.  I just

18    want to make sure that there isn't a corrective instruction

19    that defense counsel would want to hear with respect to that.

20    If there's anything --

21             THE COURT:  If I said anything, I would simply say

22    there's been testimony concerning a search warrant in this

23    case and that it was signed by a bench officer and I'm not

24    the bench officer who signed it.

25             MS. SARTORIS:  I just want to hear from defense

1    counsel if they have any corrective instructions that they

2    would like along those lines or if they prefer not to.

3              MR. SPERTUS:  No, Your Honor.  The answer is no.

4              THE COURT:  That's what I heard you say before.

5              MS. SARTORIS:  Okay.  Thank you, Your Honor.

6              THE COURT:  By asking the question, I'm not

7    proposing it.  I'm just raising the question.

8              (Court and clerk conferring)

9              THE COURT:  We're having this discussion concerning

10   juror number 15.  My latest information is she still hasn't

11   -- she's not feeling a hundred percent yet.  So I suggest we

12   stop for another ten minutes here rather than all of us

13   sitting here waiting.

14             If at the end of ten minutes she feels up to

15   proceeding, we'll proceed.  If she doesn't, we'll start again

16   tomorrow.  I wonder, though, if we do that, during the break

17   can you find out if -- well, it's not essential -- if

18   Mr. Barner could come back earlier.  Do we know where he is?

19             MS. HEINZ:  We could check in the back of the

20   courtroom, Your Honor, and find out if he's back there.

21             MS. SARTORIS:  Your Honor, I just on this last

22   break spoke to somebody who was inquiring if he could perhaps

23   go down to the cafeteria and get some food.  I said that I

24   thought that would be fine and that we wouldn't need him back

25   until 2:00.  So I believe we could probably find him if --

1        THE COURT:  We can obviously --

2        MR. SPERTUS:  Your Honor, on that issue, the thing

3   that I just am -- that I don't understand is that he'll then

4   come back for literally 15 minutes of testimony to

5   authenticate these wafers and --

6        THE COURT:  I don't know what else you had in mind

7   in terms cross-examination, but I've already ruled on what

8   I'm going to do here.

9        MR. SPERTUS:  Thank you.  I understand.  He just

10  seemed very upset to learn that, and I would just like the

11  Court to inform the witness that that was the Court's

12  decision or whatever.

13       THE COURT:  I didn't interpret his reaction to my

14  question about whether he's available week after next as

15  anything more than, yes, I would be available.  Also I didn't

16  understand that you had in mind testimony by him if you were

17  to recall him, that would be limited to 15 minutes.  I didn't

18  know that.

19       MR. SPERTUS:  It might be slightly longer, but

20  basically it was the testimony surrounding the wafers.  So

21  however long that takes.

22       THE COURT:  Okay.  I understand.  All right.

23       Let's resume in ten minutes.  And if -- we'll

24  resume in ten minutes.  Thank you.

25       (Recess taken from 1:23 p.m. until 1:37 p.m.)

1          THE COURT:  We're back on the record.  All counsel

2     and parties are here.  No jurors are present.  Ms. Kiefer

3     reports that juror 15 is still not feeling well, and I think

4     it's better for us to have us resume tomorrow morning.  I

5     don't want to lose the juror, and I don't want her to be here

6     if she can't focus, or risk any health issues.  So I'm going

7     to excuse the jurors.

8          I think, unless you want me to bring the jurors

9     back into the courtroom for me to tell them they're excused

10    until tomorrow, I would have Ms. Kiefer just tell them.

11         MR. SPERTUS:  No objection to Ms. Kiefer telling

12    them, Your Honor.

13         MS. HEINZ:  No objection, Your Honor.

14         MS. SARTORIS:  No objection, Your Honor.

15         THE COURT:  All right.  Let's do that.  Thank you.

16    So we'll resume tomorrow at 8:30.

17         And with respect to Mr. Barner, have we located

18    him?

19         MS. SARTORIS:  Your Honor, I think he might be

20    here.  I know if he is not directly outside, he is not very

21    far.  So we can get him up here in a couple minutes.

22         THE COURT:  That's fine.

23         Mr. Mai, we'll be resuming tomorrow at 8:30.

24    You're excused for the day.  Thank you.

25         MS. SARTORIS:  I apologize, Your Honor.  I told him

```
1     he could be gone and be back at 2:00.

2               THE COURT:  No one has done anything wrong.  I'm --

3     I mean, from my point of view, I'm here anyway.  I'm trying

4     to do this so that all of you can leave.

5               MR. SPERTUS:  Before Dr. Barner comes, can I just

6     get clarity on what we're doing with him?

7               THE COURT:  Yes.  My plan is this.  Because, as

8     I've said, I plan to have a hearing next week on the issues

9     that we've discussed concerning the wafers that have been

10    marked as exhibits, and one of the issues that is presented

11    is whether these are wafers produced by Cree.

12              If these are among the wafers that were -- wafers

13    produced by Cree among those that were produced pursuant to

14    the agreement with -- that has been discussed in this case --

15              MR. SPERTUS:  Yes.

16              THE COURT:  -- I thought that we can hear his

17    testimony on that.  I didn't have in mind an extensive amount

18    of testimony frankly.  Just I think it would add in to the

19    testimony from your legal assistant and from the government's

20    witness as to the chain -- what I'm calling the

21    chain-of-custody issues and where the -- well, that sort of

22    thing.

23              MR. SPERTUS:  So I understand, and that's, I think,

24    going to be very useful.  The additional thing that would be

25    useful would be -- the prosecutors have said these materials,
```

1    these wafers do not appear to be the same.  I think what

2    they're saying is some MMICs are removed for testing.  So the

3    witness obviously is going to say that other than removed

4    MMICs which were tested, these are the same.  If Barner says

5    that, I'd say that's useful testimony to have.

6              THE COURT:  Does the government have any --

7              MR. SHOBAKI:  Your Honor, I think certainly if

8    Dr. Barner inspects the wafers that the defense has brought

9    to court, he can make that assessment as to whether he thinks

10   they look like genuine Cree wafers that were produced

11   pursuant to the transactions.

12             He can also opine as to whether they appear to be

13   in the state that they would have been when they left Cree or

14   not, which really addresses what Mr. Spertus is raising,

15   which is the question of whether and what has been removed,

16   if anything, from the wafers.

17             MR. SPERTUS:  Your Honor, we stipulate that MMICs

18   were removed for testing.

19             THE COURT:  I understand.

20             MR. SPERTUS:  Right.

21             THE COURT:  The reason that I'm going this, as I

22   said, is he won't be here next week.  Other people will be

23   here next week.  While he's here, why don't we spend the five

24   minutes we need with him just to get some very basic

25   information.

```
 1              For example, I don't know.  If we show him these --
 2     if we show him the exhibits, will he be able by a physical
 3     examination on the witness stand to answer detailed questions
 4     concerning are these exactly the same condition as before.
 5     I don't know the answer to that.
 6              MR. SPERTUS:  First of all, I have the packing
 7     slips.  He'll match the serial numbers, I anticipate, because
 8     that's -- that matters.  He's not testing his memory.  But I
 9     can, I think, put him on a direct that I would consider a
10     sufficient foundation.  Then the government could ask
11     whatever it wants.
12              THE COURT:  What I'm saying is I don't know whether
13     he's going to be -- what questions he'll be able to answer.
14     This is not a -- I'm really -- it's a very focused, narrow
15     area.
16              MR. SPERTUS:  Right.
17              THE COURT:  Because the issue is your disagreement
18     about whether these should be admitted.  Putting aside the
19     government's position that they should be excluded on the
20     discovery grounds, I'm focused on are these the same units.
21              MR. SHOBAKI:  Your Honor, understood, and
22     understood with that narrow scope as to the Rule 16 issues.
23     Now with these new wafers that we haven't ever actually seen,
24     we've just seen that filing last night that said that they
25     would appear in court.
```

UNITED STATES DISTRICT COURT

```
1              THE COURT:  What about that?  There are other

2     wafers?

3              MR. SPERTUS:  So we forfeited the cross in our

4     opinion of Alex Storino in order to present these wafers from

5     Canada to the witness today.  The Court didn't allow us.  I

6     wish we hadn't filed it.  But the three attachments to our

7     brief, one is that when Dr. Shih was released from custody

8     and went home, he called us and said the FBI didn't take the

9     wafers, and we've given the Court that --

10             THE COURT:  I --

11             MR. SPERTUS:  Right.  The same exact error that

12    happened with Agent Miller happened with the Canadian Mounted

13    Police.  That is what I think counsel is receiving to.  So

14    the RCMP took one wafer and left three back, and my paralegal

15    went and picked them up.

16             THE COURT:  In Montreal?

17             MR. SPERTUS:  Yes.  So those are the two -- that's

18    what we briefed.  And Alex Storino, I believe, would have

19    been cross-examined in the exact manner of Agent Miller, but

20    we decided as a strategic matter that it's more important to

21    show the wafers to Dr. Barner.

22             MR. SHOBAKI:  Your Honor, may I be heard very

23    briefly on that?

24             THE COURT:  Yes.

25             MR. SHOBAKI:  First of all, last night's filing was
```

1    the first time that there has been any -- and this is again

2    understanding that this would be relevant to the Rule 16

3    determination.  Last night's filing was the first time ever

4    that we've had any information about these wafers that were

5    supposedly retrieved from JYS Technology in Canada.

6           Mr. Spertus's assertions about cross-examination of

7    Special Agent Storino, I don't know what the basis is for

8    that, given that Special Agent Storino was in Los Angeles on

9    the day the search happened in Canada.

10          So what purported impeachment would happen, I don't

11   know.  The bottom line, Your Honor, is these are -- I don't

12   know how many.  I think they said three more wafers that

13   never before seen, never before disclosed, including

14   investigative reports about them dating back more than a year

15   from this date or approximately a year.  That again, you

16   know, that will be part of the Rule 16 conversation.

17          For the purposes of what these things are, to the

18   extent that Dr. Barner is able to, from looking at them and

19   perhaps from looking at the documents related to them, able

20   to make some assessment about what he thinks they are, you

21   know, that is certainly something he could do today.  And I

22   understand that is something the Court is interested in

23   knowing about.

24          THE COURT:  Well, are the wafers -- are the wafers

25   that you say were retrieved from Montreal, are those here

```
 1    today?

 2              MR. SPERTUS:  Yes.  We would have shown them to

 3    Dr. Barner.

 4              THE COURT:  Okay.

 5              MR. SPERTUS:  But, Your Honor, the one thing I want

 6    to correct, first of all, this is not the first the

 7    government has heard about it.  I talked about it in opening

 8    statement where these were located.  So, one.  Two, we filed

 9    in camera the defense, you know, just so the Court wouldn't

10    be surprised.

11              Our goal is not to have the Court surprised by

12    anything, but cross-examination material by definition is not

13    shared with the government.

14              THE COURT:  I understand.  Well, okay.  You know

15    what?  I think maybe we should -- here he is.  Do we have

16    those exhibits?

17              MS. SARTORIS:  I saw him walk in.  Should I grab

18    him?

19              THE COURT:  Yes, please.  I think he's coming in.

20              Could you come forward, please, sir.  Please be

21    seated.

22              Would you please restate your name.

23              THE WITNESS:  Jeffrey Brian Barner.

24              THE COURT:  Mr. Barner, you understand you remain

25    under oath?
```

```
 1              THE WITNESS:  Yes.

 2   Jeffrey Brian Barner, Government's witness, previously sworn

 3              THE COURT:  Thank you for coming back.  I know this

 4   is earlier than we had stated.

 5              First we're going to ask you some questions outside

 6   the presence of the jury.  And just as a -- in the event that

 7   you are recalled as a witness when the jury is present, I

 8   just want to start by saying unless instructed otherwise, you

 9   shouldn't be, in response to questions at that time,

10   disclosing that there was this separate hearing.

11              THE WITNESS:  Understood.

12              THE COURT:  Okay.

13              Do we have -- what are the exhibit numbers, please?

14              MR. SPERTUS:  Your Honor, the exhibits are

15   Exhibit 1, and the box 3996, the box 4270, Exhibit 3638,

16   which is a wafer.

17              THE COURT:  It's these three wafers, correct?

18              MR. SPERTUS:  Plus the container and two other

19   boxes.

20              MR. SHOBAKI:  Your Honor, I don't believe that it's

21   appropriate to ask Dr. Barner about the boxes.  We've been

22   talking about the wafers.

23              THE COURT:  Yeah, I want to ask him about the

24   wafers.

25              MR. SPERTUS:  But he's going to also authenticate
```

```
 1    the boxes as chief of the foundry.
 2              MR. SHOBAKI:  Your Honor, that assertion is pretty
 3    much what -- I don't even need to explain why it makes no
 4    sense.
 5              THE COURT:  Could you take those out, please.
 6              I'll do the questioning for now.  Please be seated.
 7    If counsel want to approach to see and of the exhibit
 8    numbers, you may.
 9              Dr. Barner, in front of you is a container which
10    has within it three separate items.  Do you see that?
11              THE WITNESS:  Yes, I do.
12              THE COURT:  Could you remove the first of those,
13    the one that's closest to you, please.
14              THE WITNESS:  (Witness complies.)
15              THE COURT:  And you'll see on that -- Mr. Spertus,
16    if you want to approach, you may, too.  You're not required
17    to.
18              Do you see a number on there, 3638 perhaps?
19              THE WITNESS:  I have 3640.
20              THE COURT:  That's fine.  That's 3640.  And then?
21              THE WITNESS:  3639 and 3638.
22              THE COURT:  Okay.  Just starting with 3640, which
23    is the one in your hand, do you recognize that or think you
24    recognize it?
25              THE WITNESS:  Yes.
```

1          THE COURT:  What is it?

2          THE WITNESS:  It is a process wafer which is on

3    dicing tape, a Nitto brand dicing tape.  It is diced.  There

4    are a variety of devices removed that primarily appear to be

5    harvested out of the PCM area, which is the devices

6    potentially we would have harvested before.

7          THE COURT:  Okay.  Stop there.  Hang on.  Do you

8    recognize Exhibit 3640 as a wafer that was produced by Cree?

9          THE WITNESS:  This does appear to be a water that

10   was produced by Cree.

11         THE COURT:  And by examining it -- and if you need

12   to open the case, let me know, but don't open it -- can you

13   tell when it was produced?

14         THE WITNESS:  I could not tell from this when it

15   was produced.  I would have to look at the manufacturing

16   records back at the factory.

17         MR. SPERTUS:  I can project on the monitor the

18   packing --

19         THE COURT:  That's fine.  Go ahead.  Just a moment.

20         And is the same -- Mr. Barner, is the same true

21   of -- there are two others.  One is 3639.  Could you look at

22   those?

23         THE WITNESS:  Yes.

24         THE COURT:  Is that 3639 in your hand?

25         THE WITNESS:  This is 3638 in my hand.

1              THE COURT:  3638, what is that?

2              THE WITNESS:  It appears to be a Cree-manufactured

3     wafer.

4              THE COURT:  Okay.  And 3639?

5              THE WITNESS:  Again appears to be a

6     Cree-manufactured wafer.

7              THE COURT:  And you said you could --

8              THE WITNESS:  But --

9              THE COURT:  I'm sorry.  Go ahead.

10             THE WITNESS:  -- there are no chips left on this

11    wafer at all --

12             THE COURT:  Okay.

13             THE WITNESS:  -- it appears.

14             MR. SPERTUS:  I do have the other three.

15             THE COURT:  Just a minute.

16             Do you have the -- what is the -- was the packing

17    material marked as an exhibit?

18             MR. SPERTUS:  Yes, Your Honor.

19             THE COURT:  What's the exhibit number, please?

20             MR. SPERTUS:  It's 36 -- I'm sorry, 3996-A, B, and

21    also the box is 3996.

22             MR. SHOBAKI:  Your Honor -- you're referring to the

23    slips that show the serial numbers and the PCM for the

24    wafers?

25             THE COURT:  Yes, I am.

1          MR. SPERTUS:  No, no, no.  That's 753.  I'm going

2     to project that.  That's in evidence.

3          THE COURT:  No.  I don't want those.  I want 743,

4     just --

5          MR. SPERTUS:  743 is the packing slip.

6          MR. SHOBAKI:  Your Honor, that's admitted into

7     evidence.  743 is the December 26, 2013, Cree packing slip

8     which I believe also includes the wafer serial numbers.

9          THE COURT:  One page, correct?

10         MR. SPERTUS:  Yes, Your Honor.  I displayed on the

11    monitor the serial numbers.

12         THE COURT:  Please don't do that.  Just show him

13    the exhibit.  Is it a one-page exhibit?

14         MR. SPERTUS:  One page, yes.

15         THE WITNESS:  I can see it.

16         THE COURT:  The book next to you, Exhibit 743.

17    It's in Volume 9.  Do you see that?

18         THE WITNESS:  Yes.  Uh-huh.

19         THE COURT:  Do you recognize Exhibit 743?

20         THE WITNESS:  Yes, I do.  This is our packing slip

21    that was for the shipment from the 93-B2 project.

22         THE COURT:  If you compare -- in looking at

23    Exhibit 743 together with Exhibits 3638, 3639, and 3640, are

24    you able to determine whether they correspond?

25         THE WITNESS:  So --

1          MR. SPERTUS:  Your Honor, if I can -- we have a

2     second packing slip.

3          THE COURT:  Just a minute.

4          THE WITNESS:  -- 3638 is part of this packing slip.

5          THE COURT:  Yes.

6          THE WITNESS:  3639 is part of this packing slip.

7          THE COURT:  Okay.

8          THE WITNESS:  And 3640 is not part of this packing

9     slip.

10          MR. SPERTUS:  Your Honor, could I display the

11     second --

12          THE COURT:  Would you wait a second, please.  If

13     you could just let me...

14          How are you able to tell that 3638 corresponds to

15     the 1 of 2 Exhibit 743?

16          THE WITNESS:  Because of the wafer ID that is

17     labeled on the barcode that we place on the diced wafer.

18          THE COURT:  And which -- are you referring to the

19     IDs as the ones that begin with letters under specification

20     of commodities?

21          THE WITNESS:  That's correct.  Our basic numbering

22     scheme is the first two letters refer to the crystal growth

23     tool that the crystal silicon carbide is grown from.  The

24     next four digits are the number of boules grown in that tool.

25     And the dash number 20 is the slice that was taken out of

```
1    that crystal boule and polished, and then eventually Gallium

2    Nitride was grown on it.  And then eventually it was

3    processed into this wafer.

4              THE COURT:  When you said dash number 20, are you

5    referring to 12 or 24 or 03 or something else?

6              THE WITNESS:  So in 3640, the exhibit, explicitly

7    it is JE0628-20.

8              THE COURT:  To which of the three numbers in the

9    specification of commodities does that exhibit correspond, if

10   you know?

11             THE WITNESS:  I'm sorry?

12             THE COURT:  In Exhibit 743 under specification of

13   commodities, do you see that?

14             THE WITNESS:  Yes.

15             THE COURT:  It says -- it says four GaN MMIC

16   wafers.  Do you see that?

17             THE WITNESS:  I do.

18             THE COURT:  And below that it says three wafers

19   diced?

20             THE WITNESS:  Yes, and one undiced wafer.  So on

21   that --

22             THE COURT:  My question is whether -- does BE refer

23   to a wafer?

24             THE WITNESS:  BE alone does not refer to a wafer.

25             THE COURT:  Does HG refer to one?
```

 1                    THE WITNESS:  No.

 2                    THE COURT:  Does LS refer to one?

 3                    THE WITNESS:  Not by itself, no.  I mean, the

 4     entire string of numbers and dash numbers refer to a wafer.

 5                    THE COURT:  But there are three wafers?

 6                    THE WITNESS:  There are three diced wafers.

 7                    THE COURT:  How does Exhibit 743 correspond to each

 8     of 3638, 3639, and 3640?  How are you able to make that

 9     connection?

10                    THE WITNESS:  I am making that connection from the

11     wafer ID that is on the label in the exhibit and listed on

12     the packing slip.

13                    THE COURT:  By exhibit, you're referring to 3638?

14                    THE WITNESS:  3638, 3639, and 3640.

15                    THE COURT:  And the number on 3638, how do you know

16     that corresponds to what's on Exhibit 743?

17                    THE WITNESS:  Which item?

18                    THE COURT:  3638.

19                    THE WITNESS:  So 3638, this is wafer LS0125-03.

20                    THE COURT:  I see.  So that does correspond to one

21     of the numbers here under specification of commodities in

22     Exhibit 743; is that correct?

23                    THE WITNESS:  That is correct.

24                    THE COURT:  And then the second wafer you said that

25     you think is identified on Exhibit 743 is Exhibit 3639; is

1    that right?

2              THE WITNESS:  That is correct.

3              THE COURT:  And does that correspond to either the

4    BE or the HG number?

5              THE WITNESS:  It is the HG070124.

6              THE COURT:  Okay.  Thank you.

7              Now, Mr. Spertus, did you say you have another

8    packing slip?

9              MR. SPERTUS:  Yes, Your Honor.

10             THE COURT:  Do you think it corresponds to

11   Exhibit 3640?  What's the exhibit number?

12             MR. SPERTUS:  3120.

13             THE COURT:  Has that been published before?

14             MR. SPERTUS:  I don't know.

15             THE COURT:  All right.  Thank you.

16             Just a minute.  If you could --

17             MR. SPERTUS:  It was produced by the government but

18   not on their exhibit list.

19             THE COURT:  Exhibit 3120 is a defense exhibit.

20             MR. SPERTUS:  Yes.  It was produced by the

21   government but not included on their exhibit list.

22             THE COURT:  Does the government have a copy of

23   3120?

24             MR. SHOBAKI:  Not with us, Your Honor, but --

25             MR. SPERTUS:  I'll give them one.

1          MR. SHOBAKI:  -- I'll be happy to take a look.

2          THE COURT:  Okay.  Thanks.

3          Mr. Barner, if you could turn to the other set of

4    books, Volume 2.

5          If you would turn to tab 3120, please.

6          THE WITNESS:  (Witness complies.)  All right.  I

7    have that.

8          THE COURT:  Does the exhibit you have there which

9    has been marked as 3640 correspond to any of the four numbers

10   in the specification of commodities box in Exhibit 3120?

11          THE WITNESS:  Are you asking me if any of these on

12   this packing slip are here?

13          THE COURT:  Well, I'm -- specifically Exhibit 3640.

14          THE WITNESS:  3640 is in fact listed on this

15   packing slip.

16          THE COURT:  And which of the four numbers is it?

17          THE WITNESS:  It is JE0628-20.

18          THE COURT:  And you're able to tell that because

19   there is a number on the wafer?

20          THE WITNESS:  It is not physically on the wafer.

21   It is on the barcode that's attached to the wafer that is

22   attached to the dicing tape and in the ring in this

23   clamshell.

24          THE COURT:  May I see that, please.

25          THE WITNESS:  Sure.

1          THE COURT:  So I'm clear, the barcode to which

2     you're referring is attached to the wafer; is that right?

3          THE WITNESS:  It is not actually touching the

4     wafer.  It's touching the tape that the wafer is mounted on.

5     It's sitting beside it.

6          THE COURT:  Okay.  Let me ask you this.  With

7     respect to the three wafers that you have there -- Exhibits

8     3638, 3639, and 3640 -- as you sit here today and look at

9     them, are you able to -- can you determine -- I've asked you

10    this already, but just to be clear, are you able to determine

11    whether those were produced by Cree?

12         THE WITNESS:  Yes.

13         THE COURT:  And are they?  Were they?

14         THE WITNESS:  They appear to be so, yes.

15         THE COURT:  And as you sit here today, do you know

16    whether these three wafers -- 3638, 3639, and 3640 -- were

17    shipped by Cree to MicroEx?

18         THE WITNESS:  Yes, they were.

19         THE COURT:  Okay.  What are the other wafers that

20    you have?

21         MR. SPERTUS:  So there's Exhibit 1, which is --

22    should also be -- was one of the four wafers of run one.

23    Then I have the three --

24         THE COURT:  Excuse me.  Exhibit 1?

25         MR. SPERTUS:  Exhibit 1 is a government exhibit

1    which is from run one matching the packing slip 743.  He

2    should be shown Exhibit 1.

3            THE COURT:  But is that disputed?  Exhibit 1 was

4    produced by --

5            MR. SHOBAKI:  It's not disputed, Your Honor.  In

6    fact, Exhibit 1 was sent to Cree and Cree examined it.

7    That's the wafer that went to Cree.

8            MR. SPERTUS:  I'm identifying all the wafers.

9            THE COURT:  I don't think that's an issue.

10           MR. SPERTUS:  Okay.

11           THE COURT:  That's not the issue.  Is there any

12   other wafers that --

13           MR. SPERTUS:  Yes, there's three additional ones.

14   One -- I will identify them for the record as Exhibits 3641,

15   which is a run-one wafer; 3642, which is a run-two wafer; and

16   3643, which is also a run-two wafer.

17           THE COURT:  Okay.  Those three exhibits will be

18   marked for identification.  Would you show them to the

19   government, please, if the government hasn't seen them yet.

20           MR. SPERTUS:  Will the Court be needing me to

21   display any packing slips?

22           THE COURT:  Is there a packing slip associated with

23   these three, Exhibits 3641, 3642, and 3643?

24           MR. SPERTUS:  Yes.  There's one packing slip for

25   run one and another packing slip for run two.  All six of

1    these wafers are on those two packing slips.

2              THE COURT:  What's the -- are those marked as

3    exhibits?

4              MR. SPERTUS:  So the same exhibits that have been

5    displayed, when I said run one next to those newly identified

6    exhibit numbers, those are on 743.

7              THE COURT:  There's not a separate packing slip,

8    right?

9              MR. SPERTUS:  There is.  Each packing slip --

10             THE COURT:  What I'm asking is -- I've's already

11    gone over 3638, 3639, and 3640 with the packing slip,

12    Exhibit 743.

13             My question is, with respect to what you have now

14    identified as 3641, 3642, and 3643, is there a different

15    packing slip?

16             MR. SPERTUS:  3641 is going to be on 743.  It's not

17    a different one.  The other two, 3642 and 3643, are going to

18    be on Exhibit 3120, which is the second of the two packing

19    slips.

20             THE COURT:  Thank you.

21             MR. SHOBAKI:  Your Honor, yes, there are two

22    different packing slips.  Each reflects four wafers.

23             THE COURT:  That's fine.

24             MR. SHOBAKI:  So there's a hodgepodge between these

25    two.

```
 1                    THE COURT:  Good.  But both of those packing slips
 2      are before the witness.
 3                    MR. SHOBAKI:  Yes, Your Honor.
 4                    THE COURT:  That's fine.
 5                    MR. SHOBAKI:  The other one is 3120.
 6                    THE COURT:  Okay.  Has the government had
 7      sufficient time -- any objection to having the witness look
 8      at 3641, 3642, and 3643?
 9                    MR. SHOBAKI:  No objection, Your Honor.
10                    THE COURT:  Thank you.
11                    Mr. Barner, would you take a look at what has been
12      marked as 3641, 3642, and 3643.  And tell me when you've had
13      a chance to review each of them, please.
14                    THE WITNESS:  I'd like to open this one.
15                    THE COURT:  Which one would you like to open?
16                    THE WITNESS:  This one.
17                    THE COURT:  What number is that?
18                    THE WITNESS:  3641.
19                    THE COURT:  Any objection to the witness opening
20      those?
21                    MR. SPERTUS:  No, Your Honor.
22                    THE COURT:  Well, any objection?
23                    MR. SHOBAKI:  No objection, Your Honor.
24                    THE COURT:  Mr. Barner, before you open it, would
25      -- will opening it create any risk that the exhibit will be
```

1    changed because it's -- because the box is opened?

2            THE WITNESS:  Only if I touch it.  I don't intend

3    to touch it.

4            THE COURT:  Thank you.  You may open it.

5            THE WITNESS:  There's some scotch tape around it.

6    I'm having difficulty.

7            THE COURT:  Do you need assistance?

8            THE WITNESS:  Okay.

9            THE COURT:  So you've now looked at what have been

10   marked as 3641, 3642, and 3643; is that right?

11           THE WITNESS:  That's correct.

12           THE COURT:  And do you recognize each of these?

13           THE WITNESS:  Yes, I do.

14           THE COURT:  What is each of them?

15           THE WITNESS:  3641 is an undiced wafer.  It refers

16   to wafer number JE0570-26, I believe.  I'm having trouble

17   looking through the plastic.

18           THE COURT:  That's fine.

19           THE WITNESS:  It may be 20.

20           THE COURT:  Okay.

21           THE WITNESS:  3642 is a diced wafer --

22           THE COURT:  Excuse me.  Before you move on, --

23           THE WITNESS:  Sure.

24           THE COURT:  -- if you'd go back and look at

25   Exhibit 743.  Do you see Exhibit 743?

```
1                THE WITNESS:  Yes.  It's on the screen.

2                THE COURT:  Do you see in that same box where it

3     says specifications of commodities?  Do you see that?

4                THE WITNESS:  Yes, I do.

5                THE COURT:  Do you see the last one that says one

6     wafer undiced?

7                THE WITNESS:  One wafer undiced?

8                THE COURT:  Yes.  Do you see that?

9                THE WITNESS:  Yes, I do.

10               THE COURT:  Does that correspond to Exhibit 3641 by

11    number?

12               THE WITNESS:  Yes, it does.

13               THE COURT:  Okay.  And with respect to 3642?

14               THE WITNESS:  3642 is a diced wafer.  And it

15    corresponds...

16               THE COURT:  To what does it correspond?

17               THE WITNESS:  I'm sorry.  It's JH0727-45 wafer.

18               THE COURT:  And that's -- that is shown on the

19    foundry packing slip in Exhibit 3120; is that right?

20               THE WITNESS:  That's correct.

21               THE COURT:  Okay.  And Exhibit 3643?

22               THE WITNESS:  Again it is a diced wafer.  However,

23    I cannot -- the barcode label has been removed.  And short of

24    inspecting the details of the circuit, I cannot determine

25    which wafer this is.
```

1          THE COURT:  Okay.  And in order to inspect the

2     details of the circuit, what would you have to do?

3          THE WITNESS:  I'd have to look under a microscope

4     and by reason of it, of elimination between these eight

5     wafers, to determine that it must be the last remaining

6     wafer.

7          THE COURT:  Well, there's six.  We've shown you

8     six.

9          THE WITNESS:  That's true.  So I wouldn't know.

10         MR. SPERTUS:  Your Honor, exhibit --

11         THE COURT:  Just a minute.  So let me make sure I

12    understand.  Of the six wafers you have examined today, you

13    believe that each of them was produced at the Cree foundry in

14    North Carolina?

15         THE WITNESS:  Yes.

16         THE COURT:  And you believe that each of them was

17    then shipped to MicroEx?

18         THE WITNESS:  Yes.

19         THE COURT:  Now, is there -- are you able to

20    determine whether the wafers that are in -- that are in these

21    -- that have been marked as these six exhibits 3638, 3639,

22    3640, 3641, 3642, 3643, are in the same condition now as they

23    were in when they were shipped from the Cree plant in North

24    Carolina?

25         THE WITNESS:  Without doing very -- without using a

1       microscope and inspecting the condition of it, I wouldn't be

2       able to determine that.

3               THE COURT:  How long would it take you -- how long

4       would it take a person who is familiar with the process, do

5       you think, to make that determination?

6               THE WITNESS:  To determine whether or not it is now

7       in the same condition, visual inspection could take 10 or

8       15 minutes.

9               THE COURT:  Per wafer?

10              THE WITNESS:  Per wafer.  And if we had to check

11      whether or not an electrical performance has been changed,

12      that would be a matter of hours.

13              THE COURT:  Per wafer?

14              THE WITNESS:  Per wafer.

15              THE COURT:  Now, when the wafers are shipped --

16      before the wafers were shipped, was there a document that

17      recorded the features or characteristics of the wafer?  What

18      I mean, what I'm asking or what I'm trying to ask is, when

19      each wafer, when the production of each wafer was completed,

20      was there a record kept as to what dat or features were on

21      each wafer?

22              THE WITNESS:  Yes.  By wafer ID we would have kept

23      all of the processing information, inline test data which

24      would have included the PCM data, and basic inspection.  And

25      that continues to be in our database on these wafers.

1          THE COURT:  So when you mentioned that these wafers

2     can be examined with a microscope and/or other testing, would

3     that testing then be -- could that testing be used to

4     determine whether the wafers in their present condition match

5     what the data you have concerning the condition of the wafers

6     at the time they were shipped?

7          THE WITNESS:  Yes.  We could repeat measurements

8     of, say, the PCM devices and compare them now to when we

9     shipped.

10          THE COURT:  Okay.

11          Mr. Spertus, do you have any further area of

12     questioning just as with respect to the issue that we've been

13     discussing, chain of custody?

14          MR. SPERTUS:  All my questions are dealing with

15     authenticity.  And if those are authentic Cree wafers, if the

16     Court would find those are authentic Cree wafers, I have no

17     other questions.

18          THE COURT:  Does the government have any questions?

19          MR. ROLLINS:  Just a few, Your Honor.

20          THE COURT:  Go ahead.

21                    **EXAMINATION BY MR. ROLLINS**

22     BY MR. ROLLINS:

23     Q.   Dr. Barner, just to understand correctly.  Without

24     microscopic inspection, would it be possible to be

25     100 percent certain that the MMICs on those wafers were

1    manufactured by Cree?

2    A.    A hundred percent?  No.  They would need inspection.

3    Q.    And without testing, would it be possible to be

4    100 percent certain that the MMICs on those wafers were made

5    by Cree?

6    A.    I -- I do not think that we would need to do the testing

7    unless -- I mean, no, I don't think the testing would be

8    required to do a hundred percent identification.

9    Q.    Sorry.  I should have asked a different question.

10   Without testing, would you be 100 percent certain of the

11   power levels on those MMICs?

12   A.    No.

13   Q.    Okay.  And can you remember if you have ever seen those

14   wafers at all before today?

15   A.    I can't remember these IDs and wafers.

16   Q.    And do you have any idea where those wafers have been

17   before today?

18   A.    No.

19   Q.    And how many MMICs would have been on that wafer if it

20   were manufactured by Cree the moment it left the foundry?

21   A.    There two different mask sets, so I would have to go

22   back and review how many quantity wise were on each mask set.

23   Q.    And are you confident that they are now missing MMICs?

24   A.    Some of these wafers appear to have die harvested from

25   the dicing tape.

1    Q.    And what do you mean by harvested?

2    A.    Picked off the tape.

3    Q.    So do you have any idea what would have happened to

4    those MMICs that were harvested?

5    A.    Typically people will take them and build them up into

6    higher-level assembly for further characterization and

7    testing.

8    Q.    Could they put them in a Chinese missile guidance

9    system?

10    A.    Yes.

11    Q.    All of your testimony comparing the labels to the

12    packing slips a moment ago, that was all predicated on the

13    accuracy of the labels on those wafers; is that right?

14    A.    That is correct.

15    Q.    Okay.  And you don't know where those labels have been;

16    do you?

17    A.    Not since we shipped.

18    Q.    And without talking to people who work for Cree, is it

19    possible for -- Cree's shipping department, I should say --

20    would it be possible for you to say with 100 percent

21    certainty that those labels are genuine Cree labels?

22    A.    Yes.

23    Q.    Yes?

24    A.    Yes.

25    Q.    You can say that?

1    A.    Yes.  I mean -- I mean, no, I --

2    Q.    Okay.

3    A.    These appear to be an exact copy of the labels that we

4    would use.

5    Q.    Got it.

6          And do you have any way of knowing whether those

7    wafers were shipped back to the United States after being

8    exported by the defendant, by his Chinese co-conspirators,

9    for example?

10   A.    I have no knowledge of that.

11   Q.    Do you have any idea whether those wafers were brought

12   back to the United States by Air China pilots?

13   A.    No.

14   Q.    Do you have any idea whether those wafers were brought

15   back to the United States by the defendant or one of his

16   friends after he was arrested?

17   A.    No.

18          MR. ROLLINS:  I think that's going to be it, Your

19   Honor.  But if I could have a moment to confer with counsel.

20          (Government counsel conferring)

21   BY MR. ROLLINS:

22   Q.    I think you testified about one of the wafers being

23   empty?

24   A.    Yes.

25   Q.    Would you mind just elaborating a bit for the Court on

1    what that means.

2              THE COURT:  What exhibit are you --

3              THE WITNESS:  3639.  I can't quite see underneath

4    the 93-B2GM label that's on the outside of this clamshell

5    that's holding the diced wafer, but everything I can see is

6    nearly all if not all of the die on this wafer were removed.

7              MR. ROLLINS:  Nothing further, Your Honor.

8              THE COURT:  Thanks.

9              Mr. Spertus, do you have any questions?

10             MR. SPERTUS:  No questions, Your Honor.

11             THE COURT:  Thanks.

12             Mr. Barner, with respect to -- let's take -- sorry.

13   The exhibit you were most recently discussing, was that 3643?

14             THE WITNESS:  3639.

15             THE COURT:  I'm sorry.  That's the one you think

16   that has -- where things may have been removed from it?

17             THE WITNESS:  That's correct.

18             THE COURT:  Here's my question.  Earlier in my

19   questions I asked you about whether these could be examined

20   so that they could be compared with the data that you have at

21   Cree to see whether they are the same as -- whether you

22   believe they are in the same form or condition as they were

23   when shipped.  Do you recall that?

24             THE WITNESS:  Yes.

25             THE COURT:  As I understood it, you said

```
 1    microscopic examination would be part of it.  And then
 2    another more detailed, a different, more detailed examination
 3    would be part of that; is that right?
 4                THE WITNESS:  That's correct.
 5                THE COURT:  Okay.  And if those two examinations
 6    were performed, would they identify, for example, the missing
 7    data that was just referenced?
 8                THE WITNESS:  That's correct.  If there's not a die
 9    there to test, then we wouldn't be able to test it.  And we
10    keep track of it by row and column position on the wafer.
11                THE COURT:  All right.  Now, just to be clear, if
12    something had been removed, the data that you have in your
13    system in North Carolina would show that the data was there?
14                THE WITNESS:  That's correct.
15                THE COURT:  Okay.  Is the testing to which you're
16    referring something that can only -- could the necessary
17    testing be performed in Los Angeles?
18                THE WITNESS:  Sure.  If you have that equipment, it
19    could be done.
20                THE COURT:  Okay.  And do you know what expertise
21    would be required of the person or persons who were doing the
22    testing?
23                THE WITNESS:  It would require basic on-wafer test
24    experience similar to what we have in North Carolina.  I
25    would have to analyze that and create a list of detailed
```

```
 1    requirements needed.

 2              THE COURT:  Okay.

 3              Any further questions?

 4              MR. ROLLINS:  One further question that might be

 5    helpful for the Court.

 6              Would Cree have ever shipped those wafers empty?

 7              THE WITNESS:  No.

 8              THE COURT:  Well, okay.

 9              Dr. Barner, you can step down.  If you wouldn't

10    mind just waiting a few minutes for us.  You can just wait

11    outside for a few minutes.

12              Oh, one other question.  I'm sorry.

13              This goes back to the other question we talked

14    about earlier.  And that is, you said you're not available

15    next week, the week of June 3rd?

16              THE WITNESS:  That's correct.

17              THE COURT:  But you're available the week of

18    June 10th.  And the best days of that week would be June --

19    any day except June 14th; is that right?

20              THE WITNESS:  That's correct.  The 14th is a

21    Friday.

22              THE COURT:  Correct.  Flag Day.

23              THE WITNESS:  Yes.

24              THE COURT:  Among those dates, June 10th through

25    13th, which is Monday through Thursday, is there any of those
```

1    that's better than another for you?

2              THE WITNESS:  Not that I'm aware of.  I think it

3    should be fine.

4              THE COURT:  Okay.  And how much advance notice

5    would you need if we need you to be here on one of those

6    days?

7              THE WITNESS:  Three hours from the time you want me

8    to depart.  So that would be approximately 12 hours.

9              THE COURT:  Okay.  We would give you more notice

10   than that.  But again, just to be clear, it may be necessary

11   for you to come back.  And if that is the case, I will direct

12   that you do come back.  But we'll try to work this out in a

13   way that's most convenient to you, and we will not give you

14   three hours' notice.

15             THE WITNESS:  Thank you.  I appreciate that.

16             THE COURT:  I mean, we'll do our best not to do

17   that.  I don't expect that.

18             If you could step down.  Thank you.

19             Mr. Spertus, anything you wanted to say?

20             MR. SPERTUS:  Your Honor, I think the way that the

21   government asked questions about can a MMIC be placed in --

22   it has nothing to do with this case.

23             THE COURT:  Well, okay.

24             MR. SPERTUS:  This is a testifying witness.  Okay?

25   And as such, I should have said no.  Then I have no --

 1          THE COURT:  No, it's not that.  What we're focusing

 2     on here, as you recall, is the issue of authenticity and --

 3          MR. SPERTUS:  I understand that, but --

 4          THE COURT:  -- chain of custody.  I don't think

 5     those questions bear on that.

 6          MR. SPERTUS:  This witness will testify in front of

 7     the jury with that argument in his mind, and it bothers me.

 8     But if the Court doesn't see it that way, I understand.  I

 9     don't think the government should be allowed to do that.

10          THE COURT:  Okay.  I understand.

11          MR. ROLLINS:  Those questions are directly

12     relevant, Your Honor, we believe, as to chain of custody.  It

13     goes to where the wafers have been since they were shipped by

14     Cree.

15          THE COURT:  Okay.  Well, I understand that.  But if

16     these wafers are tested in the manner that the witness

17     described with using a microscope and the other materials and

18     other equipment -- and I didn't get into the details of the

19     type of equipment other than to ask whether he thought that

20     equipment is available in Los Angeles -- what I understood

21     his testimony to be was that they could take the data that

22     they have stored in North Carolina as to what was on each of

23     these disks at the time that it was shipped and compare it

24     with the data that's on it today.

25          Do you agree that's what he said?

1          MR. ROLLINS:  Yes, Your Honor.

2          THE COURT:  Do you agree with that, Mr. Spertus?

3          MR. SPERTUS:  Yes.  He said that.

4          THE COURT:  So would it make sense to have these

5    disks tested so that we could confirm that?

6          MR. SPERTUS:  I do not believe so because the

7    standard for a 104 hearing, which I understand this to be, is

8    can any juror find based on his testimony that these are the

9    Cree wafers.

10          So what the government's questions, asking can you

11   testify with 100 percent certainty, and he said, no, I needed

12   that testing to rise to that level of a hundred percent

13   certainty, is not close to the threshold finding the Court

14   needs to make.

15          It's just burdensome, and I feel that with further

16   change, if the government is going to seriously argue that

17   removal of a MMIC for testing is somehow a changed condition

18   of the wafer, okay.  So as long as the government is not

19   going to do that --

20          THE COURT:  That's not what I have in mind.

21          MR. ROLLINS:  Your Honor, I think the 104 hearing

22   in this context depends on the type of evidence at issue.  In

23   this case, as the Court has already heard from witnesses, the

24   evidence is complicated and it's difficult to identify

25   exactly what MMIC is on a wafer without sophisticated

1    testing.

2            THE COURT:  Right.

3            MR. ROLLINS:  And the reason -- and I say this with

4    all due respect to defense counsel, but the reason we are in

5    this position is because they waited, and they had what we

6    believe to be evidence in a federal criminal investigation

7    for more than a year and didn't provide it to the government

8    or the Court as far as we're aware.

9            So we just got it middle of trial, and that is the

10   reason we are in this position.  In Taylor versus Illinois,

11   the Court would be well within its discretion to exclude this

12   for the Rule 16 violations alone.

13           THE COURT:  Okay.  Well, just a minute.  Just a

14   minute.  Is there something new that you wanted to add,

15   Mr. Spertus, that we haven't discussed before?

16           MR. SPERTUS:  Your Honor, this is a full shift to a

17   separate issue.  So, no, on authenticity, nothing to add.

18           THE COURT:  Okay.  Well, my view is this.  I think

19   there are serious issues presented, that the government has

20   presented on the discovery matter.  And the defense can

21   respond to include this was rebuttal evidence as to, for

22   example, the thoroughness of the investigation during the

23   search.

24           As I think I've explained in the past, it's that

25   dispute that led me to the path of conducting a hearing to

1   evaluate the -- what I've been calling the chain-of-custody

2   issue.  And today's testimony is part of that.

3        I think that in response to, Mr. Spertus, your

4   point, I think what the -- I think it's appropriate to gather

5   the information as to how, if at all, the disks -- I'll call

6   them that -- Exhibits 3638 through 3643, whether how, if at

7   all, they're different today than they were when they were

8   shipped, because that information may be pertinent to some

9   arguments the government may wish to present.

10        I think also frankly today's testimony probably --

11   I don't know that we're going to learn anything new from your

12   legal assistant, because if the testing is done in that

13   fashion, then I think that would be -- that would -- that

14   would be what's necessary.

15        Do you disagree with that?

16        MR. ROLLINS:  One clarifying point, Your Honor.  We

17   still would need foundation for where the wafers were from

18   the moment they left the defendant's house to the moment they

19   showed up in court.

20        So defense counsel could theoretically be able to

21   argue, oh, we retrieved these from our client's home on this

22   date.  But so far there are no facts in evidence to support

23   that.

24        THE COURT:  That's fine.  I mean --

25        MR. ROLLINS:  Similar issues with Canada, Your

1    Honor, with the Canadian wafers.  Similar basic foundational

2    issues on where those have been since they were retrieved by

3    the paralegal.  So that is something the government

4    would definitely want to elicit through the --

5            THE COURT:  Okay.  And is the reason for that the

6    authenticity or because it would go to whether they may have

7    moved outside the United States in the interim?

8            MR. ROLLINS:  All of the above frankly, Your Honor.

9    It could be said that those were genuine wafers perhaps, but

10   you could not establish where they had been at any point

11   after they left Cree.  And that would be something the

12   government would need to explore.

13           THE COURT:  All right.  I understand.  I

14   understand.  But I think again for purposes -- I understand

15   that, but I see that as a distinct issue from authenticity.

16           MR. ROLLINS:  I think I agree with the Court on

17   that.

18           THE COURT:  Do you disagree with that?

19           MR. SPERTUS:  Your Honor, I don't disagree.  I

20   think --

21           THE COURT:  Go ahead.  I think what needs to be

22   done is these wafers should be tested here in Los Angeles

23   promptly.

24           MR. SPERTUS:  If they're -- okay.  Fine.  Fine.

25           THE COURT:  It's not -- to be clear, I'm not --

UNITED STATES DISTRICT COURT

1    I've just said I don't think we need a hearing with your

2    legal assistant in terms of are these the wafers that were

3    retrieved that your legal assistant retrieved.  Why don't I

4    think that?  Because we have a witness who is saying that the

5    witness that said technological evaluations can be made that

6    can compare them with what was sent from the Cree factory in

7    North Carolina several years ago.

8            MR. ROLLINS:  Right.  I think the issue would come

9    when the jury could potentially be confused by a line of

10   questioning that assumes facts not in evidence, which would

11   be that these were in the defendant's home on the date of the

12   search.  That would assume facts not in evidence.

13           THE COURT:  I understand.  Well, those matters,

14   yes, you're right.  We could have a hearing on that.  I think

15   the focus -- what I have now in mind in light of the

16   discovery objection would be to have these six exhibits

17   tested so that the data that's -- well, I'm repeating

18   myself -- so the data can be compared to what it was at the

19   time they were shipped.

20           Each side can then assess with the help of experts

21   what if -- if that's what -- whether or not that's material.

22           MR. ROLLINS:  We will attempt to see if Dr. Barner

23   can use a lab in Los Angeles to do that testing, Your Honor,

24   and we will report back to the Court.

25           MR. SPERTUS:  Your Honor, the only -- the only

UNITED STATES DISTRICT COURT

```
1    objection the defense has is that there are six disks

2    presently in the Court's custody -- I mean, you know,

3    possession.  What the Court is proposing is going to let them

4    out of the building.

5            And if Dr. Barner for whatever reason leaves them

6    in a cab, they will be gone.  I'm not saying he would.  But

7    to -- given that authenticity we submit can't reasonably be

8    questioned in light of the testimony received, a juror could

9    conclude those are the Cree wafers based on Dr. Barner's

10   testimony.  I don't want to put those wafers at risk.

11           THE COURT:  I understand, but I don't think that's

12   quite the issue.  I -- for the reasons I've explained, it's

13   not enough for me -- in light of the discovery issue, I think

14   it's appropriate to have these tested.

15           Now, you've certainly -- I agree that it must be

16   done in an extremely careful manner in that we wouldn't just

17   necessarily, for example, turn over the six exhibits to an

18   individual and tell the individual that he or she may take

19   these to wherever he or she wants and test them.

20           I think that we need to have a protocol established

21   before they leave the courtroom.  The protocol would include

22   how will they be transported, by whom, and who can be

23   present, for example, if anyone, during the testing.

24           Then I think it would also -- I assume that each

25   side would also like to have the opportunity to examine the
```

 1    data from North Carolina.  Each side would also like to know

 2    what data is being gathered from North Carolina to be used to

 3    compare these disks with that data, because the parties may

 4    agree or disagree that the data that's being used is

 5    appropriate.

 6           Again, I'm not -- it's not that I think that's

 7    likely, but I think you would probably both want to know.

 8    You both may want to have -- I don't have -- I mean, I can

 9    think of various ways this could occur.

10           There could be an independent tester who can do the

11    testing independently, appointed by the Court as a court

12    expert, and each party could have a person present

13    potentially during that, while that expert does what that

14    expert is going to do.

15           I mean, there's various ways to do this, but I

16    think efficiency and fairness warrants your discussing it and

17    see if you can come to an agreement, because I don't have

18    enough information.  For example, where in Los Angeles could

19    this be tested?  Who would be able to do the testing?

20           If Mr. Barner is not available next week, you know,

21    when would he -- he said this would be several hours.  When

22    could the testing be completed?  I don't want it to take two

23    weeks.  I'd like it to get done quickly.

24           MR. SPERTUS:  The one other mechanical issue is

25    that almost every percipient witness to the ordering process

will have to be subject to recall, which could be avoided if

the Court believes that the current testimony is sufficient.

For example, Kiet Mai could be excused.  If I can't show him

the wafers, he would be subject to recall.

And at some point in time, I think that there's

sufficient evidence for authenticity that will allow the

trial to go forward without having to recall witnesses.

THE COURT:  Well --

MR. ROLLINS:  Your Honor, we don't believe he

should be used for cross for the reasons we stated in our

brief, because the issue is it creates the false impression

or at least an impression that we do not yet know to be true

that these were in the defendant's home on the date of the

search.

Then the other point, Your Honor, and I know the

Court is trying to be fair to both parties on this issue, but

it's just that from our perspective the fair thing to do is

to allow the government to conduct its examinations and tests

because the defense has now stated that they intend to

introduce these into evidence.

They've had them for a year, as I said, and they've

had an opportunity to do their own examination and testing.

At this point it really should be fair, would be fair to the

government I think to have the opportunity to do the same

thing.

```
1              THE COURT:  Well, it -- Mr. Spertus?

2              MR. SPERTUS:  I want to make an objection to that

3     process.  We don't want -- they're in the Court's possession

4     now.  We think it would be very unfair to release them to the

5     government.

6              THE COURT:  What I want -- I think what I've

7     explained, whether it's deemed -- Mr. Rollins, are you

8     suggesting that the government -- if hypothetically the

9     government were given leave to do the testing, would the

10    government then have any disclosure obligation to the defense

11    as to the test results?

12             MR. ROLLINS:  Certainly, Your Honor, and we would

13    provide that to the defense.

14             THE COURT:  All right.  Well, I think -- sorry.  Go

15    ahead.

16             MR. SPERTUS:  The only point is the process of

17    testing damages the MMICs.  To give the government the tools

18    to then say these somehow are changed from the date that they

19    came from Cree --

20             THE COURT:  I understand.  The testing needs to be

21    done by a qualified person in, I don't know if you'd call it

22    a laboratory, but it needs to be done in a proper manner.

23    And whether -- so that's what I need to know.  I need to know

24    -- it's not necessarily about whether the testing is under

25    the control of the -- testing will be under the control of
```

```
1    the Court.  And then I want to ensure that the laboratory is

2    qualified, that the person conducting the testing is

3    qualified, and that the, you know, appropriate steps will be

4    taken to protect the integrity of this evidence both in terms

5    of transporting it from the Court to a laboratory and then

6    transporting it back.

7              Yes, Mr. Hanusz.

8              MR. HANUSZ:  Your Honor, if I may, our

9    understanding of just how the testing works is that there

10   will be probe marks then placed on -- so at the time the

11   testing is conducted, the testing itself will change the

12   condition of the MMICs from the condition they're in today.

13             THE COURT:  Yes.

14             MR. HANUSZ:  So if the government is concerned

15   about that being an issue, it just adds more uncertainty to

16   that process.

17             THE COURT:  But they can be -- you've already

18   photographed them.

19             MR. SPERTUS:  Your Honor, for example, I on

20   cross-examination of Dr. Barner asked him whether he would be

21   able to tell whether the undiced wafer PCMs had been removed

22   or tested and things like that.  He said, yes, with a visual.

23             If we give these wafers to the government, what is

24   now a pristine surface will become marked and he will say

25   that, yes, the testing occurred.  So the process of this
```

1    testing will prevent us establishing at trial that these

2    wafers were not in fact tested by Dr. Shih as alleged in the

3    government's direct of Dr. Barner.

4              THE COURT:  I'm not quite following that.

5              MR. SPERTUS:  Okay.

6              THE COURT:  Because if the -- I think this goes to

7    the capability of the tester, because the tester should be

8    able to take the current condition and compare it to the

9    condition from the data in North Carolina.  And the tester

10   should also --

11             MR. SPERTUS:  I don't think that the government is

12   alleging, is going to allege that these are counterfeited,

13   but that's --

14             THE COURT:  That's not --

15             MR. SPERTUS:  -- the only reason -- testing will

16   only be relevant to that issue, are these counterfeit MMICs.

17             THE COURT:  I don't think that's quite it.  I think

18   the issue is whether they were changed between the time they

19   were shipped from North Carolina and now and prior to the new

20   testing.

21             MR. SPERTUS:  I don't think the government is

22   alleging that the circuitry has changed.

23             THE COURT:  Well, there is some issues about what

24   was removed.

25             MR. SHOBAKI:  Your Honor, to be clear here, we just

UNITED STATES DISTRICT COURT

```
 1    don't know.  There's one of these wafers that showed up with
 2    no barcode whatsoever on it.  We know that there is a MMIC
 3    foundry now in China, for example, where you could take the
 4    same design and make the MMICs again.
 5            So that's part of why we want to have some
 6    inspection.  I think that Dr. Barner's testimony was twofold.
 7    He said that he could from visual inspection come to a decent
 8    -- like a fair degree of certainty as to whether they were
 9    the -- whether they appeared to be the same design that had
10    been manufactured by Cree.
11            THE COURT:  Yes.
12            MR. SHOBAKI:  And there was another line of
13    questioning that related to the electronic testing and the
14    question as to whether, for example, the PCMs which had been
15    tested at Cree were then subsequently retested.
16            You know, he suggested that that -- doing some --
17    you need to do more work to do an electronic test of the
18    components.  However, I'd like to -- I think we can confer a
19    little bit on this, but I think that with respect to whether
20    he's able to determine that these indeed appear to be
21    Cree-manufactured wafers and circuitry, I believe he said
22    that he could determine that in large part by looking at them
23    under a microscope or someone qualified under a microscope.
24            I think we can confer with Dr. Barner and determine
25    if possibly there's some place in Los Angeles where that type
```

1    of equipment is available.  I assume that there is.  Whether

2    we could do, you know, whether it would be possible to

3    arrange for some sort of protocol to get over there.  And

4    perhaps even have him look at it.  I mean, he's certainly a

5    person who's qualified to know what Cree products look like.

6           THE COURT:  All right.  I understand.  I think -- I

7    think you need to look into this promptly.  I think there's

8    two issues here.  One is authenticity.  Are these Cree

9    wafers?  And the testimony was, from the witness, he believes

10   they are.  To be sure, he acknowledged that was based on the

11   tags that are on the wafers themselves, the barcode.

12          So hypothetically could somebody take the same

13   barcode or create it somehow and put it on a different wafer?

14   I suppose hypothetically that's somehow possible, but that's

15   not what he thought.

16          So if microscopic examination is all that would be

17   necessary, then it shouldn't cause any change to the wafers.

18   If something beyond that is necessary, I'll need to hear

19   about what it is in terms of assessing how to proceed.

20          To be clear, to be sure, I don't know that the --

21   if the concern, for example, were that there is -- that the

22   testing would result in some physical change to the

23   appearance of one of the six exhibits, I don't know how

24   material it would be to the jury, because the jury is just

25   looking at something that looks like -- they're comparing to

 1    something with which they're familiar.

 2          They -- it could also be explained that this change

 3    was due to testing that occurred, you know, due to testing.

 4    Here are the photographs that were made, dated, and that show

 5    that prior to the testing it wasn't -- that feature wasn't

 6    there.

 7          MR. SPERTUS:  It's not -- Your Honor, that point is

 8    -- has nothing to do with the jury's examination of the

 9    wafers.  It has to do with how Dr. Barner would testify when

10    I asked him to look at the undiced wafer and determine

11    whether any testing was done on it.

12          If I had been able to show him that, I proffer his

13    answer would have been, no, there was no testing.

14          THE COURT:  Well, that's not --

15          MR. SPERTUS:  I want that answer on the recall

16    testimony.

17          MR. SHOBAKI:  Your Honor, I think the transcript

18    clearly shows that that's not what Dr. Barner said.  He said

19    it would be possible for testing to done by someone with

20    sufficient skill such that you wouldn't be able to tell.

21          Again, I think the point is, you know, the Court is

22    asking about getting some sort of verification to assure

23    itself about the authenticity of these items.  The record

24    that we have today reflects that at the very least,

25    microscopic examination would be appropriate.

1          Again, you know, we're here because of equal

2    egregious violations of Rule 16.  So, you know, that's what

3    puts us in this bind in the middle of trial, Your Honor,

4    which is exactly why the rules exist.

5          THE COURT:  Okay.  Well, I understand.  You'll

6    agree to disagree on that, but it's guiding in part my

7    approach here, because I think a suitable expert can, whether

8    it's Dr. Barner or a different person, appropriately examine

9    these things and without -- either without modifying them by

10   doing microscopic examination or, if there has to be some

11   modification, doing it in a fashion that is appropriately

12   recorded so that there is no question about when something

13   changed.

14         Before there would be a modification -- because I

15   would have to approve this.  Before there would be a

16   modification, the issue would be, well, do we need to hear

17   testimony from Dr. Barner prior to the testing so that he can

18   examine the item in its current condition?

19         You know, if hypothetically you find that you --

20   that the government proposes only a microscopic examination

21   and it's done by a capable -- in a capable facility and we

22   have an appropriate means of assuring careful transport to,

23   appropriate oversight during, and appropriate transport back,

24   then I think we can address many of these problems.

25         MR. SPERTUS:  Very well, Your Honor.

1          THE COURT:  Okay.  So get on this, please.

2          MR. SHOBAKI:  Thank you, Your Honor.

3          MR. ROLLINS:  Thank you, Your Honor.

4          THE COURT:  Thanks for your help.

5          Oh, wait a minute.  One other question.  Did

6    Dr. Barner go?  I asked him about days he would -- that would

7    be most convenient during the week of June 10th.  He said any

8    of the days, 10 through 13.

9          Do you think we should pick a day now and ask him

10   to make himself available for that day if needed?

11         MR. SPERTUS:  I just have my cell phone off.  Any

12   day convenient for the Court is fine.  I would submit a

13   Tuesday.  That's just one of those days that's usually --

14         THE COURT:  June 11th?

15         MR. SHOBAKI:  Your Honor, I think that it's

16   probably best to do that.  And, you know, at least

17   preliminary thinking is if Dr. Barner would be able to assist

18   with any examination, that we might be able to get him here,

19   for example, on Monday to do it.

20         But we need to talk to him, and we need to find out

21   about facilities and figure that out.

22         I did have one total pivot, which is to just also

23   ask for the Court's guidance with respect to our schedule

24   next week.  We're trying to coordinate travel.

25         THE COURT:  First of all -- just a minute.  Next

1    week, Tuesday, June 4, is when juror number 8, I think it

2    is -- same one.  June 4 is when juror 15 has the family

3    graduation which I was hoping would be in the afternoon or

4    evening but which is in the morning.

5           So there's an issue about June 4th.  If she goes to

6    the -- I mean, obviously I can tell her, no, you can't go to

7    your daughter's graduation, but I'd prefer to accommodate

8    her.  The jurors are accommodating us for a long period of

9    time.

10          Then on June 5 I'm committed in the morning from

11   9:00 to 12:00, although -- well, we've got several hundred

12   students coming here, so I'm committed in the morning, and

13   this courtroom will be in use for that.  So -- although

14   perhaps I could make some adjustments to that if necessary.

15          At the moment I would say that it would be in

16   session on June 5 in the afternoon.  We can go later.  We

17   need to make up some of the time.  June 6 and June 7 are not

18   issues, correct?  And the following week, June 10, there's no

19   issues.

20          Then during the week of June 17 we do have an issue

21   because one of the jurors, juror number 5, has this vacation

22   plan to be away that week, through the 25th.  Now, perhaps

23   we'll be finished by then.  I don't know.  But that's out

24   there at the moment, and there are various options there.

25          I don't think we can get there yet.  I think we'll

1    be better able to evaluate that when we get closer.  You

2    disagree with that?

3              MR. SPERTUS:  No, Your Honor.

4              MR. SHOBAKI:  No, Your Honor.

5              THE COURT:  Okay.  So I think we have to be -- I

6    think we need to give juror 15 the graduation day of June 4.

7    I'm tied up, I said, on the morning of June 5.  If it becomes

8    essential I can probably -- I can make some accommodation to

9    make myself available before noon.

10             But then, as I say, I'm willing to go later that

11   day so that we'll make up the time we lose.  And then I think

12   there's no issue through June 14.  So does that assist you

13   with your schedule?

14             MR. SHOBAKI:  Yes, Your Honor.  If I'm hearing

15   correctly, we're going to not be in session on June 4?

16             THE COURT:  Correct, because that's the graduation

17   day.  I mean, I can say go to the graduation in the morning

18   and then come here in the afternoon and skip all the family

19   events and we'll be in session from 1:00 to 5:00, but I...

20             MR. SPERTUS:  Your Honor, I agree.

21             MR. SHOBAKI:  You've advocated compellingly for

22   taking the day off.

23             THE COURT:  From what is she graduating?  It's a

24   school.  Okay.

25             Okay.  That's the plan.  We'll see you tomorrow at

1    8:30.

2            MR. SPERTUS:  Thank you, Your Honor.

3            MR. ROLLINS:  Thank you, Your Honor.

4            MR. SHOBAKI:  Thank you, Your Honor.

5            THE COURT:  If Dr. Barner is still here, perhaps

6    you can confer with him.  We'll let him know when we can as

7    to what day of the week.

8            MR. SHOBAKI:  Yes.

9            THE COURT:  You'll let me know as soon as you know

10   about your proposed process for testing.  Confer with defense

11   about that and let me know what you agree on.

12           MS. HEINZ:  Thank you, Your Honor.

13               (Proceeding adjourned at 2:51 p.m.)

14                      CERTIFICATE

15   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

16   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

17   THE ABOVE MATTER.

18   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22   /s/ Miriam V. Baird          06/03/2019

23   MIRIAM V. BAIRD                      DATE
     OFFICIAL REPORTER
24

25