1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE JOHN A. KRONSTADT, US DISTRICT JUDGE

4                    – – –

5

6

7                                    )
  UNITED STATES OF AMERICA,          )
8                                    )
                    PLAINTIFF,       )
9                                    )
          vs.                        ) No. CR18-50-JAK
10                                   )
  (1) YI-CHI SHIH, ET AL.,           )
11                                   )
                    DEFENDANT.       )
12  _____)

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL

16            DAY 3, VOLUME II

17         FRIDAY, MAY 17, 2019

18              11:08 A.M.

19         LOS ANGELES, CALIFORNIA

20

21

22  _____

23       CINDY L. NIRENBERG, CSR 5059, FCRR
         U.S. Official Court Reporter
24         350 W. 1st Street, #4455
           Los Angeles, CA 90012
25         *www.msfedreporter.com*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:
                          UNITED STATES ATTORNEY'S OFFICE
 4                        BY: JUDITH HEINZ,
                              ASSISTANT US ATTORNEY
 5                            JAMES HUGHES,
                              ASSISTANT US ATTORNEY
 6                            WILLIAM ROLLINS,
                              ASSISTANT US ATTORNEY
 7                            MELANIE SARTORIS,
                              ASSISTANT US ATTORNEY
 8                            KHALDOUN SHOBAKI,
                              ASSISTANT US ATTORNEY
 9                        312 NORTH SPRING STREET
                          13TH FLOOR
10                        LOS ANGELES, CA 90012
                          213-894-2434
11

12

13

14

15   FOR THE DEFENDANT:
                          SPERTUS LANDES & UMHOFER
16                        BY: JOHN HANUSZ, ATTORNEY AT LAW
                              JAMES W. SPERTUS, ATTORNEY AT LAW
17                            CHRISTA L. CULVER WASSERMAN,
                              ATTORNEY AT LAW
18                        1990 SOUTH BUNDY DRIVE
                          SUITE 705
19                        LOS ANGELES, CA 90025
                          310-826-4700
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          I N D E X

 2    GOVERNMENT'S WITNESSES:                    PAGE

 3    CHRISTOPHER NORDQUIST

 4        CROSS BY MR. HANUSZ (RESUMED)           6

 5

 6    CARLOS MONROY

 7        DIRECT BY MR. SHOBAKI                   9

 8        CROSS BY MR. SPERTUS                   35

 9

10

11    FURTHER PROCEEDINGS

12    DISCUSSION HELD OUTSIDE PRESENCE OF JURY    4

13    DISCUSSION HELD AT SIDEBAR                 30

14    DISCUSSION HELD AT SIDEBAR                 45

15

16

17                      E X H I B I T S

18

19    TRIAL EXHIBITS                    MARKED   ADMITTED

20    (None.)

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, MAY 17, 2019

 2                         11:08 A.M.

 3                         - - - - -

 4       (The following was heard outside the presence of the

 5       jury.)

 6              THE COURT:  Back on the record.  All counsel are

 7   present.  No jurors.

 8              Are you ready to proceed?

 9              MR. SPERTUS:  Yes.

10              MR. SHOBAKI:  If I can have one minute?

11              THE COURT:  Yes.

12       (Counsel confer off the record.)

13              THE COURT:  Are you ready to proceed?

14              MR. SHOBAKI:  Yes, Your Honor.  Just a moment.  If --

15   are we on the record?

16              THE COURT:  Yes.

17              MR. SHOBAKI:  Yes.

18              Your Honor, I've conferred with defense counsel with

19   respect to the range of exhibits that were identified prior to

20   the break and which has been confirmed during the break with

21   the Court and the clerk.

22              Other than with respect to Exhibit 3200, which is the

23   contested thesis with the translation issues and other issues,

24   and based on representations which the government believes to

25   be accurate from the defense that the remainder of those
```

1    exhibits are either IEEE publications or from the journal that

2    Dr. Nordquist sits on the board of, the government does not

3    have any authentication objections to those documents and

4    reserves the other issues that the Court has identified.

5           THE COURT:  All right.  And the reason I -- anything

6    further?

7           MR. HANUSZ:  Not on that issue.

8           THE COURT:  All right.  No, the reason I reserved it

9    is I recognized that the defendant has presented an issue

10   concerning various exceptions, including academic discourse.

11   So I want to evaluate the admissibility of these in the context

12   of that evidence, which I don't have yet.

13          And I also -- I haven't read through all 40 or 50 of

14   these, looked at them to see who is the author of each one and

15   so on.  But that's why I am reserving.

16          MR. HANUSZ:  Understood.  Thank you, Your Honor.

17          Your Honor, I will just have one or two more

18   questions for Dr. Nordquist.

19          THE COURT:  That's fine.

20       *(Jury in at 11:12 a.m.)*

21          THE COURT:  All right.  Please be seated.  All 15

22   jurors are present, including the alternates.

23          Dr. Nordquist, could you please restate your name.

24          THE WITNESS:  Christopher Daniel Nordquist.

25          THE COURT:  And do you understand that you remain

1    under oath?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.  Please proceed, Mr. Hanusz.

4              MR. HANUSZ:  Thank you, Your Honor.

5                    CHRISTOPHER NORDQUIST,

6              having been previously duly sworn,

7                testified further as follows:

8                    CROSS-EXAMINATION

9                       (RESUMED)

10   BY MR. HANUSZ:

11   Q.   Hello again, Dr. Nordquist.

12   A.   Hello again.

13   Q.   Just a couple more questions for you.

14        Are you familiar with the Nanjing University of

15   Science and Technology?

16   A.   No.

17   Q.   Okay.  Are you familiar with an individual named Yuan Ye?

18   A.   Only based on some of the -- I've seen his name associated

19   with this case.

20   Q.   Okay.  Did you review -- if you can take a look at the

21   items Exhibit Numbers 3201 through 3203.

22   A.   So I'm going to look at just the titles --

23   Q.   Just the titles.

24   A.   -- and the format.

25   Q.   Just the titles.  Just the top paragraph.

```
 1   A.    Okay.

 2   Q.    Well, the title and the names.

 3   A.    So 3201, 3202, and 3203.

 4   Q.    Do you recognize those as articles from Electronics

 5   Letters?

 6   A.    The first two appear to be from IEEE proceedings from some

 7   conference, and 3203 appears to be from Electronics Letters.

 8   Q.    Okay.  Very well.  I misspoke.

 9          So do you recognize 3203 as from Electronics Letters?

10   A.    Yes.

11   Q.    Okay.  Did you actually review this article before

12   publication?

13   A.    No.

14   Q.    Okay.  But this is in the journal that you sit on the

15   peer-review board of?

16   A.    To clarify, I am a peer reviewer.  I am not sitting on the

17   board.

18   Q.    Very well.  But you review articles --

19   A.    Yes.

20   Q.    -- before they are published in Electronics Letters --

21   A.    Yes.

22   Q.    -- as part of your kind of research and academic

23   interests?

24   A.    Yes.

25   Q.    Okay.  Very well.
```

1          MR. HANUSZ:  No further questions.

2          THE COURT:  Thank you.

3          Any redirect?

4          MR. SHOBAKI:  No, Your Honor.

5          THE COURT:  Dr. Nordquist, thank you for your

6   testimony.  You are excused.

7          Would the government please call the next witness.

8          MR. SHOBAKI:  The government calls Carlos Monroy.

9          THE CLERK:  Can you please step forward.

10         Can you please raise your right hand.

11         Do you solemnly swear that the testimony you're about

12  to give in the cause now before this Court shall be the truth,

13  the whole truth, and nothing but the truth, so help you God?

14         THE WITNESS:  Yes, I do.

15         THE CLERK:  Can you please state your full name and

16  spell it for the record.

17         THE WITNESS:  My name is Carlos Monroy, C-a-r-l-o-s.

18  M-o-n-r-o-y.

19         THE COURT:  All right.  Good morning, Mr. Monroy.

20         Please proceed, Mr. Shobaki.

21  ///

22  ///

23  ///

24  ///

25  ///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1                          CARLOS MONROY,

2                  having been first duly sworn,

3                      testified as follows:

4                      DIRECT EXAMINATION

5    BY MR. SHOBAKI:

6    Q.   Good morning, Mr. Monroy.  Where do you work?

7    A.   I work for the Bureau of Industry and Security with the

8    US Department of Commerce in Washington, D.C.

9    Q.   And if I refer to the Bureau of Industry as "BIS," is

10   that -- will you understand what I am saying?

11   A.   That's correct.

12   Q.   So if I say that, that's an okay shorthand?

13   A.   That's okay.

14   Q.   How long have you worked there?

15   A.   I have worked for 13 years with BIS.

16   Q.   And what is your job there?

17   A.   I am an electronics engineer and licensing officer.

18   Q.   And can you briefly describe for the jury your educational

19   background?

20   A.   I have a Bachelor of Science in electrical engineering,

21   and I have worked since college in the microelectronics design

22   and manufacturing of microchips.

23   Q.   And as part of your work at BIS, do you receive regular

24   training?

25   A.   Yes, I do.
```

```
1    Q.    And what kind of training do you receive?

2    A.    We have training on regulations, specifically.

3    Q.    And are those regulations that you are involved with

4    interpreting on a day-to-day basis?

5    A.    That's correct.

6    Q.    And how often do you receive that kind of training?

7    A.    As often as a regulation or a change in the Commerce

8    Control List takes place.

9    Q.    Is that the CCL?

10   A.    The CCL, um-hmm.

11   Q.    Okay.  So when changes take place in the Commerce Control

12   List, do you receive training on those changes?

13   A.    We receive training, um-hmm.

14   Q.    And is that training something you apply daily in your

15   job?

16   A.    Yes, I do.

17   Q.    Do you work in a particular area at BIS?

18   A.    Yes.  I work with the Electronics and Materials Division.

19   Q.    And can you explain what your job duties as a licensing

20   officer and an electronics engineer are with BIS?

21   A.    Well, I have a large portfolio of processing licenses.  I

22   do commodity classification requests, license determinations,

23   commodity jurisdictions, and I'm part of the technical team

24   that goes to Vienna for Wassenaar meetings on every quarter of

25   the year.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    Okay.  You mentioned commodity classifications.

 2             What's that?

 3   A.    A commodity classification, it's something that the

 4   Commerce Department has available for researchers, industry,

 5   and persons or manufacturers that would like to know how the

 6   products that they decide on manufacture is controlled or if it

 7   requires a license.

 8             By this process, we issue something that we call an

 9   ECCN, which is an export control number that would be assigned

10   for the part.  And we will tell usually the exporter of the

11   industry if it requires a license or not.

12   Q.    And do you also -- you also mentioned commodity

13   jurisdiction.

14             What's that?

15   A.    Commodity jurisdiction is a process by which different

16   agencies from the government evaluate a submission of usually

17   an industry that would like to know if their item that they

18   manufacture is controlled by the State Department on the United

19   States Munition List or if it is controlled by the Department

20   of Commerce under the Commerce Control List.

21   Q.    So that's just to determine whether it's something within

22   the range of your agency?

23   A.    That's right.

24   Q.    You also mentioned license determinations.

25             What are those?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    License determinations, it's a process by which an agent

2    or a different agency, such as Border Patrol or FBI, Customs,

3    or agents from our bureau, would like to understand or

4    determine whether an item was exported under certain ECCN or if

5    there was a license required for the export or reexport of that

6    item.

7    Q.    So that's a situation where you would provide advice based

8    on an item brought to you by agents?

9    A.    Yes.

10   Q.    Do you also work in license processing?

11   A.    Yes, I do.

12   Q.    What's that?

13   A.    That's the process by which industry, persons, agencies

14   submit a request for export an item, and usually that request

15   is submitted by a system called SNAP-R and it's available for

16   the general public.

17          And they submit a license request, and as a licensing

18   officer, I examine that request and we determine whether an

19   item needs a license or -- to export outside the United States

20   or to reexport it to another country.

21   Q.    Okay.  You mentioned reexport.

22          Are reexport authorizations something else that you

23   work on?

24   A.    That's correct.

25   Q.    And can you explain to the jury what those are.

1    A.   A reexport is another authorization that we process, and

2    it's usually coming from overseas from an item that has been

3    authorized for export, and the country requesting it is usually

4    asking us to -- for a formal authorization to transfer it or

5    reexport it to another country.

6              Usually, the reexport authorization or request

7    consists of an original ultimate consignee, which is usually in

8    the United States; the new ultimate consignee, meaning the

9    person or party in the new country that the item is going to be

10   exported to; and purchaser in the new country and the new

11   end-user.

12   Q.   So a reexport authorization, is that for an item that has

13   already been exported from the United States to another

14   country?

15   A.   That's correct.

16   Q.   And then that's a request back to the United States for

17   authorization to send it onward?

18   A.   Um-hmm, that's correct.

19   Q.   Now, you mentioned the word "commodity" several times.

20             Does that have a special meaning in your world?

21   A.   Yeah.  Commodities is what we call devices, equipment,

22   materials.

23   Q.   So it's a thing?

24   A.   A thing.

25   Q.   And is that separate from other --

1    A.    It's separate from software or technology.  Technology

2    means, for us, the know-how of how to manufacture something or

3    the data necessary to design an item.

4    Q.    How many people at BIS work in the area that you work in,

5    electronics and materials?

6    A.    We have seven engineers in charge of analyzing and doing

7    the same things I do.

8    Q.    And can you estimate, for the BIS as a whole, do you know

9    about how many export license determinations BIS deals with on

10   an annual basis?

11   A.    Past fiscal year, 2018, we had around 33,000.

12   Q.    And for your group, the electronics group, do you know how

13   many your group processed?

14   A.    About 4300 licenses.

15   Q.    Now, are you familiar with the term "EAR"?

16   A.    Yes.  EAR stands for Export Administration Regulations.

17   Q.    And is the CCL, which you mentioned before, part of the

18   EAR?

19   A.    Yes, sir.

20   Q.    And what is the CCL?

21   A.    It's a commodity class- -- it's a list of commodities that

22   are dual use in nature.

23   Q.    And what does "dual use" mean?

24   A.    Dual use for an item, it's -- that can be -- that has

25   military applications as well as civil applications.

```
 1   Q.   And are dual-use items items that fall within the BIS's

 2   domain of authority?

 3   A.   That's correct.

 4   Q.   Okay.  Now, is the CCL -- you mentioned electronics.

 5             Does it have categories of different things?

 6   A.   Yes.  To name a few, we have computers, we have

 7   telecommunications, we have electronics, we have marine, we

 8   have lasers, we have aviations and sensors.

 9   Q.   And is there a reason why there are those categories?

10   A.   The main reason is that there are a wide range of items

11   designed for different purposes and different applications and

12   different end-users.

13   Q.   How many categories are there within the CCL?

14   A.   Right now, we have nine categories.

15   Q.   And how are those nine categories decided?

16   A.   Those nine categories go through what we call proposals

17   to -- that we take on a yearly basis to Vienna, Austria, in

18   which all of us participate -- there's 40 countries that meet,

19   and we agree upon what we call an ECCN, which is an

20   alphanumeric number, nomenclature, and that distinguishes what

21   type of devices we are dealing with.

22   Q.   So are you --

23   A.   In Wassenaar, every country has a vote; and when it's

24   agreed, then each country implements it in their own system of

25   exports.
```

1    Q.    So this Wassenaar is a meeting of 40 countries?

2    A.    Forty countries.

3    Q.    And are the ECCNs that you mentioned, are those agreed

4    upon -- they are agreed upon within that group?

5    A.    Yes.  All of the ECCNs that appear on the Commerce Control

6    List are agreed upon, that group.

7    Q.    Do you know who the members of the Wassenaar are?

8    A.    It's a large number.  We have Canada, France, Germany,

9    Switzerland, Italy, Argentina, Mexico, India, Korea, Austria,

10   Australia.  And I can't remember the others right now.

11   Q.    Is China part of the Wassenaar?

12   A.    No, it is not.

13   Q.    Is Hong Kong part of the Wassenaar?

14   A.    No, it is not.

15   Q.    Are you familiar with the term "EAR99"?

16   A.    Yes.  EAR99 is an item that has been reviewed under all

17   categories of the Commerce Control List, CCL, and it has been

18   determined that it doesn't meet any of the metrics or

19   parameters as stated in -- and characteristics listed in all

20   the Commerce Control List.

21   Q.    So for an EAR99 item, does it usually not require an

22   export license?

23   A.    That's right, except when it's being exported to parties

24   of concern such as listed on the entity -- on an entity list

25   that we have in Commerce Department.

1    Q.   Now, do you work on a -- you mentioned you worked on the

2    electronics area.

3          Can you describe what some of the types of items that

4    fall within electronics are?

5    A.   Yeah.  In our Category 3, we have items that are under the

6    alphanumeric 3A001 as devices.  And that section includes

7    microprocessors, field-programmable --

8          THE REPORTER:  I'm sorry?

9          THE WITNESS:  Gate arrays.  Field-programmable gate

10   arrays, FPGAs.

11         THE COURT:  Could you spell that, please.

12         THE WITNESS:  Field, f-i-e-l-d; programmable,

13   p-r-o-g-r-a-m-m-a-b-l-e; gate, g-a-t-e; arrays, a-r-r-a-y.

14         THE COURT:  Thank you.

15         THE WITNESS:  And we have microprocessors, we have

16   programmable logic devices, we have MMICs amplifiers, we have

17   transistors.

18         We also have equipment, we also have materials, and

19   we also have software and technology under our Category 3.

20   BY MR. SHOBAKI:

21   Q.   So are software, technology, and commodities all

22   considered items under the CCL?

23   A.   They are.

24   Q.   Do they have -- are they all governed by the same rules?

25   A.   They are governed by the same rules.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  Q.   In evaluating whether a -- the ECCN for software,

2  technology, or commodity, they have different ECCN numbers?

3  A.   That's correct.

4  Q.   Okay.  And are they treated differently depending on

5  whether it's a software, technology, or commodity?

6  A.   Yes, they are.

7  Q.   Now, previously you mentioned -- when I asked you about

8  commodity classifications, is that what you would call CCAT?

9  A.   That's correct.

10  Q.   Okay.  And could you explain how an exporter would seek a

11  CCAT?

12  A.   Yeah.  A CCAT is a commodity classification request that

13  industry, a researcher, or whoever in the general public, if is

14  interested in knowing how their item would be classified under

15  the Commerce Control List, it's submitted via our system, which

16  is called SNAP-R.

17      And by this process, the exporter is able to submit

18  technical specifications, a letter of explanation.  And in such

19  letter, they explain to us what the item is, what the

20  background, the design limits, parameters, and what the

21  intention of such a design is.

22      And by providing all the tech specs and disclosing

23  all the information, we make a decision on whether the item

24  requires a license or not.

25  Q.   And would you then assign an ECCN?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.   We assign an ECCN, and this ECCN and the final decision is

2    issued in the form of a document with the United States seal to

3    the exporter or person that is receiving the CCATS.

4    Q.   Now, with respect to MMIC power amplifiers, does the ECCN

5    list specific names of amplifiers?

6    A.   Yes.

7    Q.   So it has MMIC power amplifiers in there?

8    A.   Yes.

9    Q.   And then how are the ECCN categories defined?

10   A.   For MMICs?

11   Q.   Yes.

12   A.   Yes.  It's -- the alphanumeric number, per se, for MMICs,

13   it starts with 3, number 3, the letter A, 001, followed by a

14   period, then the letter b, then another period, letter 2 --

15   number 2.

16   Q.   Are there subcategories within that?

17   A.   There are subcategories of "a" -- so it's called b.2.a,

18   b.2.b, b.2.c, b.2.d, b.2.e, b.2.f, b.2.g, depending upon the

19   operating frequency and powers for each entry.

20   Q.   So is that list of subparts of the ECCN, is that to

21   categorize MMIC power amplifiers based on their performance?

22   A.   That's correct.

23   Q.   You mentioned before the entity list.

24        What does it mean for a person or entity to be added

25   to the list?

1    A.    It means a vigorous process for any exporter in the United

2    States to submit a license even when an item is EAR99, simply

3    because when a party is listed or put on that list, it is

4    because that end-user or party or person have been involved in

5    things that are against the interests or foreign policy of the

6    United States.

7    Q.    So you said that would apply even to restrict potentially

8    ER99 items?

9    A.    That's correct.  Some of the items -- some of the policies

10   are a restriction for all items and presumption of denial for

11   many of the parties listed on that list of the Commerce Control

12   List.

13   Q.    Now, you mentioned the ECCN 3A001.b.2.

14            In order to determine what ECCN, if any, applies to a

15   MMIC power amplifier, what do you need to know?

16   A.    For this specific entry, we need to know the operating

17   frequency, the fractional bandwidth, as well as the output

18   power.

19   Q.    Now, can you purchase a MMIC power amplifier from a US

20   manufacturer?

21   A.    Yes, we can.

22   Q.    And if you were to try and determine what the ECCN that

23   applied to that MMIC was, what would you look at?

24   A.    I would go to the website, and usually they have data

25   sheets available for which -- whatever frequency you will be

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   interested in.  And some of them even display the ECCN.
 2              For example, Qorvo, they have a list of ECCN --
 3              THE REPORTER:  I'm sorry?
 4              THE WITNESS:  Qorvo, Q-o-r-v-o, is one of the
 5   companies -- one of the major manufacturers of MMICs.
 6              Analog Devices also has a list of ECCNs that allows
 7   you to access and determine whether an item needs a license or
 8   not.
 9   BY MR. SHOBAKI:
10   Q.   So you would look at a data sheet to determine if one
11   existed to determine the applicable ECCN?
12   A.   That's correct.
13   Q.   So once you know what ECCN a MMIC power amplifier falls
14   into, what do you do next to determine if a license is required
15   for the export of that power amplifier?
16   A.   Once I determine, I need to also make sure that requires a
17   license or not through the List Based License Exceptions that
18   are specially indicated for MMICs.
19              And it has -- these exceptions only apply if the item
20   is being exported to all four -- I should say civil and
21   telecommunications applications.
22   Q.   And are they called List Based Exceptions because they
23   relate to lists of countries?
24   A.   Yes.  Usually, US allies and Group B countries, if the
25   item is going to be used in civil telecommunications,
```

1    therefore, license exception will be applicable.

2    Q.    That's for Group B countries.

3    A.    That's for Group B countries.

4    Q.    Do you know what country list China is on?

5    A.    China is under D1 country.

6    Q.    So do any of the list based exceptions apply to China?

7    A.    No, they don't apply.

8    Q.    So is LVS a list based exception?

9    A.    LVS is limited value shipment.  It's an exception, and

10   it's only for Group B countries.

11   Q.    Okay.  So not Group D?

12   A.    No.

13   Q.    What about GBS?

14   A.    GBS is Group B shipment, when you are shipping these items

15   or any other item to Country Group B.

16   Q.    So that suggests that also applies only to Group B?

17   A.    That's right.

18   Q.    And then, finally, STA, is that also a list based

19   exception?

20   A.    Yeah.  This is -- it's strategic trade authorization, and

21   it is a list of countries there, with the exception of China.

22   Q.    Now, in addition to those list based exceptions, are there

23   other exceptions to the license requirements of the Commerce

24   Control List?

25   A.    Yes, there are other license requirements.

1    Q.    And are those requirements that you work with and apply on

2    a daily basis in your analysis?

3    A.    Um-hmm.

4            THE COURT:  Is that "yes"?

5            THE WITNESS:  Yes.  Yes.  I'm sorry.

6    BY MR. SHOBAKI:

7    Q.    Now, you mentioned that you receive training whenever the

8    Commerce Control List is changed, right?

9    A.    That's right.

10   Q.    Does it change quite frequently?

11   A.    Depends what is the change.

12   Q.    So depending on the area?

13   A.    On the area.

14   Q.    So in terms of evaluating whether a license was required

15   at a specific time and the exceptions that would apply to that

16   potential export, do you need to look at the rules in place at

17   the time?

18   A.    That's correct.

19   Q.    So that would be at the time of the export --

20   A.    That's right.

21   Q.    -- or proposed export?

22   A.    That's right.

23   Q.    So I want to direct your attention specifically -- let's

24   talk about the time period from December 2013 to January 2014.

25            Is that fair?

1    A.    Um-hmm.

2    Q.    Is that a "yes"?

3    A.    Yes.

4    Q.    Okay.  Please --

5    A.    I'm sorry.  Yes.

6    Q.    Yes.  Or specifically with respect to December 2013 to

7    January 2014, the rules in place at that time.

8    A.    Yes.

9    Q.    Are you familiar with the APR exception?

10   A.    It's an additional permissive reexport authorization, a

11   license exception.

12   Q.    So you talked about reexports before, right?

13   A.    Um-hmm, yes.

14   Q.    Now, does this exception apply to exports or only to

15   reexports?

16   A.    Only to reexports.  As I mentioned before, there's a

17   difference between an export and a reexport and even a

18   difference in license application process.

19   Q.    So to help understand the difference between exports or

20   reexports, if someone were to send an item from the United

21   States to China and it passed through a third country on the

22   way, would that be an export to China?

23   A.    That will be an export to China.

24         And we receive thousands of license [sic] on a daily

25   basis that have a list of parties and -- for example, cargo is

1  shipping to China, a certain amount of MMICs, and usually have

2  Singapore and Hong Kong as intermediate countries.  And they

3  don't want to list every export license.  They do an export

4  knowing that the intended destination is China or the end-user

5  is in China.

6  Q.    So when you talk about an export, do you look at the final

7  destination for the good?

8  A.    That's correct.

9  Q.    So would the fact that it travels through another country

10 make that a reexport from the middle country to the other

11 country?

12 A.    No.

13 Q.    Was this exception available for China during the December

14 2013 to January 2014 time frame?

15 A.    No.

16 Q.    During that time frame, it wasn't?

17 A.    Oh, the APR itself?  Yes.

18 Q.    Yes.

19 A.    Yes, yes.

20 Q.    But that was only for reexports, right?

21 A.    For reexports.

22 Q.    And is it subject to other restrictions?

23 A.    Yes.

24 Q.    Are you familiar with the TMP exception?

25 A.    It's a temporary authorization.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And is that applicable for items that are purchased for

2    export?

3    A.    That's correct.

4    Q.    Does it apply to those items?

5    A.    Um-hmm.

6    Q.    So if a buyer --

7    A.    Yes, yes.

8    Q.    If a buyer purchased something from one location in the

9    United States, had it shipped to another location in the United

10   States, and then shipped it to China, would that be a TMP?

11   A.    No, that would not be a TMP.

12   Q.    Okay.  So TMP would not apply if you were buying something

13   with the intention of exporting it.

14   A.    Right.  That's not -- if there is a purchase order

15   involved, then there is no intention of temporary being

16   somewhere.

17          And within the limitations of TMP, you cannot pass a

18   year time.  If you do so, then a license -- it's treated as a

19   license requirement or reexport license requirement after such

20   time.

21   Q.    Would that be only if it had not been subject to a

22   purchase order, though?

23   A.    Right, that's correct.

24   Q.    Finally, we had talked a little bit about technology and

25   software versus commodities.

1          Are you aware of the publicly available exception to

2    the CCL?

3    A.    Correct.  If it's publicly available, then it's not

4    subject to the EAR.

5    Q.    But does that apply to commodities or just technology and

6    software?

7    A.    Just technology and software.

8    Q.    Okay.  And are MMIC power amplifiers technology or

9    software?

10   A.    They are items, not technology -- neither technology nor

11   software.

12   Q.    Okay.  So they are -- are they commodities?

13   A.    They are commodities.

14   Q.    So do the publicly available rules in the CCL have any

15   application to MMIC power amplifiers?

16   A.    No.

17   Q.    Now, you mentioned that you had done some work --

18   previously you had worked in fabrication of microelectronics,

19   right?

20   A.    Yes.

21   Q.    Now, are you generally familiar with how MMIC power

22   amplifiers are manufactured?

23   A.    Yes, I do.

24   Q.    And are they made on a wafer?

25   A.    They are made on a wafer, and they usually go by the

1    standard process of -- a clean room process that any other

2    devices do.

3         And, of course, there are peculiarly -- or peculiar

4    things done on it, different from a laser or an LED, that

5    apply -- all the rules for processing applies to the MMICs.

6    Q.   So if a MMIC power amplifier was manufactured on a wafer,

7    would you consider the whole wafer as -- when you are

8    evaluating it for an export license?

9    A.   That's correct.

10   Q.   So what if just one MMIC power amplifier on that wafer

11   needed a license?

12   A.   Then that -- we would consider the entire wafer controlled

13   for export, or would require a license as such.

14   Q.   Now, in connection with this case, did you -- were you

15   asked by government agents to evaluate whether certain MMIC

16   power amplifiers required export licenses?

17   A.   Yes, sir, I was asked.

18   Q.   And do you know who the manufacturer of those power

19   amplifiers was?

20   A.   It was Cree.

21   Q.   And were the MMIC power amplifiers that you evaluated

22   custom fabricated or off-the-shelf components?

23   A.   It was -- they were custom fabricated.

24   Q.   So did they have data sheets?

25   A.   They had test results.

```
 1   Q.   So you mentioned test results.

 2             Did you look at test results in order to evaluate the

 3   power amplifiers?

 4   A.   Yes, I do --

 5   Q.   And --

 6   A.   -- because they are valid data.

 7   Q.   Were those -- so are you familiar with the performance

 8   characteristics, based on your review as part of your

 9   evaluation of the MMICs?

10   A.   Um-hmm.  Yes, sir.

11   Q.   Were those narrow or broadband power amplifiers?

12   A.   Broadband power amplifiers.

13   Q.   And are you familiar with the term "specially designed for

14   telecommunications purposes" in the CCL?

15   A.   Yes.

16   Q.   As it relates to MMIC power amplifiers?

17   A.   Yes, sir.

18   Q.   Would any of the broadband MMIC power amplifiers you

19   evaluated fall into that category?

20             MR. SPERTUS:  Your Honor, objection.  Calls for an

21   expert opinion.  There is no foundation.

22             THE COURT:  Your response?

23             MR. SHOBAKI:  The expert opinion is based on his

24   knowledge of the CCL, which he's talked about extensively.

25             MR. SPERTUS:  Your Honor, the question was -- I
```

1    direct the Court to the question.  He asked whether there was a

2    telecommunications purpose.  That's beyond the scope of this

3    witness's expert qualifications.

4           THE COURT:  Let me talk to you briefly.

5       *(The following proceedings were held at sidebar.)*

6           THE COURT:  How is this different than the other

7    questions that have been asked about whether something does or

8    does not require a license under the regulations that he's

9    overseeing?

10           MR. SPERTUS:  So thus far, the witness has been

11    describing how outputs assign an item to an ECCN.  That's fine.

12    That's his expertise.

13           This question was, "Did you determine from the test

14    results you evaluated whether there was any telecommunications

15    purpose?"  That is not a function of interpreting the Commerce

16    Control List; that is interpreting the underlying test results.

17           The defense is that these chips were for

18    telecommunications purpose.  I understand Nordquist was a prior

19    witness who testified with qualifications on that issue, but

20    this witness is not a second engineering expert who tested the

21    MMICs.

22           MR. SHOBAKI:  Your Honor, all of his evaluations --

23    sorry, this is Khal Shobaki.

24           All of Mr. Monroy's evaluations are based on looking

25    at -- sorry -- on looking at test data, and that test data

1    embodied in the Cree test reports and in Nordquist test

2    reports, if I may, that's how he does his job.

3           THE COURT:  Yeah.

4           MR. SHOBAKI:  So the question of whether he can say,

5    looking at specific performance characteristics of a MMIC,

6    whether it would fall into that category is in the heartland of

7    his expertise.

8           THE COURT:  Yeah, I think -- I'm not quite

9    understanding the distinction.  I don't think -- I think that

10   he -- it's a distinction being that he's not here to opine as

11   to what -- he didn't test the product.  He can't opine as to

12   what the product tests would show.  But he is here to testify

13   about how -- if a product has certain characteristics, how it's

14   treated under the list.

15          So I think this question is posed based on, assuming

16   that the product had certain characteristics as reported to use

17   somewhere, would it be on the list.

18          MR. SPERTUS:  So can I just ask the prosecutor to

19   clarify that?

20          MR. SHOBAKI:  Sure.

21          MR. SPERTUS:  If he restates the question, I won't

22   object.

23          MR. SHOBAKI:  I'm happy to restate the question, Your

24   Honor.

25          MR. SPERTUS:  Thank you.

```
 1        (The following proceedings were held in open court.)

 2        (The Court and clerk confer off the record.)

 3            THE COURT:  One moment, please.  Just a minute.  We

 4    have one of our jurors -- we are waiting for one of our jurors

 5    to return.

 6        (Brief pause in proceedings.)

 7            THE COURT:  All right.  Please proceed, Mr. Shobaki.

 8    BY MR. SHOBAKI:

 9    Q.   Mr. Monroy, based on the test results that you reviewed

10    for the MMIC power amplifiers you were asked to evaluate, would

11    any of those power amplifiers fall into the specially designed

12    for telecommunications purposes category?

13    A.   No.

14    Q.   Why not?

15    A.   Because the nature of the broadband, the broader the band

16    is, the less likely it is specially designed for as you go

17    across several ranges of frequencies.

18    Q.   Now, you mentioned that you were asked by agents to

19    evaluate these MMIC power amplifiers.

20            Did you do that as part of what you would refer to as

21    a license determination?

22    A.   That is correct, it's through the license determination

23    process.

24    Q.   So from your work, are you familiar with the part number

25    PA21615A1?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.    That was one of the license determination that I

2    reviewed.

3    Q.    And did you evaluate that part based on both testing

4    performed by Cree and by Sandia National Lab?

5    A.    That's correct, yes, sir.

6    Q.    And did you determine an ECCN that applied to that part?

7    A.    It was concluded that it met the control parameters of

8    ECCN 3A001.b.2.c.

9    Q.    And between January 1, 2011, and December 22nd, 2014, was

10   a license required to export a MMIC power amplifier with that

11   ECCN to China?

12   A.    Yes, a license was required to China for export of that

13   type of MMIC.

14   Q.    And during that time period, did any of the exceptions

15   that we talked about apply for that export?

16   A.    For APR and TMP, it didn't apply.

17   Q.    And also the list based exceptions?

18   A.    They did not apply either.

19   Q.    Now, did you also evaluate test results for a power

20   amplifier designated as PA11020A1?

21   A.    Yes, sir, I did.

22   Q.    And was that based on testing at Sandia National Lab?

23   A.    That is correct.

24   Q.    Did you determine an ECCN for that power amplifier?

25   A.    If I recall, it was under 3A001.b.2.b.

1    Q.   And to ask the same question, between January 1, 2011, and

2    December 22, 2014, was a license required to export a MMIC

3    power amplifier with that ECCN to China?

4    A.   Yes, a license was required for export of this type of

5    MMICs with these parameters on an ECCN to China.

6    Q.   And same question with regard to the exceptions that we

7    previously discussed.

8    A.   All of the list of exception and the exception that we

9    discussed did not apply to China.

10   Q.   Finally, did you also evaluate a MMIC power amplifier

11   designated as PA21020A1?

12   A.   Yes, I did.

13   Q.   And was that also based on the Sandia testing?

14   A.   That's correct.

15   Q.   And did you determine an ECCN that applied for that MMIC

16   power amplifier?

17   A.   Yeah.  It was 3A001.b.2.b.

18   Q.   And between January 1, 2011, and December 22nd, 2014, was

19   a license required to export a MMIC with that ECCN to China?

20   A.   Yes, it required a license for export to China under that

21   ECCN.

22   Q.   And, again, did any of the license exceptions that we

23   discussed apply?

24   A.   It did not apply to China.

25        MR. SHOBAKI:  No further questions, Your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  All right.  Mr. Spertus,
 2   cross-examination.
 3              MR. SPERTUS:  Thank you, Your Honor.
 4              Your Honor, I will likely be referring the witness to
 5   exhibits for identification.  Not all will be admitted, but I'd
 6   like to give to the government a set.
 7              THE COURT:  Thank you.
 8                        CROSS-EXAMINATION
 9   BY MR. SPERTUS:
10   Q.   Mr. Monroy, no license is required for anything that falls
11   within EAR99, correct?
12   A.   Correct, under certain exceptions.
13   Q.   Okay.  Well, generally speaking, EAR99 is the label for
14   items that people can send around the world without any concern
15   for your department, correct?
16   A.   Correct.
17   Q.   And your point on direct regarding your license
18   determinations was based on your review of specifications that
19   government agents had provided to you for a product, right?
20   A.   That's right.
21   Q.   There would be no way for you to make any license
22   determinations unless you had those specifications, right?
23   A.   That's right.  And for any other items, I would need to
24   see tech specs.
25   Q.   In fact, are you aware -- not you personally, but members
```

1  of your group, were contacted by the agents who were involved

2  in this case previously asking for license determinations and

3  your group told the agents, "We don't have enough information

4  to make one"?

5  A.   Yes, there was some, and I think one of the engineers that

6  was assigned reviewed and considered that there were not enough

7  details to provide such determination.  I believe so.

8  Q.   And then the agents went back, presumptively, and got more

9  details, but they gave you specs, then, that were, in your

10  opinion, sufficient to make a license determination?

11         MR. SHOBAKI:  Objection.  Calls for speculation

12  and -- I'll just leave it at that.

13         THE COURT:  Do you understand the question?  Do you

14  understand the question?  That's just a yes or no.

15         THE WITNESS:  Yes.

16         THE COURT:  You do?  You may answer.  Overruled.

17         Do you want the question read?

18         THE WITNESS:  Please.

19         THE COURT:  Would you read the question, please.

20     *(The record was read.)*

21         THE WITNESS:  Well, the agent did not give me any

22  more details.  The request that I have was -- I was the first

23  one involved in whatever they provided for me, and in the

24  package was a complete package of parameters, such as

25  frequencies, powers, bandwidth that were sufficient for me to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    determine the licensability of a MMIC power amplifier.

2            I was not involved in the determination of the prior

3    licensing officer or request that you mentioned.

4    BY MR. SPERTUS:

5    Q.    That's fine.

6            When did you first --

7    A.    What was provided for me was sufficient for me to

8    determine, and it was only a one-time submission that I got all

9    the entire package through our system.

10   Q.    Is it your testimony you only provided license

11   determinations one time?

12   A.    No.  The request was one time for me.  The other request

13   was for the other engineer, but we work independently.

14   Whatever he received, I don't know what it was, but I was not

15   involved in the process of what was evaluation or what he has

16   to do or to check for more information.  I'm not -- I wasn't

17   involved.

18   Q.    I understand.  You personally, though, were involved many

19   times with many separate requests for license determinations in

20   connection with this case, correct?

21   A.    Yes.  Yes, sir.  In connection with this case, yes.

22   Q.    So it wasn't just one time; it was -- approximately how

23   many times were you asked for license determinations?

24   A.    We -- several times, and they provided what was needed

25   each time.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   Q.   How did you first become aware of this case?

2   A.   As a case or as a license determination, when it was first

3   submitted to me, assigned to me --

4   Q.   Okay.

5   A.   -- usually through the system.  We have a queue, and in

6   the queue appears what is assigned to us.

7             So we look for the submission, what is requested, the

8   part number, and if there are technical specifications or

9   supporting documents that would allow a licensing officer to

10  determine the classification of the item.

11  Q.   The documents that I may want to identify and show you are

12  going to be in the case behind you, the black binders, in

13  Volumes 16 and 17.

14            Can you pull those binders, please.

15  A.   Sure.

16  Q.   And for the benefit of the government, I'll identify any

17  item I want you to look at by exhibit number.

18  A.   Okay.

19  Q.   Will you take a look, please, at Exhibit 4006.

20  A.   It's not in this binder.

21  Q.   They are in Volumes 16 and 17 behind you, and 4006 is in

22  Volume 16.

23  A.   Got it.  And -- okay.  Volume 16 of 19?

24  Q.   If you just turn the tab in Volume 16 to Tab 4006, I want

25  to just ask -- I'm marking that for identification only.  I
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    want you to have it in front of you.

2    A.    Sure.  Item 4006 is -- I have it here in front of me.

3    Q.    Item 4006 was the request for a licensing determination

4    made to you by Agent Willie Lo; is that correct?

5    A.    That's correct.

6    Q.    And your license determination was based entirely on the

7    information provided to you in the licensing request, correct?

8    A.    That's correct.  I'm double-checking.

9    Q.    Now, Agent Lo was the one that informed you that the MMIC

10   he was asking you to give an opinion on regarding licensing

11   requirement was -- I'm sorry, the wafer was sent to China,

12   right?

13   A.    That's right.

14   Q.    Your license determination that a license was required

15   assumes that the wafer went to China, right?

16   A.    Yes.

17   Q.    You agree --

18   A.    But there are no MMICs involved in this request.  It

19   happens to be on a 3A001.b.3, which is not a MMIC, it's a

20   transistor.

21   Q.    Okay.  But there is something that Agent Lo wanted you

22   to -- asked you, "Does it require a license to ship to China,"

23   and you responded, "Yes, it requires a license," right?

24   A.    Right.

25   Q.    But you assumed as true that the item went to China,

1   right?

2   A.   I assumed so, yes, at that time.  Provided that the

3   information is correct, yes.

4   Q.   Right.  Because if the item didn't go to China, you don't

5   need a license, right?

6   A.   If the item isn't in China -- can you repeat that again?

7   I'm sorry.

8   Q.   Let's say hypothetically that a wafer that's made in North

9   Carolina ends up at UCLA in Los Angeles, just hypothetically

10  speaking.

11  A.   Yeah.

12  Q.   Would a license from your department be required?

13  A.   No, because there is no -- an export is not taking place.

14  Q.   Right.

15  A.   It's within the United States.

16  Q.   And even in the case of exports, say, to Canada, there's

17  no license required to send something to Canada because we have

18  an exception for Canada, right?

19  A.   That's correct.  That's correct.

20  Q.   So your testimony that a license required assumes the

21  wafer is not going to Canada or Los Angeles, right?

22  A.   That's correct.

23  Q.   Separately, it appears that Agent Lo told you that the

24  end-user is a company called Chengdu Gastone Technology

25  Company, right?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.  It's written on the request.

2    Q.    And it's written on all of the licensing determination

3    requests that Agent Lo made to you in this case, right?

4    A.    That's correct.

5    Q.    Did all of the licensing determination requests come from

6    Agent Lo?

7    A.    I believe so.

8              MR. SPERTUS:  Your Honor, for this portion of

9    testimony, I'd ask that Agent Lo be excused from the courtroom.

10   I apologize.  I didn't realize that he is present.

11             MR. SHOBAKI:  No objection, Your Honor.

12             THE COURT:  That's fine.

13             Agent Lo, if you would just -- thank you.

14   BY MR. SPERTUS:

15   Q.    Agent Lo works for the Department of Commerce, right?

16   A.    That's correct.

17   Q.    And you work for BIS.  That's a division, really, of the

18   Department of Commerce, right?

19   A.    That's correct.

20   Q.    Do you work frequently with Agent Lo?

21   A.    No.

22   Q.    Have you worked with him before?

23   A.    I work for many agents.

24   Q.    Okay.  Have you ever -- have you worked with Agent Lo

25   other than in connection with this case?

1  A.    No, not at all.

2  Q.    Does your knowledge of this case come primarily from

3  Agent Lo?

4  A.    The request for this specific LDs, yes, they came from

5  Mr. Willie Lo.

6  Q.    And all of the licensing determinations that you offered

7  on your direct exam originated as requests from Agent Lo to

8  you, right?

9  A.    That's correct.

10  Q.    And all of them assumed that the end-user for whatever it

11  was that he was asking you to make a licensing determination

12  about was CGTC, Chengdu Gastone --

13  A.    Technology Company.

14  Q.    Right?

15  A.    That's correct.

16  Q.    So every one of your licensing determinations in this case

17  is dependent on CGTC being the ultimate end-user, right?

18  A.    That's right.

19  Q.    Now, there was a time when Agent Lo was asking you about

20  Chengdu Gastone Technology Company being added to the entity

21  list, right?

22  A.    Um-hmm.  Yes, sir.  Yes.

23  Q.    And that matters, right?

24  A.    It does.

25  Q.    Your licensing determinations are dependent, in some part,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    on whether or not the ultimate end-user is a listed entity on

2    the entity list, correct?

3    A.    That's correct.  Even when items are EAR99, I would --

4    it's being assumed that it doesn't require a license.  It will

5    require a license if on the entity list -- it's listed on the

6    entity list.

7    Q.    Now, you agree that what also matters is the date ranges

8    when you're being asked to make a licensing determination,

9    right?

10   A.    That's correct.  Whoever requests is supposed to provide a

11   time frame.

12   Q.    Right.  And why does the time frame matter?

13   A.    Because it allow us to not only examine the -- on the LD,

14   the parameters provided therein, but also it allow us to

15   consider what the regulations were at that time.

16   Q.    Because the regulations control the issue of whether or

17   not there's some license, right?

18   A.    That's correct.

19   Q.    So would it matter to you if the date range an agent gives

20   you straddle the date that some end-user entity identified the

21   agent was placed on the entity list?

22   A.    In our system, we have the ability to split the request.

23   And when the -- prior to -- we can manage within the system to

24   split the dates as to when the party was added to the list or

25   prior to the party being added to the list.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            So we can provide a range of prior what was the item
 2   classified as, and if the entity was listed in that time frame
 3   or not --
 4   Q.   But your --
 5   A.   -- and if a license was required or not at that time of
 6   the time frame specified.
 7   Q.   But your licensing determinations weren't split in any
 8   manner, correct?
 9   A.   They were.
10   Q.   They were not?
11   A.   They were.
12   Q.   They were split?
13   A.   They were split.
14   Q.   So you made separate licensing determinations -- okay.
15   Strike that.
16            Assume for this line of questioning that CGTC,
17   Chateau Gastone Technology --
18   A.   Chengdu Gastone Technology Company.
19   Q.   -- was added to the entity list on August 1, 2014.
20   A.   That's correct.
21   Q.   Oh, so, actually, you can testify that was the date it was
22   added, correct?
23   A.   Yes --
24   Q.   Okay.
25   A.   -- because we have a set of regulations where it tells us
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    when it was added.

 2    Q.    Okay.  So the date ranges that Agent Lo asked you for

 3    licensing determinations varied, I guess, sometimes because,

 4    you know, the end date changed.  But they began on May 6, 2011,

 5    right?  That was the start date, for example, for the license

 6    determination that's in -- specified in Exhibit 4006, right?

 7    A.    That's correct, May 6, 2011.

 8    Q.    Okay.  And that preceded the date that CGTC was added to

 9    the entity list by many years, right?

10    A.    Um-hmm.

11            THE COURT:  Is that "yes"?

12            THE WITNESS:  Yes, sir.

13    BY MR. SPERTUS:

14    Q.    So --

15            THE COURT:  Can I talk to you just for a moment,

16    please?

17            MR. SPERTUS:  Yes.

18        *(The following proceedings were held at sidebar.)*

19            THE COURT:  I just wanted to clarify something.

20            In his prior testimony about Exhibit 4006 and in

21    response to your questions whether this concerned the MMICs, he

22    said it didn't, it concerned a different thing.

23            I just wanted to make sure your questions now, if

24    they're -- it's appropriate to distinguish, that you do.

25            MR. SPERTUS:  It doesn't matter.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  Okay.  I just wanted to make sure.

2              MR. SPERTUS:  Thank you so much, Your Honor.

3              MR. SHOBAKI:  Thank you, Your Honor.

4         (The following proceedings were held in open court.)

5              THE COURT:  Thank you.  Please proceed, Mr. Spertus.

6    BY MR. SPERTUS:

7    Q.   And it's your testimony, sir, that if an item is EAR99,

8    sent prior to the date an ultimate end-user is placed on an

9    entity list, no license is required, right?

10   A.   That's right.  That's right.

11   Q.   Now, you agree that these export control laws are

12   extremely complicated, right?

13   A.   Yes.

14   Q.   I mean, you have extensive training and experience that

15   you spoke about at the start of your testimony, right?

16   A.   That is right.

17   Q.   But it requires that level of training and experience to

18   be able to follow along a lot of these export control issues,

19   right?

20             MR. SHOBAKI:  Objection.  Calls for speculation.

21             THE COURT:  Overruled.

22             You may answer.

23   BY MR. SPERTUS:

24   Q.   Right?

25             THE COURT:  You are asking as to the witness,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  correct?

2        MR. SPERTUS:  Yes.  I am asking does he agree that

3  a -- and I believe the witness answered yes.

4        THE COURT:  Well, just make it clear that -- just

5  restate the question, please.

6  BY MR. SPERTUS:

7  Q.   In your opinion, it requires training and experience to

8  understand the export regulations, right?

9  A.   From this side, yes.

10  Q.   Without --

11  A.   As a licensing officer, yes.

12  Q.   Without the training and experience, it would be very

13  difficult to make license determinations, right?

14  A.   Right.  And that's why we offer many seminars around the

15  country for people to become aware of export regulations.

16  Q.   In fact, your division, BIS, has a whole department for

17  trying to train people around the country about the export

18  regs, right?

19  A.   Yes, we do go around and offer that experience to

20  researchers, industry, and labs and whoever wants to know about

21  the regulations.

22  Q.   And I'm going to get into that in more detail, because, in

23  fact, there's different training for beginners and people with

24  more experience offered by your department, right?

25  A.   That's correct, sir.

1    Q.    How many different levels of experience seminars does your

2    department offer?

3    A.    Well, I'm not completely aware of what they do, but I know

4    that they offer different seminars for -- around the country.

5    That's all.

6    Q.    Can you estimate how many people are in that division

7    trying to train people about the export regulations?

8    A.    It's not my division.  I don't know.

9    Q.    But can you give an estimate from being a member of BIS?

10    A.    No.  Actually, I don't know.

11          MR. SHOBAKI:  Objection.  Speculation, Your Honor.

12          THE COURT:  It's answered.  It's sustained.

13    BY MR. SPERTUS:

14    Q.    Okay.  Have you ever attended any of those seminars?

15    A.    I did, and they called me as an expert technical presenter

16    of one of the seminars.

17    Q.    How many times have you been a presenter in the BIS

18    educational seminars?

19    A.    One time.

20    Q.    And was it well attended?

21    A.    Yes.  In the United States, we did one here and it was

22    well attended.  They were very, very -- all the exporters in

23    the industry were very positive on what they learned.

24    Q.    And they wanted to learn with the help of BIS as the

25    teacher.  That's why they went, right?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Right.

2    Q.    And the attendees were people who are in the business of

3    exporting, by and large, right?

4    A.    By and large, although I couldn't say if there were other

5    type of people in there.

6    Q.    Right.  But you're --

7    A.    When I said that we give one here in the United States, we

8    have -- I have done others in China, seminars -- BIS seminars

9    in China.

10   Q.    So BIS has a division in China?

11   A.    No, sir.  We were invited to do so at one time in

12   Shanghai.

13   Q.    Okay.  And you attended and spoke to them about --

14   A.    That's right, and some other engineers from other

15   categories, because they wanted the Chinese industry,

16   universities, and researchers to know the export control

17   regulations from the United States.

18           THE COURT:  Mr. Monroy, please wait and make sure the

19   question is finished before you respond.  Otherwise, the

20   reporter has a challenge.

21           THE WITNESS:  I will.

22           THE COURT:  Thank you.

23   BY MR. SPERTUS:

24   Q.    And the BIS offers a lot of online tools to help people

25   who are trying to determine how to categorize their items,

1    tries to help them with online tools, right?

2    A.    That's right, sir.

3    Q.    And, in fact, the export regulations are published in the

4    Code of Federal Regulation, right?

5    A.    Right.

6    Q.    They're almost 800 pages long, right?

7    A.    That's right.

8    Q.    Have you read the whole thing?

9    A.    No.

10    Q.    You only read the sections that affect your professional

11    responsibilities?

12    A.    Yes, sir.

13    Q.    And those codes change almost every year, right?

14    A.    Almost every year.

15    Q.    In fact, during the time periods that Agent Lo was asking

16    you for licensing determinations, even the sections that were

17    underlying your determinations changed.

18    A.    That's correct.

19    Q.    For example, in 2014, the outputs that you described,

20    which determined which ECCN might apply, were evaluated based

21    on average output, right?

22    A.    That's correct, sir.

23    Q.    That changed in 2015, right?

24    A.    Um-hmm.  Yes, sir.

25    Q.    And how did it change?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A.   It went through scrutiny with the Department of Defense,

2   as well as Wassenaar Arrangement.  That's how it changed.

3   Q.   And what was decided?

4   A.   That it was added to the CCL under new reasons for

5   control.

6   Q.   But, I mean, does the term "peak perform-" --

7   A.   I am giving you the entire picture.

8   Q.   But I'm just --

9          THE COURT:  Just a minute.  Wait.  Don't interrupt

10  the witness, please.

11         Read the question, please, and the answer to that

12  point, please.

13     *(The record was read.)*

14         THE COURT:  Okay.  Had you finished your answer?

15         THE WITNESS:  No, I haven't.

16         THE COURT:  Could you reread the question.

17         Then would you respond, please.

18         MR. SPERTUS:  Your Honor, I think he misunderstood my

19  question.

20         THE COURT:  Just a minute.

21         Would you read the question, please.

22     *(The record was read.)*

23         THE COURT:  Do you have that in mind?

24         THE WITNESS:  Yes.

25         THE COURT:  Just a minute.  Restate the question,

1    please.

2    BY MR. SPERTUS:

3    Q.    In 2015, the ECCNs you've identified became dependent on

4    peak performance of a MMIC, correct?

5    A.    2014 is correct, not 2015.

6    Q.    2014 was average.

7    A.    December 23rd, 2014, was peak power; December 22nd, 2014,

8    was average power.

9    Q.    Okay.  But it changed from average output performance to

10    peak performance for a MMIC, right?

11    A.    That is correct.

12    Q.    And that change affected 2015 exports, right?

13    A.    Affected exports starting on December 23, 2014.

14    Q.    When does a change in law become effective?

15    A.    When it's published.

16            MR. SHOBAKI:  Objection.  Speculation.

17            THE COURT:  I couldn't hear you.

18            MR. SHOBAKI:  I'm sorry, Your Honor.  Objection.

19    Calls for speculation and a legal conclusion.

20            THE COURT:  Sustained as framed.  He said the "law."

21    BY MR. SPERTUS:

22    Q.    When does a change in an ECCN requirement become

23    effective?

24    A.    When it's published -- officially published in the

25    regulations --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q.    And so --

2    A.    -- CFR.

3    Q.    -- your point is that the change from basing an ECCN on

4    average performance to basing an ECCN category on peak

5    performance was published on December 24, 2014?

6    A.    Um-hmm.  Yes, sir.  And we go by exact date.

7              THE COURT:  Excuse me.  Did you mean December 23?

8              MR. SPERTUS:  Perhaps.

9              THE COURT:  Could you clarify that, please.

10   BY MR. SPERTUS:

11   Q.    When did the change in law regarding how MMICs are

12   interpreted by you, what ECCNs apply, when did that get

13   published?

14   A.    December 23, 2014.

15   Q.    Okay.  And Agent Lo had asked you to make licensing

16   determinations over a time period that spanned that change in

17   law, too, right?

18   A.    That is correct.

19   Q.    And did your license determinations take into account

20   changes in law?

21   A.    Yes, sir.

22   Q.    So you --

23   A.    And we are very strict about that.

24   Q.    Okay.  Did Agent Lo tell you -- when the item he was

25   asking you to determine whether it fell within an ECCN, did he
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  tell you when it was hypothetically shipped?

2  A.   No.   It is not registered on the request when it was -- it

3  was only -- a license determination was only for the

4  licensability of the item during a certain time period.

5  Q.   And you based your opinion on specifications and test

6  results that were given to you that showed the output upon

7  which you could make a determination, right?

8  A.   Right, and also --

9  Q.   But that wasn't assigned to any time period?

10 A.   License determination cannot be issued without a time

11 period.  You have to have a -- and submit under the license

12 determination a time period; otherwise, the system wouldn't

13 allow you to submit the request.

14 Q.   All right.  I want to ask you about a new -- a new line of

15 questioning.

16          The export regulations, the 800 pages of published

17 regulations that you previously described, begin with a

18 flowchart, right?

19 A.   That's correct.

20 Q.   That's designed to make the following 800 pages

21 understandable to someone who's trying to comply with the

22 regulations, right?

23 A.   It could be the case.

24 Q.   Take a look, please, at Exhibit 4046.  It will be in this

25 next binder.

1    A.    Volume 17?

2    Q.    The next binder.  If you look at Tab 4046.

3         THE COURT:  That's correct.  Actually, that's not

4    correct.

5         MR. SPERTUS:  Oh, I misspoke.  Yeah, Volume 17.

6         THE WITNESS:  Yeah, that's what I was asking.

7         MR. SPERTUS:  Sorry.  Volume 18.

8         THE WITNESS:  Volume 18.

9         THE CLERK:  18 or 17?

10        THE COURT:  18.

11        MR. SPERTUS:  18, 1-8.

12        THE WITNESS:  Got it.

13   BY MR. SPERTUS:

14   Q.    Okay.  Do you recognize Exhibit 4046?

15   A.    Yes.

16   Q.    And does Exhibit 4- -- what is Exhibit 4046?

17   A.    It's guidance of how an item goes through the analysis on

18   whether a license is required or not.

19        MR. SPERTUS:  Your Honor, I move Exhibit 4046 into

20   evidence.

21        THE COURT:  Any objection?

22        MR. SHOBAKI:  No objection, Your Honor.

23        THE COURT:  All right.  Exhibit 4046 is admitted.

24        *(Exhibit 4046 admitted into evidence.)*

25        MR. SPERTUS:  May I publish?

1          THE COURT:  You may.  Once an exhibit is admitted,

2     either side may publish.

3          MR. SPERTUS:  Thank you, Your Honor.

4     BY MR. SPERTUS:

5     Q.   Okay.  So I'm placing on the monitor in front of you --

6     and I want to draw your attention, first of all, to the

7     heading.

8          The "Export Control Tree" is how your department

9     references the flowchart on this page, correct?

10    A.   That's correct.

11    Q.   And the "Decision Tree" helps people in the public who

12    don't receive specialized training how to navigate the export

13    regulations, right?

14    A.   That's correct.  And when in doubt, they call us for

15    questions.

16    Q.   Now, directing your attention to the very first step, the

17    very first step of any analysis through the export regulations

18    is to determine whether the EAR applies, right?

19    A.   Correct.

20    Q.   Whether something is subject to the EAR, that, itself, is

21    a complicated question, right?

22    A.   I don't see it as a complicated question.

23    Q.   The -- well, because -- well, you have extensive training

24    and experience, right?

25    A.   No, because it's prompting you to see Section 734.225.

1    Q.   Well, why don't we turn to the flowchart on the second

2    page for a second.

3                Do you see that flowchart?

4    A.   Yes, I do.

5    Q.   On page 2 of Exhibit 4046, right?

6    A.   That's correct.

7    Q.   It's a subject flowchart designed to just help people in

8    the public determine whether the things that they are working

9    on are even subject to the EAR, right?

10   A.   Right.

11   Q.   Do you have -- did you have any involvement in the

12   creation of the flowchart that's the second page of Exhibit

13   4046?

14   A.   No, sir.

15   Q.   Have you read it?

16   A.   I have read it.

17   Q.   Well, directing your attention, for example, to the fourth

18   box down, "Is the technology or software I am planning to

19   export or reexport publicly available (excluding encryption

20   items)?"

21                Do you see that box?

22   A.   Yes, sir.

23   Q.   And there is a citation beneath it to a federal regulation

24   that -- I guess that that section is related to, right?

25   A.   Right.  And it's only applicable to technology and

1   software.

2   Q.   And so next to -- I should have gone broader -- if the

3   answer is yes, that something is publicly available, then --

4   correct me if I'm wrong -- but it's not subject to the EAR,

5   right?

6   A.   That's correct, when we speak about technology or

7   software, not when we speak about commodities.

8   Q.   Is there a separate decision tool that BIS offers for that

9   separate question of whether something is technology or not?

10   A.   Well, it's understood that technology and software, from

11   the regulation, is an item -- considered an item.  The know-how

12   that gets you to produce and develop -- develop and produce an

13   item, the know-how, it's by the decision tree that you

14   mentioned before on page 224 -- or page 2 of this 4046 exhibit,

15   it's pointing at only technology and software.

16   Q.   Well, that's just for the very first step of the EAR

17   analysis.  Whether it's even subject to the EAR depends, in

18   some part, on whether it's publicly available or not, right?

19   A.   When we speak about the technology, yes, and the software,

20   yes.

21   Q.   You don't even go into the analysis; you stop at the first

22   diamond on the chart if you are dealing with publicly available

23   technology, right?

24   A.   That's correct.

25   Q.   After you finish the first step, then let's go to the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    second step.

2         BIS, as published in the CFR, asks, "Is your item

3    classified under an ECCN on the CCL?"

4         Do you see that?

5    A.   Yes, sir.

6    Q.   Okay.  If the answer is "no," then you are EAR99, right?

7    A.   Yes, because it's not listed on the Commerce Control List.

8    Q.   Okay.  And if -- following that decision tree, if you're

9    EAR99, there is a question of, "Do general prohibitions apply?"

10        And I guess that would be whether there's somebody or

11   the ultimate user on the Entity Control List, right?

12   A.   Right.

13   Q.   So when you're dealing with a shipment, an export, that's

14   not on the Entity Control List and the answer is "no," that

15   takes you to this oval, "No license is required," right?

16   A.   That's correct.

17   Q.   Okay.  So whether something or somebody is on an Entity

18   Control List matters, right?  Correct?

19   A.   It matters.

20   Q.   So for technology shipped, for example -- and I'm just

21   hypothetically asking you.  For technology shipped related to

22   CGTC in this case, which you know to be listed on August 1,

23   2014, so a shipment before that date of technology would not

24   require any license whatsoever, right?

25   A.   Technology --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Right.

 2   A.   -- not hardware.

 3   Q.   I understand.  I'm asking you about technology.

 4   A.   Because there's a difference, yeah.

 5   Q.   Well, let's just say there was no ECCN that applied to --

 6   what did you call it?  "Commodity" was the term you used?

 7   A.   Um-hmm.  Yes, sir.

 8   Q.   So what happens if you are dealing with a commodity not on

 9   any ECCN?

10   A.   When a commodity is not under any ECCN, it is assumed that

11   it's not on the Commerce Control List, but that doesn't

12   determine that it will not require a license.

13   Q.   Well --

14   A.   As -- I said this because when we say this is subject to

15   the EAR, that's not a free ticket, because you can also be

16   dealing with a part that, although it's not subject to the EAR,

17   it could be subject to the ITAR regime.

18            THE REPORTER:  Can you spell that?

19            THE WITNESS:  Itar, i-t-a-r.

20   BY MR. SPERTUS:

21   Q.   Okay.  Delete ITAR issues from this case.

22            Well, you're not doing any licensing determinations

23   based on any other laws other than EAR in this case, correct?

24   A.   Although I'm not doing that, but I have to clarify that

25   subject to the EAR can take you to another restriction under
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   the United States munitions list.

 2   Q.   Okay.  There could be other laws that apply is what you're

 3   saying, right?

 4   A.   Yes, sir.

 5   Q.   Okay.  Agent Lo asked you to interpret the EAR, right?

 6   A.   He asked me to evaluate and proceed with his request on

 7   certain MMICs, hardware, what we call, if they were controlled

 8   or not under the EAR; and if they were controlled, what the

 9   ECCN will be and if we require license under certain time

10   period.

11   Q.   So the answer to my question is "yes"?

12            THE COURT:  Next question, please.

13   BY MR. SPERTUS:

14   Q.   So all of my questions, assume, are dealing with the EAR.

15   You don't have to talk about, in your answers, other unrelated

16   laws that may apply.  Okay?

17            MR. SHOBAKI:  Objection.

18            THE WITNESS:  Disagree.

19            THE COURT:  Just pose questions, please.

20            MR. SPERTUS:  Well, I just want to define the

21   universe of my questions.

22            THE COURT:  Okay.  Then --

23            MR. SPERTUS:  Okay.

24            THE COURT:  Also, if you'd refer to these as the

25   "regulations," please.

```
 1              MR. SPERTUS:  Okay.  The other law is also
 2   regulations, and I think that's what led to the confusion.  So
 3   EAR I thought was specific enough to the issues in this case.
 4              THE COURT:  State the question, please.
 5              MR. SPERTUS:  Okay.
 6   BY MR. SPERTUS:
 7   Q.   So assuming that I'm asking you to interpret the EAR -- do
 8   you understand those parameters?
 9   A.   Yes, sir.
10   Q.   Okay.  So within those parameters, an item that does not
11   fall within an ECCN is EAR99, right?
12   A.   Not necessarily.
13   Q.   If no ECCN applies and the shipment is to an end-user not
14   on any entity list anywhere, you're saying that a license could
15   be required?
16   A.   Yes, sir, it could be required.  If it's EAR99, it means
17   it's subject to the EAR.
18              If it doesn't appear anywhere, we can conclude --
19   such as published information, data, technical data sheets,
20   patent, it's, therefore, not subject to the EAR.  It will not
21   require a license and is not EAR99, because it's not subject to
22   the EAR.
23              We call -- EAR99 is because it's mentioned in the
24   list, but it doesn't meet the parameters stated within the
25   list, and it makes it subject to the EAR99.  That's why we put
```

1    the words "EAR" prior to the "99" number.

2    Q.   That's Level 2 of the flowchart you just described, right?

3    A.   Um-hmm.

4    Q.   If an item is subject to the EAR -- because some items are

5    not even subject to the EAR -- you then go down one step in the

6    flowchart to determine whether the item falls within an ECCN on

7    the CCL, right?

8    A.   That's correct.

9    Q.   If it doesn't fall within an ECCN, then it's EAR99 and you

10   can ship it without a license.

11   A.   Under certain conditions.

12   Q.   Unless the recipient is on an entity list.

13   A.   Probably.

14   Q.   Correct?

15   A.   Correct.

16   Q.   These flowcharts have many different escapes from

17   licensing requirements, right?

18   A.   I don't see it as escapes; I see it as a checkpoint when

19   you decide it requires a license or not.

20   Q.   I'm sorry.  Let me just draw your attention, for example,

21   to the licensing exceptions.

22        Even if an ECCN does apply to an item, there are

23   many, many different types of licensing exceptions to the

24   licensing requirement, right?

25   A.   That's correct.  That's correct.

1   Q.   We're going to go over those in more detail, but I just

2   wanted your opinion on the number of different steps that are

3   required before you even do a license determination analysis.

4            The first is:  Is something subject to the EAR,

5   correct?

6   A.   That's correct.

7   Q.   The second is:  If it is, then does the item fall within

8   the described categories, called ECCNs, or not, right?

9   A.   That's correct.

10  Q.   If it doesn't, you can ship it without a license, with the

11  entity list exceptions in mind, right?

12  A.   It could be.

13  Q.   Okay.  And if it does fall within an ECCN, then there's a

14  second level of analysis regarding all the exceptions to the

15  licensing requirements, right?

16  A.   That's right.

17  Q.   Okay.  If you would take a look briefly at Exhibits 4289

18  and 4290, please.

19  A.   We're talking about the same volume?

20  Q.   No, no, we are not.  I'll tell you the volume number in

21  one second.

22            THE COURT:  It's in Volume 21.

23            THE WITNESS:  Volume 21.

24  BY MR. SPERTUS:

25  Q.   We're talking about the last volume, Volume 21, please.

1    A.   Got it.

2    Q.   If you would just look at Exhibits 4289 and 4290.

3         I'm just going to ask you whether those are tools

4    provided by BIS to help the public understand the regulations.

5    A.   4289?

6              MR. SHOBAKI:  Objection.  Foundation.

7              THE COURT:  Just a minute.

8    BY MR. SPERTUS:

9    Q.   Yes.  Looking at 4289, for example, are those electronic

10   decision tree tools offered by your department to help people

11   determine whether or not any licensing is required?

12             THE COURT:  Is there an objection?

13             MR. SHOBAKI:  Same objection, Your Honor.  Just

14   foundation.

15             THE COURT:  Do you understand the question?

16             THE WITNESS:  No, I don't understand the question.

17             THE COURT:  Okay.  Would you restate it, please.

18   BY MR. SPERTUS:

19   Q.   Does the Bureau of Industry and Security offer online

20   decision tree tools to help people navigate these regulations

21   that we've been talking about today?

22   A.   In some cases, we do.

23   Q.   Okay.  In looking at Exhibit 4289, are those online tools

24   decision tree tools that your department offers to help

25   navigate these regulations?

1   A.   This particular tool that you are referring to, it refers

2   to "order of review."  As the export reform took place, this

3   was one of the decisions was made to make available to the

4   public, especially to those items that were coming through the

5   ITAR USML under the State Department to the Commerce

6   Department.

7        As you may know, there were MMICs and many other

8   items that were not deemed significantly military that were

9   transferred from the State Department to the Commerce

10  Department.

11       So this specific decision tree was not just to

12  determine licensability, but order of review for jurisdiction.

13  Q.   Without asking you all of the reasons behind why this tool

14  was created, I'm just asking:  Is this a tool that BIS offers?

15  A.   We offer for help with the CCL order of review, yes, sir.

16  Q.   Okay.  And you also offer help for people trying to figure

17  out what the term "specially designed" means, right?

18  A.   Yes, because as a result of the export reform taking

19  place, items coming from the ITAR to the EAR need to be

20  determined whether they were specially designed or not for

21  civil applications.

22  Q.   That's very, very complicated, right?

23  A.   Depending upon what you were examining.

24  Q.   I mean, it's difficult enough to require an online tool to

25  figure out, right?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A.   It's not easy to navigate the concept.

2   Q.   It's not easy to navigate, right?

3   A.   The concept of it.

4   Q.   Let me direct your attention for a second to the ECCNs

5   that you gave opinions on.

6            If you could look at Exhibit 4044, please.

7   A.   Are we in the same volume?

8   Q.   Volume 17.  You will see on the spine of each binder it

9   specifies the exhibit numbers inside that binder.

10  A.   I have Volume 17.

11           And what is the exhibit?

12  Q.   4044.

13  A.   4044?

14  Q.   Yes, sir.

15  A.   Okay.  Got it.

16  Q.   Are those the ECCNs that Agent Lo asked you to evaluate

17  when you made licensing determinations in this case?

18           MR. SHOBAKI:  Objection, Your Honor.  This --

19           THE WITNESS:  I'm sorry.  This is --

20           THE COURT:  Excuse me.

21           Objection?

22           MR. SHOBAKI:  Objection is vague.  This is a lengthy

23  document, multiple ECCNs.

24           THE COURT:  Just a moment.

25           Restate the question in terms of if you're asking a

1    percipient knowledge question with respect to what Agent Lo

2    asked.

3              MR. SPERTUS:  Let me just ask a different question.

4    BY MR. SPERTUS:

5    Q.   What is Exhibit 4044?

6    A.   It's a list of ECCNs, and not related to the matter that

7    is on the table today.

8              MR. SPERTUS:  Your Honor, I'd ask to move Exhibit

9    4044 into evidence so I can publish.

10             MR. SHOBAKI:  Your Honor, based on the testimony from

11   the witness, I'd object to relevance.

12             MR. SPERTUS:  Your Honor, the witness will be

13   cross-examined on the ECCNs.

14             THE COURT:  Well, I am not going to admit the

15   regulations just yet.  You can ask him questions about it

16   first.

17             MR. SPERTUS:  Can I use it as a demonstrative until

18   the Court --

19             THE COURT:  But you don't need to publish it.  He can

20   see it.  He has it in front of him.

21             MR. SPERTUS:  But I'd like to --

22             THE COURT:  I'd like you to move on, please.  Thanks.

23   Ask questions about the exhibit.  It's fine.

24   BY MR. SPERTUS:

25   Q.   So the jury can follow along, please read the --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Please pose a question about the exhibit,

 2    not --

 3              MR. SPERTUS:  I'm going to, but I -- the language

 4    matters.

 5    BY MR. SPERTUS:

 6    Q.   So please --

 7              THE COURT:  Come to the side, please.

 8         (The following proceedings were held at sidebar.)

 9              THE COURT:  Mr. Spertus, that's not an appropriate

10    comment toward me, so please don't do that again.

11              MR. SPERTUS:  I apologize.  Sorry.

12              THE COURT:  I didn't want to say that in front of the

13    jury.

14              MR. SPERTUS:  Thank you.

15              THE COURT:  But if you want to ask the witness a

16    question about the content of the document, you can direct him

17    to the specific paragraph and say, "Starting with the word X

18    and so on to Y."  But when you said you were going to read

19    it -- have him read it when I just said not to publish it, it's

20    not consistent with my ruling.

21              MR. SPERTUS:  I'm sorry.  And perhaps I can explain

22    what's going on here.  He made an error on his ECCN analysis on

23    direct testimony.  He misread the statute when he made his

24    license determinations.  I want to be able to pull up the

25    underlying three ECCNs that he testified about and talk about
```

```
 1    his error.
 2              THE COURT:  I don't have a problem with your asking
 3    questions.  I don't want it published until it's determined
 4    that it's going to be admitted.
 5              MR. SPERTUS:  Can I ask what the objection would be
 6    from the government before --
 7              MR. SHOBAKI:  Well, the objection I have is that this
 8    is a giant document.  This is -- I'm sorry.  This is Khal
 9    Shobaki.
10              I have an objection that this document, A, first of
11    all, we don't know what years this is published from.
12              MS. SARTORIS:  The publishing page --
13              MR. SHOBAKI:  Okay.  Publishing page.  What year is
14    it?
15              MS. SARTORIS:  2014.
16              MR. SHOBAKI:  2014.  He testified about 2013 to 2014.
17    So I would say it's not relevant to his determination that he
18    just discussed, at least on direct testimony.
19              Second of all, it contains a whole bunch of other
20    stuff that isn't ECCN.  So I don't think that this is
21    appropriately an exhibit until there is foundation laid for it
22    and an explanation why it's relevant --
23              MR. SPERTUS:  Okay.
24              MR. SHOBAKI:  -- when we can, you know, revisit that.
25              MR. SPERTUS:  Okay.  The proffer of relevance, Your
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Honor, is that there are ECCNs that say rated for certain

2    outputs.  There are other ECCNs in the documents that say

3    "designed" or "rated."  That language makes a huge difference,

4    so I want to compare the different sections.

5              THE COURT:  Well, he can go through this document and

6    ask him questions.  I don't have a problem with that.  I'm just

7    saying don't publish it until I've determined that it's

8    admissible.

9              MR. SPERTUS:  Right, but I don't want to do it twice.

10             THE COURT:  Well, you may have to do it twice --

11             MR. SPERTUS:  Okay.

12             THE COURT:  -- but I don't think you really do,

13   because if he testifies, then, at the appropriate time, you

14   show it to the jury --

15             MR. SPERTUS:  Thank you.

16             THE COURT:  -- and don't necessarily have to --

17             MR. SPERTUS:  And I apologize, Your Honor.  I

18   sincerely apologize.

19             THE COURT:  That's fine.

20             MR. SPERTUS:  I did not mean to --

21        (The following proceedings were held in open court.)

22   BY MR. SPERTUS:

23   Q.   So on Exhibit 4044, there lists lots of different ECCN

24   categories, correct?

25   A.   That's correct.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Including the two that you believe, based on

2    specifications that Agent Lo handed you, caused the MMICs that

3    Agent Lo asked you about to require a license, right?  On page

4    1 of 4044.

5             THE COURT:  That's internal page 819; is that

6    correct?  At the bottom.

7             MR. SPERTUS:  It's -- oh, I'm sorry.  It's on page

8    823.

9    BY MR. SPERTUS:

10   Q.    The bottom has page numbers.

11   A.    823, yes.  That's what I was going to say.

12   Q.    Okay.  Are you looking at page 823?

13   A.    Yeah, provided that --

14            THE COURT:  Excuse me.  That's page 4 of Exhibit

15   4044.

16            Go ahead.  And would you restate the question,

17   please.

18            MR. SPERTUS:  Yes, Your Honor.  And --

19            THE WITNESS:  I got 823.

20            THE COURT:  Actually, it's page 5 of the exhibit.

21            You agree with that, Mr. Spertus?

22            MR. SPERTUS:  I don't have it in front of me.  I had

23   the electronic version, so if I can have one second.

24            Yes, Your Honor.  I apologize.  It is with the bottom

25   page number 823.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    BY MR. SPERTUS:

2    Q.    Do you have that page in front of you?

3    A.    Yes, sir.

4    Q.    Are the ECCNs that you believe apply in this case on this

5    page?

6    A.    They might apply if, and only if, corresponds to the date

7    or time frame prior to December 23, 2014 --

8    Q.    Okay.

9    A.    -- which is not displayed on this page.

10    Q.    So the -- your point is that the law changed, as we

11    previously discussed, in -- December 23, 2014.  I understand

12    that.

13           For ease of questioning, can I use the label "2015"

14    for the ECCN language change that happened on December 23,

15    2014?  Will you understand what I mean when I say "the 2015

16    regulations"?

17    A.    There is no such thing 2015 regulations, only December 23,

18    2014.

19    Q.    Okay.  I'll use the long label.  I was just curious if we

20    could use a shorter label, but --

21    A.    No.  I'm sorry.  As a federal -- as a federal employee and

22    technical expert, I need to follow strict laws and dates.

23    Q.    Okay.  So Exhibit 4044 are the ECCNs that you gave

24    licensing determinations about that applied from the date

25    December 23, 2014, prior, right?

1    A.    Prior, yes, that's correct.

2    Q.    Okay.  I'm going to call them 2014 so my questions are

3    shorter.

4          But the 2014 regulations provide that the item must

5    be rated for operation at certain specified frequencies, right?

6    A.    That's correct, sir.

7    Q.    And this was one of the ECCNs that you analyzed in

8    connection with the specifications Agent Lo gave to you in this

9    case, right?

10   A.    That's correct.

11   Q.    Your licensing determinations, in part, were based on

12   this, right?

13   A.    That's right.

14   Q.    And --

15         MR. SPERTUS:  Your Honor, may I --

16         THE COURT:  Just a minute.  Has it been established

17   whether Exhibit 4044 reflects the regulations in effect as of

18   December 23, 2014?

19         MR. SPERTUS:  Yes.

20         THE COURT:  And the answer is it is?

21         MR. SPERTUS:  Yes.

22         THE COURT:  You agree with that?

23         MR. SHOBAKI:  No, Your Honor.

24         THE WITNESS:  I don't agree with that.

25         MR. SHOBAKI:  Perhaps some clarification as to the

1    date of this document would be helpful.

2              THE COURT:  Is there a date on the document?

3              MR. SPERTUS:  Yes.

4              THE COURT:  Could you give me the internal page,

5    please.

6              MR. SPERTUS:  Your Honor, I believe it's 822.

7              THE COURT:  Thank you.  Which column?

8              MR. SPERTUS:  Right column, Your Honor.

9              THE COURT:  Where on the right column?  You're

10   saying --

11             THE WITNESS:  822.

12             THE COURT:  Excuse me.  On the right column up at the

13   very top --

14             MR. SPERTUS:  Yes.

15             THE COURT:  -- after the CFR cite, there is a paren

16   that says 1/1/14.

17             MR. SPERTUS:  Yes.

18             THE COURT:  Is that a date of the publication?

19             MR. SPERTUS:  Yes.

20             THE COURT:  Would that be prior to December 23, 2014?

21             MR. SPERTUS:  Yes.

22             THE COURT:  So then are you saying this is what would

23   have been in effect as of December 22, 2014?

24             MR. SPERTUS:  I'm just -- I didn't think this would

25   be so controversial.  Yes, I thought for the entire year of

```
 1   2014 -- I just want to talk using labels "2014 regs" and "2015
 2   regs."
 3              THE COURT:  Well, I think it would be easier for the
 4   witness if we use the precise dates, so I think --
 5              MR. SPERTUS:  It will just lengthen the questions a
 6   lot.
 7              THE COURT:  That's all right.
 8              MR. SPERTUS:  Okay.
 9              THE COURT:  Thank you.
10              MR. SPERTUS:  I can ask a new question.
11   BY MR. SPERTUS:
12   Q.   So the licensing regulations in effect from January 1,
13   2014, through December 22, 2014, are in front of you, correct?
14   A.   Correct.
15   Q.   And those are true and accurate copies of the regulations
16   in effect during that date range that you are looking at,
17   right?
18              MR. SPERTUS:  I just want to --
19              THE COURT:  I understand.  That's the representation
20   you are making, correct?  Is it true and accurate copies of the
21   Code of Federal Regulations as of that date?
22              MR. SPERTUS:  I am asking the witness to verify that
23   so I can move it into evidence.  That was my goal.
24              THE COURT:  But I'm just asking, are you representing
25   this is a true and --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SPERTUS:  I am --

 2              THE COURT:  -- accurate copy?

 3              MR. SPERTUS:  -- yes.

 4              THE COURT:  Because I don't think -- without him

 5    reading the entire thing, we may not get there.

 6              MR. SPERTUS:  I am, yes.

 7              THE COURT:  Does the government contest the

 8    authenticity here?

 9              MR. SHOBAKI:  No, Your Honor.  It appears to be

10    authentic.

11              THE COURT:  That's fine.

12              Okay.  What's the next question, please?

13              MR. SPERTUS:  Your Honor, is that sufficient for

14    publication -- for moving into evidence, I mean?

15              THE COURT:  Any objection?

16              MR. SHOBAKI:  The only objection is it's a lengthy

17    document and relevance as to the whole thing.

18              THE COURT:  All right.  You can publish the portions

19    of it at this time and it will be admitted.  4044 is admitted.

20         (Exhibit 4044 admitted into evidence.)

21    BY MR. SPERTUS:

22    Q.   So, Agent Monroy, I'm directing your attention now --

23    first of all, this is page 823 of the EAR, right?

24    A.   Of the CCL.

25    Q.   Right, of the Commerce Control List, correct?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Um-hmm.
 2              THE COURT:  Is that "yes"?
 3              THE WITNESS:  Yes, sir.
 4    BY MR. SPERTUS:
 5    Q.    Now, on page 823, there's a category b.2 that you
 6    testified on direct that you believe applies in this case,
 7    right?
 8    A.    That's correct.
 9    Q.    Okay.  And b.2 has several subcategories, and on direct,
10    just to direct your attention to your prior testimony, you said
11    b.2.b applied to some of the specifications that Agent Lo asked
12    you about, right?
13    A.    Right, b.2.b and b.2.c.
14    Q.    Right.  The highlighted portions of Exhibit 4044 on the
15    monitor, right?
16    A.    That's correct.
17    Q.    Okay.  Now, b.2.b requires that an item be rated for
18    operation at certain frequencies, right?
19    A.    Yes, sir.
20    Q.    In order to fall within this category of the federal
21    regulations, right?
22    A.    Um-hmm.  Yes, sir.
23    Q.    And do you see where they are defining this category, as
24    I'm pointing to right now, as the average output power?  Do you
25    see that language?
```

1    A.    Yes, sir.

2    Q.    Your point is that on December 23, 2014, that language

3    changed to a different evaluation based on peak performance,

4    right?

5    A.    That's correct, saturated power output.

6    Q.    Okay.  All of the ECCNs from January 1, 2014, through

7    December 22, 2014, were based on average power, right?

8    A.    That's right.

9    Q.    Now, what I wanted to draw your attention to is the first

10   word, "rated for operation," that I am circling now.

11          Do you see that word?

12   A.    Yes, sir, I see it.

13   Q.    Okay.  What does that word mean?

14   A.    Specified to operate at.

15   Q.    That means -- what do you mean by use of the words

16   "specified to operate," that Agent Lo told you?

17   A.    Technical specifications are the document that we see.

18   Q.    Okay.  So it's, in other words, the testing output for the

19   item, right?

20   A.    Not the testing output.  It's the operating frequency, the

21   power output, and the fractional bandwidth, as stated there in

22   those ECCNs subparagraphs.

23   Q.    But without those three variables, you can't determine

24   whether an ECCN applies or not, right?

25   A.    That's correct.

1    Q.    Okay.  So testing is required to determine those

2    variables, right?

3    A.    Yes, sir.

4    Q.    And, in fact, for your license determination, you were

5    giving testing reports with those variables, right?

6    A.    That's correct.

7    Q.    Without those variables, the item is not rated, correct?

8    A.    Without the specifications, the items are not able to be

9    evaluated.

10   Q.    They're --

11   A.    The word "rated" is this device is specified to operate

12   at.  That's how we view the word "rated."

13   Q.    Well, the word "rated" isn't specially defined among the

14   800-plus pages of the CCCL [sic], is it?

15   A.    It's not among the 800.  There are definitions of terms on

16   the Commerce Control List.  If it's not listed -- if it's not

17   in quotes or -- it's not a defined term.

18   Q.    Right.  There are lots of defined terms, dozens and dozens

19   of defined terms, elsewhere in the CFRs for the CCL, right?

20   A.    We always check under definitions of terms on the Commerce

21   Control List.

22   Q.    But the word "rated" is not defined, right?

23   A.    The word "rated," as per what is shown here, is not on

24   the -- in quotes, and, therefore, it's considered not a defined

25   term.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  Q.   So the term has -- so the term, then, means what it means

2  in ordinary English language, right?

3  A.   Yes.

4  Q.   And "rated," then, means that somebody has taken the item

5  and determined the outputs of that item, that MMIC, correct?

6         MR. SHOBAKI:  Objection.  Vague and calls for

7  speculation.

8         THE COURT:  Do you understand the question?

9         THE WITNESS:  No.

10        MR. SPERTUS:  I'll rephrase.

11        THE COURT:  Thanks.  And when you get to a convenient

12 place to break, let me know, please.

13        MR. SPERTUS:  Okay.

14 BY MR. SPERTUS:

15 Q.   The use of the term "rated" means that somebody has

16 determined what the outputs are, right?

17 A.   The word "rated" is that the device is specified to

18 operate at.

19 Q.   Specified by who?

20 A.   Specified to operate at.  By who?  We have the Qorvos, the

21 custom MMICs, Cree, we have Analog Devices, and a US person

22 that does testing of a device.

23 Q.   But somebody must do the testing before an item is rated

24 for operation, correct?

25 A.   Companies do that.  So how could they guarantee that at

1   the specified frequency, it's going to reliably operate?

2   Q.   What do you understand an unrated item to be?

3   A.   It's something that it hasn't been specified to operate at

4   those frequencies reliably.

5   Q.   Okay.  And I'm just -- when you say "specified," do you

6   mean tested?  Is that what you're using that term to mean?

7   A.   It could be one of those.  It could be.

8        Because, remember, when we have a finished device, it

9   has been through a process of research, development, and

10  production.  And in each one of those stages, design, research,

11  development, and production, it has to go through certain

12  testing in order for the company or the person to determine

13  that it specifically meets certain frequencies and output

14  powers that would contribute to that device to operate reliably

15  in the market.

16  Q.   Okay.  And the first time that that item is made or

17  science experiment before the testing is done, the item is

18  unrated, right?

19  A.   The item is unrated.

20       MR. SPERTUS:  Your Honor, this is a convenient time.

21       THE COURT:  We'll take our break here, ladies and

22  gentlemen.  Please don't discuss the case during the break.

23       We will resume in about 20 or 25 minutes.  Thank you.

24       *(Jury out at 1:13 p.m.)*

25       *(The following was heard outside the presence of the*

1          *jury.)*

2              THE COURT:  All right.  Please be seated.

3              Mr. Monroy, you can step down.  Thank you.

4              Is there anything we need to discuss before we break?

5              MR. SPERTUS:  Just with Mr. Monroy on cross, if the

6      Court could just ask him not to speak to anybody on this case,

7      including government agents.

8              MR. SHOBAKI:  Yeah, the government agrees.

9              THE COURT:  Okay.  Just follow that instruction,

10     please.

11             Mr. Monroy, this way, please.  Yes.  Thank you.

12             THE WITNESS:  I'm sorry.

13             THE COURT:  That's all right.  Thank you.

14             MR. SPERTUS:  Thank you, Your Honor.

15             THE COURT:  Mr. Monroy, just to be clear, you

16     shouldn't be discussing anything with anyone about your

17     testimony.  That doesn't mean you can't ask somebody how to

18     navigate the building or something.  Thank you.

19         *(Recess taken 1:14 to 1:34 p.m.)*

20             THE COURT:  We're back on the record.  No jurors are

21     present.

22             Mr. Spertus, what's your time estimate to complete

23     your cross-examination?

24             MR. SPERTUS:  He's going to continue beyond today,

25     Your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Thank you.

 2              When you leave today, you will need to clear your

 3   things, take your things either into the -- with you or you can

 4   leave them in one of the adjoining rooms, because we will have

 5   other hearings Monday.

 6              We tried to reach Juror Number 16 more than once.

 7   There was no response.  And I don't plan to do anything to

 8   follow up on that unless either side thinks anything is

 9   warranted.

10              MS. SARTORIS:  No, Your Honor.

11              MR. SPERTUS:  No, Your Honor.

12         (Jury in at 1:38 p.m.)

13              THE COURT:  All right.  Please be seated.  All 15

14   jurors and alternates are present.

15              Thank you for being back on time, ladies and

16   gentlemen.

17              Mr. Monroy, would you please restate your name.

18              THE WITNESS:  Carlos Monroy.

19              THE COURT:  And do you understand that you remain

20   under oath?

21              THE WITNESS:  Yes, Your Honor.

22              THE COURT:  You okay?

23              A JUROR:  Yeah, it just went back.  Okay.

24              THE COURT:  Is that all right?  You want to sit in

25   the next chair?
```

```
 1              A JUROR:  Yeah, let me just move over.

 2              THE COURT:  Thank you, Ms. R.  We will work on that

 3   later.  Thank you.

 4              Please proceed, Mr. Spertus.

 5   BY MR. SPERTUS:

 6   Q.   Mr. Monroy, the language in b.2.b that an item be rated

 7   for operation before it falls into this ECCN, that language

 8   also appeared in the change in the law that happened

 9   December 23, 2014, correct?

10   A.   I need to see the actual document.

11              MR. SPERTUS:  Your Honor, I believe, without

12   objection, I can just move it into evidence.  I've spoken with

13   the prosecutor about this.

14              THE COURT:  Is that right?

15              MR. SHOBAKI:  No objection to Exhibit 4045,

16   Your Honor.

17              THE COURT:  Thank you.  It's in a different book,

18   though.

19        (Exhibit 4045 admitted into evidence.)

20              MR. SPERTUS:  Well, I'll just display it on the

21   monitor, Your Honor.  Would that be okay?

22              THE COURT:  That's fine.

23   BY MR. SPERTUS:

24   Q.   So I'm going to publish Exhibit 4045, Mr. Monroy, and

25   just -- I seek to just confirm with you that that same
```

1  language, "rated for operation," appeared in the revised ECCN

2  b.2.b language, right?

3  A.   Correct.

4  Q.   In fact, the only thing that changed is what we previously

5  discussed, these two subparts dealing with peak saturated

6  power, as I'm indicating now on the monitor in Exhibit 4045,

7  right?

8  A.   That's correct.

9  Q.   Okay.  Now, there are many other ECCNs that use the term

10 "designed or rated" as their qualifying language, right?

11 A.   I cannot speak by other ECCNs.

12         MR. SPERTUS:  Your Honor --

13 BY MR. SPERTUS:

14 Q.   Please look in the binder in front of you at Exhibit 4048.

15         THE COURT:  It's in Volume 18.

16         THE WITNESS:  Volume 18?

17         THE COURT:  What's that?  Is that 18?

18         THE WITNESS:  It's not 18.  This is 19.

19         I have Volume 19.  What's the reference?

20         THE COURT:  4048.

21         MR. SPERTUS:  4048.

22 BY MR. SPERTUS:

23 Q.   And I'm going to direct your attention to -- I'll just

24 refer to the bottom page number, 791.

25         MR. SHOBAKI:  Your Honor, objection to publication of

```
 1   this.  It's not in evidence.

 2            MR. SPERTUS:  I'm sorry.  Yes.  Okay.

 3            THE COURT:  I didn't hear the objection.

 4            MR. SHOBAKI:  Sorry, Your Honor.  This is not an

 5   exhibit that has been admitted and it was published.

 6            MR. SPERTUS:  I've taken it off.

 7            MR. SHOBAKI:  I will represent that we had discussed

 8   this and there is no big issue from the government.

 9            THE COURT:  Go ahead.

10   BY MR. SPERTUS:

11   Q.   So please look at page 791.

12            Do you see that?

13   A.   I see that.

14            THE COURT:  That's page 2 of the exhibit, correct?

15            MR. SPERTUS:  Yes, Your Honor.

16            THE COURT:  Thank you.  And this is dated December --

17   this has 1/1/14?

18            MR. SPERTUS:  Yes, Your Honor.

19            THE COURT:  Thank you.

20   BY MR. SPERTUS:

21   Q.   Do you see subparagraph C on the left column, third

22   paragraph down?  Do you see that?

23   A.   Page 7- -- I'm sorry, page 791.

24   Q.   Look in the left-hand column.

25   A.   Left-hand column.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Look at subpart C.

 2   A.   Subpart C of ECCN 2B008?

 3   Q.   My only question to you is whether you are going to see

 4   the terms within quotes there.

 5   A.   I don't know if I have the same volume, but I don't see

 6   the -- oh, it's not on the bottom, it's on the top left.

 7   Q.   Yes.  Look at, for example, paragraph D is another --

 8   A.   B -- I see B, "specially assigned to comply with national

 9   safety" --

10   Q.   I'm just asking you if the term "specially designed" is

11   appearing throughout those ECCNs?  Yes or no?

12   A.   It's a "specially designed" term, yes.  I was under the

13   impression that you were asking me about the "rated."

14   Q.   I am just trying to confirm that when an item -- when the

15   regulations are intended to cover the design of an item, they

16   specify by using the word "designed or rated" in the ECCNs,

17   correct?

18         MR. SHOBAKI:  Objection.  Calls for a legal

19   conclusion.

20         THE COURT:  Yeah, sustained --

21         MR. SPERTUS:  Okay.

22         THE COURT:  -- as framed.

23         Just to be clear, the quotation to which you're

24   referring on page 2 of Exhibit 4048?

25         MR. SPERTUS:  I'm going to use a different example.
```

```
 1              THE COURT:  I just want to be clear, because is that
 2    part of what's on the prior page under 2B007, in that area?
 3              MR. SPERTUS:  I don't know.  I will find an example
 4    that's freestanding.
 5              THE COURT:  Thank you.
 6    BY MR. SPERTUS:
 7    Q.   If you look, sir, at page 820, which is the next page on
 8    this document.
 9              Do you see that?
10    A.   Yeah, I have 820.
11    Q.   On the right-hand column towards the bottom, there is
12    paragraph 8.1.
13              Do you see that?
14    A.   Yes.
15    Q.   "Integrated Circuits"?
16    A.   Yes.
17    Q.   Okay.
18    A.   "Designed or rated as radiation hardware," yes.
19    Q.   Okay.  So that's an example.  I am just asking if that is
20    an example of where the term "designed or rated" is used in the
21    ECCNs?
22    A.   Yes.
23    Q.   If you'd turn the page --
24    A.   Sir, can I -- can I -- before you turn the page --
25    Q.   Well, no.  That's my -- I'm done with that page.  I have
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    another example to show you.

2            THE COURT:  Just a moment.

3            Okay.  Go ahead.

4    BY MR. SPERTUS:

5    Q.   Please turn to the page marked 822 on the bottom, page

6    822.

7            Do you see that?

8    A.   Yeah, I see 822.

9    Q.   Okay.  Look in the middle of the right-hand column.

10   There's a note.

11   A.   I see it.

12   Q.   That note actually applies to the ECCNs that you used in

13   your analysis, right?

14   A.   Note 2?

15   Q.   Note 1.

16   A.   Page 822.

17           THE COURT:  Which column?

18           THE WITNESS:  Column to the right?

19   BY MR. SPERTUS:

20   Q.   The right column, halfway down.

21   A.   Yes.  There is a note.  It says "Note 2."

22   Q.   It says "Note 1."  Do you see --

23   A.   I am in Volume 18, 4084 [sic], page 822, in the middle I

24   see -- okay.  Note 1.  Yes, I found it.

25   Q.   That's what I'm directing your attention to.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Pardon me.  It's Exhibit 4048.

 2              THE WITNESS:  4048, yes.

 3              THE COURT:  And page 822 in the right-hand column.

 4         Where in the column?

 5              MR. SPERTUS:  Halfway down, it says, "Note 1:" --

 6              THE COURT:  Do you see that?

 7              THE WITNESS:  Yes, I do.

 8              THE COURT:  What's the question, please?

 9    BY MR. SPERTUS:

10    Q.   That 3A001.b.1 was actually the ECCN that you used for

11    your license determinations in this case, right?

12    A.   No, sir.

13    Q.   Okay.  Well, regardless, Note 1 says "designed or rated

14    for operation," right?

15    A.   As it's written, it says, "Does not -- 3A001.b.1 does not

16    control tubes designed or rated for operations in any frequency

17    band and having all of the following," yes.

18    Q.   Okay.

19    A.   But it does not correspond to 3A001.b.2 or any other

20    license determination in which I worked.

21    Q.   In this case.

22    A.   In this case.

23    Q.   Right.  But as an engineer at BIS, you are familiar with

24    the ECCN 3A001.b.1, correct?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SPERTUS:  Okay.  Your Honor, I request permission
 2    to move Exhibit 4048 into evidence and publish this.
 3              MR. SHOBAKI:  Your Honor, the document appears to be
 4    a set of excerpts of different pages from the CFR, not a
 5    complete document.  I have an objection as to the completeness
 6    if the document is going to be brought in and have a general
 7    relevance objection, but I don't question the authenticity.
 8              THE COURT:  All right.  Well, I agree the document is
 9    not complete, and it should be -- at least with respect to the
10    portions on which you wish to rely, there should be sufficient
11    additional pages that give the context.
12              But you can publish this page.
13              MR. SPERTUS:  Thank you, Your Honor.
14              THE COURT:  I would make it -- what I would like you
15    to do is put together a more complete version, to confer with
16    the government about that, and perhaps you can reach an
17    agreement on that.  And if not, I'll deal with it.
18              MR. SPERTUS:  Yes.  Thank you, Your Honor.
19              THE COURT:  You're welcome.
20    BY MR. SPERTUS:
21    Q.   Okay.  So here is just an example of an ECCN using the
22    term "designed or rated for operation" at certain performance
23    levels, right?
24              So an ECCN written in this manner would include the
25    design goals of a science experiment, right?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes, sir.

2    Q.    But the term -- the ECCNs that don't have the language

3    "designed or rated" exclude from the ECCN items where the

4    variables of performance are unknown, correct?

5    A.    Not necessarily.

6    Q.    Well, I thought we covered before -- correct me if I'm

7    wrong, but every ECCN applicable to this case says "rated" for

8    certain performance levels, right?

9    A.    Yes, but you are referring to a different ECCN in which

10   the word "design" doesn't appear in quotes, so it's not

11   applicable to "specially designed," first; and, second, "or" --

12   there is an "or," so it's either one of those two; and "rated,"

13   as understood, it's specified to or at the operating frequency

14   on what it was designed for.

15   Q.    First of all, I've moved on to another example that

16   doesn't have the quotes "specially designed."

17            Do you understand that?

18   A.    Yes, I do.

19   Q.    So the term that you were just referencing called

20   "specially designed" is a defined term because it has quotes on

21   either side, right?

22   A.    That's correct.

23   Q.    The definition of the term "specially designed" runs three

24   pages of the EAR, right?

25   A.    That's correct.

1    Q.    It's very lengthy, correct?

2    A.    Very lengthy, yes, sir.

3    Q.    And it requires a high level of specialized training and

4    experience to navigate those requirements for "specially

5    designed," right?

6    A.    Yes.  And when in doubt, we offer a wide range of

7    resources to help.

8    Q.    Including the online tools.

9    A.    The online tools, phone calls, visits to us, and

10   different -- there's different ways that help --

11   Q.    Right.  It's so comp- --

12   A.    -- the industry.

13   Q.    It's so complicated that BIS recognizes that all of these

14   different tools are required to deal with this term, "specially

15   designed," right?

16             MR. SHOBAKI:  Objection.  Speculation.

17             THE COURT:  Sustained.  Let's move on, please.

18   BY MR. SPERTUS:

19   Q.    Well, this language that's now in front of you doesn't

20   require understanding the "specially designed" definition,

21   right?

22   A.    This one doesn't.

23   Q.    Because there are no quotes, right?

24   A.    There are no quotes.

25   Q.    Okay.  So these terms are given their ordinary and common

1  meaning because they're not defined terms, right?

2  A.   Right.  But understood that if it's designed on the

3  drawing board, the product has not been made and I could,

4  through simulation, input values and parameters that would

5  allow me to specify that item to work as certain -- in the

6  design stage before development and production.

7  Q.   Didn't you testify earlier today that an item only means a

8  thing, not something on the design board, something that's

9  made?

10          MR. SHOBAKI:  Objection.  Misstates testimony.

11          THE COURT:  Sustained.  Restate the question, please.

12  BY MR. SPERTUS:

13  Q.   What is an item?

14  A.   An item can include a commodity, a software, or

15  technology --

16  Q.   Okay.  Do ECCN --

17  A.   -- in general.

18  Q.   Do the ECCNs that we're discussing right now -- I thought

19  I understood your testimony to be that they were for exporting

20  things that were made.

21          Is that accurate?

22          MR. SHOBAKI:  Objection.  Vague as to which ECCNs are

23  being discussed.

24          THE COURT:  Do you understand the question?

25          THE WITNESS:  No.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Would you restate it, please.
 2   BY MR. SPERTUS:
 3   Q.   Don't these ECCNs cover things that are made?
 4   A.   If you are referring to this ECCN that is on the display,
 5   all MMICs or transistors are devices, hardware.
 6   Q.   Okay.  So -- you are an engineer, correct?
 7   A.   Yes, sir.
 8   Q.   Okay.  Are you an electrical engineer?
 9   A.   Yes, sir.
10   Q.   Okay.  So when an electrical engineer has an idea, first
11   he designs something to perform his idea, right?
12   A.   Um-hmm.  Yes, sir.
13   Q.   And -- right.  And he can take as long as whatever, but
14   then he gets the design made into a thing, right?
15   A.   Yes, sir.
16   Q.   The term -- we've already agreed that the term "rated"
17   means the testing results for the thing, right?
18              MR. SHOBAKI:  Objection.  Misstates testimony.
19              THE COURT:  Overruled.
20              You may answer.  Do you understand the question?
21              THE WITNESS:  Repeat the question, please.
22              THE COURT:  Would you read the question, please.
23          (The record was read.)
24              THE COURT:  Do you understand the question?
25              THE WITNESS:  I understand the question, but I don't
```

1  agree that's what I -- I said that the "rated" meant specified

2  to be at the operating frequencies.  And when we say "specify,"

3  it could be through testing or publications of data sheets that

4  I have not seen the testing.

5  BY MR. SPERTUS:

6  Q.   That's for you to do your license determination, right?

7  A.   Not necessarily.

8  Q.   So how would you get a data sheet if the thing that was

9  made was never tested?

10  A.   The data sheets are published by the manufacturers.

11  Q.   Right.  The man- --

12  A.   And they have easy access available to everyone for

13  reviewing the parameters and comparing to the necessity of such

14  a device or design that any engineer is working on.

15  Q.   Okay.  The manufacturer you are referring to includes the

16  foundry in the case of MMICs, right?

17  A.   Not necessarily.

18  Q.   Okay.  What do you mean by the term "manufacturer"?

19  A.   "Manufacturer" could be the one that incorporates all the

20  stages of the item --

21  Q.   Okay.

22  A.   -- as a -- when we say that's a product of design -- I'm

23  sorry, research, design, and development --

24  Q.   Well, let me direct your --

25  A.   -- and manufacturing, what we call production.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Let me direct your attention to MMICs.  Okay?  I

2    understand you guys evaluate a lot of things, but focus on

3    MMICs.

4    A.    Okay.

5    Q.    MMICs are made in a foundry, right?

6    A.    Yes.

7    Q.    Foundries sometimes do design and testing and sometimes do

8    not.

9    A.    That's correct.

10    Q.    Okay.  Focusing on the foundries that don't do design or

11    testing, they're basically machine shops making a design that

12    was created by someone else, right?

13    A.    We call those fabless --

14              THE REPORTER:  What is it?

15              THE WITNESS:  Fabless.

16              THE COURT:  Can you spell that, please?

17              THE WITNESS:  F-a-b-l-e-s-s.

18              -- companies.

19              Take, for example, AMD.  They manufacture, they

20    design -- it's a design house, and they do design the

21    microprocessors, but they do not manufacture such

22    microprocessors.

23    BY MR. SPERTUS:

24    Q.    Okay.  But I am focusing on the manufacturer, the foundry.

25    AMD is not a foundry, right?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.   I'm giving you the example that you are saying that there

2    are design houses, and I agree with that, that they only work

3    on the design.

4    Q.   I think you misheard my question.  I am talking about

5    foundries that make MMICs.  Okay?

6         Every foundry makes a MMIC, right?

7         MR. SHOBAKI:  Objection.  Vague as to "foundry."

8         THE COURT:  Yeah, as stated.

9    BY MR. SPERTUS:

10   Q.   What do you think the word "foundry" means?

11   A.   Foundry is where items such as processing equipment,

12   semiconductor processing equipment, resides in such an order

13   that would produce a semiconductor device at the end.

14   Q.   Have you ever heard of the company Cree?

15   A.   Yes, I do.

16   Q.   Okay.  Directing your attention to Cree, Cree does design

17   work, testing work, or manufacturing work, creating a MMIC,

18   right?

19   A.   Right.

20   Q.   If Cree was simply doing the manufacturing piece, making

21   the MMIC based on a design that Cree received, Cree can't

22   produce a spec sheet for the MMIC, right?

23   A.   Right.  I believe so.

24   Q.   It would have to test the MMIC in order to do a spec

25   sheet, right?

1    A.    If for publication.

2    Q.    Okay.  And you're aware that Cree will make the designs

3    for people who want to test their designs, right?  I mean,

4    somebody wants their design made, they can go to Cree and get

5    the chips made, right?

6    A.    It could be.  I'm not too sure about, you know, what they

7    do in there.

8    Q.    But the point is the term "rating" requires someone to

9    test it to know how a chip is rated, right?

10   A.    "Rated" could be understood as specified to --

11   Q.    What --

12   A.    -- operate at certain frequencies or have certain output

13   power.

14   Q.    But are you using the term "specified to" to mean

15   "designed"?  Is that how you are using the term "specified to"?

16   A.    "Specify," it would include design, development, and

17   production of the item, and at which each stage requires

18   testing.

19   Q.    Okay.  So if there's testing, then a chip can be rated.

20   That's your point; is that correct?

21   A.    It could be.

22           MR. SHOBAKI:  These questions are asked and

23   answered --

24           THE COURT:  Sustained.

25           MR. SHOBAKI:  -- multiple times.

```
 1              MR. SPERTUS:  Your Honor, they have not been

 2   answered.  Oh, Your Honor, I apologize.

 3              THE COURT:  This area has been covered.  Let's move

 4   to a new area, please.

 5   BY MR. SPERTUS:

 6   Q.   Is it your position, then, that the term "designed or

 7   rated" is the exact same thing as the term "rated"?

 8              MR. SHOBAKI:  Objection.  Calls for a legal

 9   conclusion.

10              THE COURT:  Do you understand the question?

11              THE WITNESS:  No.

12   BY MR. SPERTUS:

13   Q.   What is the difference -- when the ECCNs use the term

14   "designed or rated," what is the difference between that

15   language, in your mind, with the language used in ECCNs

16   "rated"?

17   A.   As I said and as stated before, when you include "design,"

18   you are including a stage through which a final product goes

19   through:  Design -- research, design, development, and

20   production.

21   Q.   You're broadening the ECCN with the language "designed or

22   rated," right?

23              MR. SHOBAKI:  Objection.  Argumentative.

24              THE COURT:  Sustained.

25   ///
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MR. SPERTUS:

 2    Q.   Isn't an ECCN that uses the term "designed or rated"

 3    broader than an ECCN that uses only the term "rated"?

 4              MR. SHOBAKI:  Objection.  Vague.

 5              THE COURT:  Do you understand the question?

 6              THE WITNESS:  No.

 7              THE COURT:  If you want to -- perhaps if you would

 8    focus on a specific regulation if you want to ask this

 9    question.

10              MR. SPERTUS:  All right.

11    BY MR. SPERTUS:

12    Q.   So directing your attention to the monitor in front of you

13    right now, this note, "3A001.b1 -- .1, "does not control tubes

14    designed or rated for operation."

15              Would that paragraph have any different meaning, in

16    your mind, if we deleted the words "designed or"?

17    A.   To me, as written, it's very specific and it covers

18    certain aspect that is quite important.  One is the design,

19    which was going to lead me to technology, and we have certain

20    rules for that, and the "or" is going to lead me to another

21    option.

22    Q.   So the answer is yes, it has a different meaning when you

23    use the term "designed or rated" versus the term "rated"?

24              MR. SHOBAKI:  Objection.  Asked and answered.

25              THE COURT:  You may answer.  Then let's move on.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    BY MR. SPERTUS:

2    Q.   Is the answer "yes"?

3          THE COURT:  Read the question, please.

4          *(The record was read.)*

5          THE WITNESS:  It doesn't have -- from my perspective,

6    it doesn't have a different meaning.

7    BY MR. SPERTUS:

8    Q.   Okay.  So the addition of the words "designed or" to you

9    have no meaning.

10   A.   It has a meaning, but it doesn't defer from what you are

11   trying to address.  And it has a meaning, a specific teller, to

12   that a specific note, and to that a specific ECCN that ties

13   what comes after it.  We cannot take it out of context.

14   Q.   Well, you agree there are many ECCNs that begin with the

15   terms "designed or rated" that aren't just notes, correct?

16          MR. SHOBAKI:  Objection.  Asked and answered again.

17          THE COURT:  Let's move on, please.

18          MR. SPERTUS:  Your Honor, I believe the witness has

19   to limit --

20          THE COURT:  This is cumulative.  You've been over

21   this quite a few times, so please move on.

22   BY MR. SPERTUS:

23   Q.   Let me just ask you at a high level -- we will probably

24   dig into it more on Tuesday -- but there are no licensing

25   issues with shipments to Canada, correct, for items?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              You don't have to -- even if something falls within
 2     an ECCN, you can export it without a license to Canada, right?
 3     A.   Understood, yes.
 4     Q.   Now, in 2014, January 1, 2014, through December 22, 2014,
 5     you could export to Hong Kong, correct, something that -- Hong
 6     Kong didn't require the licensing, correct?
 7              MR. SHOBAKI:  Objection.  Vague.
 8              THE COURT:  Yeah, as framed.  Restate the question to
 9     make clear you are talking about the regulations controlling
10     and not another rule.
11              MR. SPERTUS:  Your Honor, can I confer with the
12     government to see if I can publish a series of CFRs to speed
13     this up?
14              THE COURT:  Yes.
15        (Counsel confer off the record.)
16              MR. SPERTUS:  Never mind.  Your Honor, I'll just do
17     them one at a time.
18     BY MR. SPERTUS:
19     Q.   Let me walk you through a series of licensing exceptions,
20     okay?
21              Please take a look at Exhibit 4042, which is in
22     binder, I believe, 17.
23              THE COURT:  That's correct.  No, wait.  I'm sorry.
24     You said 4042?
25              MR. SPERTUS:  Yes, 4042.  Yes, Your Honor.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Thank you.

 2              MR. SPERTUS:  Binder 17.

 3   BY MR. SPERTUS:

 4   Q.   Look at the third page of Exhibit 4042, and I'll direct

 5   your attention to Section 734.7.

 6              Do you see that heading?

 7   A.   Yes, I do.  734.7, "Published Information and Software."

 8              MR. SPERTUS:  Your Honor, would there be any

 9   objection from the government to publishing Exhibit 4042?

10              MR. SHOBAKI:  No objection.

11              THE COURT:  You may publish.

12              Is there any objection to its admission?

13              MR. SHOBAKI:  No objection.

14              THE COURT:  All right.

15              MR. SPERTUS:  Your Honor, I move Exhibit 4042 into

16   evidence.

17              THE COURT:  Thank you.  4042 is admitted.

18        (Exhibit 4042 admitted into evidence.)

19   BY MR. SPERTUS:

20   Q.   Okay.  So 4042 discusses items that are subject to the

21   EAR, correct?

22              Section 734.3 is depicted on the monitor in front of

23   you that's identifying items subject to the EAR, right?

24              THE COURT:  You are not publishing page 1 of the

25   exhibit, correct?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SPERTUS:  No.  I moved -- I'm on the -- I'm

 2   sorry.  Yeah, I was now publishing page 1.

 3   BY MR. SPERTUS:

 4   Q.   And on page 1 in the column -- I'm going to highlight it

 5   for you -- on the right-hand side of the column begins the

 6   heading "For a list of items that are not subject to the EAR,"

 7   right?  And I put that on the monitor in front of you, right?

 8              THE COURT:  You're talking about 734.3(b)?

 9              MR. SPERTUS:  No, I -- yes.

10              THE COURT:  Do you have that?

11              THE WITNESS:  734.33?

12              THE COURT:  No.  "B," as in boy.

13   BY MR. SPERTUS:

14   Q.   It's on the monitor, sir, in front of you.

15              THE COURT:  But I'd like him to be able to see the

16   context.

17              THE WITNESS:  The context, yes, please.

18   BY MR. SPERTUS:

19   Q.   That's the beginning of a section about items not subject

20   to the EAR, correct?  Page 1 of Exhibit 4042.

21   A.   I got it.

22   Q.   I'm just asking you whether this heading, (b), entitled

23   "The following items are not subject to the EAR," begins a

24   lengthy section of the CCL that excludes items from the EAR?

25   A.   Yes.  And it points to, if it's not on the EAR, where to
```

1  go.

2  Q.   And so directing your attention to the next page of the

3  document, page 2, I am going to call out a section for you

4  that's highlighted and ask you whether publicly available

5  technology, software, except software classified in ECCN 5D02

6  are excluded from the EAR if those subparts (i), (ii), (iii),

7  and (iv) are met.

8           Do you see that?

9  A.   I need to see the entire document.  Which page are you

10  referring to here?

11  Q.   The page number is 230 on the bottom.

12          And my only question to you is if publicly available

13  technology and software, with one limitation, are excluded from

14  the EAR if they're published or will be published or arise or

15  result from fundamental research or are educational or are

16  intended to be included in certain patent applications.

17          Do you see that highlighted language?

18  A.   Yes.  Yes, I do, sir.

19  Q.   Those categories are excluded from the EAR, correct?

20  A.   Yes.

21  Q.   Now, if you'll turn the page to the page that has, I

22  believe, 234 on the bottom.

23          Do you see that?

24  A.   Yes.

25  Q.   Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   I have it in front of me.

2   Q.   Okay.  So published information and software is excluded

3   from the EAR, right?

4   A.   Yes, provided that all the items there are met.

5   Q.   Okay.

6   A.   But the mere factor that is not subject to the EAR doesn't

7   mean that you are exempt from a license.  They are pointing you

8   to other agencies that could be under, such as Department of

9   the State, Treasury Department, Nuclear Regulatory Commission,

10  Department of Energy, Patent Trademark Office, or Department of

11  Defense.

12  Q.   If you will turn the page one more time.  Look at the page

13  that on the bottom says 235.

14           Do you see that?

15  A.   235, bottom of page?

16  Q.   The heading at the top of the column on the left excludes

17  from the EAR information resulting from fundamental research,

18  correct?

19  A.   That's correct.

20  Q.   If information results from fundamental research, the EAR

21  does not even apply, right?

22  A.   Right.

23  Q.   And defined in this section, it includes -- fundamental

24  research includes university-based research, correct?

25  A.   That's correct.

1    Q.    Research related to federal agencies or federally funded

2    research and development centers, right, corporate research or

3    research based elsewhere?

4    A.    Research can be research conducted by scientists,

5    engineers, or students at the university normally will be

6    considered fundamental research as described in paragraph

7    (b)(2) through (6).

8    Q.    Okay.  Now, if you could turn the page one more time of

9    Exhibit 4042.

10            After the "Fundamental Research" section, the CCL

11   then excludes from the EAR educational information not

12   referenced in the "Fundamental Research" section, right?

13   A.    Yeah, I see that.  734.9, "Educational Information."

14   Q.    That type of information, even if it wasn't included as

15   fundamental research, is also excluded from the EAR, right?

16   A.    Right.

17   Q.    Unless some other law applies, it means the licensing

18   paradigm doesn't apply.

19   A.    As long as we are talking about data or technology --

20   Q.    Okay.

21   A.    -- not hardware.

22   Q.    I understand.

23            Are you -- I'm just curious.  Do you view yourself,

24   in your mind, as part of the government's team?

25            MR. SHOBAKI:  Objection.  Argumentative.

```
 1              THE COURT:  Sustained.  Disregard that comment.
 2    BY MR. SPERTUS:
 3    Q.    As a representative of the Bureau of Information, BIS, do
 4    you view yourself somehow as --
 5              MR. SPERTUS:  Is there an objection?
 6    BY MR. SPERTUS:
 7    Q.    -- trying to help Agent Lo in this case?
 8              MR. SHOBAKI:  Objection.  Argumentative.
 9              THE COURT:  Sustained.
10    BY MR. SPERTUS:
11    Q.    All right.  Continuing to the next section of things that
12    are excluded from the EAR, do you see that patent applications
13    don't -- nothing -- 734.10 excludes from the EAR patent
14    applications?  Do you see that?
15    A.    Yeah, I see that.
16    Q.    Now, separate from the category of things that are
17    excluded from the EAR, there are also license exceptions for
18    things that sometimes fall within the EAR, right?
19    A.    Right.  And, again, depending upon what you are talking
20    about, all -- the tour that you gave me was all related to
21    data, technology information, emails, research, and that is in
22    the technology category.
23    Q.    And where -- direct me to where in the CCL would I find
24    the definitions you just spoke?  Where would I find the
25    difference between technology and information?
```

1   A.   In each ECCN under each category, we have subsets.   3A001

2   is an alphanumeric indicator that the item is a device or

3   hardware.

4         3B, when they start with 3B, it's -- I'm sorry.   Then

5   it's 3A002, that's equipment.   That includes signal generators,

6   signal analyzers, and all sorts of test equipment.

7   Q.   What I'm asking you is something different.

8         I'm not asking you to define each ECCN category; I'm

9   saying if I am holding technology, how do I find out whether

10  it's within the EAR or out of the EAR?   Where's the definition

11  that directs me --

12  A.   There is a definition for "technology."   That's where I

13  was heading.

14        So if you go through each subset, then you get to --

15  in Category 3 to 3E001, and that points you exactly where to

16  look for the technology note and how and what it's incorporated

17  into it and what it consists of.

18  Q.   Okay.

19  A.   And that's where the big difference is made between

20  software and technology --

21  Q.   Okay.

22  A.   -- apart from hardware, equipment, and test equipment and

23  semiconductor equipment.

24  Q.   Okay.   And we'll go over that definition, I believe, on

25  Tuesday.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              While we're still fresh on your ECCN analysis for

 2    commodities, you're assuming that a MMIC is a commodity when

 3    you -- that has been tested when you place it in an ECCN like

 4    you did for Agent Lo, right?

 5              MR. SHOBAKI:  Objection.  Misstates testimony.

 6              THE COURT:  Do you understand the question?

 7              THE WITNESS:  No, I don't understand.

 8              THE COURT:  Could you restate it, please.

 9    BY MR. SPERTUS:

10    Q.   When you told Agent Lo that a license would be required to

11    export a MMIC with the output specifications that Agent Lo told

12    you to assume, you made assumptions yourself when you answered

13    Agent Lo's questions, right?

14              MR. SHOBAKI:  Objection.  Foundation and misstates

15    prior testimony.

16              THE COURT:  Yeah, sustained as framed.

17    BY MR. SPERTUS:

18    Q.   Do you remember doing licensing determinations in this

19    case?

20    A.   License determination, yes.

21    Q.   Those were given to Agent Lo, correct?

22    A.   Agent Lo submitted a request for a license determination.

23    Q.   And then you did one and gave it back to him, right?

24    A.   I don't give up stuff to anybody.  I do not assume

25    anything to -- for that respect.
```

```
 1          The system is in place.  We do the evaluation, and

 2   the government has established the system which provides an

 3   advice to an agent or anyone that requests a CCAT, license

 4   determination, or a license.

 5   Q.   Okay.  And you gave Agent Lo your opinion that a license

 6   would be required for the -- assuming the facts that he told

 7   you, right?

 8   A.   I gave issue -- a license determination to Agent Willie Lo

 9   based on the regulations, not on any assumptions, and based on

10   the technical parameters provided.

11   Q.   The technical parameters provided were assumptions that

12   you made, right?  You accepted them as true.

13   A.   No.

14          MR. SHOBAKI:  Objection.  Argumentative.

15          THE COURT:  This has been covered.

16          MR. SPERTUS:  I know.

17          THE COURT:  So then we don't need to do it again.

18   It's been covered when you asked questions concerning what

19   materials were examined in connection with the determination.

20   So let's move on, please.

21          MR. SPERTUS:  I thought it had been covered, too,

22   Your Honor.

23   BY MR. SPERTUS:

24   Q.   When you made a license determination in this case, you

25   were given outputs to do it, right?
```

1          MR. SHOBAKI:  Objection.  Asked and answered.

2          THE COURT:  This is --

3          MR. SHOBAKI:  Cumulative.

4          THE COURT:  Yeah, let's move on, please.

5          MR. SPERTUS:  Your Honor, before I begin a new area

6   of questioning, is the Court intending to stop at 2:30?

7          THE COURT:  We will stop -- is this a good place for

8   you to break?

9          MR. SPERTUS:  Yes.

10          THE COURT:  All right.

11          Ladies and gentlemen, as promised, we're going to

12   conclude now.  We're going to resume Tuesday -- don't come

13   Monday, please -- Tuesday at 8:30.  So if you can be here

14   before 8:30 to make your way through the entry process, it

15   would be helpful.  See you then.  Have a nice weekend.  Please

16   do not discuss the case with anyone during the break.  Thank

17   you.

18          THE CLERK:  All rise.

19      *(Jury out at 2:28 p.m.)*

20      *(The following was heard outside the presence of the*

21      *jury.)*

22          THE COURT:  Please be seated.

23          You may step down, Mr. Monroy.  You may step down.

24          Mr. Spertus, what is your time estimate for the

25   balance of your cross-examination?

1        MR. SPERTUS:  I'm going to try to edit down my

2   questions.  I didn't get through nearly as much as I expected.

3   I really thought a lot of this would go much quicker than it

4   was.  I think it's going to be at least -- at least two hours

5   minimum.

6        THE COURT:  All right.  Well, when you're going

7   through and preparing, keep in mind the following.

8        I think there's been a lot of -- one thing I said

9   yesterday when you raised the estimated length was I didn't

10  have a question about that, but I said not if it's cumulative.

11  There's been a lot of questions today that I think have been

12  asked more than once, and I think that it's important, as you

13  go through your notes, to focus on that, please.

14       MR. SPERTUS:  Yeah, and, Your Honor, I totally see

15  this issue through the Court's eyes, I really do.

16       This witness is not answering questions.  My

17  questions about "designed or rated" versus "rated," do the

18  words have different meanings, that took half an hour.  I

19  thought it would take five seconds.  I kept staying on it

20  because I just didn't believe that he ever answered a question.

21       THE COURT:  Well, in the most recent colloquy, there

22  were prior questions concerning what was provided to him, the

23  testing data that was provided, you asked questions about did

24  somebody else handle it before he did, and you were asking --

25  you asked those questions --

```
 1            MR. SPERTUS:  Yes.

 2            THE COURT:  -- quite a while ago we covered what

 3    information he received and the analysis that he did, and then

 4    I think we resumed the same questions just a few minutes ago.

 5    So that's one example.

 6            We've been over lots of the regs.

 7            MR. SPERTUS:  I agree with Your Honor.

 8            THE COURT:  I think it's also important here in terms

 9    of cumulativeness that -- I don't -- I recognize some of the

10    defenses that you are presenting, which are fine, but I think

11    you may not need to ask as many questions to provide a

12    sufficient basis to make the arguments you want to make as to

13    a -- one or more defenses.

14            MR. SPERTUS:  I am going to take this under -- I'm

15    going to really try.

16            And I just do want to respond to one thing the Court

17    said.  I didn't expect those last questions to be necessary

18    until he said, "No, I made no assumptions of the data," and it

19    garbled the testimony.  I really thought it was clear.  I

20    didn't want to go back.

21            THE COURT:  Well, you were referring to assumptions

22    that he was given by the agent.

23            Do you recall that?

24            MR. SPERTUS:  Yeah.  It might have been the language

25    barrier.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Well, perhaps, but that's different than
 2    saying, "Did the agent give you data that you analyzed?"
 3              MR. SPERTUS:  Well, data that you assumed to be true.
 4    Okay.  I understand.  I'm going to reflect on this.  I will try
 5    to ask this -- I'll try to --
 6              THE COURT:  I'm sure you will.  Thanks.  I know you
 7    will.
 8              MR. SPERTUS:  Yeah.  Thank you.
 9              THE COURT:  Anything else we need to do today?
10              MR. SPERTUS:  Just the witnesses for Tuesday,
11    Your Honor.
12              THE COURT:  Will you let them know, please.
13              MR. SHOBAKI:  Your Honor, I will let them know.  Just
14    based on Mr. Monroy going into Tuesday, we had planned to have
15    a variety of people traveling.  We are going to try and work
16    some people around.
17              But I will let Mr. Spertus know.  We will confer
18    afterwards and check on people's schedules and we'll let you
19    know.
20              THE COURT:  Please do that.  As soon as you know,
21    send an email.
22              MR. SHOBAKI:  Will do.
23              MS. SARTORIS:  Also, Your Honor, after Mr. Monroy
24    ends, it's possible that the next witnesses -- taking in mind
25    that we have to figure out who's next based on schedules, there
```

 1 | may be evidentiary objections from the prior filings that the

 2 | parties did to resolve before those witnesses can take the

 3 | stand.

 4 |       THE COURT:  All right.  Well, earlier today I was

 5 | told there might be some exhibit disputes.

 6 |       Are those the ones to which you're referring?

 7 |       MS. SARTORIS:  Yes, Your Honor.  If those same

 8 | witnesses would be the same ones for Tuesday, yes.

 9 |       But given that we do have a number of people

10 | traveling, it could be that we put different people on on

11 | Tuesday because they are already flying in.  So we might have

12 | to shift our schedule.

13 |       But we have a number of exhibit objections that

14 | pertain to particular witnesses.

15 |       MR. HANUSZ:  I think there are two separate issues.

16 | There are demonstrative exhibits and charts that the government

17 | would like to use with its witnesses that we have made clear

18 | our objections to the government.

19 |       The second issue relates to evidentiary -- objections

20 | to actual exhibits.  We've made a lot of progress, certainly.

21 | Ms. Sartoris and I were here for a good while yesterday.  We

22 | made a lot of progress, but I expect there's more --

23 |       THE COURT:  Okay.  Thank you both for doing that.

24 |       MR. HANUSZ:  -- I expect there's more to make.  A

25 | part of it just depends on kind of what the witness order is

```
 1   and we would prioritize, as we've been trying to do.

 2           THE COURT:  I appreciate that.  Thanks for your

 3   collaboration.

 4           What would be helpful -- given that you have

 5   identified the witnesses and you know the exhibits that are

 6   presently either in dispute or potentially in dispute by

 7   witness, I think it would be helpful if you could -- after you

 8   confer further today, if you conclude there still is a dispute,

 9   whether about demonstrative or non-demonstrative exhibits, if

10   you can give me the list of the exhibits that are in dispute

11   and your best estimate of the order in which those disputes

12   will come up in the trial so that I can look at those and try

13   to resolve them before -- so we don't keep the jury waiting.

14           MR. HANUSZ:  So the one thing the defense would need,

15   then, Your Honor, is a list of which exhibits will be used with

16   each witness.  We don't have that currently, so we would need

17   that in order to be able to do that.  And we'll certainly do it

18   if --

19           THE COURT:  All right.  Why don't you confer and see

20   what progress you can make.

21           MS. SARTORIS:  Yes, Your Honor.  We'll confer.

22           THE COURT:  And let me say this, too.  Depending on

23   where you are in that process and whom you plan to call on

24   Tuesday, because you will know more, if you think it would be

25   efficient to come in on Monday afternoon to go through some of
```

1    these exhibit disputes, then let Ms. Keifer know and we can see

2    if we can find time to do that.

3              MS. SARTORIS:  Thank you, Your Honor.

4              MR. HANUSZ:  Will do.  Thank you, Your Honor.

5              THE COURT:  All right.  Thanks.

6              MR. SPERTUS:  Your Honor, I am very sorry if the tone

7    of any comment I made was offensive to the Court.  I was

8    frustrated with myself not getting several questions answered.

9              THE COURT:  No, my earlier comment, as I said,

10   concerned after I had ruled not to publish something, the

11   witness was asked to read it.

12             MR. SPERTUS:  Right.  I understand.

13             THE COURT:  That's what I was referring to.

14             MR. SPERTUS:  Right.

15             I am going to give the government a list of all

16   exhibits that I'm going to show this witness and know in

17   advance if they have any objections.

18             THE COURT:  Thank you.  Have a good weekend.  Thanks.

19        *(Evening recess taken 2:35 p.m.)*

20                         --oOo--

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1

2

3                          CERTIFICATE

4

5        I hereby certify that pursuant to Section 753,

6   Title 28, United States Code, the foregoing is a true and

7   correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12  Date: JUNE 5, 2019

13

14

15

16

17              /s/  Cindy L. Nirenberg, CSR No. 5059

18                        Official Court Reporter

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA