UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT, US DISTRICT JUDGE

– – –

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                    PLAINTIFF,      )
                                    )
          vs.                       ) No. CR18-50-JAK
                                    )
(1) YI-CHI SHIH, ET AL.,            )
                                    )
                    DEFENDANT.      )
_____)
```

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 5, VOLUME II

WEDNESDAY, MAY 22, 2019

10:59 A.M.

LOS ANGELES, CALIFORNIA

_____

CINDY L. NIRENBERG, CSR 5059, FCRR
U.S. Official Court Reporter
350 W. 1st Street, #4455
Los Angeles, CA 90012
*www.msfedreporter.com*

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:
                        UNITED STATES ATTORNEY'S OFFICE
4                       BY: JUDITH HEINZ,
                            ASSISTANT US ATTORNEY
5                           JAMES HUGHES,
                            ASSISTANT US ATTORNEY
6                           WILLIAM ROLLINS,
                            ASSISTANT US ATTORNEY
7                           MELANIE SARTORIS,
                            ASSISTANT US ATTORNEY
8                           KHALDOUN SHOBAKI,
                            ASSISTANT US ATTORNEY
9                       312 NORTH SPRING STREET
                        13TH FLOOR
10                      LOS ANGELES, CA 90012
                        213-894-2434
11

12

13

14

15   FOR THE DEFENDANT:
                        SPERTUS LANDES & UMHOFER
16                      BY: JOHN HANUSZ, ATTORNEY AT LAW
                            JAMES W. SPERTUS, ATTORNEY AT LAW
17                          CHRISTA L. CULVER WASSERMAN,
                            ATTORNEY AT LAW
18                      1990 SOUTH BUNDY DRIVE
                        SUITE 705
19                      LOS ANGELES, CA 90025
                        310-826-4700
20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                      I N D E X

 2

 3   GOVERNMENT'S WITNESSES:                      PAGE

 4   MAUREEN MILLER

 5       CROSS BY MR. SPERTUS (RESUMED)       15

 6       REDIRECT BY MS. SARTORIS            27

 7       RECROSS BY MR. SPERTUS             32

 8

 9   BARBARA HONG LI

10       DIRECT BY MS. HEINZ                37

11       CROSS BY MS. WASSERMAN             44

12

13   JESSE LU

14       DIRECT BY MS. HEINZ                49

15       CROSS BY MS. WASSERMAN             86

16       REDIRECT BY MS. HEINZ              91

17

18   ROBERT BERGER

19       DIRECT BY MS. HEINZ                92

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1               I N D E X

2                 (CONTINUED)

3

4      *FURTHER PROCEEDINGS*                    *PAGE*

5      DISCUSSION HELD OUTSIDE PRESENCE OF JURY    6

6      DISCUSSION HELD OUTSIDE PRESENCE OF JURY   15

7      DISCUSSION HELD AT SIDEBAR                 47

8      DISCUSSION HELD OUTSIDE PRESENCE OF JURY   80

9      DISCUSSION HELD AT SIDEBAR                 98

10     DISCUSSION HELD AT SIDEBAR                110

11     DISCUSSION HELD OUTSIDE PRESENCE OF JURY  118

12

13

14

15

16               E X H I B I T S

17     *TRIAL EXHIBITS*              *MARKED*  *ADMITTED*

18     1608                                      97

19     1609                                     102

20     1611                                     103

21     1695                                      41

22     2123                                      79

23     2123                                      85

24     2203                                      63

25     2501                              57     108

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                      E X H I B I T S

 2                        (CONTINUED)

 3   TRIAL EXHIBITS                    MARKED   ADMITTED

 4   2504                                         66

 5   2606                                         69

 6   2706                                         71

 7   2707                                         73

 8   2708                                         76

 9   2709                                         78

10   4245                                         88

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 22, 2019

 2                         10:59 A.M.

 3                         - - - - -

 4      (The following was heard outside the presence of the

 5      jury.)

 6          THE COURT:  We're back on the record.  All counsel

 7   who were previously here are present.  No jurors are present.

 8          Mr. Spertus.

 9          MR. SPERTUS:  Your Honor, I wanted to provide a

10   citation to the Court for the proposition that the quality of

11   the government's investigation is always at issue, and I

12   mentioned that in my opening, so it's central to this defense,

13   US v Sagar.

14          THE COURT:  That's not the issue.  The issue is that

15   you've asked this question repeatedly, and you phrased it in

16   terms of was it an error, and I've explained that what

17   constitutes an error or, as you put it -- it could open other

18   issues in terms of how to evaluate that term.  You've asked

19   whether -- if you want to ask again whether, if seen, this

20   should have been provided, you can do that, but it's your use

21   of that descriptive term that I think raises the problems

22   because how is that defined.

23          MR. SPERTUS:  Yeah, but this agent has a subjective

24   understanding of the term.  She's in charge, but I'm just

25   saying that it's her opinion that I want.
```

```
 1          THE COURT:  I've ruled on this several times, and I

 2   just reexplained it and what you could and -- could do, and,

 3   frankly, it's been asked quite a few times already.

 4          MR. SPERTUS:  I'm going to let it go.  I just want it

 5   clear to the Court that her opinion is what I was seeking.

 6          THE COURT:  Well, when you ask her opinion in terms

 7   of was it agent error, that requires a determination of what

 8   does "agent error" mean.  That's what I keep saying.  It's one

 9   thing to say, "Did you expect this," or so on, but it's another

10   when you characterize it with a specific term.

11          MR. SPERTUS:  But she can answer, and I will

12   follow-up with questions if there's an ambiguity.  She

13   understands it.

14          THE COURT:  I think I've explained it as best I can

15   and what I think you can and cannot do, and I think that --

16   just follow those instructions, please.

17          MR. SPERTUS:  I will, but just so I don't stumble on

18   the line, the Court is ruling out that I can ask for this

19   agent's opinion on the quality of the work of the people she's

20   supervised?

21          THE COURT:  I don't think that's quite the question

22   you last asked, but -- you asked whether there was agent error,

23   didn't you?

24          MR. SPERTUS:  Yes.  And will the Court permit -- I

25   don't want to be objected to, but will the Court permit
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    questioning about her opinion of the quality of work by the

2    agents she supervised?

3            MS. SARTORIS:  Your Honor, defense counsel has

4    already asked Special Agent Miller on several occasions if she

5    would have seized it or if she thought it should have been

6    seized.  I think the Court's correct that whether or not

7    there's error would -- is something that would probably take

8    like an FBI review panel to determine, and this agent is not

9    qualified to address what would be agent error or not.

10           She's already stated that in her personal opinion,

11   that she -- there's a lot of hypotheticals here, too.  If the

12   boxes are as described by defense counsel to her, did she think

13   that they should be seized?  She's answered, yes, if they had

14   the label.

15           Someone -- I think that in the world of agents,

16   there's a lot of difference of opinions on what should or

17   should not be seized, and I think it opens up a lot of sort of

18   irrelevant and time-consuming discussion about, you know, we

19   already know she would have seized this box.  She's already

20   said that.

21           THE COURT:  Okay.  All right.  Thank you.

22           Again, Mr. Spertus, although I think it's already

23   been asked, if you want to ask the witness again whether if

24   this box had been identified, is it something that you would

25   expect to have been provided to her and so on, you can reask

1    that.

2           MR. SPERTUS:  I agree that's been answered.  I agree

3    with that.

4           THE COURT:  Okay.

5           MR. SPERTUS:  I'm asking her to judge the quality of

6    work by the people that reported to her on this day.

7           THE COURT:  Okay.  I think you have a sufficient

8    foundational basis to make arguments, as I said earlier, as to

9    what you contend to be the quality or error in the work.

10          MR. SPERTUS:  I understand.  The arguments would be

11    stronger if she agreed.

12          THE COURT:  I think that she's already addressed that

13    issue by responding to your questions about expectations about

14    the production of these boxes in the event they had been there

15    as they were and were identified.

16          MR. SPERTUS:  One other point.  I'll stay away from

17    that subject matter.  I understand the Court's guidance.  Thank

18    you.

19          I am prepared -- I can try to have the person from my

20    office who seized the boxes from Dr. Shih's home testify this

21    afternoon out of order, which will then, throughout this trial,

22    allow the key exhibits to be in evidence.

23          If the Court won't conditionally admit them, which is

24    my first request -- because the Court has already said it can

25    remove things from evidence if it concludes that there was an

1    insufficient foundation.  So I would request conditionally

2    admitting them now.

3            The only remaining step I want to do with this agent

4    is to compare a couple serial numbers to the packing slip she

5    just testified about because they match.  And if, you know, the

6    Court won't allow me to do that, then I'll have to call her

7    back at the end of the case.

8            MS. SARTORIS:  Your Honor, that's fine.  I mean,

9    Special Agent Miller is local.  We don't have the travel

10   restrictions.  Defense counsel has an opportunity to put on his

11   case --

12           THE COURT:  Slow it down.

13           MS. SARTORIS:  -- but it's not appropriate for him to

14   inject witnesses at this point in the government's case.

15           THE COURT:  Well, is what you want to ask the witness

16   whether numbers on the wafers that you have match numbers on

17   the other document?

18           MR. SPERTUS:  Yeah, so Government's Exhibit 743 is an

19   item that Agent Miller seized.  Two of those numbers appear on

20   two of the wafers in this case.

21           MS. SARTORIS:  Your Honor, if I may?

22           MR. SPERTUS:  I just want to confirm that with this

23   witness and then move those two wafers into evidence.

24           MS. SARTORIS:  Special Agent Miller has made it very

25   clear that she has not seen these wafers before or looked in

1    the box, so it doesn't seem appropriate to make her sit on the

2    stand and read numbers to defense counsel.

3              THE COURT:  Just a minute.

4              MR. SPERTUS:  Your Honor, the foundation could be

5    laid through any witness.

6              THE COURT:  Just a minute.  743 -- you're referring

7    to 743, which is a document at the top that says "Cree,"

8    correct?

9              MR. SPERTUS:  Right.  It's what Agent Miller on

10   direct had said --

11             THE COURT:  Just a minute.  Where in this -- and then

12   are you saying that under "Specification of Commodities" where

13   there are three wafers listed --

14             MR. SPERTUS:  It's zoomed up on the screen.  It's

15   that portion of Exhibit 743.

16             THE COURT:  And your offer of proof is that the

17   documents in the box, the wafers themselves, correspond to

18   three of those numbers?

19             MR. SPERTUS:  Yes.  Two of the -- yes, there's a

20   total of eight wafers in this case.  Two of them were in that

21   box and match the packing slip, the one packing slip that's

22   presently in evidence.  There's another.

23             So I just want to match these two with that packing

24   slip and then use that as the foundation for admissibility with

25   the hope of passing them to the jury like the government did

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    with its Exhibit 1.

2              MS. SARTORIS:  Your Honor, I would like to be heard

3    on this.

4              First of all, this is the first time that defense

5    counsel's mentioned these wafers in the year and a half.  We've

6    had no opportunity to inspect them or to review them.

7    Certainly, Special Agent Miller has not.

8              And so it is extremely inappropriate for him to pull

9    these items in the middle of court and hand them to a witness

10   who has no information about them, as if to represent that

11   somehow if she reads the numbers, it makes them authentic.

12             MR. SPERTUS:  Yes, that's exactly the point.

13             If the numbers match the packing slip that she has

14   introduced into evidence, that's a sufficient foundation for

15   admission.

16             THE COURT:  All right.  I understand.

17             I think that -- Mr. Spertus, here's what I think.  I

18   think that in terms of whether the numbers on these disks for

19   the present purposes match the numbers on Exhibit 743 is

20   probably something about which there's not a dispute because

21   somebody can read the numbers.

22             Now, however, whether the disks that you -- or the

23   items -- the wafers that you have with you today are the

24   authentic wafers, and so on, is something that I can't

25   determine.  I don't have any -- I don't know one way or the

1    other.

2              So I think that the appropriate thing to do is to

3    provide the opportunity for the government to examine these,

4    and if you want to recall the witness to have her confirm that

5    fact, you could do that, but I don't think it's necessary at

6    this point just to match numbers.

7              MR. SPERTUS:  Well, Your Honor, my goal is simply

8    this.  At this point in the testimony, I want to pass these two

9    wafers to the jury.  The government did that with its waiver.

10             THE COURT:  They need to be authenticated.

11             MR. SPERTUS:  Right, but that's where the numbers

12   come in.

13             THE COURT:  That's not where the numbers come in

14   because part of authentication would be whether these are the

15   same physical exhibits.

16             MR. SPERTUS:  Well, then, can I call my -- a witness

17   out of order to make that foundation?

18             I submit for a unique item, that's -- I respectfully

19   didn't have that view, but if that's the Court's view,

20   obviously I'll respect that.  I have a witness that will

21   testify, "I went to Dr. Shih's house when he got out of jail

22   and recovered the wafers exactly as depicted in the photo."

23             THE COURT:  Briefly.

24             MS. SARTORIS:  Yes, Your Honor.  Two things:  One, it

25   is not exceptional that Dr. Shih may have handed these wafers

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to somebody who works for defense counsel.  That still does not

2    establish where they came from or that they were there that

3    day.  It probably opens up some attorney-client issues.  I

4    don't quite know, because, unfortunately, defense counsel did

5    not bring this up in advance.  We've had ample opportunity to

6    discuss these issues.

7            Secondly, with respect to recalling Special Agent

8    Miller to read numbers also seems inappropriate.  If defense

9    counsel wants to put into evidence the numbers in this case,

10    that is the point of the defense case and he will have the

11    opportunity to do that.  She's not seen these before.  She's

12    not uniquely qualified to read numbers.

13            THE COURT:  All right.  My view is this.  To be

14    clear, Mr. Spertus, I'm not questioning your -- the

15    representations that you're making to me, but until I --

16    there's a process that needs to be undertaken, and I don't

17    think the right thing now -- we've got a jury outside here.

18    We're trying to keep things moving, and given the length of the

19    estimated trial, I don't think it's materially different

20    whether this occurs today or a different day --

21            MR. SPERTUS:  Thank you.

22            THE COURT:  -- so I'd rather just do it on a

23    different day.

24            MR. SPERTUS:  Thank you, Your Honor.

25            THE COURT:  Thank you.

```
 1              MR. SPERTUS:  Okay.  So, Your Honor, then I'll move

 2    on to an entirely different area.

 3              THE COURT:  That's fine.  Thank you.

 4         (Jury in at 11:10 a.m.)

 5              THE COURT:  Please be seated.

 6              All of our jurors are present.  Sorry we kept you

 7    waiting a minute there, ladies and gentlemen.  We're always

 8    trying to get things done efficiently.

 9              Just to remind you, we will not be in session

10    tomorrow or Friday or Monday, the holiday.  Thank you.  But we

11    will start again on Tuesday.

12              Ms. Miller, would you please restate your name.

13              THE WITNESS:  Maureen Miller.

14              THE COURT:  And you understand that you remain under

15    oath?

16              THE WITNESS:  Yes, I do.

17              THE COURT:  Mr. Spertus, please proceed.

18                         MAUREEN MILLER,

19              having been previously duly sworn,

20                  testified further as follows:

21                       CROSS-EXAMINATION

22                          (RESUMED)

23    BY MR. SPERTUS:

24    Q.  So, Ms. Miller, you've been involved in this investigation

25    for at least a couple years, right?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   Since May of 2017.

2    Q.   Okay.  Were you involved when Agent Baker went to UCLA to

3    recover a Cree wafer from Ethan Huang at UCLA?

4    A.   I don't believe -- no, I don't believe I was involved in

5    this investigation at this point.

6    Q.   Okay.  But did you come to know that Professor Ethan Huang

7    simply gave Agent Baker the wafer when Agent Baker requested

8    it?

9    A.   Well, I don't think it was an Agent Baker.  If memory

10   serves me correctly, that is not the correct name.

11   Q.   I'm sorry.  And I apologize.  I'd like to reask the

12   question.  Agent Burke, right?

13   A.   Yes.

14   Q.   Okay.  So the case agent at the time for the FBI who went

15   to UCLA and asked Professor Huang if he could have the wafer

16   was James Burke, right?

17          MS. SARTORIS:  Objection.  Foundation.

18          THE COURT:  It's a "yes" or "no."

19          MR. SPERTUS:  Brian Burke.  Your Honor, I had two

20   errors in a row.

21          THE COURT:  Restate the question, please.  Just to

22   simplify this, would you ask it in a foundational basis.

23   BY MR. SPERTUS:

24   Q.   Do you know whether Brian Burke went to Professor Huang at

25   UCLA and said, "I work at the FBI.  May I have the wafer?"
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  At this point, it's just a "yes" or a

2   "no" or "I don't know."

3          THE WITNESS:  Can you repeat the question one more

4   time, please?

5          THE COURT:  Would you read the question.

6      *(The record was read.)*

7          THE COURT:  The question is simply do you know.  It's

8   a "yes" or "no" whether you know that.

9          THE WITNESS:  Yes.

10         THE COURT:  Then ask the next question, please.

11  BY MR. SPERTUS:

12  Q.  Do you know whether during the window when you were

13  participating in this case Keit Mei was being asked questions

14  by Agent Storino and voluntarily answering all of Agent

15  Storino's questions?

16         MS. SARTORIS:  Objection, Your Honor.  Vague as to

17  time.

18         THE COURT:  Do you understand the question?

19         THE WITNESS:  I believe I understand it, but I'm not

20  sure that it's going to be a "yes" or a "no" answer.

21         THE COURT:  No, the purpose of that was just to

22  determine if you had the knowledge so that then there could be

23  the next question about what your knowledge is.

24         Would you restate the question with the time frame,

25  please.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. SPERTUS:
 2   Q.   Since the time you became associated with this
 3   investigation, was Kiet Mai answering questions asked of him by
 4   Agent Storino?
 5   A.   Again, I'm not sure I can answer this in a "yes" or "no"
 6   fashion.  I was aware that agents from our office had spoken
 7   with Kiet Mai in -- I believe it was before I joined the
 8   investigation.
 9          Again, my memory is a little bit not clear on the
10   timeline.  I don't believe Kiet Mai was talking with us during
11   my participation in the case until after we had conducted the
12   search warrant and the arrest.
13   Q.   So you've never seen any emails, for example, between
14   Alex Storino and Kiet Mai before the searches?
15          MS. SARTORIS:  Objection.  Relevance and scope and
16   hearsay.
17          THE COURT:  Well, it's -- just to be clear, Agent
18   Miller, if I'm asking you to say "yes" or "no" to a question,
19   it's simply whether or not you know something.  Then there
20   would be a follow-up question as to what you know.
21          Do you understand that distinction?
22          THE WITNESS:  I think so.
23   BY MR. SPERTUS:
24   Q.   Are you aware before the searches that Kiet Mai was
25   answering questions posed to him by Alex Storino?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.   I understand that you want a "yes" or "no" answer.  Um --

 2              THE COURT:  Well, it's a "yes" or "no" whether you

 3    know that, and then there can be a follow-up question as to --

 4              THE WITNESS:  Yes, I was aware that Kiet Mai and

 5    Special Agent Storino had communicated.

 6    BY MR. SPERTUS:

 7    Q.   Right.  I guess let me ask it this way.  You're aware that

 8    the FBI's investigation was no secret to Dr. Shih, correct?

 9              MS. SARTORIS:  Objection, Your Honor.  Foundation to

10    what Dr. Shih knows.

11              THE COURT:  Vague as to time.

12    BY MR. SPERTUS:

13    Q.   Prior to January 19, 2018, you're aware that Kiet Mai and

14    Professor Huang at UCLA said, "I'm going to discuss your

15    questions with Dr. Shih," right?

16              MS. SARTORIS:  Objection, Your Honor.  Hearsay.

17              THE COURT:  It's not offered -- is your question

18    premised on that being stated to this witness?

19              MR. SPERTUS:  Maybe I'll just ask a completely

20    different question.

21    BY MR. SPERTUS:

22    Q.   The very first time Dr. Shih and you met was the date of

23    the search, January 19, 2018, correct?

24    A.   Yes, that is correct.

25    Q.   To your knowledge, nobody from the FBI ever once reached
```

1    out to Dr. Shih to discuss his research or the wafers or

2    anything related to your case, right?

3    A.    That is my understanding, yes.

4    Q.    Interviewing is one of the fundamental things that FBI

5    agents do, right?

6    A.    Yes.

7    Q.    But yet no one interviewed Dr. Shih to explain the work at

8    Chengdu Ganide or the work at UCLA that he was doing or the

9    Cree wafers that he ordered through Kiet Mai or anything like

10   that, right?

11   A.    That is my understanding, yes, but there would be a number

12   of reasons why we may not conduct an interview.

13   Q.    Why wouldn't you interview him?

14   A.    There's -- again, like I said, there's a variety of

15   reasons why we may not approach an individual for an interview.

16         As agents, we like to be as prepared as possible for

17   conducting the interview so that we can know if the person

18   being interviewed is telling the truth to us or not.

19         We -- if you go out and interview an individual, they

20   may change their habits or their daily activities, which could

21   result in evidence being lost or destroyed, and then, if you --

22   again, if you interview an individual, they may also -- if they

23   have the resources, they could potentially flee the country.

24   Q.    So all of those stated reasons for not interviewing

25   someone that you just articulated apply to people being

1    investigated who are unaware of your investigation, right?

2    A.   Can you repeat the question?  I'm not sure I quite

3    understand it.

4    Q.   I'll reframe it.  You described that people could destroy

5    evidence.  That was one of your reasons, right?

6    A.   Yes.

7    Q.   Okay.  But someone who knows the FBI's investigating them

8    could then destroy evidence, right?

9    A.   Yes.

10    Q.   So your point is that you don't want to interview because

11    you don't want to tip someone off to an investigation that

12    they're otherwise unaware of, right?

13    A.   We --

14         MS. SARTORIS:  Your Honor, these questions go well

15    beyond the scope of direct examination.

16         THE COURT:  Overruled.  You may answer.

17         THE WITNESS:  Can you repeat it one more time, again?

18         THE COURT:  Would you read the question, please.

19    *(The record was read.)*

20         THE WITNESS:  We want them to -- we don't want them

21    to change their behaviors or change their daily activities

22    because that could -- as I said, it could result in the

23    destruction of evidence, which, you know, could be proof that

24    they committed a violation of federal law.

25    *///*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    BY MR. SPERTUS:

2    Q.    But all of these reasons not to interview that you just

3    described are because you don't want to make somebody aware of

4    your investigations.  That's the reason you don't interview,

5    you testified to just now.  I want to make sure I'm getting it

6    right.  Strike that.  I want to ask a new question.

7          I just asked you why wouldn't you go to Dr. Shih, ask

8    him about his research and work at Ganide.  In response, you

9    gave a variety of reasons.  Those reasons you gave are reasons

10   that would not apply if Dr. Shih's well aware of your

11   investigation and is expecting you to come ask him about his

12   research, right?

13   A.    I don't believe that that is an accurate statement, if

14   that makes sense.

15   Q.    Okay.  Other than informing a target of an investigation,

16   is there any other reason not to interview him about the facts

17   that are of interest to you as an FBI agent?

18   A.    Can you repeat the question one more time, please.

19   Q.    You didn't interview Dr. Shih before you met him for the

20   first time, the date that you and your colleagues arrested him,

21   right?

22   A.    Correct.  I was not part of the interview.

23   Q.    Well, the interview happened after Dr. Shih was arrested,

24   right?

25   A.    It happened during the execution of the search warrant.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Right.   The first step of the execution of the search

2    warrant at 6:00 a.m. in the morning on January 19, 2018, was to

3    arrest Dr. Shih, right?

4    A.    We had an arrest warrant for Mr. Shih, yes.   We took him

5    into custody and then conducted an interview.

6    Q.    And prior to arresting him -- this is my question to you.

7    Why wouldn't you just ask him about his research and his work

8    at CGTC if the FBI was investigating those activities,

9    especially if you knew that he was aware of your investigation?

10   A.    We -- again, I stated a variety of reasons why we may not

11   go -- we may not go interview someone.   If we suspect that they

12   have committed a crime, a violation of the law, then, you know,

13   we want to hold them accountable for that.

14   Q.    I understand.   But you want to get your facts right,

15   correct?

16   A.    Yes.

17   Q.    Isn't interviewing him an opportunity for you to make sure

18   that your theories of wrongdoing are correct?

19   A.    That could -- it could be one step in the investigative

20   process.

21   Q.    So that step was not done in this case, right?

22        MS. SARTORIS:   Objection, Your Honor.   Dr. Shih was

23   interviewed in this case.

24        THE COURT:   Restate the question.

25   ///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    BY MR. SPERTUS:

2    Q.   That step was not done before Dr. Shih was arrested as a

3    first step in your investigative activities on January 19,

4    2018, correct?

5              MS. SARTORIS:   Objection, Your Honor.   That's a vague

6    and compound question.

7              THE COURT:   Do you understand the question?

8              THE WITNESS:   Yes.

9              THE COURT:   You may answer.

10             THE WITNESS:   We did not conduct an interview prior

11   to the execution of the search warrant on January 19.   It is

12   not a required step in our investigative process to interview

13   someone.   That is a decision that is made based on the

14   individual cases and the agents that are involved.   So it

15   wouldn't necessarily -- it wouldn't be a first step and it may

16   not be a step at all.

17   BY MR. SPERTUS:

18   Q.   Were you involved in the decision to not ask him about the

19   wafers before January 18, 2019, when he was arrested?   I'm

20   sorry.   I misstated the date, but let me restate the question.

21             Were you involved in the decision to not ask Dr. Shih

22   about his research or where the wafers were before you entered

23   his residence on January 19, 2018?

24   A.   I was involved in a variety of discussions that we had in

25   this case since when I joined it in May of 2017.   I don't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  specifically recall any discussions that we had regarding an

2  interview and so I cannot recall that I was involved in any

3  conversations that were discussed about interviewing Mr. Shih

4  before we conducted our search warrant.

5  Q.   Before executing the search and arrest warrants at

6  6:00 a.m. on the 19th -- January 19, are you aware of any other

7  investigative steps designed to better understand Dr. Shih's

8  research at UCLA that were taken by FBI agents?

9  A.   We conducted a variety of investigative steps prior to the

10 search warrant, which did involve UCLA.

11 Q.   You recovered a Cree wafer from UCLA and that Cree wafer

12 matched the packing slip that you ultimately seized on

13 January 19, 2018, that's in evidence, correct?

14 A.   I would have to take a look at the -- our Exhibit Number 1

15 to say with 100 percent certainty that that was one of the

16 numbers that was listed on that Cree packing slip.

17 Q.   So as you sit here today, you don't know?

18 A.   There's a variety of numbers that are on that Cree wafer,

19 and there's a variety of numbers on the Cree slip that has been

20 entered into evidence.  I cannot recall the very specific

21 numbers that match the two of them off the top of my head right

22 now.

23 Q.   Okay.  I'm just going to direct your attention to the

24 packing slip you testified about earlier this morning.  I'm not

25 testing your memory on numbers.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            Are you aware of whether the wafer that Professor

 2   Ethan Huang gave to Brian Burke was a wafer ordered from Cree

 3   reflected on the packing slip?

 4            THE COURT:  By "packing slip," are you referring to

 5   Exhibit 743?

 6            MR. SPERTUS:  I am, Your Honor.

 7            THE COURT:  Thank you.

 8            THE WITNESS:  Upon looking at this packing slip, in

 9   the present moment, I am not a hundred percent sure that the

10   numbers and letters -- the combination of numbers and letters

11   on this slip match the one that has been entered as Exhibit 1.

12   BY MR. SPERTUS:

13   Q.  But you are 100 percent sure that one of the Cree wafers

14   was at the UCLA Department of Electrical Engineering being

15   tested and studied by Ethan Huang, right?

16   A.  Yes.

17            MR. SPERTUS:  Your Honor, may I have a moment?

18            THE COURT:  Yes.

19       (Counsel confer off the record.)

20            MR. SPERTUS:  Your Honor, I just request that Agent

21   Miller be subject to recall for the reasons we discussed, and

22   with that I'd have no further questions.

23            THE COURT:  That's fine.  She will be.

24            Any redirect?

25            MS. SARTORIS:  Yes, Your Honor.  Thank you.
```

```
 1                    REDIRECT EXAMINATION

 2   BY MS. SARTORIS:

 3   Q.   Special Agent Miller, defense counsel was just asking you

 4   some questions about interviewing the defendant.

 5            Now, the FBI did, indeed, interview the defendant; is

 6   that correct?

 7   A.   Yes, we did.

 8   Q.   And it was done at the same time as a search warrant was

 9   done on defendant's home; is that correct?

10   A.   Yes.

11   Q.   And that search warrant was signed by a judge?

12   A.   Yes.

13   Q.   And the judge -- the affidavit in support of the search

14   warrant did not include information suggesting that the

15   defendant was interviewed?

16   A.   Can you repeat the question?

17   Q.   So the affidavit in support of the search warrant didn't

18   include information that the defendant was interviewed?

19   A.   Correct.

20   Q.   And there's good reason, right, to not interview targets

21   at all times prior to executing a search warrant; is that

22   right?

23   A.   Yes, correct.

24   Q.   What are some of those reasons?

25            MR. SPERTUS:  I just object to the leading nature of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the questions.

2              THE COURT:   Sustained.   Restate the question, please.

3    BY MS. SARTORIS:

4    Q.   Are there reasons that the FBI or other agents don't

5    interview targets of investigations before conducting search

6    warrants?

7    A.   Yes.

8    Q.   And what are those?

9    A.   As I stated earlier, the reasons would be that we -- as

10   agents, before going into an interview, we want to make sure

11   that we understand everything that we're going to be talking

12   with the individual about to know -- in order to know if they

13   are being truthful with us, and we -- you know, after

14   interviewing one, it's not uncommon for individuals to do

15   something different with their daily lives and alter their

16   patterns of behavior and -- which that can include destruction

17   of evidence.   And then, again, if they have the resources,

18   particularly the financial resources, they can flee the

19   country.

20   Q.   When federal agents interview people, do they sometimes

21   lie to them?

22   A.   Yes.

23   Q.   And when federal agents interview people, are -- they

24   sometimes obscure information or provide false information?

25   A.   Yes.   A lot of times interviewees will minimize their

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    involvement in something or tell us false statements to protect

2    another individual or to protect themselves.

3    Q.    So it is the practice -- as you were suggesting, the FBI

4    and yourself in particular, as well -- in the right

5    circumstances to decide to be really prepared prior to an

6    interview and get as much information prior to the interview.

7              Is that something you testified to?

8    A.    Yes.

9    Q.    And is that so that you can better assess if people are

10    lying to you when they interview?

11    A.    Yes.

12    Q.    Is it also a concern that they might alert

13    co-conspirators?

14    A.    Yes, that would also be a concern.

15    Q.    And then it's a trickle-down effect, right?

16    Co-conspirators might flee or destroy evidence or tell other

17    co-conspirators?

18    A.    Yes.

19    Q.    Now, defense counsel asked you some questions about boxes

20    that were in a photograph that appeared to have the Cree tape

21    on them; is that correct?

22    A.    Yes.

23    Q.    Do you remember that?

24    A.    Yes.

25    Q.    And the FBI did not seize those boxes?

```
1    A.    That is correct.

2    Q.    So they haven't been in the possession --

3          MR. SPERTUS:  Objection.  Leading the witness.  Every

4    question.

5          MS. SARTORIS:  I can rephrase it, Your Honor.

6          THE COURT:  Restate the question, please.

7    BY MS. SARTORIS:

8    Q.    Did the FBI seize the boxes that were in the photograph?

9    A.    We did not.

10   Q.    Have they been in the FBI's possession since January 2018?

11   A.    They have not.

12   Q.    Have they ever been in the FBI's possession?

13   A.    No.

14   Q.    Defense counsel asked you to open a box and pull out

15   bubble wrap and other contents of a box?

16   A.    That is correct.

17   Q.    And that was a box -- was that a box that he pulled out of

18   another box here in court right in front of everybody?

19   A.    Yes.

20   Q.    Is that the first time --

21         MR. SPERTUS:  I ask that the prosecutor not lead the

22   witness.

23         THE COURT:  Okay.  What's the next question, please?

24   BY MS. SARTORIS:

25   Q.    Have you seen the contents of that box before today?
```

```
1    A.   I have not.
2    Q.   Were there other people at the Beckman Road residence that
3    remained when the FBI left in January 2018?
4    A.   Yes, there was.
5    Q.   Did this include family members?
6    A.   Yes.  I believe the defendant's wife and the daughter's
7    boyfriend were at the residence when we left.
8    Q.   And as far as you know -- do you know who's been in the
9    residence since January 2018?
10   A.   I do not.
11   Q.   Has defendant himself resided at that house for roughly
12   over the past year?
13   A.   Yes.  That is my understanding.
14   Q.   Do you know if the defendant put those items in the box?
15            MR. SPERTUS:  Your Honor, this is incredibly
16   argumentative.
17            THE COURT:  Yeah, sustained.
18   BY MS. SARTORIS:
19   Q.   Do you know who put the items in the box?
20            MR. SPERTUS:  Your Honor, argumentative.
21            THE COURT:  Sustained as framed.
22   BY MS. SARTORIS:
23   Q.   So I won't ask who, but do you know how those items ended
24   up in the box?
25   A.   I do not.
```

```
 1              MS. SARTORIS:  I think, Your Honor, I have no more

 2    questions.

 3              THE COURT:  Thank you.

 4              Briefly.

 5                        RECROSS-EXAMINATION

 6    BY MR. SPERTUS:

 7    Q.   Within the scope of the questions the prosecutor just

 8    asked you, you previously admitted that you're not even aware

 9    whether an agent opened the box on the day of the search, the

10    two Cree boxes depicted in Government's Exhibit 743, correct?

11              MS. SARTORIS:  Your Honor, I believe that is beyond

12    the scope of the questions I asked.

13              THE COURT:  All right.  You may answer.  Do you

14    understand the question?

15              THE WITNESS:  Say it one more time for me, again.

16    BY MR. SPERTUS:

17    Q.   The prosecutor just asked you a question, "Do you know

18    whether -- who put the wafers in the box?"  Do you recall that

19    question that you were just asked?

20    A.   Yes.

21    Q.   You said "no," right?

22    A.   Correct.

23    Q.   And the reason you don't know is because you didn't look

24    in the box on the day of the search, right?

25              MS. SARTORIS:  Objection, Your Honor.  Calls for
```

```
 1   speculation.  It wouldn't be the reason why she wouldn't know.
 2           THE COURT:  Sustained as framed.
 3   BY MR. SPERTUS:
 4   Q.   If you had looked in the box on January 19, 2018, you
 5   would know what was in the box on January 19, 2018, correct?
 6           MS. SARTORIS:  Objection, Your Honor.  It assumes
 7   facts not in evidence.
 8           THE COURT:  Sustained as framed.  This goes to the
 9   issue we have not yet addressed.
10   BY MR. SPERTUS:
11   Q.   Directing your attention to the questions you were just
12   asked on redirect by Melanie Sartoris -- okay? -- she was
13   asking you questions about whether other people resided at
14   Dr. Shih's residence after the FBI left the premises on
15   January 19, 2018.  Do you recall that question?
16   A.   Yes.
17   Q.   What did you understand the importance of that question to
18   mean to you?
19   A.   I would have interpreted that question as that there were
20   residents -- there were occupants left at the residence after
21   we had left and that they may have altered the contents of the
22   boxes.
23   Q.   And if you had looked at the boxes yourself on January 19,
24   2018, you would know, right?
25   A.   So this was -- the residence was very large.  We had a
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1  number of agents working to conduct the search of the
 2  residence, and so -- and I was filling a variety of tasks as
 3  team leader, and so as team leader, we are not always able to
 4  look at every piece of evidence that we may take out of a
 5  residence.
 6         We seized over 120 items from this residence,
 7  which -- some of them included, as I've stated, thousands and
 8  thousands of pages of documents, many, many digital devices,
 9  and so I was not able to look at all of the items in great
10  detail.
11  Q.  Which gives you no basis whatsoever to believe that
12  anybody altered those boxes after the FBI departed, right?
13         MS. SARTORIS:  Objection, Your Honor.  It's
14  argumentative.
15         THE COURT:  You may answer.
16         THE WITNESS:  I cannot say if anyone altered the
17  boxes after we had left.
18  BY MR. SPERTUS:
19  Q.  Because you didn't look at them when you were there,
20  right?
21  A.  As I have stated, I was unable to look at every piece of
22  evidence or every item that was brought to my attention that
23  day, and so I was not able -- I did not specifically look
24  inside these boxes that day because, like I said, there was a
25  number of other items that we seized.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q.   The boxes were very large as depicted in the photograph,

2   right?

3   A.   I wouldn't -- I guess I wouldn't consider them large

4   boxes.  They were underneath a table in a very cluttered,

5   upstairs office loft space.

6   Q.   In order for someone to take the picture that is marked

7   Government's Exhibit 743, they would have to be facing the

8   boxes in order for the boxes to be in the picture, right?

9   A.   Correct.

10  Q.   And there's no doubt that the agents on site are looking

11  at exactly the scene depicted in Government's Exhibit 743,

12  right?

13          THE COURT:  I don't think that's the correct exhibit

14  number.

15          MR. SPERTUS:  I'm sorry.  And that's why I was --

16  793, page 16.

17          THE COURT:  Thank you.

18  BY MR. SPERTUS:

19  Q.   Agent Miller, I've just placed Exhibit 793, page 16, on

20  the monitor.  I don't want to quibble about whether the boxes

21  are large or small, but they're the exact size depicted in the

22  Government's photo, correct?

23          MS. SARTORIS:  Your Honor, I'm objecting to this line

24  of questioning.  They do go well beyond the scope of the cross.

25          MR. SPERTUS:  Well, I'll strike that question.

1    BY MR. SPERTUS:

2    Q.    Agent Miller, do you have any basis whatsoever to conclude

3    that somebody created these boxes that you're now looking at in

4    the courtroom and that they're not the boxes depicted in

5    Government's Exhibit 793?

6    A.    No.

7              MR. SPERTUS:  No further questions, Your Honor.

8              THE COURT:  All right.

9              MS. SARTORIS:  No further questions, Your Honor.

10             THE COURT:  Ms. Miller, thank you for your testimony.

11   You may step down, subject to being recalled.

12             THE WITNESS:  Thank you.

13             THE COURT:  Government call the next witness, please.

14             MS. HEINZ:  Your Honor, the government calls Barbara

15   Hong Li.

16             THE CLERK:  Please raise your right hand.

17             Do you solemnly swear that the testimony you shall

18   give in the cause now before this Court shall be the truth, the

19   whole truth, and nothing but the truth, so help you God?

20             THE WITNESS:  Yes, I do.

21             THE CLERK:  Please have a seat.

22             THE WITNESS:  Thank you.

23             THE CLERK:  Can you please state your full name and

24   spell it for the record.

25             THE WITNESS:  Yes.  My name is Barbara Hong Li.  Last

```
 1    name L-i.  First name two words, Barbara and then H-o-n-g.

 2              THE COURT:  Good morning, Ms. Li.

 3              THE WITNESS:  Good morning, Judge.

 4              THE COURT:  Please proceed.

 5                        BARBARA HONG LI,

 6                 having been first duly sworn,

 7                    testified as follows:

 8                      DIRECT EXAMINATION

 9    BY MS. HEINZ:

10    Q.   Good morning, Ms. Li.

11    A.   Good morning.

12    Q.   Did you prepare and also review Mandarin-language

13    documents in this case?

14    A.   Yes, I did.

15    Q.   And did you prepare or review English-language

16    translations of those?

17    A.   Yes.

18    Q.   Could you please describe for us your education.

19    A.   I have two master's degrees, and then I finished my

20    college education and undergrad -- college education and

21    post-graduate studies in China.  And my major in college was

22    English literature, and my major in graduate studies was

23    linguistics and applied linguistics.

24              And then when I moved to the United States, and then

25    I went to Monterey and I got my master's degrees in translation
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    and interpretation at Monterey Institute of International

2    Studies.

3    Q.    And what is your native language?

4    A.    Mandarin.

5    Q.    And how long have you been speaking English?

6    A.    Since -- since high school.  I would say over 30 years.

7    Q.    And do you also know Cantonese?

8    A.    Yes.  I lived and worked in the only Cantonese-speaking

9    province in China for ten years, and -- yeah, that was my

10   working language, in Cantonese, so that was during -- for the

11   last ten years before I came to the US.

12   Q.    And I think you mentioned you have two master's degrees?

13   A.    Yes.

14   Q.    Could you tell us about those.

15   A.    One was the translation -- Master's of Science -- Master's

16   of Art in Translation and Interpretation from Monterey

17   Institute of International Studies, and the other one was from

18   University of Leicester from UK.  And I had a program, I

19   attended a program for HR management and training.

20   Q.    Ms. Li, do you work in the court system?

21   A.    Yes.  I was a part-time staff interpreter for the

22   California state -- for the Los Angeles County Superior Court,

23   and recently I -- and then later I became a full-time staff

24   interpreter.  Then in April -- April 15th this year, I quit the

25   full-time job and went back to the part-time status.

1    Q.   So that's state court.  Could you also talk about your

2    federal court experience.

3    A.   Yes.  I have been an uncertified -- because Mandarin and

4    Cantonese are not certified languages with the federal court,

5    so I have been a federal court-approved Mandarin and Cantonese

6    interpreter for a long time.

7    Q.   And do you also work for the United States State

8    Department?

9    A.   Yes.  I -- as a freelance interpreter, I have multiple

10   contracts, including a lot of US Government agencies, including

11   the US State Department, and also other partners -- other

12   departments as well.

13   Q.   Do you also perform translation services for nongovernment

14   entities?

15   A.   Yes.  I have multiple contracts with a variety of

16   universities in the United States, such as Georgetown

17   University.  I have also interpreted on the high-level programs

18   involving China for Stanford University, for UCLA, UCLA

19   Extension, and also the Anderson School of Business for UCLA,

20   and Georgetown University, and also law firms, yeah.

21   Q.   And have you also translated websites?

22   A.   Yes.  I translated part of the website for the State of

23   Utah for their court's website and also the website of -- the

24   South Carolina court's website, and also -- I'm sorry -- the

25   L.A. -- Los Angeles Convention Center website as well.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Do you also teach interpretation and translation?

2    A.   Yes.  I taught -- and also I'm going to teach the legal

3    translation and the interpretation program for UCLA Extension.

4    I teach and I have taught translation, consecutive

5    interpretation and simultaneous interpretation.

6    Q.   I would like you to look at what has been marked as

7    Government's Exhibit 1695.

8    A.   Is that here?

9    Q.   Yes.  It will be in the binders over there.  I'm sorry.  I

10   don't have the volume number.

11            THE COURT:  Volume 20.

12            THE WITNESS:  Volume 20?

13   BY MS. HEINZ:

14   Q.   And it should be the very last pages in that binder.

15   A.   Can you say the number again, please?

16   Q.   1695.

17   A.   1695.  I only see 1692.  That's the last one.

18   Q.   I think it's right behind that.  I don't think it has a

19   blue divider.

20   A.   Oh, okay.  Thank you.  Yes.

21   Q.   Okay.  Do you see that exhibit?  What is that exhibit?

22   A.   It's an exhibit of translations I have either reviewed or

23   I have translated.

24   Q.   In this case?

25   A.   Yes.

1   Q.   And is that a complete list of what you've either reviewed

2   or yourself prepared in this case?

3   A.   Yes.  I think more than that.

4   Q.   So you've actually prepared or reviewed more translations

5   in this case than are on this list; is that correct?

6   A.   Yes.

7   Q.   So this particular list, does this represent a list of the

8   translations you have prepared or reviewed that are exhibits in

9   this case?

10  A.   Yes.

11        MS. HEINZ:  Your Honor, we'd like to admit

12  Government's Exhibit 1695 at this time.

13        MS. WASSERMAN:  No objection, Your Honor.

14        THE COURT:  Exhibit 1695 is admitted.

15        It's a one-page document, correct?

16        MS. HEINZ:  Yes, Your Honor.

17     (Exhibit 1695 admitted into evidence.)

18  BY MS. HEINZ:

19  Q.   Looking at this list, Ms. Hong, the translations that you

20  have prepared or viewed that are listed as exhibits on

21  Government's Exhibit 1695, are they accurate?

22  A.   Yes.

23  Q.   I'd like you to look specifically now at what's been

24  marked as Government's Exhibit 144 and 144-A.

25        THE COURT:  It's in Volume 2.

```
 1              THE WITNESS:  Okay.  Yes.  I see 144.  And 148,

 2   right?

 3   BY MS. HEINZ:

 4   Q.    144 and 144-A.

 5   A.    Oh, okay.  Yes, I see them.

 6   Q.    So first I'd like you to look at 144, and specifically I'd

 7   like you to look at the Mandarin-language document.

 8   A.    Okay.

 9   Q.    That's 144.

10   A.    Yes.

11   Q.    And I'd like you to also look at 144-A.  Specifically, on

12   144-A, I'd like you to look at what's page 8.

13   A.    Sure.  Yeah.

14   Q.    Do you see that?

15   A.    Yes.

16   Q.    Now, I'm looking at the English-language translation that

17   you reviewed, page 8.

18   A.    Yes.

19   Q.    In the middle of the page, there is the word "evade"?

20   A.    Yes.

21   Q.    Do you see that?

22   A.    Yes.

23   Q.    Could you explain to the jury why you have translated the

24   Mandarin-language characters that are on Government's

25   Exhibit 144, why you have translated that as the word "evade"?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Because --

 2              THE COURT:  Excuse me one second.

 3              In Exhibit 144-A, you said page 8?

 4              MS. HEINZ:  Yes.

 5              THE COURT:  That Bates number 14346?

 6              MS. HEINZ:  Yes, Your Honor.

 7              THE COURT:  Thank you.

 8              Could you read the question, please.

 9              THE WITNESS:  Because that's what the Chinese

10    language says.  If you -- the words "evade," the Chinese -- the

11    two characters used in the source language is "gui bi."

12              So if I can -- if you allow me, then I can tell you

13    exactly -- maybe I can write those down and tell you separately

14    what each character means.

15              The first one "gui," spelled as g-u-i, actually means

16    "planning," and so this word is always used to indicate a

17    department within the city.  They call it City Planning

18    Department.  So that word "gui" means planning to do something,

19    make a plan to do something or make a plot to do something.

20              And, "bi," spelled as b-i, means "avoid."  So

21    actually the word "bi" is already enough to say to avoid

22    something, to shy away from something, to circumvent something.

23    But when you put "gui" and "bi" together, that means you make a

24    plan or you make a plot to avoid something.  So that's exactly

25    what the Chinese language means.
```

```
 1              MS. HEINZ:  Thank you, Ms. Li.  I have no further

 2    questions.

 3              THE WITNESS:  You're welcome.

 4              THE COURT:  Cross?

 5              MS. WASSERMAN:  May I have just one moment,

 6    Your Honor?

 7              THE COURT:  Sure.

 8         (Counsel confer off the record.)

 9              MS. WASSERMAN:  Thank you, Your Honor.

10              THE COURT:  You're welcome.

11              Please proceed, Ms. Wassermann.

12                        CROSS-EXAMINATION

13    BY MS. WASSERMAN:

14    Q.   Good afternoon.

15    A.   Good afternoon.

16    Q.   You testified that you have multiple government contracts

17    for interpreting, correct?

18    A.   Yes.  Yes, and translation, too.

19    Q.   Approximately how many times have you served as an

20    interpreter for the government?

21    A.   For the State Department, I started from 2007, like I

22    would do four or five programs a year.  So it's been a long

23    time.

24    Q.   Is it fair to say that the government is an important

25    client of yours?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   It is and it is not because I have a lot of contracts.  I

2    do other programs as well.

3    Q.   You're going to be paid approximately $80,000 in this case

4    for your work, correct?

5    A.   I don't know yet.  I have not sent in all my invoices yet.

6    Q.   Do you have a better estimate you could provide?

7    A.   I don't know until I see all of the work I have done.

8    Q.   Could you provide a ballpark, please?

9    A.   Approximately, yeah.  Maybe a little less.

10   Q.   What did you know about the allegations in this case

11   before you began your translation work?

12   A.   I don't know anything, yeah.

13   Q.   I'd like to direct your attention back to Government

14   Exhibit 144, please.

15   A.   Sure.  I'm looking at this one.

16   Q.   Excellent.  If you could turn to the page --

17   A.   Which page?

18   Q.   I'm going to give you a pin cite in just a moment, if you

19   will bear with me.

20             -- ending in 142175.

21   A.   142175, sure.  Okay.

22   Q.   Do you see the characters circled there?

23   A.   Yes.

24   Q.   That's the character "bi" that you previously testified

25   about?
```

1    A.    Yeah, "gui bi."

2    Q.    In this portion of the translation, you translated this

3    character as "avoid," correct?

4    A.    "Evade," yes.

5    Q.    It's your testimony that you translated this character as

6    "evade" on this page as well?

7    A.    Yeah, either "evade" or -- I need to see the translation.

8    So both are correct, either "evade" or "avoid."

9    Q.    So either "evade" or "avoid" is an appropriate translation

10    of that character?

11    A.    Yes.

12    Q.    They're both reasonable translations?

13    A.    Yes.

14    Q.    And it's the case that there's a completely different

15    Chinese character for the word "evade," correct, (speaking in

16    foreign language)?

17    A.    (Speaking in foreign language) is different.  "Gui bi" is

18    just like what I explained.  "Gui" means planning, to make a

19    plot, to do something, to avoid something.

20         (Speaking in foreign language) is -- just simply

21    means "run away."  It does not involve any making a plan or

22    making a plot or something.

23         And "gui bi" is -- is more serious.  Usually,

24    companies will use this "gui bi," use the word to say "gui bi"

25    (speaking in foreign language).

```
 1                 THE COURT:  Just a moment.

 2                 THE WITNESS:  I'm sorry.

 3                 THE COURT:  Just a minute.

 4                 THE REPORTER:  I can only take down English.

 5                 THE COURT:  I understand.

 6            Let me just talk to you briefly.

 7         (The following proceedings were held at sidebar.)

 8                 THE COURT:  Do you want the witness to try to spell

 9    in English the sound that she's saying in the other language so

10    the reporter can record it?

11                 MS. HEINZ:  That would be fine, Your Honor.

12                 MS. WASSERMAN:  Yeah, I think that would be

13    appropriate.

14                 THE COURT:  So why don't you ask her that question

15    then.  When she -- ask her words that she's used.  She just

16    used two different words.  So ask her if she can spell each

17    word in the English language in English, so it's -- with that

18    sound.

19                 MS. WASSERMAN:  Yes, Your Honor.

20                 THE COURT:  Thank you.

21         (The following proceedings were held in open court.)

22    BY MS. WASSERMAN:

23    Q.   Ms. Li, could you please spell -- stepping back, Pinyin is

24    an English way of reflecting a Chinese character, correct?

25    A.   Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Could you spell in Pinyin the "bi" character we were

2    discussing?

3    A.    B-i.

4    Q.    Thank you.  And I believe you previously testified, but I

5    just want to make sure that I understand.  An appropriate

6    translation of "gui bi" -- and could you spell "gui" also in

7    Pinyin?

8    A.    G-u-i.

9    Q.    "Avoid" is an appropriate translation of that character?

10   A.    Yeah, it's appropriate, yes.

11          MS. WASSERMAN:  No further questions.

12          THE COURT:  Any redirect?

13          MS. HEINZ:  No, Your Honor.

14          THE COURT:  Ms. Li, thank you for your testimony.

15   You're excused.

16          THE WITNESS:  Oh, thank you.  I thought I would be

17   here longer.

18          THE COURT:  Would the government call the next

19   witness, please.

20          MS. HEINZ:  Yes, Your Honor.  The government calls

21   Jesse Lu.

22          THE CLERK:  Please raise your right hand.

23          Do you solemnly swear that the testimony you shall

24   give in the cause now before this Court shall be the truth, the

25   whole truth, and nothing but the truth, so help you God?

```
 1                    THE WITNESS:  Yes.

 2                    THE CLERK:  Can you please be seated.

 3                    Can you state your full name and spell it for the

 4       record.

 5                    THE WITNESS:  Full name J-e-s-s-e, T-z-u, W-e-i.

 6       Last name's Lu, L-u.

 7                    THE COURT:  Good afternoon, Mr. Lu.

 8                    Please proceed.

 9                              JESSE LU,

10                    having been first duly sworn,

11                       testified as follows:

12                         DIRECT EXAMINATION

13       BY MS. HEINZ:

14       Q.   Good afternoon, Mr. Lu.

15       A.   Good afternoon.

16       Q.   Do you know a person by the name of Yi-Chi Shih?

17       A.   Yes.

18       Q.   And do you see the person you know as Yi-Chi Shih in the

19       courtroom?

20       A.   Yes, the gentleman right over there (indicating).

21       Q.   Could you please describe what he's wearing.

22       A.   He's wearing a gray suit and red-colored tie.

23                    MS. HEINZ:  Your Honor, may the record reflect that

24       the witness has identified the defendant?

25                    THE COURT:  Any objection to that?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. WASSERMAN:  No objection, Your Honor.
 2              THE COURT:  The record will reflect that
 3   identification.
 4   BY MS. HEINZ:
 5   Q.   And when approximately did you first meet the defendant in
 6   this case, Yi-Chi Shih?
 7   A.   At I would say maybe around the year of 2000.
 8   Q.   And what was the occasion?
 9   A.   I believe a social occasion.  That's the first meet.
10   Q.   And did you eventually begin employment with the
11   defendant?
12   A.   2001.
13   Q.   And what was that employment?
14   A.   MMComm.
15              THE COURT:  MMComm, is that what you said?
16              THE WITNESS:  Right.
17              THE COURT:  Would you spell that for the reporter,
18   please.
19              THE REPORTER:  I've got that one.
20              THE COURT:  All right.  Never mind.
21              Go ahead please, Ms. Heinz.
22   BY MS. HEINZ:
23   Q.   Where was MMComm?
24   A.   Torrance.
25   Q.   Torrance, California?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A.   California.

2    Q.   And what kind of a company was it?

3    A.   It was a millimeter wave component company.

4    Q.   And how is it that you came to work there?

5    A.   I was -- worked there as a salesperson and through one of

6    my friend, Ken Yen.

7    Q.   Could you say that name again.

8    A.   My friend named Ken, last name Yen.

9    Q.   Thank you.

10          And approximately how long were you employed at

11   MMComm?

12   A.   I think started 2001 to 2007.

13   Q.   Did you work there 40 hours a week?

14   A.   Yes.

15   Q.   And approximately how many employees worked at MMComm when

16   you worked there?

17   A.   I would say approximately 15.

18   Q.   Fifteen?

19   A.   Or 20.  15 to 20.  I'm not really sure.

20   Q.   Who was your supervisor at MMComm?

21   A.   I would say my direct supervisor is Dr. Yi-Chi Shih.

22   Q.   And what was Yi-Chi Shih's position at MMComm?

23   A.   President.

24   Q.   So was it his company?

25   A.   I believe he have a partner, but he is the president.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And did MMComm sell things?

2    A.    Yes.

3    Q.    What did they sell?

4    A.    Millimeter wave components.

5    Q.    And could you describe for us the work that you did at

6    MMComm.

7    A.    A salesperson.  I pretty much in charge for the window

8    that receiving inquiries from outside and respond to the

9    customers.  And I also doing purchasing.  And it's a small

10   company, so I have so many hats.  So I also do shipping.

11   Q.    All right.  So let's start with purchasing.  What kinds of

12   things would you purchase for MMComm?

13   A.    If I have orders from the engineering team, so I will

14   place the order to many different vendors, like DigiKey.  I buy

15   some parts.  I'd also place the orders to the machine shop for

16   the machine housings and et cetera.

17   Q.    Okay.  So when you talk about housing, could you describe

18   that for us.

19   A.    Housing is the component casing that we actually

20   manufacture our components using that metal housing.  It is

21   manufactured with -- outside with a CNC machine.

22   Q.    Okay.  And what was the housing made out of?

23   A.    Metal.  Sometimes different metals, maybe brass, for

24   example.

25   Q.    And then I think you said that you ordered the parts.

```
1    Would the parts go into the housing?

2    A.    Yes, some of the parts are going into the housing.

3    Q.    And what kind of parts would those be?

4    A.    Many different parts, but the major one would be a MMIC

5    chip.

6    Q.    Okay.  Is that M-M-I-C?

7    A.    Yes.

8    Q.    A MMIC chip?

9    A.    Right.

10   Q.    And where would you purchase the MMIC chips?

11   A.    Various sources.  There's MMIC chip factories.

12   Q.    And then you said that one of your functions was sales,

13   and I think you said you were at the front window.  Was this

14   the kind of company where people would come in person to buy

15   parts or buy the products?

16   A.    Well, if the customer in domestic, there is a possibility

17   they actually will visit us to see our facility and also

18   discuss the possible, you know, purchase, but mostly we -- for

19   international, we actually go through emails mostly.  Of

20   course, sometimes if they visit US, they might stop by.

21   Q.    Okay.  So if someone wanted to purchase a part from

22   MMComm, how would that process work?

23   A.    On my end?

24   Q.    Describe to us what you would know about how the -- how

25   that would work when someone wanted to buy a part.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Okay.  If we receiving the order from customers -- and

2    usually I will report it during our business meeting, which we

3    have every week, morning, so -- and we will actually discuss if

4    we are able to deliver such part.  Then the engineering team

5    will take a look, and if they say, yeah, that's -- it's doable,

6    then I will provide a quotation to customer to let them know

7    that's the price we offer, and we start from there.

8    Q.    So you mentioned a morning meeting.  Who would be at the

9    morning meeting?

10   A.    I would say everybody, but mostly every department's head,

11   including Dr. Yi-Chi Shih and Long Bui and all the engineer

12   team and a few key people.

13   Q.    All right.  So I want to ask you some questions about the

14   kind of customers that MMComm had, the kind of customers that

15   would buy the parts or buy the components that MMComm was

16   selling.

17            Would these include the United States military?

18   A.    Yes.

19   Q.    Would they include the navy?

20   A.    Yes.

21   Q.    The air force?

22   A.    Yes.

23   Q.    Would they also include defense contractors?

24   A.    Yes.

25   Q.    And do you know what I mean when I say "defense

1    contractor"?

2    A.   Can you describe more?

3    Q.   Yes.   That would be a civilian organization who had a

4    contract with the military in order to do something for the

5    military.

6    A.   I would say we mostly have a development contract with

7    military.   I would not say necessary we selling them something.

8    It's pretty much all studies or some kind of project that we do

9    it for militaries.   We have -- well, personally, I hardly see

10   something with delivered product.   We might deliver some

11   product but using for report purposes.

12   Q.   All right.   That's for the military.   What about for --

13   would you ever sell parts to companies like Honeywell or

14   Raytheon or BAE or -- companies like that?

15   A.   Yes, we do.

16   Q.   And I think you mentioned international sales.   You would

17   also sell to companies outside the US?

18   A.   Yes.

19   Q.   During your employment at MMComm, did you ever learn about

20   any United States Government regulations that control the

21   export of items from the United States to foreign countries?

22   A.   I don't have official training for that, but I do have

23   knowledge to actually understand.   There's things controlled by

24   the government that we not allowed to export unless with the

25   export license.

1    Q.   And how did you -- you said you didn't receive training.

2    So how did you learn about this?

3    A.   For example, when I ship things out, and I need to fill

4    out a form called Export Declaration Form, and in order for me

5    to fill that paper out, I need to actually go step by step, put

6    in all the correct information.  And, usually, those are

7    shippers, which is, I would say, US -- UPS, FedEx, they have a

8    website or a PDF instruction to show you how to do those, and

9    we can actually learn all the information from there.

10   Q.   And would you ever consult the defendant, Yi-Chi Shih,

11   about whether or not you could export something?

12   A.   Oh, yes, a few times.

13   Q.   Please describe that.

14   A.   Let's say, if we have inquiry from customer outside the

15   United States and if I see or I report it during the morning

16   meeting, usually Mr. Chic Shishido will say, "Oh, this product

17   maybe require export license or we might want to look into it,"

18   so after the meeting, we usually -- I walk into Dr. Yi-Chi's

19   office and actually to find out if the product it's actually

20   controlled or not.

21   Q.   And based on what you observed Dr. Shih do during those

22   meetings, what would you see him do when you would ask about

23   whether something needed a license to be sent outside the US?

24   A.   Usually, the procedures that the -- first, Dr. Yi-Chi Shih

25   will get a big, large government book.  That book will indicate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    a category.  All the products very detailed, and we actually

2    will look detaily [sic] to look if the product would fall into

3    which category.  And if that category was specified it's been

4    controlled, then we either have to reply back to customer that

5    this thing is controlled, which require export license.  So

6    either the customer themself have to apply for the export

7    license or we will follow the procedure.

8    Q.   During these kinds of meetings with Defendant Shih, did it

9    appear to you that he understood the export regulations?

10   A.   Oh, yes definitely.

11          MS. HEINZ:  At this time, Your Honor, I would like

12   this witness to look at certain pages of an exhibit that has

13   not yet been admitted, and I'm not asking to admit those -- the

14   exhibit through this witness, but it's important that he look

15   at certain pages.

16          THE COURT:  What's the exhibit number?

17          MS. HEINZ:  The exhibit number is 2501.

18          THE COURT:  It's Volume 22.  Exhibit 2501 is marked

19   for identification.

20       (Exhibit 2501 marked for identification.)

21   BY MS. HEINZ:

22   Q.   Mr. Lu, do you have Government's Exhibit 2501 in front of

23   you?

24   A.   Yes.

25   Q.   I'm just going to ask you to look at very specific pages.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    All right.

2    Q.    First, I'd like you to look at page 4.

3    A.    Okay.

4    Q.    And I'd like to ask you do you recognize the location that

5    is depicted on page 4?

6    A.    That looks like in one of the MMComm's office room.

7    Q.    And do you recognize the person who is on the right-hand

8    side of that photo?

9    A.    Yes.

10   Q.    Who is that person?

11   A.    Dr. Yi-Chi Shih.

12   Q.    And do you recognize the person who is on the left-hand

13   side of that photo?

14   A.    I remember the person, but I don't remember his name or --

15   but I do recognize this guy.

16   Q.    What, if anything, do you remember about that person?

17   A.    According to Dr. Yi-Chi Shih's introduce, he's from China

18   and I believe from a city named Chengdu.

19   Q.    Can you spell that?

20   A.    No.

21   Q.    Can you say it again?  From what city?

22   A.    It's one of the provinces, Sichuan, and the city name -- I

23   can pronounce in Chinese, but not English.  I don't know how to

24   pronounce in English.

25            THE COURT:  We're done.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. HEINZ:  Your Honor, would it be possible to

 2    publish this page only to the jury?

 3              THE COURT:  Any objection to this being published?

 4              MS. WASSERMAN:  Just one moment, Your Honor.

 5              THE COURT:  Sure.

 6              MS. WASSERMAN:  No objection, Your Honor.

 7              THE COURT:  You may publish.

 8              This is page 4 of Exhibit 2501, which is Bates Number

 9    01748032; is that correct, Ms. Heinz?  Bates page '8032?

10              MS. HEINZ:  I don't have a Bates number.

11              Oh, yes, that's correct, Your Honor.

12              THE COURT:  Thank you.

13              You're not seeking to admit this page; you're just

14    publishing?

15              MS. HEINZ:  No, I just -- so the jury knows what we

16    were looking at.

17    BY MS. HEINZ:

18    Q.   All right.  I'd like to direct your attention, Mr. Lu, to

19    page 6.

20    A.   Yes.

21    Q.   Do you recognize what is depicted on page 6?

22    A.   That's MMComm's lab room.

23    Q.   Okay.

24              MS. HEINZ:  And, Your Honor, could I publish page 6

25    of Exhibit 2501 to the jury?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. WASSERMAN:  No objection, Your Honor.

 2              THE COURT:  You may publish that with Bates number

 3    ending in 8034.

 4    BY MS. HEINZ:

 5    Q.   Mr. Lu, I'd like you to look at page 11.

 6    A.   Yes.

 7    Q.   Do you recognize the location that is depicted on page 11?

 8    A.   That looks like MMComm's bench table.

 9    Q.   And do you recognize the person who is on the right-hand

10    side of that photo?

11    A.   Yes, I do.

12    Q.   Who is it?

13    A.   Dr. Yi-Chi Shih.

14    Q.   And do you recognize the person that is on the left side

15    of the photo?

16              THE COURT:  Excuse me.  What are you publishing?

17              MS. HEINZ:  I'm sorry?

18              THE COURT:  I don't think the photograph that's being

19    published has --

20              MS. HEINZ:  It hasn't been yet.

21              THE COURT:  Okay.

22              MS. HEINZ:  I'm talking about page 11.

23              THE COURT:  Thank you.

24              MS. HEINZ:  We can take that one down.

25              I'm sorry for the confusion, Your Honor.  We are
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   looking at page 11.

2           THE COURT:  Is there any objection to that being

3   published?

4           MS. WASSERMAN:  No objection, Your Honor.

5           THE COURT:  You may publish page 11.

6   BY MS. HEINZ:

7   Q.   So, Mr. Lu, the person on the left-hand side there, is

8   that the person you were describing earlier in the earlier

9   photo?

10  A.   Yes.

11  Q.   Then I'd like you to look at what's been -- what is

12  page 31 in Government's Exhibit 2501.

13          THE COURT:  That's Bates page ending in 8059,

14  correct?

15          MS. HEINZ:  Yes, Your Honor.

16          THE COURT:  Thank you.  Any objection to publishing?

17          MS. WASSERMAN:  No objection, Your Honor.

18          THE COURT:  Thank you.

19          You may publish page 31.

20  BY MS. HEINZ:

21  Q.   Mr. Lu, do you recognize the location that is depicted in

22  that page that is currently on the monitor?

23  A.   Yes.  That's another testing bench in MMComm.

24  Q.   And then, lastly, I'd like you to look at the very next

25  page, which is page 32, which would be the Bates number ending

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    in 60.

2    A.    Okay.

3              THE COURT:  Is there any objection to that being

4    published?

5              MS. WASSERMAN:  No, Your Honor.

6              THE COURT:  All right.  You may publish that.

7    BY MS. HEINZ:

8    Q.    And, Mr. Lu, do you recognize the item that is depicted

9    there on the left side of the screen that's sort of yellow?

10    A.    The left side, bottom?

11    Q.    The left side, bottom, yes.  Do you recognize what that

12    is?

13    A.    I don't recognize what that is, but that looks like it's

14    our component.

15    Q.    I'm sorry.  What kind of component?  I just didn't hear.

16    A.    I don't recognize exactly what the component is, but that

17    looks like it's one of our product.

18    Q.    Okay.  I'd like you to look at what's been marked as

19    Government's Exhibit 2203.  What is Government's Exhibit 2203?

20    A.    Do you mean the first page of --

21    Q.    Yes.  The first page where the Bates number ends in 94.

22    A.    I'm sorry.  I couldn't find that one.  It's 2303?

23    Q.    2303.  It might be in a different binder.  I'm sorry.

24              THE COURT:  It's 2203.

25    ///

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   BY MS. HEINZ:

2   Q.   Oh, I'm sorry.  It's 2203.  I misspoke.  I'm sorry.

3   A.   Oh, yes.  I got it.

4   Q.   Do you recognize it?  Do you recognize what it is?

5   A.   Yes.

6   Q.   And what is it?

7   A.   That's one of the email threads from Dr. Yi-Chi Shih.

8   Q.   And are you also on this email?  Are you copied on this

9   email?

10  A.   Yes, I'm copied on it.  Yes, my name is on the email copy.

11  Q.   And, generally, is this a communication with a potential

12  customer?

13  A.   Yes.

14        MS. HEINZ:  Your Honor, the government would seek to

15  admit Government's Exhibit 2203.

16        MS. WASSERMAN:  No objection, Your Honor.

17        THE COURT:  Thank you.

18        Exhibit 2203 is admitted.

19     (Exhibit 2203 admitted into evidence.)

20  BY MS. HEINZ:

21  Q.   Mr. Lu, the email -- when we look at the top part of the

22  email, the first name where it says "From" and it says "Yi-Chi

23  Shih, MMComm," do you see that?

24  A.   Yes.

25  Q.   Is that the Defendant Shih's MMComm email address?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    Yes.  All the --

 2   Q.    And then down below --

 3   A.    Sorry.

 4   Q.    -- where it says Jesse Lu, do you see where it says --

 5              THE COURT:  Excuse me one moment.

 6              Had you completed your answer?

 7              THE WITNESS:  When you say "From," and "Dr. Yi-Chi

 8   Shih," there's -- right behind it, I don't recognize those.

 9   But on the cc copy, which is -- you can see my name, the first

10   one, and right below, that's Dr. Yi-Chi Shih's email address.

11   That's MMComm's emails, which I recognized, but not the very

12   first one.

13   BY MS. HEINZ:

14   Q.   I understand.  Thank you.

15              All right.  I'm going to just jump down to the text

16   of the email there where it starts with "Dear Judy."

17              MS. HEINZ:  And I'd like to read that email,

18   Your Honor.

19              THE COURT:  Any objection to its being read?

20              MS. WASSERMAN:  The document speaks for itself,

21   Your Honor.

22              THE COURT:  Agree.

23              MS. HEINZ:  Then I'd like to direct the jury to the

24   middle section of that email and give them a chance to read it.

25              THE COURT:  That's fine.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Can the jurors see the email on your respective

 2    screens?

 3    BY MS. HEINZ:

 4    Q.   Okay.  The next exhibit would be Government's Exhibit

 5    2504.  If you could take a look at that, Mr. Lu.  2504.  It is

 6    probably in a different binder.

 7              THE COURT:  No, it's the same binder.

 8              THE WITNESS:  Same binder.

 9              MS. HEINZ:  Oh, it is the same binder?  Thank you.

10              THE COURT:  Do the jurors need -- do you need more

11    time to read the prior exhibit?

12              A JUROR:  Just a little bit more time.

13              THE COURT:  I'm sorry.  Could you republish 2503,

14    please.

15              And then, jurors, please let me know when you're

16    finished.

17              A JUROR:  Are we supposed to read the entire email?

18              THE COURT:  You're not required to read any of it,

19    but there's a portion that was highlighted.  All admitted

20    exhibits will be available to you at the time of your

21    deliberations.  I just didn't -- if any of you wanted to spend

22    more time now reading it, I didn't want to get in the way of

23    that.

24              Any of you -- you're done?

25              Anyone need more time?  No?
```

```
 1              Okay.  Thank you.  Please proceed, Ms. Heinz.
 2    BY MS. HEINZ:
 3    Q.   Mr. Lu, are you looking at Government's Exhibit 2504?
 4    A.   Yes, I am.
 5    Q.   Do you recognize Government's Exhibit 2504?
 6    A.   Yes.
 7    Q.   And what is it?
 8    A.   That's an invoice copy of MMComm.
 9              MS. HEINZ:  Your Honor, the government seeks to admit
10    2504 and to publish.
11              THE COURT:  Any objection?
12              MS. WASSERMAN:  No objection, Your Honor.
13              THE COURT:  All right.  Exhibit 2504 is admitted and
14    may be published.
15         (Exhibit 2504 admitted into evidence.)
16    BY MS. HEINZ:
17    Q.   Mr. Lu, looking at Government's Exhibit 2504, I'd like to
18    direct your attention to the lower right-hand corner.
19    A.   Yes.
20    Q.   Is that your name?
21    A.   Yes.
22    Q.   And was that your -- one of your positions, at least,
23    account executive?
24    A.   Of sales, yes.
25    Q.   And is that your signature?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes, it is.

2    Q.    So at the top, directing your attention to the top of it,

3    it says "MMComm Incorporated."  Do you see that?

4    A.    Yes.

5    Q.    And do you see the email address there?

6    A.    Yes.

7    Q.    Was that an email address that you would respond to?

8    A.    Yes.

9    Q.    And then up in the upper left-hand corner, it says

10   "Invoice 818," and it has a date of January 13 of 2006.  Then

11   where it says "Customer" over on the left-hand side there, do

12   you see that?

13   A.    Yes.

14   Q.    It says "Augar International," do you see that?

15   A.    Yes.

16   Q.    In Singapore?

17   A.    Yes.

18   Q.    Were you familiar with that customer?

19   A.    Yes, I do remember this customer.

20   Q.    And was it part of your job at MMComm to prepare invoices

21   such as this one?

22   A.    Yes.

23   Q.    And would you have prepared this one because your name is

24   on it?

25   A.    This is my duty to prepare this.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Okay.  I'd like you to look, then, at the description part

2    of this invoice, and specifically I'd like you to look at the

3    part numbers.

4    A.    Okay.

5    Q.    Do you see that column?

6    A.    Yes.

7    Q.    Okay.  So item Number 2 on that list is TGA4517.  Do you

8    see that?

9    A.    Yes.

10   Q.    And opposite that where it says "Description," it says

11   "MMIC HPA."  Do you see that?

12   A.    Yes.

13   Q.    What is a "MMIC HPA"?

14   A.    I believe this is a MMIC power amplifier chip.

15   Q.    And where it says "Quantity," it says "6"; is that

16   correct?

17   A.    Yes.

18   Q.    And the unit price is $290?

19   A.    Yes.

20   Q.    Okay.  Going back over to the list of part numbers, Part

21   Number 3, do you see that?

22   A.    Yes.

23   Q.    That's TGA1073C.  Do you see that?

24   A.    Yes.

25   Q.    And opposite that, the description is "MMIC HPA."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    Yes.
 2    Q.    And this invoice says that four of them were ordered; is
 3    that correct?
 4    A.    Yes.
 5    Q.    I'd like you to look now at Government's Exhibit 2606.  Do
 6    you have that exhibit in front of you, Mr. Lu?
 7    A.    Yes.
 8    Q.    What is Government's Exhibit 2606?
 9    A.    That's a Shipper's Export Declaration form.
10    Q.    And is this something you were familiar with when you
11    worked at MMComm?
12    A.    Yes.
13          MS. HEINZ:  Your Honor, the government seeks to admit
14    Government's Exhibit 2606.
15          MS. WASSERMAN:  No objection, Your Honor.
16          THE COURT:  Thank you.
17          Exhibit 2606 is admitted.
18       (Exhibit 2606 admitted into evidence.)
19    BY MS. HEINZ:
20    Q.    Mr. Lu, directing your attention to the top of this form,
21    it says "Shipper's Export Declaration."
22          Do you see that?
23    A.    Yes.
24    Q.    And up where it says Box 1a, it says "MMComm" with an
25    address?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   Is that the address of MMComm -- or was that the address

 3   of MMComm?

 4   A.   Yes, it was the address.

 5   Q.   And below that at 4a, it lists "Augar International."

 6           Do you see that?

 7   A.   Yes, I do.

 8   Q.   And is that the same Augar International who is mentioned

 9   in the previous exhibit, the invoice that you told us about?

10   A.   I think so.

11   Q.   And looking down -- I'm sorry, looking down at box 29,

12   sort of near the bottom, is that your name there?

13   A.   Yeah, it looks like my name.

14   Q.   And you testified earlier it was part of your duty to

15   complete this?

16   A.   Yes.

17   Q.   Was the defendant, Yi-Chi Shih -- did he know you were

18   doing this?

19   A.   I'm sure that he would know I need to have to fill out

20   this in order to ship the item out.

21   Q.   Okay.  And so did the defendant, Yi-Chi Shih, know that

22   you were filling this out?

23   A.   I would say yes.

24   Q.   Please look at Government's Exhibits 206 [sic] through

25   2710, and Exhibit 2123.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Could you restate that because you

 2   started with Exhibit 206.  Did you mean to?

 3              MS. HEINZ:  No.  I'm sorry.  I meant -- I'm sorry,

 4   Your Honor.  Government's Exhibit 2706 -- let's do them one at

 5   a time. 2706.

 6   BY MS. HEINZ:

 7   Q.   Mr. Lu, do you have Government's Exhibit 2706 in front of

 8   you?

 9   A.   Yes.

10   Q.   And what is it?

11   A.   This is an email copy from this customer in Singapore.

12   Q.   And looking at the top, who is the email from?

13   A.   From this Augar International.

14   Q.   And who is it to?

15   A.   To me.  Sorry, to Dr. Yi-Chi Shih.

16              MS. HEINZ:  Your Honor, the government seeks to admit

17   Government's Exhibit 2706.

18              THE COURT:  Any objection?

19              MS. WASSERMAN:  No objection, Your Honor.

20              THE COURT:  Exhibit 2706 is admitted.

21        (Exhibit 2706 admitted into evidence.)

22   BY MS. HEINZ:

23   Q.   Mr. Lu, I'm directing your attention sort of down a little

24   bit where it says "Original Message."

25              Do you see that?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.   Yes.

 2   Q.   And it says "From:  Augar International" and it's dated

 3   May 22nd of 2006, and it says "To:  Jesse Lu."  Is that you?

 4   A.   Yes.

 5   Q.   And the email says, "Hi Jesse.  Please provide the pricing

 6   of TGA4516EPU."  Do you see that?

 7   A.   Yes.

 8   Q.   Do you recognize that designation where it says TGA4516?

 9   A.   I don't remember exactly this part number, but it looks

10   like the TGA was related to the previous invoice.

11   Q.   So do you recognize it as a part number?

12   A.   Yes.

13   Q.   And then do you see at the top of the email where it says

14   "To:  Yi-Chi Shih," and it has an address, and then below that,

15   it says "ypc@dingtian.com.cn."

16              Do you see that?

17   A.   Yes.

18   Q.   Do you recognize that email address?

19   A.   No.

20   Q.   Okay.  I'd like you to look at what has been marked as

21   2707.

22              Do you have that in front of you?

23   A.   Yes.

24   Q.   Do you recognize Government's Exhibit 2707?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.    What is it?

 2   A.    That's an email thread from Augar to Yi-Chi Shih.

 3              MS. HEINZ:  Your Honor, the government seeks to admit

 4   2707.

 5              THE COURT:  Any objection?

 6              MS. WASSERMAN:  Just one moment, Your Honor.

 7              THE COURT:  Sure.

 8              MS. WASSERMAN:  Just to confirm we're looking at the

 9   same document, is this Bates ending in 206-4111?

10              MS. HEINZ:  Sorry.  I am looking at something that

11   ends in '2028.

12              MS. WASSERMAN:  Oh, 181-2028?

13              MS. HEINZ:  Yes.

14              MS. WASSERMAN:  No objection, Your Honor.

15              THE COURT:  Thank you.

16              Exhibit 2707 will be admitted.  It's a two-page

17   document.

18              Do you have both pages, Ms. Wassermann?

19              MS. WASSERMAN:  I apologize, Your Honor.

20              THE COURT:  Do you have both pages?  It's two pages.

21              MS. WASSERMAN:  I do, Your Honor.  Thank you.

22        (Exhibit 2707 admitted into evidence.)

23   BY MS. HEINZ:

24   Q.    I'm going to direct your attention to the middle of the

25   email where it starts with "Hi."
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1              Do you see that?

2    A.    Yes.

3    Q.    So it says, "Hi, please specify the quantity you need.

4    Thanks."

5              And is that your signature block below that, below

6    "best regards"?

7    A.    Yes.

8    Q.    And then there's an email up above, okay, which says --

9    it's the original message and it says, "Hi, Jesse.  Please find

10   PO generated for paying you parts you procured for DT earlier

11   and fund would be transferred after you invoice accordingly.

12   No delivery is therefore required for this."

13   A.    Yes, I do see that.

14   Q.    And then at the top, there is an address where it says

15   from Augar to Yi-Chi Shih.

16             Do you see that?

17   A.    Yes.

18   Q.    Now, there is an attachment to this email, so I'd like to

19   turn to the attachment, which is the next page.

20             So could you explain briefly to us how purchase

21   orders work, Mr. Lu.

22   A.    Once I receive the purchase order, I will actually present

23   it to the meeting, let everybody know that we have received a

24   purchase order.  And the purchase order will then deliver to

25   Dr. Yi-Chi Shih, and he will give it to the responsible

```
 1   department, which may be the engineering team.
 2   Q.   And this purchase order is from Augar International; is
 3   that correct?
 4   A.   Yes.
 5   Q.   And just directing your attention to the middle section
 6   there, it says "Item 1, Part Number NA," and the description is
 7   Ka-band PA Design Solution."
 8            Do you see that?
 9   A.   Yes, I do.
10   Q.   And the company is MMComm?
11   A.   Yes.
12   Q.   And the price is $2500?  Do you see that?
13   A.   Yes.
14   Q.   Are you familiar with what that is?
15   A.   This is a typical PO from customer, and I don't remember
16   this particular PO.
17   Q.   Okay.  Going to the top part, right underneath where it
18   says "Purchase Order," do you see where it says "Order Number"?
19            THE COURT:  You can circle that on the screen if you
20   want.
21            THE WITNESS:  Oh, I got it.  "Order Number"?
22   BY MS. HEINZ:
23   Q.   Yes.  Do you see that?
24   A.   Yes.
25   Q.   Do you recognize the order number or the type of order
```

1    number?

2    A.    I don't remember.

3    Q.    Thank you.

4          Okay.  Turning your attention to 2708, and this is

5    the Bates number ending in 261.

6          Mr. Lu, do you recognize Government's Exhibit 2708?

7    A.    Yes.

8    Q.    And what is it?

9    A.    That's an email thread.  It's between Augar and me.

10          MS. HEINZ:  Your Honor, government moves to admit

11   2708.

12          THE COURT:  Any objection?

13          MS. WASSERMAN:  No objection, Your Honor.

14          THE COURT:  Exhibit 2708 is admitted.

15     (Exhibit 2708 admitted into evidence.)

16   BY MS. HEINZ:

17   Q.    So I'm going to jump down sort of to the middle email.

18          Do you see that middle email that starts with "Dear

19   Mr. Chan"?

20   A.    Yes.

21   Q.    And is that your signature block there at the bottom of

22   that email?

23   A.    Yes.

24   Q.    It says, "Dear Mr. Chan, thanks for the PO and we also

25   have some good news for you."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  It's not necessary to read exhibits,
 2    please.  What's the question?
 3              MS. HEINZ:  Then I'd just like to give the jury a
 4    chance to read this particular email.
 5              THE COURT:  That's fine.
 6              All right.
 7    BY MS. HEINZ:
 8    Q.   Then, Mr. Lu, directing your attention to the top email
 9    that starts with "Jesse," do you see that one?
10    A.   Yes.
11              MS. HEINZ:  So I'd like the jury to have a chance to
12    read that one as well.
13              THE COURT:  If you wish.
14              Again, ladies and gentlemen, you'll have all exhibits
15    with you during your deliberations.
16              All right.  Next question.
17    BY MS. HEINZ:
18    Q.   Turning your attention to Exhibit 2709, what is
19    Government's Exhibit 2709.
20    A.   That's the email thread continued for the previous one.
21              MS. HEINZ:  Your Honor, government moves to admit
22    2709.
23              THE COURT:  Any objection?
24              MS. WASSERMAN:  No objection, Your Honor.
25              THE COURT:  2709 is admitted.
```

1              *(Exhibit 2709 admitted into evidence.)*

2      BY MS. HEINZ:

3      Q.   So, Mr. Lu, just directing your attention to the email

4      that is sort of the -- not the very top one but the one below

5      that, the one from Augar to you on June the 8th of 2006, do you

6      see that one?

7      A.   June the 8th, yes.

8      Q.   And in that email, it said that there were already a

9      hundred units on their way to Singapore and that --

10             MS. WASSERMAN:  Objection, Your Honor, to counsel

11     reading the documents.

12             MS. HEINZ:  Well, I have to set up the question,

13     Your Honor.  I'm sorry.

14             THE COURT:  Ask the question, please.

15             If you would review that section of the email.

16             What's the question?

17     BY MS. HEINZ:

18     Q.   Could you review that section of the email, Mr. Lu.

19     A.   Yes.

20     Q.   Do you see where it says, "Suggest you to keep those parts

21     with you for later use"?

22     A.   Yes.

23     Q.   And then up above, do you see your email to Defendant

24     Shih?

25     A.   Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And do you see what you asked him?

2    A.    Yes.

3    Q.    Do you know why you asked him that?

4    A.    Because I don't know what the arrangement is.

5    Q.    Okay.  And asking you to look at Government's Exhibit

6    2123.

7              THE COURT:  Do you mean 2703?

8              MS. HEINZ:  I think I mean 2123.

9    BY MS. HEINZ:

10   Q.    Do you see Government's Exhibit 2123?

11   A.    Yes, I am [sic].

12   Q.    And what is it?

13   A.    That's also an email thread from MMComm to Augar.

14             MS. HEINZ:  Your Honor, government moves to admit

15   2123.

16             THE COURT:  Any objection?

17             MR. SPERTUS:  No objection, Your Honor.

18             THE COURT:  Exhibit 2123 is admitted.

19        (Exhibit 2123 admitted into evidence.)

20   BY MS. HEINZ:

21   Q.    Mr. Lu, is this an email thread that is part of the same

22   email thread that we've already just been discussing?

23   A.    I think so.

24   Q.    And I'd like you just to turn to the attachment.  So at

25   the top of it, it says "MMComm."  Do you see that?

```
 1    A.    Yes.

 2    Q.    And it says "Proforma Invoice"?

 3            THE COURT:  To what page of the exhibit are you

 4    referring?

 5            MS. HEINZ:  I'm referring to the attachment, which is

 6    page 3.

 7            THE COURT:  That's not in our book.

 8            MS. HEINZ:  Oh, you don't have that?

 9            Your Honor, could we take a break right now?

10            THE COURT:  That's fine, yes.

11            We'll take our second break.  We'll resume in about

12    20 minutes.  Please don't discuss the matter during the break.

13            Thank you.

14            THE CLERK:  All rise.

15        (Jury out at 12:58 p.m.)

16        (The following was heard outside the presence of the

17        jury.)

18            THE COURT:  Mr. Lu, you may step down.  Please don't

19    discuss -- you may step down.  We'll resume in 20 minutes.

20    Please don't discuss the case during the break.  Thank you.

21            Any issues that anyone wants to address?

22            MS. WASSERMAN:  No, Your Honor.

23            MS. SARTORIS:  Your Honor, I would just like to

24    confirm that having identified the box and its contents that

25    the government can now inspect them.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1            THE COURT:  Any objection?

2            MR. SPERTUS:  Your Honor, I'm not -- they can inspect

3    them here in court, but I'm going to maintain custody until

4    they're introduced into evidence,, in which case they'll be

5    given to the clerk.  I don't mind them examining them here in

6    court.  Of course, as a courtesy, I would do that, but they're

7    not in evidence and I want to make sure they arrive in evidence

8    in their current form.

9            THE COURT:  Any objection to that?

10           MS. SARTORIS:  Your Honor, as an additional matter,

11   we can look at them here in court, and then if there's more to

12   talk about, we can raise it again.

13           THE COURT:  That's fine.

14           Mr. Spertus, in light of the potential issues about

15   chain of custody and the consistency of these documents with --

16   these materials with -- from the beginning of the chain to now,

17   you -- if they're not maintained in the court by the clerk,

18   then you'll need to take appropriate steps to be able to ensure

19   that they're not out of -- that the chain of custody isn't

20   broken.

21           MR. SPERTUS:  So, Your Honor, may I ask, then, that I

22   can deliver them to the clerk as identified exhibits and that

23   the clerk in court will maintain custody?

24           I always considered them unique items that didn't

25   need a chain of custody, so I'm wrong, in the Court's view, so
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    I give them to the clerk.

2            THE COURT:  Well, to be clear, I'm not saying you're

3    wrong.  What I'm saying is no one had a chance to examine these

4    before, and so I don't know, and the chain of custody could

5    include when were they placed in the box and what happened to

6    the box between that moment and today.

7            MR. SPERTUS:  Right.  So we will fill that void, and

8    from today onward the clerk will maintain custody.

9            THE COURT:  That's fine.

10           Any objection to that?

11           MS. SARTORIS:  Not at this time, Your Honor.

12           THE COURT:  Just a minute.  Let me make sure that

13   works.

14       (The Court and clerk confer off the record.)

15           THE COURT:  That's fine.  And, obviously, if either

16   side wants to review them and you consent to that, that's not a

17   problem.

18           MR. SPERTUS:  Thank you.  Just as long as we're all

19   together when that happens.

20           THE COURT:  Whatever you work out.  I'm sure you can

21   work this out.

22           MS. SARTORIS:  Thank you, Your Honor.

23           THE COURT:  Thanks.

24       (Recess taken 1:01 to 1:22 p.m.)

25           THE COURT:  Back on the record.  All counsel and
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    parties are present.  The jury is not.

2              Ms. Sartoris.

3              MS. SARTORIS:  Yes, Your Honor.  I just have one

4    request and that is that defense counsel not continue to

5    display the wafers on the table.  They're not in evidence.

6              MR. SPERTUS:  I'll move them away.

7              THE COURT:  Thank you.

8              MS. SARTORIS:  And then the second is I spoke with

9    Mr. Spertus.  He requested to be at least informed if -- and

10   possibly present if the government is going to look at the

11   wafers or the exhibits.  So I just wanted the Court to be aware

12   of that.  And then also the government would make the same

13   request if defense counsel is going to be looking at it once it

14   goes into the Court's custody.

15             THE COURT:  You've agreed on that then?

16             MR. SPERTUS:  Yes, that's fine, Your Honor.

17             MS. SARTORIS:  I just wanted to alert the Court.

18             THE COURT:  That's fine.

19             Oh, by the way, just -- that's fine, and you'll need

20   to coordinate with Ms. Keifer in terms of getting them, but I

21   don't think that will be a problem either.  If you're both

22   here, then you can take them to wherever you want to take them

23   and bring them back.

24             MR. SPERTUS:  That's fine.  We will do whatever is

25   required.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1              THE COURT:  One other minor point.  Mr. Spertus,

2    during the course of your examination, you referred to

3    Ms. Sartoris by her first and last names.  I don't know if you

4    recall doing that.

5              MR. SPERTUS:  I don't recall.

6              THE COURT:  So don't do that, please.  In examining a

7    witness, you referred to Ms. Sartoris as Melanie Sartoris.  Do

8    you recall that?

9              MR. SPERTUS:  I don't recall it.

10             THE COURT:  Okay.  That's fine.  Just be mindful of

11   it.

12             MR. SPERTUS:  Yes, Your Honor.

13             THE COURT:  I didn't think it was done purposely.

14             MR. SPERTUS:  It was not.

15             THE COURT:  I understand.  Thanks.  That's why I

16   didn't say anything at the time.

17             MR. SPERTUS:  Thank you, Your Honor.

18             THE COURT:  Ms. Heinz, are you ready to proceed?

19             MS. HEINZ:  I am, Your Honor.

20             THE COURT:  Maybe I misheard it.

21             MS. SARTORIS:  No, Your Honor.  You didn't mishear.

22   He did, in fact, say that.

23        (Jury in at 1:25 p.m.)

24             THE COURT:  All right.  Please be seated.  All 15

25   jurors are back.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Please -- Mr. Lu, would you please restate your name.

 2              THE WITNESS:  Jesse Lu.

 3              THE COURT:  And do you understand, sir, that you

 4    remain under oath?

 5              THE WITNESS:  Yes.

 6              THE COURT:  Okay.  Thank you.

 7              Now, Ms. Heinz, please proceed.

 8    BY MS. HEINZ:

 9    Q.  Mr. Lu, do you see in front of you part of Exhibit 2123

10    that says "Proforma Invoice" on it?

11    A.  Yes.

12    Q.  And directing your attention to the top that says

13    "MMComm" --

14              MS. HEINZ:  And, Your Honor, move to move in this

15    part of 2123.  It should have been an attachment to it, and it

16    was missing from our books.

17              MS. WASSERMAN:  No objection.

18              THE COURT:  The request is granted.  Exhibit 2123 is

19    admitted.

20         (Exhibit 2123 admitted into evidence.)

21              THE COURT:  The revised 2123 is admitted.  It's now

22    two pages.

23    BY MS. HEINZ:

24    Q.  Mr. Lu, do you see the date on this invoice?

25    A.  Yes.
```

```
 1    Q.    And do you see right below the date where it says "Augar

 2    International"?

 3    A.    Yes.

 4    Q.    Now I'm going to direct you further down.

 5    A.    All right.

 6    Q.    Do you see where it says "Part Number"?

 7    A.    Yes.

 8    Q.    And that says "TGA4516"; is that correct?

 9    A.    Yes.

10    Q.    And is this your signature on the invoice?

11    A.    Yes, it is.

12              MS. HEINZ:  No further questions, Your Honor.

13              THE COURT:  Thank you.

14              Cross-examination.

15              MS. WASSERMAN:  Yes.  Thank you, Your Honor.

16              THE COURT:  Ms. Wassermann.

17                        CROSS-EXAMINATION

18    BY MS. WASSERMAN:

19    Q.    Good afternoon, Mr. Lu.

20    A.    Good afternoon.

21    Q.    If you could turn to -- there's a binder behind you on the

22    second cart.  If you can find the volume that has the

23    Exhibit 4245 in it.  And I'll find the number for you, too.

24              It should be Volume 20.  And I'll direct your

25    attention to that exhibit in just a moment.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    All right.

2    Q.    But Ms. Heinz was asking you about a specific part --

3    A.    Yes.

4    Q.    -- just a moment ago.  Do you recall whether that part

5    ever was actually shipped?

6    A.    I don't remember.

7    Q.    And if you could now turn your attention to Exhibit 4245,

8    the very top email.  Do you see that?  And this is on page

9    206-4111.

10   A.    Sorry.  The binder is so big.

11   Q.    I understand.

12   A.    Did you just say 4245?

13   Q.    Yes.

14   A.    Yes.

15   Q.    Does the top email appear to be an email from you to a

16   user at Augar International email address?

17   A.    Well, it doesn't show exactly the complete email address,

18   so I'm not sure.

19   Q.    But the domain is Augar International?

20   A.    Oh, yes.

21   Q.    And this is a June 9, 2006, email?

22   A.    June 9, yes.

23   Q.    Does this appear to be part of the same chain that

24   Ms. Heinz was showing you a moment ago?

25   A.    I think so.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. WASSERMAN:  Your Honor, I'd like to move this

 2    into evidence and publish it, please.

 3              THE COURT:  Any objection?

 4              MS. HEINZ:  No objection.

 5              THE COURT:  Exhibit 4245 is admitted and may be

 6    published.

 7         (Exhibit 4245 admitted into evidence.)

 8    BY MS. WASSERMAN:

 9    Q.   So the very first sentence in the top email reads --

10    A.   All right.

11    Q.   It's a little bit cutoff.  I apologize.

12              Do you see that top sentence in that email?

13    A.   Yes.

14    Q.   Does that refresh your recollection that the parts were

15    not shipped?

16    A.   Yeah, according to the email, it looks like it.

17    Q.   And you don't have any independent recollection?

18    A.   No.

19    Q.   You can put that aside.

20              During your time at MMComm, you tried hard to follow

21    the export regulations, correct?

22    A.   Yes.

23    Q.   And Dr. Shih tried hard to follow the export regulations,

24    correct?

25    A.   Yes.
```

```
 1   Q.   You testified previously that there were weekly meetings?

 2              THE COURT:  Slow down, please.

 3              MS. WASSERMAN:  Yes, Your Honor.

 4   BY MS. WASSERMAN:

 5   Q.   Were export regulations discussed at those meetings?

 6   A.   Not discussed in a meeting, but I actually discuss with

 7   Chic Shishido if I have questions.

 8   Q.   And you previously testified that the regulations are

 9   contained in a big, large government book, correct?

10   A.   Yes.

11   Q.   The regulations are complicated?

12   A.   Very complicated.

13   Q.   And if you and Dr. Shih determined that the regulations

14   did not allow an item to be exported, you would tell customers

15   you could not export the item, correct?

16   A.   Yes.

17   Q.   So were you surprised when you learned that Dr. Shih had

18   been accused of doing something unlawful in connection with

19   exports?

20   A.   No.

21   Q.   You were not surprised?

22   A.   I mean, that -- he fully aware things can be done or not

23   be done.

24   Q.   When you testified that Dr. Shih would look in a book to

25   determine whether there were export controls, the MMICs that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MMComm was exporting, those were purchased from other

2    manufacturers, correct?

3    A.    Yes.

4    Q.    And those MMICs were rated?  They were tested, correct?

5    A.    Yes.

6    Q.    So the specifications, power, frequency, those were known?

7    A.    Yes.

8    Q.    And MMComm was not a MMIC maker, correct?

9    A.    No, we are not.

10   Q.    And MMComm took MMICs that were purchased commercially and

11   put them in housings, correct?

12   A.    Correct.

13   Q.    So MMComm did not sell experiments on MMICs, correct -- or

14   research MMICs?

15   A.    I do believe we do have inquiries from customers that they

16   want to buy MMIC, but mostly we purchase those MMIC for our own

17   use.

18              MS. WASSERMAN:  Your Honor, may I have just a moment?

19              THE COURT:  Yes.

20   BY MS. WASSERMAN:

21   Q.    Mr. Lu, do you recall meeting with the FBI previously in

22   connection with this case?

23   A.    Yes.

24   Q.    Do you recall telling the FBI during that meeting that you

25   were surprised that Dr. Shih had been charged with a crime?

1    A.    Yes.

2    Q.    So earlier when you testified that you were not surprised,

3    that was incorrect?

4    A.    Well, at the first, as I said, what I understand is that

5    Dr. Shih fully understand that there are things can be done or

6    there are things cannot be done.  And during the MMComm time, I

7    had actually walked into his office a few times, and he always

8    telling me that -- and also Mr. Chic Shishido always telling me

9    that there is a fine line, that we have actually always be

10   cautious, and that's why I always go to Chic Shishido or

11   Dr. Yi-Chi Shih to find out if I have questions.

12   Q.    So Dr. Shih was always careful to follow the export

13   regulations?

14   A.    As far as I know, yes.

15   Q.    So it would surprise you if he had violated them?

16   A.    Yes.

17         MS. WASSERMAN:  Thank you.  No further questions,

18   Your Honor.

19         THE COURT:  Any redirect, Ms. Heinz?

20                    REDIRECT EXAMINATION

21   BY MS. HEINZ:

22   Q.    So, Mr. Lu, is it your testimony that Dr. Shih knows what

23   should and should not be done under the export regulations?

24   A.    Yes.

25         MS. HEINZ:  Nothing further.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  Mr. Lu, thank you for your testimony.
 2    You're excused.  You may step down.
 3                Would the government call the next witness, please.
 4                MS. HEINZ:  The government calls Special Agent Robert
 5    Berger.
 6                THE CLERK:  Please raise your right hand.
 7                Do you solemnly swear that the testimony you shall
 8    give in the cause now before this Court shall be the truth, the
 9    whole truth, and nothing but the truth, so help you God?
10                THE WITNESS:  I do.
11                THE CLERK:  Please have a seat.
12                Can you state your full name and spell it for the
13    record.
14                THE WITNESS:  It's Robert, R-o-b-e-r-t.  Berger,
15    B-e-r-g-e-r.
16                THE COURT:  Good afternoon, Mr. Berger.  And would
17    you pull the microphone a little closer to you.  Thank you.
18                Please proceed, Ms. Heinz.
19                MS. HEINZ:  Thank you, Your Honor.
20                          ROBERT BERGER,
21                having been first duly sworn,
22                   testified as follows:
23                     DIRECT EXAMINATION
24    BY MS. HEINZ:
25    Q.   Special Agent Berger --
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  One moment.  My mistake.

 2   BY MS. HEINZ:

 3   Q.   Special Agent Berger, where are you currently employed?

 4   A.   I work for the FBI.

 5   Q.   And how long have you been working for the FBI?

 6   A.   Ten years.

 7   Q.   Have you always worked in Los Angeles?

 8   A.   I have not.

 9   Q.   Where else have you worked?

10   A.   I worked in the Albuquerque division of the FBI, Santa Fe,

11   New Mexico.

12   Q.   And what kind of investigations did you do when you worked

13   in that office?

14   A.   I did investigations into the elicit procurement of export

15   control items which were going to foreign countries.

16              THE COURT:  One moment, please.

17         (The Court and clerk confer off the record.)

18              THE COURT:  One of you is having a hard time hearing

19   the testimony?

20              All right.  Did you hear any of it?  Would you like

21   us --

22              A JUROR:  He was just talking a little low.

23              THE COURT:  All right.  We can read all of it.  Would

24   you like it all read?

25              A JUROR:  I'm good.
```

```
 1              THE COURT:  Are you sure?  Because I want to make
 2   sure you heard all of it.
 3              A JUROR:  No, I'm good now.
 4              THE COURT:  Thank you, Ms. D.
 5              Please proceed, Ms. Heinz.
 6   BY MS. HEINZ:
 7   Q.   At that time, did you receive training in conducting
 8   investigations into illegal transfer of export-controlled
 9   materials?
10   A.   Yes.  As FBI agents, we receive basic training at
11   Quantico, which lasts about five and a half months.  And then
12   when you work these kind of investigations, at the time I went
13   through, there was an additional month that you went back
14   through the academy.
15   Q.   And are you one of the case agents on this case?
16   A.   I am.
17   Q.   On January 19, 2018, did you interview the defendant in
18   this case, Yi-Chi Shih?
19   A.   I did.
20   Q.   And do you see the person you interviewed on January 19,
21   2018, in this courtroom?
22   A.   I do.
23   Q.   Could you please tell us where he's sitting and what he's
24   wearing?
25   A.   He is sitting at the end of the table over there wearing a
```

```
 1   gray suit (indicating).
 2            MS. HEINZ:  Could the record reflect that the witness
 3   has identified the defendant?
 4            THE COURT:  Yes.
 5            MR. SPERTUS:  No objection, Your Honor.
 6            THE COURT:  Thank you.  The record reflects that.
 7   BY MS. HEINZ:
 8   Q.   During your interview of the defendant on January 19 of
 9   2018, was an audio recording made of that interview while it
10   was being conducted?
11   A.   There was an audio recording that was made.
12   Q.   Okay.  Directing your attention to what has been marked as
13   Government's Exhibits 1609, 1611, 1613, 1614, 1615, 1616, and
14   1617 --
15   A.   So 1609.
16   Q.   1609.  1611.
17   A.   1611.
18   Q.   1613.
19   A.   1613.
20   Q.   1614.
21   A.   1614.
22   Q.   1615.
23   A.   1615.
24   Q.   1616.
25   A.   1616.
```

1   Q.   1617.

2   A.   1617.

3   Q.   What are these exhibits?

4   A.   These are CDs containing excerpts of the interview which

5   was conducted.  I know this because my initials are on them and

6   they're dated based on the day I listened to the excerpt.

7   Q.   Okay.  So your testimony is you've listened to all of

8   these individuals excerpts; is that correct?

9   A.   That's correct.

10  Q.   And do the exhibits that we have just named, do they

11  contain recordings that accurately reflect the sections of your

12  interview of the defendant on January 19 of 2018?

13  A.   They do.

14  Q.   Who else, if anyone, was present during the interview?

15  A.   During the interview, Special Agent Carlos Tropea of the

16  IRS and Special Agent Willie Lo of the Department of Commerce.

17  Q.   And at the beginning of the interview, did you identify

18  yourself as an FBI agent?

19  A.   I did.

20  Q.   And at the beginning of the interview, did you give the

21  defendant Miranda warnings?

22  A.   I did.

23  Q.   Directing your attention to what has been marked as

24  Government's Exhibit 1608, what is Government's Exhibit 1608?

25  A.   This is an Advice of Rights form, which contains the

1    Miranda warnings.

2    Q.   Did you observe the defendant sign Government's Exhibit

3    1608?

4    A.   I did.

5              MS. HEINZ:   Your Honor, move to admit 1608.

6              MR. SPERTUS:   No objection.

7              THE COURT:   1608 is admitted.

8         *(Exhibit 1608 admitted into evidence.)*

9    BY MS. HEINZ:

10   Q.   Could you please point out the defendant's signature on

11   1608.

12   A.   It's right -- well, it's right here (indicating).

13   Q.   In addition to giving the defendant Miranda warnings at

14   the beginning of the interview, did you also advise him about

15   making false statements during the interview?

16   A.   I did.   I told the defendant that lying to a federal agent

17   is a felony.

18   Q.   Directing your attention to what has been marked as

19   Government Exhibit 1609, which you have already testified

20   about, and Government Exhibit 1609-A, what is Government

21   Exhibit 1609-A?

22   A.   1609-A is a transcript of 1609.

23   Q.   And what is the subject matter of the recording that is

24   Exhibit 1609?

25   A.   This is when the defendant was provided Miranda warnings

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    as well as warned about lying to federal agents.

 2              MS. HEINZ:  Your Honor, move to admit Exhibit 1609.

 3              MR. SPERTUS:  Objection.  Previously briefed, FRA106.

 4    This is an excerpt of a larger interview that needs to be

 5    played.  I can address this at sidebar, if you wish.

 6              THE COURT:  Are you proposing to play a portion of

 7    this?

 8              MS. HEINZ:  Yes, Your Honor.

 9              THE COURT:  Let me talk to you.

10         (The following proceedings were held at sidebar.)

11              THE COURT:  How much of the -- what's the total

12    length of the interview?

13              MS. HEINZ:  An hour and a half.

14              MR. SPERTUS:  About an hour and a half.

15              THE COURT:  And what portion approximately of that do

16    you propose to play?

17              MS. HEINZ:  At the moment we just plan to play the

18    top portion where he was given Miranda warnings and warned

19    about lying to the FBI, and the defendant indicates he

20    understands and he's willing to be interviewed.

21              THE COURT:  Any objection to that?

22              MR. SPERTUS:  Yes.  What we briefed for the Court

23    was -- the defendant stands charged with making lies during

24    this interview.  The government is skipping over those pieces.

25    We asked --
```

1          THE COURT:  Which pieces?

2          MR. SPERTUS:  For example, he said, "The wafers are

3     upstairs in my office," for example.

4          THE COURT:  Well, but -- okay.

5          MR. SPERTUS:  Right.  So that's the corpus of the

6     crime.  So what we've briefed and asked Your Honor to do was

7     play the whole interview so that the jury can evaluate the

8     context.

9          THE COURT:  Okay.  My view is this.  I think it has

10    to be in context.  I think that playing portions of it -- the

11    rule of completeness I think is appropriate, but I don't think

12    that means we have to play the entire 90 minutes at one time.

13         I think that when portions are played, then they

14    can -- and appropriate other portions that you think should be

15    for purposes of completeness played, played.

16         That's fairly straightforward.

17         MR. SPERTUS:  Okay.  What's going to happen is that

18    we're -- the problem with the excerpts, just to direct it, is

19    that the government will get to play what I believe are

20    out-of-context excerpts.

21         THE COURT:  Right.

22         MR. SPERTUS:  And then the jury breaks for five days

23    and then we get to play the in-context excerpts.

24         THE COURT:  How many excerpts are you planning to

25    play today in the next 45 minutes?

```
 1          MS. HEINZ:  Not more than two.  I'm not sure we'll

 2   even get to the second one.

 3          THE COURT:  Okay.  If you get to the second one, do

 4   you know what that would be, the topic?

 5          MS. HEINZ:  Oh, it might be where he identifies what

 6   his emails are.

 7          THE COURT:  What his email addresses are, you mean?

 8          MS. HEINZ:  Yes.

 9          MR. SPERTUS:  That's fine.

10          THE COURT:  Okay.  Then what I'd like you to do --

11   and I appreciate all the work you have done collaboratively.

12   If you don't object, let the defense know what other portions

13   you're going to play in advance so you can identify other

14   things that you think should be added for context.

15          MR. SPERTUS:  That's fine.  Thank you.

16          MS. HEINZ:  Your Honor, as long as we're at sidebar,

17   could I address one other thing?

18          THE COURT:  Yes.

19          MS. HEINZ:  I know that you don't want us to read the

20   emails, but I am very concerned that some of the jurors will

21   not read as well as others or they have a problem reading, and

22   so -- I don't want to over do it, but at some points I would

23   ask permission to read the emails.

24          THE COURT:  Well, my view is this.  Exhibits don't

25   have to be read in general; second, we had questionnaires where
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    we asked persons about their ability to read English and they

2    responded in writing.  So I don't know that we have a lot of --

3    and some of the prospective jurors said they had challenges

4    with English, and I questioned those who were in the box about

5    that very issue.  So I don't know that I am persuaded we have

6    jurors who can't read.

7           There may be times where it's appropriate to focus a

8    witness, as you've done, on a particular portion of the email,

9    and you can read the words to orient the person because you

10   have a question about that, such as this order wasn't filled,

11   what did that mean, something like that.  But I don't think we

12   have to read to the jury, because if we do, it's going to take

13   forever.

14           MS. HEINZ:  I understand.

15           THE COURT:  And I'd say that both ways, obviously.

16           MR. SPERTUS:  Thank you.

17           MS. HEINZ:  Okay.

18           THE COURT:  And, by the way -- and, finally, I would

19   say this.  As you notice, when you've been publishing exhibits,

20   I've been looking -- I keep an eye on the jury as best I can,

21   and I've been looking to see when they seemed to have finished.

22   I've asked if they need more time, and I've given it to them,

23   so I'm not ignoring this.  Thanks.

24       *(The following proceedings were held in open court.)*

25           THE COURT:  All right.  Please proceed, Ms. Heinz.

```
 1          MS. HEINZ:  Thank you, Your Honor.

 2          Your Honor, at this time the government would like to

 3   play Exhibit 1609, and while it is playing, would like to

 4   display on the monitors 1609-A.

 5          THE COURT:  Consistent with --

 6          MS. HEINZ:  I'm sorry, yes.  I previously moved to

 7   admit it, and I don't think we had an answer on that.

 8          THE COURT:  Well, I'll admit the portion you're going

 9   to play at this time, subject, however, to a finalization of

10   the exhibit.  There may be a need to create a final version of

11   this exhibit, depending on how -- what is played in its

12   entirety.  We'll deal with that later.

13      (Exhibit 1609 admitted into evidence.)

14          THE COURT:  Second, ladies and gentlemen, you will be

15   hearing an audio, and as Counsel stated, there is a related

16   transcript that has been prepared of the audio, and that

17   transcript will be something you can view on your screens.

18          What's important about this is the following.  It's

19   what you hear that is the evidence.  It's the audio that is the

20   evidence, and if you hear something that's different from what

21   you read, it's what you hear that matters.

22          Okay.  And can you identify the time stamp of what

23   you're going to play, or is it the entirety of that one

24   exhibit?

25          MS. HEINZ:  It's just the clip, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  All right.  That's fine.

 2                MR. SPERTUS:  Your Honor, can we take off the

 3      monitor -- the agent's desktop.

 4           (Playing of audio recording.)

 5                MS. HEINZ:  I apologize, Your Honor.  There's another

 6      clip here that I forgot about.  It's the same one I talked to

 7      you about, but it is now.

 8                MR. SPERTUS:  Your Honor, may I have a moment to

 9      confer?

10                THE COURT:  Which exhibit is it?

11                MS. HEINZ:  There was another clip that I talked to

12      you about, and it is -- I would like to present it now.

13                THE COURT:  What exhibit is it, please?

14                MS. HEINZ:  I'm sorry.  That's Government's Exhibit

15      1611.

16                THE COURT:  Just a moment.

17                MR. SPERTUS:  No objection, Your Honor.

18                THE COURT:  All right.  Thank you.  You may play

19      that.

20                MS. HEINZ:  So this is 1611-A.

21                And for the record, Your Honor, we're moving to admit

22      1611.

23                THE COURT:  1611 is admitted.

24           (Exhibit 1611 admitted into evidence.)

25      ///
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1              *(Playing of audio recording.)*

2                    MR. SPERTUS:  This is not --

3                    MS. HEINZ:  We'll go just go forward and do that at

4       another time.

5                    THE COURT:  Thank you.

6       BY MS. HEINZ:

7       Q.    Special Agent Berger, directing your attention to what's

8       been marked as Government's Exhibit 2501 --

9       A.    Yes, I have it.

10      Q.    -- what is Government's Exhibit 2501?

11      A.    It is a PowerPoint presentation, which was -- which

12      contains the individuals Lilie Chen, Yaping Chen, and Yi-Chi

13      Shih.

14                   MR. SPERTUS:  Your Honor, I object to foundation.

15      This witness has no basis to make those comments.

16                   THE COURT:  I just thought that was an

17      identification.  What's the next question?

18                   MS. HEINZ:  I'm sorry, Your Honor.  I thought I had

19      the right binder, I don't.

20                   THE COURT:  It's Volume 22, I believe.

21      BY MS. HEINZ:

22      Q.    All right.  So we're talking about 2501.

23                   Do you have it in front of you, Special Agent Berger?

24      A.    Yes.

25      Q.    And what is 2501?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Appears to be a PowerPoint presentation with the names

2    Lilie Yaping, Yi-Chi Shih.

3    Q.    And what are the dates on the PowerPoint presentation?

4    A.    July 26 to the 29th of 2005.

5    Q.    And does it contain photographs of people?

6    A.    It does.

7    Q.    And do you recognize the people?

8    A.    I do.

9    Q.    Who are the people who are depicted in the PowerPoint?

10   A.    One is the --

11          MR. SPERTUS:  Objection.  Foundation.

12          THE COURT:  Overruled.

13          THE WITNESS:  One is the defendant Yi-Chi Shih,

14   another is Chen Yaping, and the other is Lilie Chen.

15   BY MS. HEINZ:

16   Q.    And does 2501 contains reference to a MMIC PA?

17   A.    It does.

18          MS. HEINZ:  Your Honor, the government moves to admit

19   2501.

20          MR. SPERTUS:  Objection.  Foundation.

21          THE COURT:  What's the -- can you establish a

22   foundational basis for this document with this witness?

23          MS. HEINZ:  I'm sorry, Your Honor?

24          THE COURT:  The source of the document and its

25   authenticity is the issue.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MS. HEINZ:  Yes, Your Honor.  I can establish the

2    source of the document.

3         Could you please bring up 1645, page 6.

4         Sorry, page 7.

5    BY MS. HEINZ:

6    Q.   Special Agent Storino [sic], do you see on 1645, page 7, a

7    reference to Exhibit 2501?

8    A.   Well -- I do.

9    Q.   And can you tell by looking at that exhibit where Exhibit

10   2501 came from?

11   A.   Yes.  It came from a computer inside Yi-Chi Shih's home.

12        MR. SPERTUS:  Your Honor, objection.  Foundation.

13   This witness is not the witness.

14        MS. HEINZ:  Your Honor, this exhibit has already been

15   admitted.  It was testified about by Special Agent Joseph Chun.

16        THE COURT:  You'll still need to establish the

17   foundational basis for this witness' knowledge about the

18   computer data that was the source of the document.

19        MS. HEINZ:  I'm sorry, Your Honor.  There is a

20   stipulation that all of the digital devices and their contents

21   are admitted.

22        MR. SPERTUS:  Your Honor, I will need to consult with

23   the government on this.  This is not the time and place to do

24   that, or we can ask for a recess.  I'm not prepared to --

25        THE COURT:  Well, is there a dispute about the source

```
1    of the documents?

2              MR. SPERTUS:  I believe -- there could be, yes.

3              THE COURT:  Why don't you discuss that briefly.

4         (Counsel confer off the record.)

5              MR. SPERTUS:  Your Honor, I withdraw the objection.

6              THE COURT:  I'm sorry.  You said you withdraw?

7              MR. SPERTUS:  I withdraw the objection.

8              THE COURT:  Thanks.  Thank you for conferring so

9    quickly.  I appreciate your collaboration.

10             So we're going back to Exhibit -- to which exhibit

11   are we now -- based on your discussion, are we back to 2501?

12             MS. HEINZ:  As long as we are on 1645, I would like

13   the agent to note something on 1645.

14             THE COURT:  That's fine.

15   BY MS. HEINZ:

16   Q.   Special Agent Storino, would you please read the file path

17   for Exhibit 1605.

18   A.   Special Agent Berger.

19   Q.   I'm sorry.  Special Agent Berger.

20   A.   The file path is

21   users\shih\documents\dtm\module\dtmma9010-0.1causa.ppt.

22             THE COURT:  From what page of 1645 are you reading?

23             MS. HEINZ:  Page 6.

24             THE COURT:  Thank you.

25             MS. HEINZ:  Your Honor, the government moves to admit
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    2501.

 2            MR. SPERTUS:  No objection, Your Honor.

 3            THE COURT:  All right.  Thank you.  Exhibit 2501 is

 4    admitted.

 5        (Exhibit 2501 admitted into evidence.)

 6    BY MS. HEINZ:

 7    Q.   Special Agent Berger, showing you page 1 of 2501, in the

 8    middle of it, where it says "vo.1," what does "DTM" mean based

 9    on your investigation in this case?

10    A.   Dingtian Micro.

11            THE COURT:  Can you spell that, please.

12            THE WITNESS:  D-i-n-g-t-i-a-n and micro.

13            THE COURT:  And can you continue to speak into the

14    microphone, please.

15    BY MS. HEINZ:

16    Q.   And looking near the bottom of page 1 above the date where

17    it says "2005-07, 26-27," there are three names there.  Based

18    on your investigation, what does "Lilie" mean?

19    A.   It means Lilie Chen.

20    Q.   What does "Yaping" mean?

21    A.   Yaping Chen.

22    Q.   Turning to page 2 of 2501 --

23            MS. HEINZ:  I'll just let the jurors read that,

24    Your Honor?

25            THE COURT:  That's fine.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    BY MS. HEINZ:

 2    Q.   Turning to page 3.  Turning to page 4.

 3          Special Agent Berger, do you recognize the person in

 4    the photograph who's on the left-hand side?

 5    A.   I do.  That's Yaping Chen.

 6    Q.   Turning to page 5, Special Agent Berger, based on your

 7    investigation, do you recognize the person who is depicted on

 8    the left-hand side of the photograph?

 9    A.   I do.  That's Lilie Chen.

10    Q.   Special Agent Berger, please look at page 8 of the

11    exhibit.  Based on your investigation, do you know what's

12    depicted on page 8?

13    A.   I believe it's a module.

14    Q.   And turning to page 9.

15    A.   A closer view.

16    Q.   And turning to page 10, based on your investigation, what

17    is depicted on page 10?

18    A.   The module.

19    Q.   And is this a drawing of a module?

20    A.   Yes, it is.

21    Q.   Turning to page 11, based on your investigation, who is

22    the person who is depicted on the left-hand side of the

23    photograph?

24    A.   That is Chen Yaping.

25    Q.   And turning to page 31 of this exhibit, based on your
```

1    investigation, who is the individual depicted?

2    A.    That is Chen Yaping.

3    Q.    And turning to page 32, the photograph on the right-hand

4    side, the person in the white sweater top, who is that

5    individual?

6    A.    That is Chen Yaping.

7    Q.    Directing your attention to Government's Exhibit 1689, I

8    believe it's in Volume 20.

9            Special Agent Berger, what is Government's Exhibit

10   1689?

11   A.    It is a product data sheet for part TGA4517.

12   Q.    Where did Exhibit 1689 come from?

13   A.    Qorvo.

14           MS. HEINZ:  Your Honor, move to admit 1689.

15           MR. SPERTUS:  Objections for the reasons previously

16   briefed.  Relevance, 404(b).

17           THE COURT:  I understand.  Let me talk to you

18   briefly.

19       (The following proceedings were held at sidebar.)

20           MR. HANUSZ:  I'm going to handle this, Your Honor.

21           THE COURT:  Is this one where -- is this one of the

22   exhibits that we specifically discussed?  I didn't go back and

23   look at my notes.

24           MR. HANUSZ:  No, Your Honor.

25           THE COURT:  Okay.  So this was derived from one of

```
 1    the computers?  What's the source of this?

 2              MS. HEINZ:  It's a certified business record.  It was

 3    produced by Qorvo.  Qorvo is the successor organization who

 4    bought Triquint.

 5              THE COURT:  I see.

 6              MS. HEINZ:  So this is from their archives from their

 7    records, and the part number on this is the part number that is

 8    in the exhibit that we have been discussing.

 9              THE COURT:  The 4516 part number that was shown on

10    the invoices and orders?

11              MS. HEINZ:  Yes.

12              THE COURT:  Why is this irrelevant?

13              MR. HANUSZ:  So a couple of objections, Your Honor,

14    which we previously briefed.  Number 1, this document

15    apparently predates the conspiracy date in this case.  It's

16    from early 2006.  This is uncharged 404(b) conduct.

17              This is discovery that was produced after the Court's

18    scheduling order which mandated a discovery cutoff.  Your

19    Honor, last evening I asked the government repeatedly to

20    identify the exhibits they would use today with their

21    witnesses.  We received no answer last evening, repeated that

22    request this morning.  I was told that they didn't have a list.

23    We would rather not bring these objections every time we have

24    them.

25              THE COURT:  I understand.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. HANUSZ:  But we're trying to resolve this,

 2   Your Honor.

 3          THE COURT:  What about the timing issue, February 10,

 4   '06?

 5          MS. HEINZ:  Your Honor, this advanced data sheet

 6   predates the date on the -- on the -- predates the --

 7       (Counsel confer off the record.)

 8          MR. HANUSZ:  Well, so this is one of a series of

 9   exhibits.  I'm not sure.  I think the Indictment indicates that

10   it was sometime in February 2006.  In any event, Your Honor, we

11   would appreciate the opportunity to work out these objections

12   outside the presence of the jury.

13          THE COURT:  Well, that's fine.  My view is this.  If

14   the representation from the government is that the TGA4516 on

15   this Triquint document corresponds to the same TGA4516 on the

16   exhibits that were discussed earlier today, which included

17   orders to and/or communications at the defendant's former place

18   of employment, then I'm not persuaded that this is irrelevant

19   or inappropriate to admit.

20          I'll do this for now.  Is there a reason that you

21   can't conclude your discussions about admissibility while

22   you -- you can question the witness about the document.  Does

23   the determination about admissibility need to be made right

24   now?

25          MS. HEINZ:  Well, we need to show certain sections of
```

```
 1   the document to the jury because certain sections of the

 2   document parallel exactly, exactly what is in the PowerPoint.

 3              THE COURT:  Okay.  Well, is there any -- is there any

 4   other area about which you plan to question this witness in the

 5   next -- because we have 15 minutes left today.

 6              MR. HANUSZ:  The rest of the direct is five hours, I

 7   believe, Your Honor.

 8              THE COURT:  Let's do this.  If there's something --

 9   do you think you can get through exhibit -- the parts you're

10   discussing in the next 15 minutes?

11              MS. HEINZ:  Yes.

12              THE COURT:  Then let's -- just a minute.  I don't

13   want to hear from both of you on the same issue.

14              MR. SPERTUS:  No, I have a different issue.

15              THE COURT:  Okay.  I think you can do that.  I'll

16   reserve on the admissibility of the issue, but I want you to be

17   very focused on the portions of the exhibit that correspond to

18   the other admitted exhibits that we've already heard today.

19              MR. SPERTUS:  Yes.  We can take it up after the day.

20   I have a process issue I'd like to address after today.

21              THE COURT:  Okay.

22         (The following proceedings were held in open court.)

23              THE COURT:  Please proceed, Ms. Heinz.

24   BY MS. HEINZ:

25   Q.   Could you please turn to page 10 of Government's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Exhibit 2501.

 2              MS. HEINZ:  And if you could enlarge that, please.

 3    BY MS. HEINZ:

 4    Q.   Special Agent Berger, do you see --

 5              MS. HEINZ:  Can you turn that?  Is it possible to

 6    turn it?

 7    BY MS. HEINZ:

 8    Q.   Special Agent Berger, directing your gaze to the bottom

 9    part of that exhibit, do you see a number there that starts

10    with "TGA"?

11    A.   I do.

12    Q.   And what is that?

13    A.   That is a Triquint part.

14    Q.   And does that number appear twice on this exhibit?

15    A.   It does.  At the top and the bottom.  It says "TGA4517."

16    Q.   And do you know what those numbers in this drawing mean

17    based on your investigation in this case?

18    A.   I do.

19    Q.   What does it mean?

20    A.   Those are the Triquint parts.

21    Q.   Okay.  Turning your attention to Government's Exhibit

22    1689, is 1689 an advanced product sheet for that part number?

23    A.   It is.

24    Q.   And where did 1689 come from?

25    A.   It came from Qorvo.
```

1   Q.   And what is a product information sheet based on your

2   investigation in this case?

3   A.   It's a sheet that the company puts out when -- right

4   before they're going to launch the product.

5   Q.   So turning to page 2 of Government's Exhibit 2505, I'd

6   like to compare that to page 2 of Government's Exhibit 1689.

7            Special Agent Berger, is there any information that

8   is on Government's Exhibit 2505 that is also on the first page

9   of Government's Exhibit 1689?

10           THE COURT:  We don't have Exhibit 2505.

11           MR. HANUSZ:  Nor do we.

12           MR. SPERTUS:  We do not either.

13           MS. HEINZ:  I'm sorry, Your Honor.  2501.  2501.

14           THE WITNESS:  2501.  Page --

15  BY MS. HEINZ:

16  Q.   2501, page 2; 1689, page 1.

17  A.   Yes, those are the same.

18  Q.   So where you see "Primary Applications," do those words

19  appear on the Advanced Product Information sheet that is 1689?

20  A.   It does.

21           MS. HEINZ:  Could we please show the jury

22  Government's Exhibit 1689?

23           THE COURT:  Just a moment.  You said that you were

24  comparing Exhibit 2501, page 10 or page 2?

25           MS. HEINZ:  Page 2.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  With 1689, page 1; is that right?

 2              MS. HEINZ:  Yes, Your Honor.

 3              THE COURT:  Could you publish page 2 of 2501 for a

 4   moment, please.

 5              That's what you're publishing?  That's the page to

 6   which you're referring?

 7              MS. HEINZ:  Yes.

 8              THE COURT:  And you're comparing that to 1681,

 9   page 1?

10              MS. HEINZ:  1689, page 1.

11              THE COURT:  Okay.  All right.  Go ahead.  You may

12   publish that.

13              MS. HEINZ:  Okay.  And also if we could look at

14   page 3 of 2501.  Can you put them side-by-side.

15   BY MS. HEINZ:

16   Q.   So, Special Agent Berger, could you compare the frequency

17   ranges on those two exhibits?

18   A.   The frequency range is the same.  It says 31 to

19   37 gigahertz.

20              MS. HEINZ:  Your Honor, I have concluded with these

21   two exhibits.  Should we go on?

22              THE COURT:  Yes, please.  How long will the next

23   section of your examination take?

24              MS. HEINZ:  Maybe five minutes.

25              THE COURT:  All right.  Then let's do that, and then
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  we'll break.  Thank you.

2  BY MS. HEINZ:

3  Q.   Directing your attention to Government's Exhibit 2301 --

4  A.   All right.

5  Q.   -- what is Exhibit 2301?

6  A.   It is an email from YPC to Yi-Chi Shih dated August 24,

7  2005, regarding Triquint parts.

8         MS. HEINZ:  And, Your Honor, I'd like to admit 2301.

9         THE COURT:  Any objection?

10        MR. SPERTUS:  We'll have to reserve this for our

11 discussion.  We very well may.  We don't know what it is.

12        MS. HEINZ:  Okay.  Please bring up Government's

13 Exhibit 1645, page 3 -- sorry, page 4.

14 BY MS. HEINZ:

15 Q.   Special Agent Berger, could you read the last part of the

16 file path for 2301.

17 A.   Yes.  It's on device 03A, underscore, 2, and it says "Asia

18 Dingtian" and some characters, which probably were Chinese.

19 Q.   Does that inform your opinion about where 2301 came from?

20 A.   Yes.  It came from Mr. Shih's home -- a thumb drive in

21 Mr. Shih's home.

22 Q.   So looking at 2301, directing your attention to the middle

23 email that starts with "Dear Mr. Chen" --

24        MS. HEINZ:  So I would ask the jury to please read

25 that.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. SPERTUS:  Your Honor, it's not in evidence.

 2              MS. HEINZ:  I'm sorry.  Can we show this to the jury,

 3    Your Honor?

 4              MR. SPERTUS:  Your Honor, the objection is it

 5    predates by more than a year the start that was alleged.

 6    404(b).  Relevance.

 7              MS. HEINZ:  That's just incorrect, Your Honor.

 8              THE COURT:  I don't think I can resolve this now.

 9              Here's what we're going to do.

10              Ladies and gentlemen, by the time we have a further

11    discussion on this, we'll be past the time I said we would stop

12    today, so we're going to stop here today with you.  We'll

13    resume Tuesday at 8:30.

14              Have a nice weekend.  Please don't discuss the case

15    during your break.  Thank you.

16              THE CLERK:  All rise.

17         (Jury out at 2:25 p.m.)

18         (The following was heard outside the presence of the

19         jury.)

20              THE COURT:  Mr. Berger, you may step down.

21              Please be seated.

22              All right.  What's the issue you have?

23              MR. SPERTUS:  Your Honor, I want the Court to know

24    that without a witness order and without lists of exhibits from

25    the government, these just -- every exhibit that we previously
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   lodged objections to is live.
 2          The first day, we tried to compartmentalize for the
 3   Court by witness because we knew who those witnesses were.
 4   Last night, we asked for a list of exhibits that would be
 5   introduced today.  It would have allowed us to work through any
 6   issues, but when I see an exhibit for the first time in trial
 7   with a lodged objection to it, we want to preserve the
 8   objection.
 9          So what I think will solve this problem is if the
10   Court will just order the government to give us the list of
11   exhibits at issue, then we can evaluate them during the break,
12   and most likely we'll have no objection to most of them.
13   That's the only way we can prevent this disruption during the
14   trial day.
15          THE COURT:  Ms. Heinz, what about that suggestion?
16   Did you hear it?
17          MS. HEINZ:  I did not because I was talking to my
18   co-counsel.  We would like to meet and confer for ten minutes
19   in the hopes of resolving this, Your Honor.
20          THE COURT:  All right.  The jury's gone.
21          What is suggested is that you can confer about this
22   exhibit, but that the efficient thing would be to, in advance
23   of Tuesday, if there's going to be -- whether it's this
24   witness -- well, do you expect this witness to occupy all of
25   Tuesday?
```

```
 1            MS. HEINZ:  I don't think all of Tuesday, but a good
 2    part of Tuesday, and perhaps with cross-examination, all of
 3    Tuesday.
 4            THE COURT:  Well, I think the issue is this.  In
 5    order to facilitate an efficient process here, is there a
 6    reason why -- in advance of the day on which you plan to call a
 7    particular witness and have that witness be shown particular
 8    exhibits, is there a reason you can't -- and to the extent
 9    those are exhibits about which objections were previously made,
10    is there a reason not to identify those in advance and discuss
11    them in advance?
12            MS. HEINZ:  I have a two-part reaction -- comment to
13    that.  One, I don't feel I can tell you this without talking to
14    my co-counsel; and, two -- and, two --
15            THE COURT:  I'm not asking you to tell me now.  I'm
16    saying as a general matter.
17            MS. HEINZ:  Well, I'd like to discuss with them as a
18    general matter.  I understand they asked for them last night.
19    There was -- I did not have time last night.  I was up very
20    late, Your Honor.  I'm sorry.  But if I can, I don't have a
21    problem with providing notice of exhibits.  That's Number 1.
22            But, Number 2, Your Honor, this is -- we have dealt
23    with this situation before.  This was the same argument on the
24    Air China pilots, the 404(b) argument.  These exhibits and this
25    conduct is inextricably intertwined with the discovery.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Well, that's something you can discuss.
 2    I think what I'm looking for is a process that would narrow
 3    disputes, and we have between -- today's Wednesday.  We're next
 4    in session on next Tuesday.  There's a few days between now and
 5    then.  You know the order of witnesses -- or the expected order
 6    of witnesses, you should know the exhibits that you plan to
 7    show to each witness between now and Tuesday, and so the sooner
 8    you can confer with the defense counsel about those exhibits
 9    you think you might use and to which they've lodged objections
10    and you can then confer about it, the better.
11              MS. HEINZ:  Your Honor, I certainly can provide a
12    list of exhibits we expect to show this witness well before
13    Tuesday.
14              THE COURT:  Okay.  And then confer about it.  Confer
15    now about the ones -- I mean, frankly, you've got some time
16    right now.  Maybe you can confer now about the remaining
17    exhibits for this witness as to which there were prior
18    disputes, or figure out a time to do it efficiently --
19              MR. HANUSZ:  We agree, and we have been asking for
20    this.  We have been trying to do it for a week.
21              THE COURT:  -- because you made a lot of progress.
22    You've narrowed issues considerably, so let's do keep at it,
23    otherwise we just lose time with the jury.
24              MR. HANUSZ:  We understand that.  The issue for us is
25    prioritizing.  There are many exhibits which are completely
```

```
 1   unobjected to by the defense.  What we don't have any insight
 2   into is which exhibits -- to help prioritize for ourselves, the
 3   Court and the jury, we don't have any insight as to what
 4   exhibits -- which exhibits will be used with which witnesses.
 5            MR. SHOBAKI:  Your Honor, if I may be heard just for
 6   the rest of the team that's over here that hasn't been up at
 7   the lectern.
 8            We've also conferred, and we don't have an issue with
 9   disclosing to the defense in advance of days of testimony the
10   exhibits to which there are still pending objections over which
11   we may want to just try and resolve those beforehand.  That's
12   entirely manageable.
13            You know, I think with respect -- Ms. Heinz covered
14   with respect to last night receiving a demand for the
15   exhibits -- and I do say last night -- for today.  It wasn't
16   something that she was reasonably able to comply with, but it's
17   something that we can do, and we're certainly, I mean, willing
18   to do just to not eat up time here.
19            To the extent that it's -- you know, obviously, the
20   defense will be coming up with whatever exhibits they intend to
21   use for cross-examination.  We would ask for a similar
22   courtesy.  To the extent that there are exhibits that are
23   already identified they plan to use, we'd like to know that,
24   too, so we can resolve the objections.
25            MR. HANUSZ:  Two things, Your Honor.  To the extent
```

1    that the government -- I appreciate the offer to identify

2    exhibits to which pending objections are -- there are live

3    objections.

4            The problem is when the government introduces an

5    exhibit, we're left to go through two or three different

6    volumes to figure out whether that's actually one of the

7    exhibits that has been stipulated to or agreed to or already

8    admitted.  So that just adds additional work.

9            In terms of the government's request for

10   cross-examination materials, which the government has made

11   before, the government is well aware of the fact that it has no

12   right to defense cross-examination materials, period.

13           THE COURT:  Okay.

14           MS. HEINZ:  Your Honor --

15           THE COURT:  Wait a minute.  Look, this is becoming

16   overly complicated.

17           With respect to your first point, if you don't

18   already have a list that you've created in some form of a

19   document with all of the exhibits in numerical order and your

20   position on, then create it so you don't have to go looking in

21   different places to see whether you do or do not object.  That

22   seems to me -- that's short.

23           Second, the government hasn't objected to providing

24   you advanced notice of the depositions it plans to use in its

25   direct examination of witnesses to facilitate the discussion

```
 1    prior to the testimony.

 2            As to cross-examination, you're right.  You don't

 3    have that same obligation, but I think you ought to look at

 4    this practically as well and determine whether it might be --

 5    whether disclosing at least some exhibits so as to resolve, if

 6    you can, disputes about those exhibits might warrant doing it

 7    in that fashion, even though it means disclosure prior to the

 8    testimony because then we don't have to stop in the midst of

 9    the cross-examination.

10            MR. HANUSZ:  Your Honor, I'll say a couple things.

11            98 percent of the cross-examination materials are

12    materials that were produced by the government in discovery, so

13    the government has those materials.  They just don't have an

14    idea of the subset of those materials that we want to use.  And

15    anything that we haven't -- we didn't receive in discovery,

16    we --

17            THE COURT:  Has the government objected to exhibits

18    that comprised materials it produced to you?

19            MR. HANUSZ:  I can't imagine the government would

20    have any objections to those.

21            THE COURT:  Well, no, but that's the point of what

22    I'm asking about.  What I'm asking you to disclose would be

23    exhibits that you intend to use to which the government has

24    objected.

25            MR. HANUSZ:  So our concern, Your Honor, is that the
```

```
 1    witness will form their testimony around the exhibits that we

 2    provide the government.

 3              THE COURT:  Okay.

 4              MR. HANUSZ:  Well, that's the concern with

 5    disclosure.

 6              THE COURT:  But I don't think you're listening to

 7    what I'm saying.  A, I'm not asking you to disclose all

 8    exhibits.  I'm trying to find a means of simplifying and

 9    streamlining the resolution of disputes over disputed exhibits.

10    And to the extent that in the cross-examination of a witness,

11    you don't plan to use a disputed exhibit, then it's not

12    something that would have to be discussed.

13              MR. HANUSZ:  That's correct, Your Honor.

14              THE COURT:  I agree.

15              So, second, to the extent that you do plan to use in

16    the cross-examination an exhibit to which the government has

17    objected, I understand that you are not obligated to discuss

18    that, and all I'm asking you to do is to consider balancing the

19    effect of disclosing that so you can discuss and potentially

20    resolve the dispute against your wish not to have that

21    disclosed.  I'm just asking a balance, and I'm not ordering you

22    to disclose it.

23              MR. HANUSZ:  No, I understand.  I understand that,

24    Your Honor.  We appreciate the Court's thoughts and we'll

25    certainly consider it.
```

```
 1            THE COURT:  Okay.  Mr. Shobaki.

 2            MR. SHOBAKI:  Nothing really further, Your Honor.  I

 3   just would like to make the point that as much as the defense

 4   strenuously objected that the government has no right to see

 5   their exhibits, they actually have no right to see ours,

 6   Your Honor, and we're just doing this to help facilitate things

 7   going along.

 8            THE COURT:  Was there something you wanted to add,

 9   Ms. Heinz?

10            MS. HEINZ:  I'm sorry, Your Honor?

11            THE COURT:  Is there something you wanted to add?

12            MS. HEINZ:  I'm going to table my thought for now,

13   Your Honor.

14            THE COURT:  All right.  Do you think it would be

15   productive to confer now or tomorrow?  When's the best time for

16   you to confer about this issue?

17            MR. SHOBAKI:  Your Honor, I think between us, we've

18   got a couple days here where Counsel are not going to be in

19   court, so I think we can try and confer and figure out at least

20   upcoming issues.

21            The one sort of procedural point, you know, with us

22   coming back next week after the Monday holiday is whether we

23   want to come in a little bit early to discuss some of the stuff

24   with the Court, you know, and tee up whatever issues there are

25   before we actually start with the jury.
```

```
 1          I know everybody in this room just groaned and rolled

 2    over when I proposed coming in early, Your Honor, but maybe if

 3    we could carve out a little time, or I don't know if the jurors

 4    could be asked to come at 9:00 instead of 8:30.  You know,

 5    something like that, just so that we're not keeping them

 6    waiting, Your Honor.  I'm just trying to be mindful of that.

 7          MR. HANUSZ:  Your Honor, once we get the list of

 8    exhibits, I think we can probably resolve it pretty

 9    expeditiously, but that's the beginning of the process.

10          THE COURT:  All right.  Well --

11          Andrea.

12    (The Court and clerk confer off the record.)

13          THE COURT:  The amount of effort that's going to be

14    necessary to communicate to the 15 individuals and make sure

15    they clearly understand what to do, I think I'd prefer not to

16    do that for a 30-minute time period.  I'll provide them with

17    some food if we need to talk.

18          So what I'd like you to do is to do what you said

19    you're -- you've been doing this already.  I mean, so keep

20    doing what you've been doing.

21          I don't think that Tuesday morning is necessarily the

22    time for us to be conferring about things that aren't going to

23    happen on Tuesday.  It would be more sensible to do that on

24    Tuesday afternoon after the jurors leave.

25          To the extent that you've reached an impasse on one
```

1  or more exhibits that are going to be shown to Mr. Berger or

2  the next witness, then have those teed up for me.

3          So send Ms. Keifer an email which says, "Here are the

4  exhibits in dispute," so we can have them pulled and the

5  basis -- I don't want briefing.  I just -- maybe you can even

6  make a chart like the ones you've been making, your H table --

7  there's not that many exhibits, I think, that would be at

8  issue -- and plaintiff's -- excuse me, government's -- the

9  defendant's objection, the government's response in boxes,

10 something -- or something simple or just be ready to talk about

11 it, if it's something that we can address quickly.

12         MR. HANUSZ:  We would love to get something to the

13 Court in advance of any time we come back to court.

14         THE COURT:  See what you can do.  But let me be

15 clear.  I know you have a lot to do.  I'm not trying to create

16 new work by saying, "Give me this chart."  If it's something we

17 can discuss in ten minutes, then I don't necessarily need a

18 chart if I have a list.  So look at it in that --

19         MR. HANUSZ:  The defense would like to give the Court

20 a chart so it's crystal clear what the parties' respective

21 positions are.

22         THE COURT:  All right.  Well, you can do something

23 like that.  Hopefully, you'll -- hopefully, you will continue

24 on the path you've been on where you, frankly, resolve a -- a

25 very high percentage of the issues anyway.  There wouldn't be

1    that many left, again, focusing on what needs to be resolved

2    with respect to the direct testimony of Mr. Berger.

3              MR. HANUSZ:  And if the government would provide the

4    names of the witnesses or at least one witness who would come

5    afterwards for Tuesday.

6              THE COURT:  Yeah, work on that.  We discussed that.

7              MR. SHOBAKI:  Yeah, we'll do that, as we've been

8    doing, Your Honor.

9              THE COURT:  And then the exhibits that might be

10   associated with that person to which the defendant has objected

11   where those objections haven't yet been discussed and/or

12   resolved.

13             MR. SHOBAKI:  We hear you loud and clear on that,

14   Your Honor.

15             THE COURT:  Okay.  Have a nice weekend.

16             MR. ROLLINS:  Sorry.  One last point, because I know

17   the Court's going to be gone for two days.  The defense boxes

18   and the wafers that they sought to admit into evidence today,

19   the government's ability to access that over the next two-day

20   period, is it possible for us to work that out with the clerk?

21             And then also I just wanted to confirm for the record

22   that there would be no objection from the defense to the

23   government fingerprinting, taking DNA swabs and photographing

24   those exhibits.

25             MR. SPERTUS:  First of all, we had worked this out at

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    the Court's request.  What Mr. Rollins is now asking for, we

 2    object to.  We informally told the government we don't mind

 3    leaving the disks with the clerk and the boxes.  Chain of

 4    custody is a non-issue.

 5         We do not want you to destructively examine this

 6    evidence and then claim, "Oh, it looks different than when it

 7    was photographed."  We will work with them.  We will work with

 8    them, but now is not the time.  The first time Mr. Rollins ever

 9    spoke a word of any kind of testing of these exhibits was

10    today.

11         And for the record, the fingerprinting, they'll have

12    my fingerprints.  They're all -- I've been handling them all

13    day.  So this is something that should -- in the first

14    instance, the government should tell us what they want to do

15    and we'll say okay as long as it doesn't damage the evidence.

16    But to go to the Court now for an order is, I think, premature.

17    I told them I would be available at reasonable times, and right

18    now they haven't even proposed a time, so --

19         MR. ROLLINS:  We can file something on this,

20    Your Honor.  We don't have to waste the Court's time.

21         MR. SPERTUS:  That would be great.

22         MS. HEINZ:  I'm sorry, Your Honor.  I have one

23    housekeeping thing.

24         THE COURT:  Well, let's just take one thing at a

25    time.  Is that related to this?
```

```
1              MS. HEINZ:  No.

2              THE COURT:  Okay.  Just a minute.

3         (The Court and clerk confer off the record.)

4              THE COURT:  Okay.  In terms of the logistics of the

5    next two days -- all right.  Tomorrow and Friday, Ms. Keifer

6    will be available here in the courtroom between 9:00 a.m. and

7    4:00 p.m.  So if you can work out a day and time -- or days and

8    times tomorrow and/or Friday when you want to be here to deal

9    with these two exhibits, let Ms. Keifer know by email so she'll

10   know.

11             With respect to your -- the issue about what, if any,

12   testing that might be done to these things, I can't address

13   that on an oral request, and I'd like you to confer further

14   about that anyway.

15             Maybe you can reach an agreement on that.  If you

16   can't, then I'll have to address it, but I've already deferred

17   the admissibility of these exhibits until there's testimony on

18   just the mechanical part of the chain of custody.  So I don't

19   think it's an issue that we necessarily have to resolve today

20   or by next Tuesday.

21             Yes, Ms. Heinz.

22             MS. HEINZ:  Yes, Your Honor.  We scheduled some

23   out-of-town witnesses to come in on Tuesday, and given that we

24   just started Special Agent Berger's testimony, I'm wondering if

25   we can stop his and take the out-of-town witnesses or if we
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    should try to reschedule the travel of the out-of-town

2    witnesses.

3              MR. HANUSZ:  Can we ask who the out-of-town witnesses

4    are, please?

5              MS. HEINZ:  Yes.  They are Jeffrey Barner and Jair

6    Whitlock.

7              THE COURT:  What's the time estimate for their

8    combined direct testimony?

9              MS. HEINZ:  Two hours at the most for both, I

10   believe, but I'm anticipating the cross will be long.

11             THE COURT:  What's your view?

12             MR. SPERTUS:  Cross will be long.

13             THE COURT:  How long?  Do you have a time estimate?

14             MR. SPERTUS:  I think five hours.

15             THE COURT:  Each?

16             MR. SPERTUS:  No, combined.

17             THE COURT:  All right.  Well, if they're presently

18   scheduled to come here on Tuesday -- are they available Tuesday

19   and Wednesday?

20             MS. HEINZ:  I will have to ask, Your Honor.  I'll

21   ask.

22             THE COURT:  I don't have any --

23             MS. HEINZ:  I think the fundamental question is could

24   we break with Special Agent Berger --

25             THE COURT:  Do you have any objection to that?
```

```
 1            MR. SPERTUS:  Yes, and if I can say why.

 2            The estimate for Berger's direct is five hours, which

 3   means that they'll do the direct, then we'll break without

 4   cross for a long period of time.  So I would ask that they just

 5   reschedule the Cree witnesses.

 6            MS. HEINZ:  That actually wasn't what we were asking.

 7            THE COURT:  That's -- no, I don't think that was what

 8   I understood the proposal.  The other witnesses would be here

 9   on Tuesday and part of Wednesday, and if they're finished, then

10   Mr. Berger would resume sometime on Wednesday.

11            MR. SPERTUS:  Oh, I see.  No more -- I misunderstood.

12   No more questioning of Berger?

13            THE COURT:  Mr. Berger.

14            MR. SPERTUS:  We go right on Tuesday to the

15   out-of-town witnesses?

16            THE COURT:  That's what I understood the proposal --

17            MR. SPERTUS:  That's fine.  That's fine with the

18   defense.

19            MS. HEINZ:  I just wanted to know if that was an

20   option in terms of -- for arrangement of travel.

21            MR. SPERTUS:  No objection.

22            THE COURT:  Thanks.  That's an option, but I think

23   that, again, informs your discussions about exhibits because if

24   these two witnesses are going to raise issues about exhibits,

25   then you need to get on that, too.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          All right.  Thanks for your help.

2          MR. SHOBAKI:  Thank you, Your Honor.

3          MS. HEINZ:  Thank you, Your Honor.

4          THE COURT:  Keep working collaboratively.  You're

5     making a lot of progress.

6         *(Evening recess taken 2:46 p.m.)*

7                         --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1

2

3                          CERTIFICATE

4

5        I hereby certify that pursuant to Section 753,

6  Title 28, United States Code, the foregoing is a true and

7  correct transcript of the stenographically reported

8  proceedings held in the above-entitled matter and that the

9  transcript page format is in conformance with the

10 regulations of the Judicial Conference of the United States.

11

12 Date: JUNE 4, 2019

13

14

15

16

17             /s/  Cindy L. Nirenberg, CSR No. 5059

18                         Official Court Reporter

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA