```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4      THE HON. JUDGE JOHN A. KRONSTADT, JUDGE PRESIDING

 5

 6  UNITED STATES OF AMERICA,        )
                                     )
 7                  Plaintiff,       )
                                     )
 8          vs.                      ) NO. 18-CR-00050-JAK
                                     )
 9  YI-CHI SHIH,                     )
                                     )
10                  Defendant.       )
    _____)
11

12

13

14        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

15                        DAY 17

16             (12:37 P.M. to 3:57 P.M.)

17               Los Angeles, California

18              Wednesday, June 19, 2019

19

20

21

22         Lisa M. Gonzalez, CSR 5920, CCRR
                   Official Reporter
23         United States District Courthouse
            350 West 1st Street, Suite 4455
24          Los Angeles, California  90012
                   (213) 894-2979
25              csrlisag@aol.com
                www.lisamariecsr.com
```

2

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   OFFICE OF THE UNITED STATES ATTORNEY
                           BY:   JUDITH A. HEINZ
 3                         ASSISTANT UNITED STATES ATTORNEY
                           CRIMINAL DIVISION
 4                         BY:   MELANIE ANN HANSON SARTORIS
                           ASSISTANT UNITED STATES ATTORNEY
 5                         BY:   KHALDOUN SHOBAKI
                           ASSISTANT UNITED STATES ATTORNEY
 6                         CYBER AND INTELLECTUAL PROPERTY
                                                 CRIMES SECTION
 7                         BY:   JAMES C. HUGHES
                           ASSISTANT UNITED STATES ATTORNEY
 8                         TAX DIVISION
                           BY:   WILLIAM ROLLINS
 9                         ASSISTANT UNITED STATES ATTORNEY
                           GENERAL CRIMES SECTION
10                         United States Courthouse
                           312 N. Spring Street
11                         Los Angeles, California 90012
                           213.894.7280/5615/0759/2579/7407
12

13

14   FOR THE DEFENDANT:    SPERTUS, LANDES AND UMHOFER LLP
                           BY:   JAMES W SPERTUS, ESQ.
15                               JOHN HANUSZ, ESQ.
                                 CHRISTA L. WASSERMAN
16                         1990 South Bundy Drive
                           Suite 705
17                         Los Angeles, California 90025
                           310.826.4700
18

19

20

21

22

23

24

25
```

3

1                              I N D E X

2

3      PROCEEDINGS:

4      Defendant's Closing Argument                              4

5      Government's Rebuttal                                    90

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          *Los Angeles, California; Wednesday, June 19, 2019;*

2                          12:37 P.M.

3                            -oOo-

4          THE COURT:  All right.  We're back on the record.

5    All counsel, parties, and party representatives are present.

6    No jurors are present.

7          Are you ready to proceed, Mr. Spertus?

8          MR. SPERTUS:  Yes, Your Honor.

9          THE COURT:  Okay.  Thank you.

10         (Jury present)

11         THE COURT:  Please be seated.  All 12 jurors are

12   present.

13         Mr. Spertus, please proceed.

14         MR. SPERTUS:  Thank you, Your Honor.

15                      CLOSING ARGUMENT

16         MR. SPERTUS:  We've just listened to about an hour

17   and a half of the government's closing argument that was in

18   a narrative.  That narrative was written before this case

19   was even charged.

20         The government spent a lot of time going through

21   e-mails -- and I'm going to do that, too -- ignored

22   everything that was presented during the trial that you sat

23   through that was inconsistent with their narrative, which

24   I'm going to highlight, and wove in themes that have nothing

25   to do with this trial.  And I'm going to unwind that.

```
 1              This trial is not about unlawful work in China.
 2    Dr. Shih's consulting work and his presidency of Chengdu
 3    GaStone is perfectly lawful, and there isn't a single count
 4    in the indictment that you're going to evaluate that is
 5    relevant to whether or not consulting with China and Chinese
 6    entities is lawful.
 7              The U.S. can outlaw it.  China is a major trade
 8    partner.  Major United States companies operate in China --
 9    Intel, Microsoft, Cree.  There are exhibits in this trial
10    that you've never seen, but I'm going to identify them for
11    you right now.  They're 3513, 3517, 3514, 3515, and 3519.
12              Those are exhibits that I had presented to
13    Dr. Barner but didn't publish at the time, and now you'll be
14    able to review them in the jury room and see that half of
15    Cree's work force is in China.  It is just not true that
16    consulting with Chinese businesses is unlawful.
17              This case has nothing to do with spying.  There
18    are crimes against spying that have nothing to do with this
19    case, were not charged.  And I submit any conceivable charge
20    that academically could be conceived of that could have been
21    added to the facts of this case would have been added.
22              I don't mean this as a joke at all, but what do
23    you get when you have five federal prosecutors, nine case
24    agents, 20 supporting agents in a room trying to figure out
25    what charges can we add?  You have the second superseding
```

6

1    indictment that you're going to be evaluating in this case.

2            This case has been an avalanche of effort to spin

3    completely innocent facts, misstate the law, and try to

4    manufacture a criminal.  And I'm going to unwind those

5    government arguments now.

6            This case has nothing to do with espionage.  It

7    has nothing to do with ITAR.  ITAR stands for the

8    International Traffic in Arms Regulations or something like

9    that, and it's irrelevant to this case.

10           None of the crimes that you'll be evaluating are

11   related to ITAR.  This has nothing to do with trade wars in

12   China.  This government can do whatever it wants to outlaw

13   conduct or lawfulize [sic] conduct or whatever it wants to

14   do, but someone can only be charged with a crime if they

15   break an existing law.

16           And China is a major United States trade partner.

17   There are tensions, but this economy is dependent on the

18   work, the trade that we have with China.

19           There's nothing about this case that has anything

20   to do with unlawful competition.  This is the closest the

21   government came to try to somehow make this case bigger than

22   the export regulation case that it is because they implied

23   by citing to the business plans that Dr. Ishiang Shih and

24   Dr. Yi-Chi Shih and others were contemplating for the

25   communications marketplace.

1          They tried to say that the whole purpose of

2     working with Cree was to compete with the U.S. and build a

3     foundry in China.  First of all, that's all true, that

4     there's a huge market for civil communications chips.  And

5     it could be military, too, by the way.

6          But there's a marketplace for chips, and Dr. Shih

7     wrote a business plan in 2013 trying to attract investment

8     to build a foundry to profit.  That's all true, and it's all

9     lawful.

10          This case should not -- naming the government's

11     presentation greed, lies, and MMICs was a creative way to

12     try to turn this case into something it's not.  Dr. Shih was

13     paid his consulting fees, but he's a scientist at his core.

14          He's an American scientist, and I'm going to be

15     presenting evidence that shows his deep-rooted roots in the

16     UCLA academic community which the government has somehow

17     included as part of its conspiracy theories.  Tell you the

18     truth, based on these facts the United States could have

19     indicted UCLA.  This case has nothing to do with stealing

20     United States technology.

21          Remember, Dr. Shih's designs are at issue.  The

22     only connection to Cree was that after doing all the design

23     work to get a sample to see if the design works, you get a

24     wafer made.  And it was done in a perfectly lawful way.

25          This case -- let's focus on what this case is

1    about.  This case is about export regulations under the EAR,

2    which is the Export Administration Regulations promulgated

3    by the Department of Commerce Bureau of Industrial Services.

4            Were items shipped to China, and was a license

5    required?  There are export controls in this country, and

6    Dr. Shih does know them.  It's amazing how much time the

7    prosecutors spent proving undisputed facts in this case, and

8    I'm going to highlight them.

9            This case is also about alleged Cree fraud.  And

10   to tell you the truth, it first crystalized for me during

11   the government's closing argument because throughout the

12   trial I'm wondering, what's the fraud?  Dr. Shih wanted

13   MMICs made, asked his friend Kiet Mai to help him with that.

14           Kiet Mai says let me handle all of the

15   communications, orders the MMICs, and pays for them.  So

16   what's the fraud?  Now I understand that somehow the theory

17   is that, well, Cree wouldn't have sold the wafers if it had

18   known they had gone to China.

19           Well, first, without any theatrics, these wafers

20   did not go to China.  And we're going to walk through that

21   issue.  It's not -- the government -- one sleight-of-hand

22   trick is to gloss over the evidence that hurts you when

23   you're trying to advocate to a jury to go along with your

24   theories.

25           The MMICs are here, and we're going to go over

1    them in detail.  And they never went to China.

2              And it's about false statements.  Again this is an

3    effort to layer on.  I guess the title of the show is greed,

4    lies, and MMICs, so they have to layer on lies.  And they

5    layered on every lie they could think of.

6              So one set of lies is that during his interview

7    when he's rousted from his bed at 6:00 a.m. in the morning

8    with 50 federal agents clearing his house, detaining his

9    daughters, detaining his wife, whisking him away so they

10   could clear the house for officer safety.  Fair.  I

11   understand why they do that.

12             But imagine the trauma and especially since he's

13   reached out to these federal agents trying to communicate

14   with them.  Kiet Mai testified that Dr. Shih tried to reach

15   out to the agents through Kiet Mai's lawyer.  So that's

16   evidence for you to consider.

17             So they come into his house.  They whisk him into

18   a room.  The interview begins right after the house is

19   cleared for officer safety reasons.  And for the first time

20   in years, Dr. Shih is allowed to tell the agents what

21   happened, to answer their questions.  He did it for two

22   hours.  And now he's charged with lying to them during that

23   interview.

24             And then again with a bunch of really good

25   prosecutors in a room trying to understand how can we make

this case more attractive to a jury, they add counts that I submit you've heard evidence during this trial they never care about.  FBAR, tax counts, all based on an error of fact which I'm going to sort out so, by the way, there was no crime.  But the mere fact that they're layered on to an export violation case should show you something.

Now, this case I divided in opening -- remember, we're circling way back to the start, because there were three separate trials really in this case.  I mean, they were related, I agree, but there's the export violations. That's what 80 percent of this case was.

And count 10, that's the money-laundering count. And I'm just going to lump that into trial number one and trial number two because if there's no unlawful activity that Dr. Shih is trying to promote, then receiving the $120,000 from his brother from JYS is certainly not money laundering.

So it's lumped in count 10 with the export violations trial.  And then we have the Cree fraud trial which is the area of the case where there's also a money-laundering because the government just told you, well, if he's trying to defraud Cree, that could be money laundering, receiving the $120,000.

So if you acquit on the export violation and you acquit on the Cree fraud, even the government agrees there's

11

1  no money laundering.  So it's not a separate trial.  And

2  then the last trial that we sat through for a long, long

3  time are the false statement counts, and I'm going to deal

4  with them at the end.

5      Now, 80 percent of this trial involved undisputed

6  facts, and I only want to highlight this at the start for

7  one reason.  It appears that the government is proving

8  something when they show things like they have to prove that

9  Dr. Shih worked at Chengdu GaStone Technology.  They have to

10 prove that, they think, because it shows the motive for the

11 export violation, I guess.

12     Well, Dr. Shih carried around business cards with

13 president of Chengdu on them, as Agent Miller held up when

14 she was testifying about things seized.  He declared it on

15 his U.S. tax returns.

16     If there was anything unlawful about working for

17 Chengdu GaStone in China, would Dr. Shih carry around

18 business cards and tell the United States on his tax returns

19 that he works there, that that's his employer, and that they

20 pay him over $300,000 a year?  Of course not.

21     I don't think Pablo Escobar carried business cards

22 saying I'm captain of a Colombian drug cartel.  If you think

23 you're doing something unlawful, you don't tell the

24 United States about it on your tax returns.

25     So I'm not going to go through all the

1    instructions.  I will a little bit on some of the elements

2    that are completely missing, but I do want to talk -- I want

3    to begin with a discussion of reasonable doubt.

4              I wrestled with whether to do it.  But because the

5    government and the defense agree on so many facts, our only

6    disagreement is on whether it's a crime.  It's important for

7    you to understand your duty, and, you know, there's no way

8    out of a criminal case unless the government dismisses.

9              Kiet Mai found a way out, but for Dr. Shih the

10   only way this ends for him is if you acquit him.  And that's

11   what I'm going to be asking you to do.  Unless the 12 of you

12   unanimously agree we do not find that Dr. Shih committed a

13   crime, he can't get out of this.

14             So we sat for five weeks while the government

15   tried to prove a narrative, and I submit they failed

16   miserably.  The reasonable doubt instruction, this is from

17   the Court.  The Court instructs you and the Court described

18   reasonable doubt when we started.  It is proof beyond a

19   reasonable doubt.

20             Proof beyond a reasonable doubt is proof that

21   leaves you firmly convinced the defendant is guilty.  A

22   reasonable doubt is a doubt based on reason and common

23   sense.  This is what I'm asking you to do.  You have common

24   sense.  You don't check it at the door and do what the

25   government tells you.

13

```
 1              You have to look at the quality of the evidence
 2   that the government has asked you to evaluate and just --
 3   it's a gut check.  Is this a crime?  You know what crimes
 4   are.  There are hallmarks of crime, and they're all absent
 5   in this case.
 6              If after a careful and impartial consideration of
 7   all the evidence you are not convinced beyond a reasonable
 8   doubt that the defendant is guilty, it is your duty to find
 9   him not guilty.  Now, there's a flip side, of course.  If
10   you find beyond a reasonable doubt that a crime has been
11   committed, it's your duty to find guilt.  I submit in light
12   of the evidence on this case, that is not possible.
13              Now, we start -- I want to just illustrate for you
14   what reasonable doubt is, because we start with the
15   presumption of innocence.  Everybody is innocent at the
16   start of trial.  On day one if you're asked to deliberate
17   after hearing the charges, you must find Dr. Shih not
18   guilty.
19              And then evidence comes in through the trial, and
20   now you're here to evaluate whether a crime has been
21   committed.  If you believe it's unlikely that he committed a
22   crime, you must find him not guilty.
23              If you think perhaps he committed a crime, you
24   must find him not guilty.  If it's possible that he
25   committed a crime or if you  think it's probable that he
```

1    committed a crime, you must find him not guilty.  If you

2    think it's most probable that he committed a crime, you

3    still must find not guilty.

4         You must be firmly convinced that the evidence

5    proved Dr. Shih guilty before you could find him guilty.  So

6    the government is asking you to have a firm conviction of

7    guilt based on things that the prosecutor just declared --

8    the $67,000 a month was salary.

9         There's no dispute -- and I'm going to get to

10   this -- that for some of the time Dr. Shih received 67,000.

11   It was a research grant, and it ended long before his work

12   at Chengdu ended.  So you know it's not salary.  It came

13   from RML and his research colleagues.  So we'll talk about

14   that at the end of the case.

15        But it's just not permitted for a prosecutor to

16   stand in front of you, declare it income, point to the

17   absence of it on the tax returns, which we agree it wasn't

18   declared.  You don't have to declare money that's not yours.

19        So the evidence that Dr. Shih committed tax fraud,

20   we'll get to that at the end, for example, comes from

21   nothing more than prosecutorial argument, and that cannot

22   support a finding of guilt.  And we're going to go through

23   the facts.

24        For trial number one the question is:  Did

25   Dr. Shih export Cree wafers to China without a required

1   license?  That's the question.  So we're at trial one, and
2   I'm going to try to stay organized because it hurts the
3   defense when the government can just pour all of their facts
4   into a big bucket, layer on seams of guilt that are
5   overlapping, and then you got 18 counts that you must find
6   guilt on, is how they conclude.

7           But if you if break that apart, I think the most
8   logical way to do it is to begin with the export case.  So
9   this goes right back to the start.  I knew this trial would
10  unfold exactly as it did.  I shouldn't say I knew, but I
11  predicted that the government would be dead wrong about the
12  law.

13          And I'm going to walk through it because it came
14  down to one witness, Carlos Monroy, who never read the
15  export administration regulations.  The government is
16  completely wrong about the facts, and we're going to get
17  into those in detail.  Photographs could be e-mailed around.
18  Well, that's not a crime.  Those aren't export controlled.

19          The wafers are here and they were studied at UCLA.
20  And the government is completely wrong about the science.  A
21  Cree wafer, a gallium nitride wafer, does not help Chengdu
22  GaStone Technology build a gallium arsenide foundry.  So no
23  wafers went to China.

24          As I walk through this phase of the case, what
25  makes me nervous is this.  The wafers didn't go to China,

 1   but the key to this case for you to understand is that they

 2   could have.  It is a red herring, which means a fish that

 3   doesn't exist.  You look for it and it's gone.  You chase

 4   something that's not really there.

 5          It is a red herring that the question for you to

 6   decide is did these wafers go to China.  Yes?  No?  You can

 7   conclude they did.  You can conclude they didn't.  And on

 8   count 1, 2, and the export violation related to counts like

 9   10, it doesn't matter because they could have gone .it was

10   perfectly lawful for them to go.  No license was required.

11          It's a willfulness crime?  So certainly I'm going

12   to explain the evidence to support this.  Dr. Shih believed

13   no license was required.  In fact, he said it.  You heard

14   his voice.  One of the things about this case that was so

15   extraordinary was the government was playing the clips that

16   established conclusively Dr. Shih's innocence.

17          His belief is what matters.  It doesn't matter

18   whether he's right or wrong.  He believed no license was

19   required, and there's absolutely no evidence in this case

20   that Dr. Shih willfully violated any law.

21          In fact, it wasn't until the opening, because I

22   was wondering what's the evidence of willfulness that the

23   government is going to cite to in their opening.  This is a

24   little bit of an aside, but they showed a slide from the

25   2013 PowerPoint where Chengdu, the foundry was 75 percent

 1  built, and Dr. Shih was president at the time.  This was in

 2  2013.

 3          And the 25 percent that wasn't built was on a

 4  slide called embargoed equipment.  That's why it wasn't

 5  built.  Was the government suggesting that Dr. Shih somehow

 6  was making arrangements to sneak that equipment into China?

 7  That equipment has nothing to do with purchasing the wafers

 8  from Cree.  What's the connection?

 9          All they're going to say is that Dr. Shih was

10  seeking investment and making an honest disclosure to

11  potential investors that, hey, we are going to have issues

12  finishing the last 25 percent because the embargoed

13  equipment would have to be built in China.

14          But it has nothing to do with the chip name, which

15  by the way, Z5 somehow sounds nefarious?  Every chip

16  designer in the world assigns a name to its chip until

17  whoever buys it gives it a brand.

18          So Intel calls its chips I7.  Dr. Shih called his

19  chips Z5.  Is that bad?  Is that a crime?  Of course not.

20  So there's no evidence that Dr. Shih willfully violated any

21  law, and we're going to walk through that.

22          Now, the Court's instruction on willfulness is

23  this:  For purposes of counts 1 and 2, the defendant acts

24  willfully if he acts voluntarily and intentionally with

25  knowledge that his conduct is unlawful.  And that's the key.

You have to know the export laws and intend to violate them

before you can be convicted of an export violation crime.

Here that means that the defendant knew that a

license was required for the export of the items at issue

and intended to violate the law.  In other words, mistakes

are not crimes.

Now, Dr. Shih is the only correct one.  I'm going

to walk you through his analysis in a second, but Carlos

Monroy was wrong.  If Dr. Shih, though, believed no license

was required, he is innocent.  Being right or wrong is

actually not even the question for you to decide.  You

should be thankful for that because you're going to see it's

quite a question.

The question is:  Can you find beyond a reasonable

doubt that Dr. Shih knew that a license was required and

intended to violate the law?  Let's now look at the

evidence.

It's undisputed that Dr. Shih knows the export

laws.  Listening to the prosecutor's opening -- remember I

said 80 percent of this case was not true?  I realize we

could have probably saved a week of trial time if I had been

allowed to stipulate to this fact.  It's unchallenged, yet

the government was able to put Agent Miller on the stand to

talk about 20 different things that she pulled from

Dr. Shih's residence that show familiarity with the export

1    regulations.

2           The prosecutor in his argument just now cited to

3    most of those.  He had export regulations in his home.  He

4    had articles from his brother that were training materials.

5    The government called somebody from Honeywell -- I don't

6    know where that is, but I don't think it's local -- to

7    testify that Dr. Shih received some training.

8           They called Jesse Lu who testified that Dr. Shih

9    would consult the big book whenever somebody from abroad

10   wanted to order a part.  We agree he knows about the export

11   laws.  The government introduced the regulations.  They

12   introduced -- they called witnesses.  They called Jesse Lu,

13   and it's uncontested.

14          Because of his knowledge, Dr. Shih knew that

15   untested and unrated MMICs, science experiments, are not

16   export controlled.  That's the law that Dr. Shih knew.  And

17   the reason that they're not export controlled is because

18   there is no ECCN on the CCL that applies.

19          Dr. Shih knew that at most MMICs that are untested

20   and unrated are EAR 99, and I'm going to walk you through

21   this analysis in a second because no license is required for

22   any thing being sent abroad to a country that is not an

23   embargo country.  Like, you can't send anything to Iran, to

24   Cuba, to Kuwait.  There are embargoed countries in the

25   world.

1          In fact, the government showed you that Dr. Shih

2    even had a list of them, but none of them applied in this

3    case.  China is not an embargoed country.  It's one of our

4    largest trade partners.  So when there is no other general

5    prohibition, you can send anything EAR 99 to China without a

6    license.

7          Dr. Shih knew that multiple licensing exceptions

8    applied, and he knew they could send anything to Canada.

9    That's just not -- Canada is a friendly, and I'm going to

10   explain to you in the export regs where this is.  It's in

11   evidence.  You'll be able to see it.  And Canada's just not

12   an issue for you I think to evaluate.

13         And even the government agrees.  Their theory of

14   the case is China.  Yes, no.  So when I said that the

15   government's wrong about the law, the facts, and the

16   science, I'm going to start with the law because the law was

17   presented to you by Carlos Monroy, the expert from the

18   Bureau of Industrial Services, which is a subdivision of the

19   Department of Commerce, whose job it is to make licensing

20   determinations.

21         And he's assigned one area, MMICs, and the

22   government called him, and he just declared that the Cree

23   wafers required a license to be sent to China, and no

24   license was obtained.  That was his testimony.

25         On cross he wouldn't answer a single question and

1    denied the law that was presented to him in black and white,

2    and I'm going to present it to you in the same manner.

3         It begins -- and this is Exhibit 4046.  By the

4    way, I'm going to try not to repeat all the exhibit numbers

5    because to the best of my ability, I always will list them

6    in the bottom right-hand corner of any slide.  And anything

7    you want to look at, if you look in the bottom right-hand

8    corner, you'll get the exhibit number and you can look at it

9    in the jury room.

10        So BIS on the CCL publishes a flow chart.  The

11   export regulations are so complicated that they've decided

12   to create a flow chart so people who want to send something

13   abroad can determine whether a license is required.  And

14   Dr. Shih, who the government spent a lot of time trying to

15   prove he knows the export laws, did not require a license

16   even if he had wanted to send the wafers to China.

17        And I apologize for the size but, you know, I do

18   want to emphasize at the start that the flow chart begins on

19   page 223.  These export regulations -- it's significant for

20   this reason.  They're 885 pages long in micro print.

21   They're the big book that Jesse Lu said Dr. Shih would

22   consult whenever a customer of MMCOMM would order a part.

23        And Dr. Shih read it, but Carlos Monroy did not.

24   And that's significant.  If he's going to be the

25   government's expert, if he's going to be the tool for guilt

1    findings on counts 1 and 2, and he didn't even read them.

2            All right.  So the first question is:  Is the

3    thing that's going to be sent out of the country even

4    subject to the EAR?  That's the very first question.  If the

5    answer is no, you're done.  Mail away.

6            So, for example, I asked Dr. Barner and

7    Dr. Sandison, who were giving government testimony about

8    certain photographs that were e-mailed back and forth and

9    PowerPoints, are any of those documents export controlled?

10   And, of course, the answer was, no, they're not, because

11   they're not even subject to the EAR.

12           Now, here's an example.  This actually -- it's

13   funny.  The government showed this in their direct.  Here's

14   a photo that I submit was a photograph taken at UCLA, sent

15   to colleagues at RML in China.  They were doing lots of

16   collaboration and modeling.

17           In fact, I'm going to show you in a few minutes

18   how the RML researchers came to UCLA, went to school in some

19   cases at UCLA.  One was a visiting professor.  One was

20   Yuan Ye who was a student, a Ph.D. student.  They worked in

21   the lab of Ethan Wang.

22           The government went to great length to show you

23   their visa applications, their text records which are every

24   time they enter and leave the country, and it conclusively

25   established that RML are researchers and they're

1    collaborating with UCLA where Dr. Shih has very deep roots.

2            He's been a professor there most of his career.

3    He went to China for a couple years to work at Chengdu CGTC,

4    the foundry, and then returned in 2014 when he resigned from

5    CGTC -- by the way, before it was placed on the entity list.

6    Okay.  So not export controlled to send photos back and

7    forth.

8            Now, if something is subject to the EAR, the very

9    first question is:  Is your item classified under ECCN on

10   the CCL?  Okay.  For someone who's never exported, this

11   would be very complicated.  It wasn't complicated for

12   Dr. Shih for all the reasons the government argued -- his

13   experience at MMCOMM, Honeywell, UCLA.

14           He knows that the very first thing to do is, is

15   your item classified on an ECCN on the CCL?  Actually I

16   don't know what ECCN stands for.  I was going to tell you

17   the long name, but it doesn't matter.  I did know it --

18   export control number on the commerce control list.

19           If the answer is no, it's EAR 99.  That's the

20   point I just made on the slide before.  If you aren't in an

21   ECCN, you're EAR 99, which means that if there's no general

22   prohibition like sending to Iran or somewhere else, no

23   license is required.

24           This is the pathway that I submit you should

25   follow when you're walking through Exhibit 4046 in the jury

1    room if you do.  It's basically saying unless you fit within

2    the category, you don't need a license.  So the first issue

3    is do ECCNs apply to unrated MMICs.

4             And what an unrated MMIC is -- let's just make

5    sure we all agree on what it is.  Okay.  You can go to any

6    company that makes MMICs or that, like MMCOMM, buys them

7    commercially and puts them in devices and sells them.

8             So if you want something for whatever -- you got a

9    radio-controlled helicopter and you need to put an amplifier

10   because if it flies too far away, it crashes.  It's too far

11   away from your thing.  You order that device size.  Someone

12   who makes it buys the little chips and stuff that go inside

13   and they buy them from commercially available places like

14   TriQuint or whatever.

15            Cree sells a ton of them.  Cree sells -- I think

16   Dr. Barner says that the commercial market was walled off

17   from his area, but he acknowledged they sell a ton of them.

18   So those chips have specs.  You buy them and you know what

19   the outputs are because that's what you're buying.  That's a

20   rated chip.

21            An unrated chip is a chip with no specs.  It's a

22   science experiment.  It's the first time you're making the

23   thing.  So no one knows what it will do.  You have design

24   goals.  I want to make a chip that will do 25 watts at

25   50,000 frequencies of whatever microns.  Okay.  Whatever

1   your design goals are, that's your design, but it's unrated

2   until you test it.

3          Now, the actual -- the government told you what

4   the ECCNs were that applied to this case.  Let's take a look

5   at what they are.  They're Exhibit 4044 on page 823 of the

6   EAR.  Carlos Monroy read this page.  So we have his

7   expertise now was interpreting this page, and I submit his

8   testimony was just -- it was just inconsistent with the

9   express written words of these sections.

10         So the two ECCNs that the government directed you

11  to are here on this page.  Let's take a look at them.  B2B

12  and B2C, both of them say rated for operation.  That's

13  critical.  In fact, that's the key to the case.

14  Respectfully, I do want -- I can't wait to get into the

15  facts section of trial one, but the law requires -- I

16  submit, this is my argument -- the law requires acquittal

17  for this reason alone.  No ECCN applied.

18         Now, rated for operation at certain frequencies.

19  They're identified.  For example, B2B says exceeding 6.8

20  gigahertz up to and including 16 gigahertz.  Both of these

21  ECCNs are performance based, output based.

22         If you know -- if you have specs for the computer

23  chip or the wafer, you see if an ECCN applies, and then

24  we'll walk through the chart because you can still export it

25  without a license for research, educational purposes, a

1   whole host of other reasons.

2          But this is the analysis to determine whether

3   there's even an ECCN that applies.  The average output power

4   has to be greater than a certain amount.  Remember, even

5   Carlos Monroy testified that the FBI agents in this case had

6   asked his predecessor to make licensing determinations, and

7   the predecessor couldn't do it.  So we don't have enough

8   information.

9          No licensing determination could even be made by

10  the government until Dr. Nordquist and Dr. Barner did their

11  tests.  So the design goals were known.  Remember the Cree

12  questionnaire specifies the design goals, but that's

13  insufficient.  You have to have test results.

14         Now, I do want to compare this with other ECCNs

15  because there are ECCNs that apply to designs.  For example,

16  Exhibit 4293 is an example.  He's an ECCN that says if

17  something is designed or rated for a certain performance,

18  this ECCN applies.

19         But you know what's so interesting?  I mean,

20  obviously the people who drafted the ECCNs know how to draft

21  them if they want them to include science experiment.  You

22  use the word designed or rated.  If you're choosing, as the

23  authors of these ECCNs did in this case, to use only the

24  word rated, you're excluding design.

25         I mean, that's the plain meaning of this language,

1    and Carlos Monroy just denied it.  He just said, no.  ECCNs

2    apply even if you don't know the results of the chips.  No

3    licensing exceptions apply.  A crime has been committed.

4    Well, that's just not true, and you're here to evaluate the

5    quality of that testimony.

6              And remember, the question for you is what did

7    Dr. Shih believe reading this language.  Would any

8    reasonable person believe that rated is different from

9    designed or rated?  If they were the exact same thing, then

10   why have two different ways to say the exact same thing?

11   Because they're different things.  That's why.

12             There is no ECCN that applies to an unrated MMIC

13   because without tests and outputs, you can't find an ECCN.

14   And that's what Mr. Monroy said.  He could not make a

15   licensing determination on the wafers he was asked to

16   evaluate until the FBI sent the wafer that they had obtained

17   from UCLA to Dr. Nordquist, who did all the tests that are

18   fancy and detailed.

19             And they sent those test results to Carlos Monroy,

20   and then he can say, oh, yeah, here's the ECCN that applies.

21   This test result shows that the frequency was above this,

22   the wattage was above that, and, yes, here's an ECCN.  If

23   these were commercially sold by Cree or TriQuint or any

24   other foundry, WIN, no problem.  They come with a spec

25   sheet.

1          But for a design engineer, it's not an ECCN if
2     it's untested, and that's the key to the case.  I just am
3     actually touching on a very sound basis to just acquit on
4     counts 1 and 2 without even evaluating whether the wafers
5     went to China.  But you obviously will evaluate whatever you
6     collectively believe is required.
7          So we're going to see very shortly that Cree
8     clearly sold these wafers without testing, so there's no
9     ECCN.  They're EAR 99, and no license is required.  So again
10    this is the pathway.  Dr. Shih could have shipped the wafers
11    to China if he had wanted to without restriction.
12          Now, let's engage in the fantasy world that there
13    is an ECCN that applies.  I want to show you how there's
14    still no license required, but I don't want you to forget
15    that there is no ECCN that applies.  So if the answer is
16    yes, we're going to go down the left side of this flow
17    chart.
18          Yes, ECCN.  What then?  There is none but let's
19    just see what happens then.  So the first step is to see --
20    again it's the same general prohibitions.  You can't ship
21    anything to Iran or Kuwait or Cuba.
22          But also you go to a list of countries, and if
23    there's an X in the box -- if there's no X in the box, like
24    Canada, for example.  When you find that chart, Canada has
25    no X in the box.  So there's no license required.  So you

1    can ship even something that falls within an ECCN to Canada,

2    JYS, I mean, Dr. Shih obviously is working closely with his

3    brother, a Ph.D. at McGill University in Canada.

4           They're two brother electrical engineers who are

5    obviously working together.  The government calls them

6    co-conspirators.  They have names.  Dr. Yi-Chi Shih is here

7    in Los Angeles.  Dr. Ishiang Shih is in Montreal, Canada.

8    And they work on dozens and dozens of projects together.

9    Undisputed.  These charts and logs of all the projects they

10   work together, undisputed.

11          Now, if you want to ship them to China and you

12   fell within an ECCN -- so remember, these are science

13   experiments, untested.  But let's just say that you bought a

14   wafer, a chip, with a spec sheet from Cree and you want to

15   send it to China.  Then according to the export regulations

16   you look to see if a license exception is available.

17          If there is an exception to the licensing

18   requirement, use the exception.  This pathway applies to

19   fundamental research.  It applies for educational purposes.

20   These are exhibits in evidence.  The government cited

21   them -- 4042, 4052.  These list the exceptions.

22          Even if you had a chip with a spec sheet so you

23   knew the outputs and you wanted to send it to China and it

24   fell within an ECCN, you can do it to further science.

25          Dr. Shih is an American scientist.  Scientists

30

1    collaborate.  We as a country have chosen not to prohibit

2    that, and the way that we have chosen not to prohibit that

3    was to create these exceptions -- fundamental research,

4    educational purposes.  These are exceptions to the license,

5    for publication or intended for publication.  That means if

6    you're going to write papers on the science that you're

7    studying, it's okay.  We want to encourage collaboration.

8          For patent applications it's okay.  Those

9    applications will be published anyway some day.  So the

10   people who wrote the EAR said just carve it out.  If you're

11   working with someone on patents -- obviously Canadian

12   colleagues like Ishiang Shih and Dr. Yi-Chi Shih don't

13   require any license.  But RML, RML in China, is a research

14   lab.

15         But if you're collaborating on research, you don't

16   need a license.  So a commercially purchased MMIC with a

17   spec sheet that's in an ECCN can become part of your

18   research for patents or educational purposes, and the

19   authors have said it's okay -- Exhibits 4042 and 4052.

20         Shipments of limited value.  Now, I'm going to get

21   into this in more detail later, but each of the Cree -- the

22   prosecutor just emphasized these wafer runs cost $130,000.

23   I'm going to give you two exhibit numbers I wrote down when

24   he said that, because they're the Cree packing slips -- 743

25   and then 3120, the Cree packing slips for run one and run

1    two.

2              Cree wrote $10,000 for four wafers as the value.

3    So they sold them for $130,000, but the value for shipping

4    purposes was 10,000, $2,500 each.  And the reason that's

5    important is because the government has cobbled together

6    some theory of lying in their story, in their narrative,

7    greed, MMICs, and lies, that the lie was undervaluing the

8    wafers when you fill out the FedEx forms.

9              And in response I want to point out the wafers are

10   valueless.  There's no commercial marketplace.  Dr. Shih if

11   he's testing research -- and when we get to the Cree fraud

12   part, Cree itself concluded that, because remember they sent

13   him defective wafers in the second run.

14             I'm going to show you those e-mails.  You've never

15   seen them before.  They weren't published when Dr. Barner

16   was on the stand.  But they called it internally at Cree.  I

17   feel like I'm in a Three Stooges movie.  Who's going to get

18   poked in the eye on this one?

19             The wafers don't work.  I submit those e-mails

20   will support a conclusion from you that Dr. Shih was

21   defrauded, but we'll get there in trial two.  But they were

22   valueless.  That's the point.

23             Temporary exports.  Additional permissive

24   re-exports, specially designed for telecommunications.  So

25   the prosecutor just now declared that the chips aren't

1  specially designed for telecommunication, and I submit that

2  the evidence shows that they were, and I'm going to show you

3  that evidence.

4           Actually I'm going to show it to you at the end of

5  the case, but I'm going to walk you through that PowerPoint,

6  that 2013 PowerPoint that the prosecutor referenced in his

7  direct.  I didn't know how much time I would have, so I

8  wanted to save it for the end.  But now I'll make a point to

9  get through it.

10          And then there's a separate theory of guilt in the

11 jury instructions.  There are four ways you can find guilt.

12 One of them was separate from violating the EAR, you can

13 fail to complete the electronic export information filings.

14 But they have the same exceptions, so I won't want to repeat

15 it.  But the government is just wrong.

16          Now, were the wafers for research or not?  That's

17 a fact question.  That's a jury question, because if you

18 think they were not for research, then maybe your analysis

19 could be affected.  But the government agrees they're for

20 research.

21          So I want to remind you back five weeks ago to the

22 very first witness in this trial, case agent Brian Burke who

23 went to UCLA, which, I don't think there was evidence

24 presented in this trial to tell you this, but UCLA is a

25 research place.  Of course.  And case agent Brian Burke

1   testified that Ethan Wang said they were doing research with

2   the wafers.

3           I asked him directly:  And the wafer was at UCLA

4   for research, correct?  And his answer was yes.  So I want

5   to bring that to your attention because I want to contrast

6   that with Agent Storino at the end who wouldn't even agree

7   on what the term research meant.

8           I mean, it was crazy, literally.  He took the

9   stand and on cross was asked:  And you agree these wafers

10  were for research purposes?  The reason is this reason,

11  because no license would be required if they were.  And

12  there was a long pause, and Agent Storino:  I define

13  research differently than testing the wafers.

14          He said, I define.  That's more confirmation.  Or

15  he had another word for it because he resisted research,

16  because he knew that fundamental research -- because Carlos

17  Monroy had already tested -- and you could see in his mind

18  where he goes, uh-oh, there's an exhibit that says you don't

19  need a license for fundamental research.  So he wouldn't

20  even agree to the meaning of the word.  All right.

21          So he did admit -- Agent Storino -- that the RML

22  researchers came to UCLA.  He knew that Ye Yuan wrote a

23  dissertation referencing the GaN science.  He admitted that

24  he failed to consider research.  That was a huge subject of

25  cross.  It was just -- he was evasive and evasive but

1    ultimately says, yes, I didn't consider these things.  An

2    incomplete investigation should not be trusted.

3            Now, you heard from Dr. Shih at the government's

4    choice because they interviewed him for two hours, and they

5    played excerpts.  And then there were a series that the

6    defense was permitted to play for just completeness

7    purposes, but the government played these, chose to play his

8    statement.

9            And Dr. Shih described during his two-hour

10   interview that the UCLA and RML researchers were

11   collaborating on research at UCLA.  One of the things that

12   bothered me a little bit was the poor quality of the audio

13   recordings.

14           There were three agents in a room with Dr. Shih

15   interviewing him before 7:00 a.m. with 50 agents combing

16   through his house, and I would have hoped for better quality

17   recording because you could hear his tone of voice, his

18   peace in knowing he did nothing wrong.

19           His tone of voice is evidence.  You can evaluate

20   his honesty by hearing him speak.  And yet the microphones

21   were hidden and close, so every time the agent moves, it

22   sounds like crashing waves.  And that bothers me.  But this

23   is Dr. Shih.

24           (Audiotape recording played)

25           MR. SPERTUS:  So that was when Agent Berger was

1  asking Dr. Shih:  Didn't Kiet Mai ever ask you about whether

2  or not these were export controlled? or something like that?

3  And that was important because there's the export control

4  questionnaire, and Dr. Shih is, like, yeah, but there were

5  no export controls because these were being tested at UCLA.

6          So I recognize that when we get to the issue that

7  the government would love to say, that these went to China,

8  that could become in the government's argument a lie.  In

9  fact, I bet on rebuttal 99 percent they're just going to

10 declare Dr. Shih lying about this.

11         But interesting, they didn't charge that as a lie,

12 right?  Count 11 has three charged lies that they say that

13 Dr. Shih made, but this wasn't one of them.  The Cree wafers

14 were at UCLA for testing.  RML researchers came to

15 Los Angeles.  No license would have been required anyway

16 because obviously they're doing fundamental research for

17 educational purposes, intended for publication, or intended

18 for patents.

19         So those points all make it irrelevant.  Why would

20 Dr. Shih lie at all about this?  He could have said safely

21 to federal agents, yeah, I shipped one to Canada and one --

22 he actually did send two to Canada.  He later in the

23 interview corrected himself.  Oh, yeah, yeah, JYS.  But he

24 could have said I sent them to RML.  What's wrong with that?

25         But he didn't because they were at UCLA.  And the

36

1    RML researchers came to UCLA.  This picture came in through

2    Agent Storino who identified this lab as Dr. Ethan Wang's

3    lab.  I was actually wondering how am I going to show that

4    the RML researchers came to Los Angeles to work in the lab.

5    The government did it for me.

6          Here they are in the lab.  And remember Agent

7    Storino said, I recognize the color of the furniture.  Well,

8    whatever.  We all agree RML collaborating with UCLA

9    researchers, Ethan Wang, at a lab in Los Angeles working on

10   the wafers.  It's in a photo.

11         All right.  And this is the photo.  I already

12   showed it to you.  The government's entire case basically

13   comes down to, as I'm saying, well, here's a photo of the

14   Cree wafer.  And by the way, I don't think either side is

15   saying that these wafers don't get moved around from case to

16   case all the time.  We agree this is a Cree wafer.

17         So even though, you know, it was in a clamshell

18   from another wafer, we agree this is a Cree wafer.  And I

19   submit this photo was taken in Ethan Wang's lab at UCLA, and

20   these RML researchers are obviously doing work on these

21   wafers.

22         They could have done it at RML.  It's kind of a

23   red herring.  Remember I said it doesn't really matter

24   anyway.  But they didn't, and the government's narrative

25   falls apart if these wafers never went to China.

1          It should be undisputed that researchers take

2    notes, researchers take photos, researchers collaborate on

3    ideas, and researchers publish.  That's what they do.  In

4    fact, I'll tell you, I mean, you didn't see -- I think you

5    saw two or three of Dr. Shih's articles.  He's published

6    over 60.  He is a giant in the electrical engineering

7    community.

8          There should be no dispute in anybody's mind that

9    Dr. Shih is a legend in this community.  He's a senior

10   member of IEEE.  That matters for something.  He's been one

11   since 1979.  He has been a professor most of his

12   professional career.  He's published over 60 papers.

13         These are the exhibit numbers.  The bottom has all

14   the exhibits, but they're somewhat grouped.  So obviously

15   it's too many to write, but for complicated reasons the

16   numbering couldn't be sequential.  It's the 3200-ish series

17   and 3300s and I guess a couple 4000s.  Sorry.  But basically

18   they're grouped.

19         All right.  Dr. Shih obtained over 70 patents.  I

20   mean, Dr. Barner was very proud.  I have six patents.  That

21   was part of his training and experience section when he

22   testified.  Dr. Shih had over 70.  His entire life is

23   devoted to the things that circumstantially happen to be

24   exceptions to the licensing requirements.

25         There are all his patents.  They're in the series

1    there.  Okay.

2           Dr. Ishiang Shih, his brother, has published his

3    own patents.  Obviously JYS, Dr. Ishiang's lab, is working

4    on research, developing new concepts, advancing science, and

5    nothing in the EAR is designed to deter that.

6           The Ye Yuan articles are in evidence.  There are

7    five.  I believe he's the one in the photo I just showed you

8    at UCLA.  But the government showed you his visa record and

9    the government proved that he came from RML for training.

10   We agree.  So what was that day-long presentation about?  We

11   agree.  And he publishes.

12          And Exhibit 3204 is just an example.  This is a

13   2015 article.  I mean, let's just recognize that RML is a

14   research lab.  We did our best to try to get that out.  I

15   think it came out.  I think you understand that it's a

16   research lab.  And here's an article, Exhibit 3204, with

17   Dr. Shih and RML Technology as authors.  So let that fact be

18   established as true.

19          Now, Dr. Shih is deeply rooted in the UCLA

20   community.  One very important exhibit that you've never

21   seen before, it's in evidence now.  It's in evidence for a

22   limited purpose.  It's Exhibit 4299.

23          This is Dr. Shih's personnel file subpoenaed by

24   the defense, self-authenticating with a certificate of

25   authenticity -- is the first page -- by UCLA administrators

39

 1  who collect the letters and things into a professor's file

 2  that the school thinks should become permanent parts of the

 3  file for business recordkeeping purposes.  It's now in

 4  evidence, 4299.  That will teach you who Dr. Shih is.

 5         He is a giant.  He has obtained a tremendous

 6  amount of grant funding for UCLA research.  He's a senior

 7  member of IEEE, and he does know that the export regulations

 8  do not apply to science experiments.  That was the

 9  government's argument.

10         He knows the export regulations because he's a

11  scientist and does research.  And I'm sitting there

12  thinking, how do I agree?  This is how I agree.  I tell you

13  now in my portion of the argument, I agree.

14         Now, the UCLA file contains Dr. Shih's resume.

15  It's eight pages.  And I'm going to not walk you through it

16  right now.  It's in the jury room.  You can see articles

17  he's written.  You can see patents he's obtained.  He is a

18  giant.  There's no fraud in these accomplishments at all.

19         But what I do want to draw your attention to is on

20  the front page he lists his employers.  On the very front

21  page, from 2011 to when he was returning to UCLA in 2014 as

22  a professor again, he puts president of GaStone Technology,

23  Ltd, on his resume.

24         That was one of the things that made him

25  attractive to UCLA.  He brings colleagues from China to

40

1  UCLA.  It's on the UCLA website.  I think Agent Storino

2  testified to that.  We had a big fight with Agent Storino,

3  how he said:  I didn't read the current resume.  I read the

4  old resume.  Whatever.  Our point is that president of

5  GaStone Technology is something that UCLA is proud of, and

6  the collaboration that that brings about between Chinese

7  electrical engineers and UCLA scholars is a good thing.

8  That's the significance of Exhibit 4299.

9          Dr. Shih knew the law, and the export regulations

10 do not apply to testing and research -- back to Exhibit

11 4046 -- and you have your answer.  That's counts 1 and 2

12 right there.

13         Now, let's turn to the second step of the first

14 trial.  So we're still in the export regulations, now

15 dealing with this question:  Did the wafers go to China?

16 No.  For the prosecutor to say under his breath, well,

17 you've seen a lot of theatrics and here's a picture that

18 shows that the MMICs were all picked off of the wafer that

19 was in the picture taken, I submit, at UCLA.  The government

20 argues in China.

21         If you take a picture of the wafer during the

22 testing process, what happens?  When you test a chip, it's

23 destroyed.  Now, Dr. Barner admitted that, and I'm going to

24 get to his testimony in a second.  But he goes, well, I have

25 the MMICs that we tested in an envelope with Exhibit 1.

41

1          You know, I never actually checked, but I bet you

2    could see in this packet, Exhibit 1, what a tested MMIC

3    looks like.  I just don't know.  I'd predict -- here they

4    are.  He actually was right.  So he's on the stand saying we

5    preserved the MMICs that we tested, but they soldered on

6    pieces, so they're destroyed.

7          So most testing, after you test it, you throw it

8    away.  So what happened with the MMICs?  Unless the FBI asks

9    you to keep them, you throw them away.  So, yes, wafers get

10   picked clean.  That is a true statement.  We don't dispute

11   that.

12         But the fact that the MMIC in court now is picked

13   clean when you've heard a tremendous amount of testimony

14   about it was there at UCLA for testing should surprise

15   nobody.  That's what happens.  That's what testing does.

16         Now, Dr. Shih told the agents exactly where the

17   wafers were during his interview on January 19th, 2018.  He

18   told them:

19         (Audiotape recording played)

20         MR. SPERTUS:  So this is at the end.  This is

21   after two hours of questioning, answering all the questions.

22   And he'd said, oh, no, I have them here, I think four times,

23   the agents admitted.  He says they're upstairs.  And at the

24   end they ask, Agent Berger:  Well, where exactly are they?

25   And he told them exactly where they were.

1          They never asked Dr. Shih to show them where they

2    were.  The wafers were not in China.  They were in his

3    office and in Canada.  He did send two to his brother.  I'm

4    going to sort that out with the accounting later.  But

5    Canada doesn't count.  The government's theory is that the

6    wafers went to China.

7          So he had wafers in his office and his brother had

8    wafers in his office.  None were in China.  And now Dr. Shih

9    is accused of lying to federal agents when he spoke the

10   words that you just heard.

11         Now, Agent Miller's testimony was perhaps what the

12   prosecutor was referring to when he described theatrics.

13   And it is critical because the theatrics came from her, and

14   I agree.  It was theatrical.

15         First of all, this is a government photo.  So

16   remember, Mr. Burkholder testified that he went and took

17   photos of the boxes.  When Dr. Shih made bond and recovered,

18   you know, checked in with his family and ultimately

19   discovered, hey, the wafers were still upstairs, we sent

20   Mr. Burkholder to go photograph them exactly as he had seen

21   them.

22         It was in, I believe, April of 2018.  And Agent

23   Berger had no idea what the government search photos

24   contained.  The government had not produced them yet.  They

25   were produced in August 2018.  Remember, Agent Burkholder is

43

1    a paralegal in my office and had access and part of his

2    responsibility was managing discovery.  And he gave you that

3    date.

4         The photos by the FBI were given to the defense in

5    August 2018, and one of them was in evidence, 793-16.  Agent

6    Miller had just walked you through a tour of the house.

7    Look, Dr. Shih's a pack rat.  Okay.  And it was just photo

8    after photo of things that the agents felt had evidentiary

9    significance.

10        His entire life is preserved and maintained.

11   That's one hallmark of great science.  You just save all

12   your stuff.  But the photos of 793, page 16 of the exhibit,

13   the government went right by it.  I don't even think they

14   knew that the Cree wafers were depicted in their own photos.

15        They didn't in fact.  I think that became clear on

16   cross, but that was a bit surprising.  I mean, it's being

17   displayed in court, and they go right to page 17.  So the

18   Cree wafers are in agent's photos.

19        And on cross I asked Agent Miller:  Did you look

20   in the box?  And the first time I was surprised was she said

21   yes.  And then -- I submit that was completely false.  And

22   then on cross-examining her, I think it became clear that

23   she changed her testimony:  Well, I didn't personally, but

24   agents under my supervision did.

25        I asked her who.  Well, I don't know.  Did anyone

1   tell you about the box?  No.  Wouldn't you have wanted to

2   know about the boxes?  Yeah.  She did admit that, because

3   she was looking right then and there at the wafers and at

4   the label addressed to Kiet Mai, and these are Cree boxes.

5          Her evasiveness is evidence in this case.  It is

6   the demeanor of an agent pursuing a narrative, not seeking

7   the truth.  Pursuing an agenda.  That is the significance of

8   Agent Miller's demeanor when she testified on the stand.

9          Changed testimony should not be trusted.  When

10  you're being asked to convict an American scientist of

11  crimes related to his research, I submit you shouldn't base

12  it on an agent who will change her testimony.

13         What about Agent Carter, then called to look in

14  the box?  He said:  I looked in the box.  It was almost

15  puppy-dog like, literally.  I looked in the box.  Yep, I

16  looked in that box.  I didn't record it anywhere.  There are

17  no reports of me looking in the box.  I don't remember

18  looking at the boxes you're showing me right now in court.

19         It was shocking.  I put the boxes in front of him.

20  Did you look in these boxes?  He said:  How can I answer

21  that question?  Because you just testified that you looked

22  in the boxes.  That's how.

23         And then he looks and says, I never heard the name

24  Cree before, which is critically important because they say

25  Cree on them, right?  So we want them -- first of all, Agent

1  Miller says she saw the boxes.  They say Cree on the side.

2  I mean, let's not pretend that if you're investigating Cree

3  as a victim and you're investigating Kiet Mai, that you're

4  going to -- Agent Miller testified about crawling around in

5  an attic and a closet to find a Cree packing slip.

6        Okay.  I submit the box is more important

7  evidence.  So if you're going to leave it behind, just say

8  you messed up.  This theory, this narrative that the wafers

9  are in China would have been readily disproven if someone

10  had looked in the box.

11        I don't think you should believe Agent Carter

12  because his last question at the end:  Why would I seize the

13  boxes?  Because they're addressed to a target of your

14  investigation from Cree, the victim of your fraud?  That's

15  why.

16        If you own it up, then pursue your case.  You got

17  your Cree fraud theories to pursue.  You can pursue your tax

18  and FBAR cases -- I'm going to get to them in a minute.  But

19  don't make the jury sit and piece together the fiction that

20  you're trying to suggest these wafers went to China.  They

21  didn't.

22        Nolan Burkholder testified that when Dr. Shih was

23  released, Nolan Burkholder recovered them.  Nolan Burkholder

24  photographed the wafers.  It was long before the government

25  produced the photos, and he maintained those wafers under

1    lock and key until the trial.

2            Same with the Montreal wafers that were documented

3    by Antonio Bianco, who flew here from Montreal to tell you

4    about his documentation which I believe he said was at the

5    direction of Julia Parris obviously a few days after we

6    recovered the wafers in Dr. Shih's residence.

7            So, wow, are they not seizing wafers?  See if

8    there are any in Montreal.  Very reasonable inference for us

9    to make, and there they are.  There are three.

10           So I want to do a very quick wafer accounting

11    because this is important.  Each shipment had four wafers.

12    Run one is Exhibit 743.  That's the packing slip.  The first

13    wafer on the packing slip was the UCLA wafer the FBI has,

14    and it's here in the courtroom, Exhibit 1.

15           The second wafer was in Dr. Shih's office exactly

16    where he said it would be, Exhibit 3639.  FBI agents left it

17    behind.

18           The next Exhibit is 3638, also in Dr. Yi-Chi

19    Shih's office.  And the last wafer, the undiced wafer, that

20    was one recovered from JYS in Montreal.

21           The second run, very quick accounting because

22    one's in the hands of the RCMP, but we have the first wafer

23    that was -- Dr. Ishiang Shih had that one at home.  And

24    remember those photos?  These wafers are strewn everywhere.

25           Actually the government's point when they show a

1  log of how long Dr. Yi-Chi Shih has been working with his

2  brother on electrical engineering projects that require your

3  design ideas to be tested and manufactured into a wafer,

4  it's their whole careers.  There are hundreds and hundreds

5  of wafers.

6          The RCMP, when the FBI gave them a little list of

7  things to seize, it was TriQuint and WIN -- no, I'm sorry.

8  I think it was WIN and Cree wafers.  They seized 330, and

9  these aren't wafers in a safe.  They're not worth $130,000

10  each so you have $500 million of value in a beaten-down lab

11  in Montreal.

12          You saw pictures from Tony Bianco.  It's a house

13  converted into a lab that no one lives there.  They just

14  study.  And there's no security.  And really?  There's half

15  a million dollars of -- actually it would be a couple

16  billion dollars of value strewn on countertops?

17          The wafers are valueless.  You're testing ideas.

18  But anyway, one was up at JYS.  This one is in the hands of

19  the RCMP.  That's the only wafer not in the courtroom now.

20  I guess the RCMP wouldn't give it to the FBI.

21          The third wafer was in Dr. Shih's office, and the

22  last wafer was the second one in Dr. Ishiang Shih's home.  I

23  just wanted to show you that.  There's no dispute that the

24  Canadians have the eighth wafer because it's on their search

25  inventory.

48

```
 1          All right.  Now, the funniest part -- this
 2   actually skips the middle of the trial story that you have
 3   ample evidence to know exactly what happened, but it's a
 4   changed government theory that I want to flag for you.
 5          So when the wafers were recovered, they
 6   disappeared.  You didn't see them again until the defense
 7   case.  They were gone and they were photographed
 8   microscopically at USC in a clean room with FBI agents
 9   taking notes, getting the photos that can be sent over to
10   Dr. Barner.  What does that tell you?
11          It means that the mid trial theory by the
12   government was that the wafers were counterfeit, like
13   somehow Dr. Shih somehow arranged to have wafers made to
14   look like the Cree wafers he bought so that he can say they
15   didn't go to China because, here, I faked them.  I have
16   substitute wafers to show the jury.  Okay.  Great.  Test
17   them.
18          Then we flew -- we weren't allowed to go outside
19   the scope of the direct, so we had to fly Dr. Barner but to
20   authenticate the wafers anyway.  But since the government's
21   counterfeit theory had failed because the forensic photos
22   proved these are the actual wafers that Cree made,
23   Dr. Barner testified during the defense case, yeah, I saw
24   the microscopic photo.  They're authentic.  These are the
25   real wafers.
```

49

1        And so, you know, I asked him, I said:  So did
2   Cree put these numbers on them?  I got corrected on the
3   periphery.  Dr. Barner said, no, that PA-1 was the sector
4   number assigned by the designer or whatever.  Okay.  It
5   doesn't matter.  No doubt in his mind that the wafers here
6   in the courtroom are the exact wafers made.
7        So the government quickly retreats from the
8   counterfeit theory which they would have advanced with flags
9   and armies if it had been true.  Now, you have all the
10  accounting.  Cree testing was done at UCLA.  You have the
11  photos of researchers at UCLA.  They took their photos.
12  They collected their data.
13       That's why it's really tough when the prosecutor
14  shows e-mail dates and tries to weave together a story by,
15  you know, showing e-mail communications with major
16  assumptions underlying them.  So they'll say here's an
17  e-mail from RML to Dr. Shih, so therefore the wafers are in
18  China.
19       That's insufficient.  That's not enough.  And all
20  the research is perfectly lawful.  Now, just to show you
21  that the government is literally making things up when
22  they're trying to base their narrative on e-mail
23  communications, you had an eyewitness testify in this trial,
24  Leo Chen.
25       So the government called Lilie Chen, who went by

1    Leo Chen, whose last question -- it was Mr. Rollings who

2    asked.  Mr. Rollins on direct examination asked:  What

3    wafers were you studying at RML?  And he said:  We were only

4    testing WIN wafers.  Okay.  We agree.  The alleged export

5    violations are for the Cree wafers.

6            I'm a little worried about in rebuttal the

7    government shifting this.  Okay, maybe the Cree wafers

8    didn't go to trial.  Maybe WIN wafers went to trial.  The

9    reason I don't think they can do that fairly is because

10   Carlos Monroy has testified that he made no licensing

11   determinations for any WIN wafers.

12           So, you know, they did recover a ton of WIN wafers

13   from I guess Dr. Shih's residence.  There were at least

14   several, many.  And then there were a whole bunch, almost

15   300, recovered from JYS by the Royal Canadian Mounted

16   Police.

17           But it would be unfair for the government in

18   rebuttal to now say, okay, not Cree wafers.  We agree.  We

19   should have acknowledged this earlier.  But WIN wafers are

20   also export controlled.  They need evidence to support that.

21   So because Carlos Monroy agrees no licensing determinations

22   have been made on any WIN wafers, you can accept as true

23   that they're not part of these export violation cases even

24   if it changes on rebuttal.

25           Again I think the government is just manipulating

1  a story to suit their narrative.  I think the opening that

2  the government just gave was drafted before this trial even

3  began.  It's inconsistent with the evidence presented at

4  this trial.  Respectfully, the evidence, particularly phase

5  one, has established for you, I think, that no export

6  license would be required for science experiments and that

7  no Cree wafers were sent to China anyway.

8          Now let's turn to the science.  The law is done.

9  The facts are done.  Now for the science.  The government's

10  motive evidence makes absolutely no sense.

11          So Dr. Shih was, yes, researching with colleagues

12  at RML, and separately he was working at Chengdu GaStone

13  Technologies, the foundry, from only 2011 to July 2014.  But

14  he was the president.  And before he went there to be the

15  president, he worked at Honeywell but was recruited to be

16  the president.

17          And -- well, first of all, GaAs is an entirely

18  different wafer than -- I got ahead of myself, so I don't

19  want to miss this point.  But gallium arsenide, GaAs, is

20  entirely different than GaN, and having a GaN chip does

21  nothing to help you build a GaAs foundry.  So I want to

22  focus on that fact and then move on.

23          The only possible evidence in this case that shows

24  that for CGTC, Dr. Shih was working on GaN was his 2013

25  proposal to investors.  It was a PowerPoint to show the

1   commercial marketplace that could be created if we had

2   low-cost GaN.  GaN is very expensive, but low-cost GaN can

3   be revolutionary.

4            And Dr. Sandison, for example, the key witness on

5   that, I'm going to walk you through at the end his

6   testimony.  But it was revolutionary.  Gallium nitride on

7   carbide, silicon carbide, is what Cree does.  And that's

8   very expensive.  Other surfaces include sapphire, industrial

9   sapphire.

10           Doing it on sand, on glass, is revolutionary and

11  has no military application.  A chip can fail in a

12  four-year-old cell phone, but if it fails on an airplane,

13  bad things happen.  So there's no military application for

14  this proposal, but it was rejected.

15           The CGTC is a gallium arsenide foundry, and

16  Dr. Shih was not working on GaN.  So RML did research for

17  CGTC.  It's amazing what collaboration does, because the

18  government puts one hat on people.

19           Now, you know from the research articles that Dr.

20  Shih is collaborating with his colleagues, one of whom is a

21  visiting professor at UCLA, on research articles.  But RML

22  also did support work for the Chinese foundry.  But anyway,

23  in 2014 and '15 RML research lab was beginning the gas

24  actuation tape-out.  Everything they did for CGTC was GaAs.

25  Today CGTC is a gallium arsenide foundry.  So to the extent

1    that matters to you, I wanted to say it.

2           Also, remember Leo Chen talked about he was in

3    Chengdu when Dr. Shih came to visit and prepared the agenda.

4    This is when they were recruiting Dr. Shih to build a GaAs

5    chip factory, not gallium arsenide and GaN.  That's just not

6    true.

7           These are exhibits that were first introduced by

8    the government to prove the undisputed fact that Dr. Shih

9    was the president of CGTC for a few years.  All right.

10          I just wanted to highlight the government's

11   theories, because this was a demonstrative that the defense

12   moved into evidence because it became clear at this stage of

13   the case that the government was changing its theory from

14   the wafers going to China to chips going to China, which is

15   completely different because Dr. Shih's statement on the

16   lies, count 11.  So I just wanted to highlight for you by

17   putting this into evidence so you can see it in the jury

18   room.

19          The government's theory is that wafers went to

20   China.  They're talking about wafers.  Don't let them in

21   rebuttal change this to something else.  So at the start of

22   trial, wafers were in China.  Mid trial the wafers are

23   counterfeit.  And now I think what we're going to see -- I

24   heard a little bit about it -- now basically at the end of

25   trial, the defense can't prove what's in the box.  That's

1    unfair.  That's turning the burden of proof upside down.

2          They may wish that we have to prove what was in

3    the box, but that is not the law.  In fact, the government

4    has to prove beyond a reasonable doubt for their theory to

5    make sense that even though they left key evidence behind,

6    no wafers were in the box.

7          There is reasonable doubt everywhere in this case.

8    The wafers didn't go to China.  It would have been perfectly

9    lawful for them to go anyway.  The research with RML

10   colleagues is perfectly lawful, and working for GaStone

11   Technology, CGTC, the foundry, was perfectly lawful.

12         And there is no evidence of any willful violation

13   of the law, and that's the key.  That's the key because the

14   government looked at Dr. Shih's life through a microscope.

15   The date range of count 1 is 10 years.  They -- he's a pack

16   rat, so they have all his computers for his entire life.

17         And they looked -- Agent Berger testified:  I

18   looked at over a hundred thousand e-mails.  Only presented a

19   few, but I looked at that volume of evidence.  And you know

20   what evidence of willfulness looks like?  It's the e-mails

21   that say, ugh, I know we need a license, but you know what?

22   If we call it glass, maybe no one will check and we can get

23   away with it -- something like that.

24         There's nothing like that.  The government is

25   so -- they're spinning innocuous e-mails separated by years

1   into some conspiracy.  You know, what they call plotting, we

2   call planning.  I mean, this is semantics that make a

3   difference.  It matters.  If Dr. Shih is to be convicted of

4   a crime, the lack of evidence of willfulness matters.  It

5   does.  The government has failed to meet its burden on

6   count 1.

7           Now let's turn to count 2, the Cree fraud.

8           You know what they are.  The prosecutor told you.

9   Counts 3 through 6 are mail fraud.  They tacked on some wire

10  fraud.  These are the -- basically it starts paying Cree the

11  money they owed Cree is now wire fraud.  And alleged

12  unauthorized access.  Cree is no victim.  Dr. Shih committed

13  no fraud.

14          Let's examine the wire and mail fraud first.  The

15  allegation is that Cree would not have sold wafers to

16  MicroEx if it had known that Dr. Shih was accessing its

17  portal.  That is not true.  Now, there is some key evidence

18  you've never seen before.  These are internal Cree e-mails

19  that will tell you what Cree cared about.

20          Point one, Cree was all about profit.  You never

21  saw this exhibit before, Exhibit 3613, which is in evidence

22  where Dr. Barner is proclaiming to the Cree team that we

23  have Q2 revenue riding on launching the first run wafer lot

24  in September of 2013.

25          This is December 2nd, 2014.  Dr. Barner is

1    proclaiming that the foundry is doing well.  It's up

2    300 percent.  He's focused on that.  They sold four wafers,

3    science projects, for $130,000, and their Q2 revenue was

4    riding on it, and this foundry is doing well.

5           This is the run two internal exchange you've never

6    seen before.  This is Dr. Barner speaking to the foundry

7    people about the second run wafers not working.  They're

8    defective.  Remember when the prosecutor referenced to you

9    just now Dr. Nordquist's testimony on how Cree makes sure

10   that every -- there's 240 times some package of chips is

11   replicated on a wafer because Cree is so thorough that they

12   have these testing procedures?

13          Well, here's the e-mail that are going to show you

14   that those testing procedures establish that the second run

15   wafers didn't work.  And then Dr. Barner is able to confirm

16   with, I guess, Cree that he'll take nonconforming material,

17   whatever that means.  But these are internal.

18          Kiet Mai is not on this e-mail exchange.  He's

19   telling the entire engineering team who are waiting with

20   bated breath:  Are we going to have to redo this lot, or are

21   we going to be able to keep the $130,000 and dump them?  And

22   Dr. Barner reports:  Client will take them.  We gotta hurry.

23   We don't want to be in the practice of getting customers for

24   waivers, waivers because the quality is bad.  So that's what

25   Cree was about.

1          Now, what's material to the government's theory,

2    Cree being about profit.  This is the point that directly

3    attacks the government's theory of Cree fraud, because they

4    claim -- the government said that their due diligence was

5    defeated because Kiet Mai said his company will be doing the

6    design, use, and testing of the MMICs.  Okay.

7          So let's take a look at the due diligence that

8    Kiet Mai defeated without one e-mail exchange.  First of

9    all, Dr. Barner went to great length to say, look, we're

10   just making science experiments for you, right?  Testing is

11   not included -- Exhibit 17.

12         Here's the full quote.  This is the very first

13   quote.  He says:  We're giving you a full quote, dedicated

14   math, without testing.  So everyone knows these aren't

15   commercial wafers.  No one has ever tested them in history,

16   and Cree's not going to.

17         And then when, you know, this was related to the

18   Three Stooges -- that e-mail we just looked at when, you

19   know, Cree is faced with this issue of can we ship these

20   wafers that are defective, they ultimately concluded, the

21   senior leadership at Cree, well, it's just design

22   verification, so we can ship it.  The risk to us is low.

23         What's the professor going to do?  Sue us?  But

24   what's so important about this e-mail, Exhibit 3613, is that

25   it shows they just -- they're talking about science

1    experiments.  So it's an acknowledgment institutionally by

2    Cree that this is just design verification, internal.

3           Now, here's the due diligence e-mail that the

4    prosecutor just talked to you about:  Thank you for your

5    time today, Kiet.  I'm attaching our general brochure as

6    well as two forms.

7           So Kiet Mai responds:  Thank you.  I'll get back

8    to you after I look into Wassenaar and others since I don't

9    have any knowledge of these.  So he tells Cree, I don't know

10   the export regs.

11          Now, it's true Dr. Shih did.  We are not claiming

12   innocence of the export regulations as a defense in this

13   trial.  But this is to show that Cree knew that its client,

14   who was Kiet Mai, knew nothing about export reg.  Dr. Shih

15   knew.  Cree wasn't dealing with Dr. Shih.

16          They were dealing with Kiet Mai, and Kiet Mai

17   says, I don't know anything about them.  And how does

18   Dr. Barner respond?  And remember, he's copying Larry

19   Dotson, the head of export compliance for Cree.  We're more

20   interested in your company information.  So you don't need

21   to know about export regs.  Just send us your company

22   information.

23          And they followed up with a registered in

24   California.  I think it's just a myth for the government to

25   say that Cree was concerned about its customer's knowledge

59

1    of export regs.  That's just inconsistent with the e-mails.

2         But let's look at the internal e-mail.  So Kiet

3    Mai then responds:  Great.  Here are the agreements.  And

4    then for frequency -- this is a bit of a joke.  For

5    frequency we will probably have two or three full wafer runs

6    a year.

7         I guess Barner in his engineering speak was

8    telling Kiet, what's the frequency of the chips, like 18

9    volts or watts or whatever, and Kiet goes, two or three

10   times a year.  So clearly Cree knows that Kiet Mai is no

11   export guru.

12        Now we go to the internal e-mails.  Kiet Mai is

13   now off this e-mail.  The first discussion, February 18th,

14   2013.  Larry Dotson, who's doing the export analysis for

15   Cree, e-mails Barner:  I do not see any export issues that

16   prevents moving forward on this potential business.

17        I don't know if you've seen this e-mail before.

18   You may have.  I just don't know.  But Larry Dotson

19   continues:  If it develops to the point where orders are

20   placed for foundry work, we may need to request an EUS

21   before releasing the parts to ensure buyer understands the

22   export controls.

23        Now, you have seen this before because I then was

24   able to ask Dr. Barner:  Did you ever ask Kiet Mai for an

25   EUS?  And he said no.  And let's see what Cree is really

1   focused on.

2           Additionally, legal needs to tell us to what

3   extent it's our responsibility to document our export

4   analysis.  In other words, they're not doing any export

5   analysis.  And if the lawyers are going to come back to me

6   later and say, hey, what export analysis did you do,

7   Mr. Dotson? he wants to know.

8           He wants to know if he's going to get that

9   question, because he's not doing any.  And Dr. Barner was

10  very surprised.  Now, I submit that Cree wasn't concerned

11  about science projects mainly because they're not subject to

12  the EAR.  They only wanted to be paid in full.  They would

13  have sold the untested wafers to Kiet Mai, no matter what.

14          Now, there were no misrepresentations.  One of the

15  things that was -- I heard it from the prosecutor, and, you

16  know, Dr. Barner kind of hinted about this on the stand, but

17  it was crazy.  But somehow there was something untrue on the

18  export compliance questionnaire.  There was nothing untrue.

19          Let's look at what they claim to be untrue.  First

20  of all, that's MicroEx's true address.  Second, this is the

21  true goals of the research that's being described.  These

22  are the design goals.  Third, will Cree's design services be

23  utilized?  No.

24          Here's where Dr. Barner said there was something

25  untrue.  Will this product be subject to your national

1    export control regulations or classified under Wassenaar?

2    So now during this trial Dr. Barner is saying they want

3    their clients to know about export regs because they have

4    these questions on their questionnaire.

5         But you know what?  I asked Dr. Barner what's

6    untrue about either of these answers, and he goes:  Well,

7    anything we make is subject to the EAR.  Even if it's

8    EAR 99, it's still subject to it.

9         So in other words, you know, his point was that --

10   if you look on the top row, right column, there's a blank

11   indicate control list number.  I guess Kiet Mai should have

12   written EAR 99.  That's their point.  I'm sorry.  Here.

13   I've actually circled it:  Will this product be subject to

14   the U.S. control regulations?  The EAR?  No.  The ITAR?  No.

15        And Dr. Barner's quote was:  Indicate the ECCN.

16   It should be EAR 99.  The point is that Dr. Barner is an

17   expert.  Larry Dotson is an expert.  If there's an

18   inconsistency on the form, they ask the customer.  Don't do

19   nothing and then when the FBI comes knocking two years later

20   to ask you questions about what you did, say then, oh, the

21   client lied on the export questionnaire.

22        They knew when they received the questionnaire

23   that it was filled out the way you've seen with a blank

24   under ECCN.  The time to ask questions is then.  That's when

25   you can get an answer and clarify any misunderstandings.

1          It's all true that this isn't -- oh, if the

2     product is to be shipped outside the U.S. -- actually this

3     is important -- please indicate the harmonized tariff

4     schedule.  They weren't shipped out of the country.  That's

5     the point.  These were wafers that went to UCLA for testing.

6          All right.  That is not the circular question.  I

7     don't want to declare that true.  You evaluate the evidence.

8     Okay?  But they certainly could have, but they didn't.

9          I just wanted to highlight for you the first time

10    they filled out approximate frequency, two to three times a

11    year, I just think that's funny.  I don't know why.  But it

12    should be 18 volts or something, but they say two to three

13    times a year.  I like that.

14         And it shows a lack of an intent to cheat and lie.

15    It's actually evidence of an innocent state of mind.  Kiet,

16    good catch on the error of frequency.  It looks fine now.

17    The prosecutor tried to say that all these communications

18    show a nefarious intent to cheat.  I say it shows real life.

19    This was in February 2013.

20         Point four, Cree knew that Kiet Mai was working

21    with others.  This is critical.  Their whole theory of fraud

22    is that Dr. Shih wrote the content of all the science

23    e-mails.  Well, not all e-mails.  Kiet handled the

24    administrative ones himself, and I'm going to get to one

25    important one.  But there was a large number of e-mails:

63

1    I'll get back to you, Jeff.  You'll hear from me soon.

2             That was so that he could consult with Dr. Shih.

3    Dr. Shih could write the content to answer Dan Fritz's

4    questions so the designs can get made.  And then Kiet Mai

5    would send that content written by Dr. Shih to Cree.  That's

6    how they got the wafers made.

7             All right.  So Dan Fritz obviously knew that Kiet

8    Mai was working with the design team.  On Exhibit 35 he

9    writes to Kiet, you or your team.  I mean, these are coming

10   from Dan Fritz, coming from Cree.  So let's not let Cree

11   pretend that they thought Kiet Mai was the designer.

12            In fact, Dr. Barner admitted that the first time

13   he was interviewed by the FBI in December 2015, he said,

14   yeah, I knew Kiet Mai wasn't the designer.  That's

15   testimony.  There's no e-mail.  Dr. Barner readily admitted

16   it.  No one at Cree thought Kiet was the designer, and

17   here's written evidence of it in black and white.

18            Point five, Kiet Mai wanted to handle the

19   communications.  This is a big deal, this piece I'm going to

20   show you, because the government has spun this.  It's so

21   easy when you don't interview a target of your investigation

22   and you just, you know, build a narrative around by piecing

23   together e-mails here and there.

24            I submit to you that I can go to Websters

25   dictionary and piece together words that say eat more bacon

64

1    to live a longer life.  It's not truth.  Parsing together

2    things doesn't create the truth.  The truth comes from

3    interviewing and doing real work.  Okay?

4            So here's the e-mail that the government says is

5    at the core of their fraud theory:  Yi-Chi, I forwarded

6    e-mail from Cree.  Please careful when reply to me just in

7    case not go to Cree.  Kiet.

8            Okay.  So Dr. Shih -- you heard from Kiet Mai UCLA

9    charges 40 percent for things, and Cree wanted all kinds of

10   nondisclosure agreements with UCLA as an institution, and

11   ordering them through UCLA would have been twice the cost

12   and twice the red tape.

13           So Dr. Shih -- Kiet Mai raised his hand and said,

14   well, I'll do it for 20 percent.  And Dr. Shih's response

15   is:  Great.  So when Kiet Mai says let me handle the

16   communications, Dr. Shih says:  Great.  Why does he care?

17   Why does it matter?

18           But this came from Kiet Mai.  And by the way, he's

19   a cooperating witness.  The Court said view his testimony

20   with caution because cooperating witnesses have a very

21   recognized bias of telling prosecutors what they want to

22   hear.

23           So basically I submit that Kiet Mai's testimony

24   should be viewed with caution because the government

25   dismissed all the counts -- he was a charged co-defendant.

1    Charges dismissed if he'll testify at trial.  Just testify

2    truthfully.  And he goes, okay.  And he fought me on every

3    question, which was shocking to me.

4         But what he didn't deny was that this was his

5    business practice.  He had a client in Japan who told him to

6    do this.  He does not want his vendors to know the

7    identities of his clients.  Dr. Shih never asked me to do

8    this.  I mean, I was nervous questioning Kiet Mai.

9         Basically the one who's going to evaluate whether

10   to move for a reduced sentence are the prosecutors who did

11   the direct, and no better way to get the lowest possible

12   sentence than making those people happy.

13        But he owned this.  I was so relieved.  He owned

14   it.  I did this entirely on my own.  This is not what fraud

15   looks like.  Fraud is a scheme to cheat and lie, to deceive

16   people and trick them, to part with property or things or

17   the Cree wafers.

18        In other words, Cree would have said:  We don't

19   want the $130,000 that we'll be paid to make these wafers if

20   we only knew that Dr. Shih was doing the engineering work.

21   Really?  That's implausible on its face.  But Kiet Mai asked

22   Dr. Shih:  Let me handle the communications.  And Dr. Shih

23   said okay.  That is not what fraud looks like.

24        So it comes down to this one e-mail, the only

25   e-mail in the entire case where any witness has said a false

1    statement was made.  It comes down to this one only.  It was

2    written on February 18th, 2013, first by Jeff Barner:  Will

3    your company be doing the design, testing, and use of the

4    MMICs?  And Kiet Mai wrote back:  Yes.

5           So they've built a fraud theory on this one

6    e-mail, and the government's argument is that if Kiet Mai

7    had written no, then they wouldn't have sold them the

8    wafers.  But Kiet Mai admitted Dr. Shih didn't write that

9    e-mail.  Did Dr. Shih tell you to write yes to Dr. Barner?

10    Kiet did that entirely on his own.  He said no.

11           Did you write yes entirely on your own?  He said

12    yes.  This is not a scheme among co-schemers to pay $130,000

13    to get four wafers from a foundry who's doing well,

14    300 percent up in profit this year.  This is the government

15    trying to manufacture a fraud where none exists.

16           It's not fraud.  Kiet Mai's business practice was

17    perfectly lawful.  Cree was happy to sell non-export

18    controlled wafers.  There was no fraud.  Dr. Shih never said

19    anything untrue.  And allowing Kiet Mai to handle the

20    communications is just not what fraud looks like.

21           Cree was paid in full, but the government now

22    says, well, that doesn't matter.  Cree was paid in full.

23    And Cree suffered no loss.  Dr. Barner said that he's not

24    aware of a penalty, a fine.  They were paid in full for all

25    the work they did.  They're not aware of anyone testing

1    their undiced wafer.  Nothing.

2            So you have a list of harm that's got zero items

3    on it, and the government wants to call that a scheme to

4    defraud.  So Dr. Shih, I respectfully submit, is not guilty

5    of counts 3 through 8.

6            Count 9 is the unauthorized access count.  I'm

7    going to try to pick it up here.  It all comes down to the

8    PDK agreement.  That was a big deal.  So the PDK agreement

9    was one of the documents that Kiet Mai signed to get access

10   to get the credentials.

11           It's not hacking.  So this entire crime is

12   basically when, you know, some guy from a basement in Korea

13   worms his way into a computer in some military base in North

14   Carolina.  That's unauthorized access.  It's hacking, and

15   that's the crime charged in count 9.

16           This isn't it.  This is basically an argument over

17   contract interpretation.  So this is the PDK agreement.  I

18   just want to flash how big it is to you because it's micro

19   print.  It doesn't matter because the government cares about

20   one sentence only, and let's look at that.

21           So they highlighted in yellow with Dr. Barner,

22   their only witness on the stand:  Customers' rights can't be

23   transferred and customer may not allow any other party to

24   use the licensed program.

25           Okay.  Skipping over the blue.  That's a defense

1  highlight, all caps interestingly.  If I want to assign

2  different weights to different sentences, all caps in the

3  blue, that basically if you're going to share it with your

4  design team, your contract workers, or those who come in

5  contact with the program, tell them about the agreement.

6          So this entire count, unauthorized access, is a

7  fight about whether or not there was authority or not.

8  Dr. Shih claims he was authorized to use the PDK.  Kiet Mai

9  also claims that he saw nothing wrong with sharing the

10  credentials with Dr. Shih.  Both of them thought it was

11  perfectly authorized under these two words, contract

12  workers, in the PDK contract.

13          Now, Kiet Mai didn't read it, and Dr. Shih did.

14  But it's authorized.  Dr. Barner testified, when asked about

15  that language, well, that language was just drafted by our

16  lawyers.  Kiet Mai testified:  I had POs and contracts with

17  Dr. Shih and JYS Technologies.

18          The prosecutor's point is, well, he doesn't

19  remember doing any work for JYS.  Dr. Shih was a technical

20  advisor to JYS.  His brother and Kiet Mai worked for

21  Dr. Shih.  The key part -- I'm going to move quickly past

22  this -- but this is Kiet Mai's testimony when he's trying to

23  help the government.  He's cooperating with the prosecutors:

24  I didn't believe it was wrong to share the PDK credentials

25  with Dr. Shih.  Now, Dr. Shih had contracts with JYS.  This

1    is not what fraud looks like.  It's not hacking and worming

2    your way from North Korea into some business in Los Angeles.

3            All right.  I just want to quickly go over the

4    contract.  It's funny because what's the government going to

5    say?  That these are somehow counterfeit?  That every one of

6    them -- Kiet Mai says that's my signature, and the

7    government's only point on cross was, well, do you recognize

8    Dr. Ishiang Shih's signature? or something like that.

9            Kiet Mai created these.  He said:  I pulled them

10   off the internet.  Sorry I didn't change -- I should have

11   been more careful.  All right.  This is the May 3rd one, JYS

12   and Kiet Mai.  This is November.  You know, two years later

13   they do another one.  MicroEx and JYS, they're the parties

14   to the contract.

15           I mean, the point is that when you have two Ph.D.

16   scholars, Dr. Ishiang Shih and Dr. Yi-Chi Shih, who are

17   crossing every i and dotting every t because that's what

18   engineers do, they're meticulous by nature, and they're

19   trying to make sure they're in full compliance, that's not

20   crime.  That's not crime.

21           This is a government-produced document.  It was

22   attached to a 2014 e-mail where the contract was up for

23   renewal and renegotiation, I guess.  But this is Dr. Yi-Chi

24   Shih's contract with JYS that the government produced.  So

25   no one is claiming this isn't genuine and authentic, and

1  there's the date range.

2          So all the conduct here puts everybody involved in

3  contracts.  Here's the business card that Kiet Mai

4  absolutely knows Dr. Shih is an advisor for JYS.  There is

5  no doubt that Dr. Shih was authorized to use the PDK when

6  Kiet Mai signed it.

7          Don't base criminal decisions -- decisions on

8  whether Dr. Shih is a criminal on contract interpretation.

9  Reasonable people with pure hearts and innocent goals would

10 interpret the express words of the PDK to authorize Dr. Shih

11 to use the credentials with his research colleagues to make

12 a MMIC.

13         They were paying $130,000 for it.  All the

14 contracts were in place.  The PDK was required for a design

15 team.  It's not a fraud.

16         Then now we've merged through all the possible

17 crimes that could support money laundering, so when count 1

18 of the export regulations fall away and the fraud falls

19 away, there's no money laundering.

20         This $120,000 was sent.  No one disputes it.  I

21 tried to stand up during Carlos Monroy's testimony and say

22 we agree to everything.  The detailed financial analysis, we

23 don't dispute it.  What we dispute are Carlos Monroy's

24 conclusions, which I'll get to in a minute.  But, yes, the

25 money for the second run Cree wafers came from JYS, but it

1   was not to promote export violations.

2           All right.  Now let's turn to the false statements

3   very quickly.  So obviously we're talking about the morning

4   of the interview, February 19th, 2018.  Here are the three

5   false statements.  They're on the verdict form.  If any one

6   of these is false, the government's big argument in rebuttal

7   will be convict them of count 11.

8           So Dr. Shih said no Cree wafers went to China.

9   What's so interesting is that since he knew he could send

10  them anyway -- there's so many better ways, by the way, to

11  commit fraud than using your true names and e-mails and

12  money that's readily traceable.

13          I mean, if Dr. Shih was trying to commit crime, he

14  could do a whole lot better.  He's not committing crime.

15  He's doing research, and he's describing for an hour to

16  these agents that the wafers are upstairs in my office or at

17  UCLA.

18          So even though he could have shipped them, this is

19  where it matters, because is that true or false?  Who had

20  the duty to look in the box?  That's your question.  No Cree

21  wafers went to Hong Kong and no -- and Dr. Shih was not

22  working on GaN.  All those statements, respectfully, the

23  evidence shows were true.  The wafers didn't go to China.

24  Here they are.

25          By the way, is it true or is it even plausible

1   that someone who goes to a big effort to send these wafers

2   to China and then gets in trouble for it when 50 agents show

3   up at your door and microscope your house, that the people

4   that you sent them to would send them back?

5        There wouldn't be any wafers in court today if

6   they were in China.  It's just not plausible.  Anyway, it's

7   a burden of proof issue.  You don't even have to decide

8   that.  That's my point.  All right.  And Dr. Shih was not

9   working on GaN.

10        I won't repeat what you've already seen.  I think

11  this, too, you've already seen.  He's working on GaAs.  And

12  part of this is context.  I mean, keep in mind he's sitting

13  there, I would say, at 6:00 a.m.  Tropea wanted to

14  emphasize, no, it was more like almost 7:00.  Whatever.

15        You're sitting there in shock with your wife and

16  daughter in the driveway handcuffed or whatever while agents

17  are clearing the house.  I don't mean to suggest those stats

18  are true.  You have no evidence of whether the daughters

19  were handcuffed or not.  All you know is they were secured

20  for officer safety reasons.

21        But the point is in that context, to try with such

22  peace and confidence in your innocence to explain ten years

23  of detailed collaboration efforts with researchers around

24  the world, it's a pretty high burden, and I think Dr. Shih

25  did pretty darn well.

73

1      Anyway, he's working on projects everywhere.  But

2  for Chengdu Technologies, which was the subject of the

3  interview, not all projects that he worked on.  They were

4  talking about the foundry efforts.  That's GaAs.

5      Now let's turn quickly to the counts where

6  there's -- basically every year Dr. Shih commits tax fraud.

7  Okay.  So the defense is that those funds, those $67,000 a

8  month that Dr. Shih undisputably paid, that was actually --

9  I'm just saying, can't we shorten this six hours of

10  testimony into one, because we don't dispute the

11  transactions.

12      What we dispute is whether that was salary to

13  Dr. Shih for his work at CGTC.  It was a research grant from

14  RML.  Yes, Yaping Chen was a research colleague of

15  Dr. Shih's for many, many years.  Obtained the funding.

16  Judy Chen described it to you.  She managed it.  It was

17  research grants.  It wasn't salary.

18      Dr. Shih was paid a salary, but for the government

19  to convert this into some under-the-table supplement is just

20  wrong.  And the only evidence of it is Carlos Tropea

21  concluding it, declaring it true, and I'm going to show you

22  the errors in his thinking.

23      And the prosecutor in closing just focused on the

24  irregularity of it.  It's $67,000 a month.  But I think that

25  they know that if it's not Dr. Shih's money, it's not

1   income.  It's not his.

2           By analogy I have money titled in my name as a

3   retirement benefit for the employees in my office.  I don't

4   declare the investment returns on those retirement funds

5   because it's not my money.

6           Judy Chen who is an attorney testified on the

7   stand when she was asked why didn't you declare the

8   $3 million deposited in the Mystical Optimism, she goes:

9   Well, that wasn't my money.  She's an attorney who cheated

10  and lied for a decade.

11          And yet when she was cross-examined on the

12  $3 million deposit to fund the research, she knew -- yes,

13  I'm a cheat, but I don't have to pay tax on that $3 million.

14  That's very well established.  You only pay money when it's

15  yours.

16          Let's examine the taxes, because I gotta tell you,

17  as this unfolded in the trial, I was so impressed with

18  Dr. Shih's efforts to cross the t's and dot the i's that I

19  want to bring it home for you in just a couple clicks.

20          This is in evidence, Exhibit 700.  This was

21  submitted by Agent Miller.  It's the employment verification

22  for Chengdu GaStone Technologies.  That was Dr. Shih's

23  salary.  And then, you know, these are hundred-page tax

24  returns that Dr. Shih filed.

25          By the way, it was actually demeaning for the

75

1    prosecutor to say he didn't have to pay much taxes in U.S.

2    He's living in China.  He's paying for housing in China.

3    He's paying tax in China.  And the U.S. gives him a credit

4    for that on his U.S. tax return.

5            Ninety-nine percent of the people who move out of

6    the country to work, they're not also filing their taxes in

7    the U.S.  He's filing his taxes, and the government wants

8    you to look bad at him because he got credit for the foreign

9    tax he paid?

10           Under the prosecutor's theory, you could be taxed

11   50 percent by China for the work you're doing there,

12   50 percent by the U.S -- say, that's your tax rate.  I'm

13   making that up, but you can see the point -- you could work

14   and make zero without such thing as the tax credit.  That's

15   all proper, all lawful, and it's what we want.  So there's

16   know evasion there.

17           Looking at the full year at GaStone, because,

18   remember, he started in July 2011.  So 2012 is a full year,

19   filed in 2013.  And I won't walk you through every detail,

20   but there's his salary.  That's the officialness of it

21   because the government likes to stamp all these things.

22           He got his tax credits.  The prosecutor is right.

23   But what I want you to see -- and he's declaring his

24   employer, GaStone Technology.  So this isn't a secret from

25   the U.S. that he's working.  The government didn't have to

76

1    spend a week of trial time proving this.  But they match.

2    That's my point.

3           I want to get to the end.  Here's a guy that it's

4    undisputed what his salary is, and it's undisputed that he

5    declared it all, including the foreign accounts where the

6    money went.  So the government's whole theory is that the

7    $67,000 a month that Dr. Shih received was under-the-table

8    income that he secretly didn't declare.

9           And based on that -- so that's the government's

10   point.  Now, our point is that you've seen enough e-mails

11   and you've seen the logs of the projects with RML.  And,

12   yes, some projects are called Z5.  Some are called I2D2.

13   Whatever.

14          It just doesn't matter what a chip is called that

15   he's designing with RML.  And our point is that this 67,000,

16   this Mystical Optimism money, was research grants.  And you

17   know that's true because that's where the money for the

18   research at UCLA came from.

19          I mean, the government had all those spaghetti

20   charts to try to show you something nefarious going on.

21   We're looking at the same money tracing and we're going,

22   that's all true.  Yes.  Those are the entities where the

23   grants were funded and that money went to all the places

24   that it went, bought wafer manufacturing, went to pay for

25   research at UCLA.  Some went to JYS.

1          We all agree with the money.  We just don't agree

2     whether it's salary or not.  And here's why it's not salary.

3     I'm going to prove that.  So if this was salary, why would

4     it stop in 2012, because Dr. Shih was still working at CGTC

5     until July 2014?

6          So you think that he just took a big pay cut in

7     2012?  That's not rational.  That's reasonable doubt if

8     nothing else, but I think it's proof that this government is

9     wrong.

10          All right.  So I just wanted to highlight Agent

11     Tropea's calculations.  He just took -- it's so simple.

12     That entire two-day testimony or day and a half really comes

13     down to this.  He took $67,000 a month by the months for the

14     half year Dr. Shih worked in 2011, and then the full year in

15     2012.

16          And readily -- that's also according to Tropea

17     only -- Dr. Shih earned an undeclared 335,000 in 2011, an

18     undeclared 804,000 in 2012; and nothing, no under-the-table

19     payments from CGTC in 2013.  It doesn't make sense.  This

20     isn't some fake lawyer trick.  It doesn't make sense,

21     seriously.  I'm not just saying the glove doesn't fit; you

22     must acquit.

23          How could it be possible that Dr. Shih is earning

24     salary under the table from the foundry where he's working

25     that stops while he works there a year and a half more.

1   It's just -- it's not salary.  That's why.  What it is is

2   the research funding that went to fund the research at RML.

3           And that's the danger.  When you have a scientist

4   working on many projects simultaneously, and you have

5   prosecutors pursuing a narrative from e-mails, not from

6   interviews of Dr. Shih, you lead to this disconnect between

7   reality and what it would appear to an outsider to look

8   like.

9           This is the prosecutor looking from the outside

10  in.  If they had any questions, they should have knocked on

11  the door and talked to Dr. Shih.  He knew about the

12  investigation from the start obviously.

13          THE COURT:  Mr. Spertus, are you finished with

14  this section of your discussion?

15          MR. SPERTUS:  Yes.

16          THE COURT:  We'll take a break here.

17          MR. SPERTUS:  Okay.

18          THE COURT:  Ladies and gentlemen, we'll take a

19  break for about 15 minutes and then resume, maybe 20.

20  Please don't discuss the matter during the break.

21          Thank you.

22          (Jury not present)

23          THE COURT:  All right.  Please be seated.

24          Mr. Spertus, what is your time estimate for the

25  balance, because you've been on for two hours?

79

1           MR. SPERTUS:  Has it been two hours?

2           THE COURT:  Yes, it has.

3           MR. SPERTUS:  I'm so sorry.  I will pack it all

4    into one half hour max.

5           THE COURT:  No.  You're going to pack it into 15

6    minutes.  We have to get moving.  Don't repeat yourself as

7    much and get it done.

8           MR. SPERTUS:  Okay.  Will the prosecutors be

9    limited, too?

10          THE COURT:  They spoke for two hours.  You've

11   spoken for two hours.  They have the burden of proof, so

12   they get some additional time.  But I'm giving you an extra

13   15 minutes, so just be efficient, please.

14          Thank you.

15                (Recess taken at 2:44 p.m.;

16           proceedings resumed at 3:02 p.m.)

17          THE COURT:  Back on the record in United States v.

18   Yi-Chi Shih.

19          Counsel are still walking in.

20          Ms. Keifer is giving counsel for both sides the

21   tiny typographical error corrections to the jury

22   instructions.  So please review those.  And if you have any

23   issues with them, let me know.

24          Second, what is the government's estimate for its

25   response?

80

1          MR. ROLLINS:  I would say 30 to 35 at the most.

2          THE COURT:  Try to keep it to 30, please.

3          Are you ready, Mr. Spertus?

4          MR. SPERTUS:  I am, yes.

5          THE COURT:  Thank you.

6          It's not a criticism, either side.  It's a reality

7   here.  We have jurors.  We want to get done today, as I

8   think we're all in the same --

9          MR. SPERTUS:  I lost track of time.  That's on me.

10         I apologize.

11         THE COURT:  Have counsel had a chance to review

12  those minor corrections?

13         MS. HEINZ:  Yes, Your Honor, I have.  And they're

14  fine.

15         MS. WASSERMAN:  We agree, Your Honor.

16         THE COURT:  All right.  Fine.  We have a new set

17  with those changes.

18         Thank you.

19         MS. WASSERMAN:  Thank you.

20         (Jury present)

21         THE CLERK:  Please be seated.  All 12 jurors are

22  back.

23         Thank you, ladies and gentlemen.  I expect that we

24  will conclude the arguments before 4:00 o'clock, and then

25  I've got some instructions, some final closing instructions

1    to read to you.

2              So I expect we would conclude around 4:00 o'clock.

3    Does that work for everybody?

4              Okay.  Thank you very much.

5              Mr. Spertus, please proceed.

6              MR. SPERTUS:  Thank you, Your Honor.

7              And I want to just skip to a last 15-minute

8    section, so I want to identify for you that there is -- all

9    the minutes of CGTC are in the record.  They're an exhibit.

10   It's Exhibit 3954.  It establishes Dr. Shih resigned on

11   July 20th, 2014.  There's no mystery when he stopped at the

12   foundry in China and came back to be a professor at UCLA.

13             And finally I'm going to skip over the FBAR counts

14   because it's the same logic.  Dr. Shih is not filing

15   documents for money that's not his, so the same logic for

16   the tax violations applies to the FBARs.

17             And again, here's a guy in China, living and

18   working in China, filing with the United States back home

19   declarations of his foreign accounts which received all of

20   his salary.  Both the FBAR counts and the tax counts are

21   willfulness crimes which, to sum up, you've heard the

22   instructions.  But you have to know what the law is and

23   intend to violate it before you can be found guilty of a

24   crime.

25             This is not the IRS mailing Dr. Shih a notice of

1  penalty for some administrative point.  This is a criminal

2  trial where they have to prove beyond a reasonable doubt

3  that Dr. Shih knew he had to file taxes and make FBARs on

4  money that's not his.

5          And again the research fund -- just by analogy

6  only, I maintain a retirement fund invested in my name that

7  an outsider looking in at the books and records in my office

8  could say, Jim Spertus, that's your money.  But it's not.

9  And all they had to do was ask him, ask Dr. Shih.

10          So before you hear the rebuttal, I want to plant

11  that seed.  If there's a dispute, if you're really going to

12  insist that we rely entirely on Agent Tropea saying because

13  there were monthly payments, it was under-the-table salary,

14  you should ask the government, well, why didn't you ask

15  Dr. Shih.

16          It's a research fund.  The circumstances support

17  that Yaping Chen and RML are research colleagues.

18          Now, I want to conclude because I have 10 minutes

19  left and then my mic will be disconnected.  So I want to

20  just highlight for you some government trial tactics that

21  drove me crazy for the last four weeks we were together.

22  Obviously I'm going to skip over and delete five slides

23  dealing with their effort to prove undisputed facts that

24  create the impression that they've accomplished something

25  when we would have raised our hand and said undisputed to

83

1    80 percent of this case.

2            I want to spend some time on distracting with

3    fear.  I'm going to budget myself six minutes because this

4    they did in closing and they did throughout the trial with

5    the references to military and missiles and radar.  And it

6    is wrong.

7            And those dimensions have nothing to do with the

8    crimes you're evaluating.  It's designed to scare you.  Wow.

9    Without telling you why we listed CGTC on the entity list,

10   here's a publication that says it's in the national security

11   interest; therefore, be afraid.  Help us.  Let's take an

12   American scientist out of the field that he's practicing in.

13           So the other ones that I probably will just get to

14   in title only are shaping the facts.  Every witness, you saw

15   the difference in demeanor on cross versus direct.  This is

16   twisting and shaping evidence, not allowing the facts to

17   come out.

18           I struggled to get the facts out for you to

19   consider.  The evidence is what it is.  Some exhibits you

20   saw for the first time in this closing.  But the bottom line

21   is if the defense isn't afraid of the facts, we hardly -- we

22   want the facts to come out.  It's the government, I submit,

23   you should know and you should feel in your gut was shaping

24   the narrative.

25           Okay.  Selective e-mail presentations are part of

1    the same thing.  Ignoring evidence everywhere.  Just turning

2    a blind eye to it.  Agent Storino not even bothering to look

3    for dissertations and research about the Cree wafers and

4    other MMICs.

5            Now, referring to Dr. Shih as the defendant, it's

6    one thing for the Court to do.  Obviously you're going to

7    get jury instructions that use those words.  But again,

8    Dr. Shih has a name, and the government never once

9    referenced him as Dr. Shih from the start to the end of this

10   case.  And it's dehumanizing.

11           It's designed to make you feel like you're not

12   evaluating a human being and his conduct, over ten years

13   examined under a microscope.  But I wanted to bring that

14   tactic to your attention.

15           Now, until the mic disconnects, I'm going to focus

16   on this distraction with fear because it permeated the

17   government's case and argument, and I guarantee you all of

18   the rebuttal will be you don't know if there's a MMIC right

19   now in a missile in China circling over Russia.  I mean,

20   you're going to hear that.

21           You're going to hear them saying imagine bad

22   things.  Don't think of science and research.  So the

23   references to dual use, missiles, radars, it all comes down

24   to, even in closing, this line:  Dr. Shih did a PowerPoint,

25   and it was done in 2013 when he was at CGTC trying to

1    explain why people should invest in the foundry.

2         Dr. Sandison was called.  He's the smartest person

3    in the world.  He runs Sandia National Laboratories.  He

4    manages a 270-million-dollar budget to create semiconductor

5    things for the United States Department of Defense.  He's

6    the smartest guy ever.

7         So he walked through the PowerPoint explaining

8    things that the government drew his attention to.  What is

9    that?  That's a missile.  Here's a big boat.  Here's another

10   big boat on water.  I really want to emphasize that, okay,

11   because the government is trying to scare you with this

12   testimony.

13        Everything Dr. Sandison said was true, and it

14   wasn't until cross-examination that I drew your attention to

15   the heading of the slide.  Never once did the prosecutors

16   ask Dr. Sandison about this chapter one of the PowerPoint,

17   which was just a background.

18        Of course semiconductor technology originates with

19   military application.  Of course, it does.  But this

20   presentation began on slide 14.  That's what Dr. Sandison,

21   the government witness, said.  And that's the first slide

22   that didn't have a heading International Background.  So now

23   we're getting to the merits of Dr. Shih's goals to investors

24   in making this presentation, and it's for the effort -- he

25   recognizes a market opportunity, the ever-increasing demand

1    for data.

2             That's what he's talking about, the need for chips

3    to connect places, people, and things.  He foresaw back in

4    2013 that by 2016 there's going to be more connective

5    devices than people on the planet, 10 billion people by

6    2016, and Sandison confirmed that he was right.

7             People need computer chips.  It's a great market

8    opportunity, and the government spun that in their thematic

9    way greed, because of this, lies, and MMICs.  That's their

10   title for their book.  But greed is -- it's not greed.  It's

11   a business plan.  It's recognizing that the green part, the

12   civilian use for chips, is going to grow 78 percent a year.

13            And he saw how to create a successful foundry.  If

14   we made six-inch MMICs -- we're on page 25 now.  Ten slides

15   have been devoted to Dr. Shih's innovation, which is

16   six-inch MMICs.  Cree makes four-inch.  TriQuint makes

17   four-inch.

18            If we could spread the cost of creating a MMIC

19   over more chips, the cost goes down.  This entire PowerPoint

20   is saying we're going to build a foundry that will reduce

21   the cost of chips.  That's brilliant.  And here's how to do

22   it, GaN on silicon.  That's sand.  When you go to the beach

23   and melt sand or silicon, it becomes glass.  There's no GaN

24   on silicon.

25            Cree's GaN on silicon carbide, very expensive, the

1   most expensive wafer out there.  Other people, TriQuint or

2   WIN or whatever, might make GaN on sapphire.  It's

3   industrially made, but it's the jewelry sapphire.

4           Dr. Shih saw an opportunity that has no military

5   application, so don't let the government show you in the

6   history charts of the slides they select where there's

7   purple on the bottom for military use and then green, which

8   is the 70 percent stacked on the purple showing the market

9   opportunity for civilian use.

10          Dr. Shih is proposing something that's only

11  civilian.  It has no military application.  Dr. Sandison

12  confirmed this.  This is where I was asking Sandison:  Would

13  anybody buy for military use a GaN-on-silicon chip?  No.

14  The failure rate is too high for military standards.

15          I also asked him about dual use.  And remember, he

16  confirmed, yeah.  M&M's is military Mars.  Everything that a

17  military uses is dual use.  I mean, trying to keep milk

18  chocolate from melting in the hands of army soldiers is a

19  dual use technology.  Don't let the government use that term

20  to scare you into convicting an American scientist.

21          It's a tactic.  Here on page 41 is the purpose for

22  this PowerPoint.  It's invest in us and we can go public.

23  That's the purpose.  And the Chinese military will secretly

24  give you a cookie.  It's we'll go public and we'll have a

25  successful business.

1            I'm going to skip through the shaping of the box.
2    I've covered it.  I won't repeat it.  The agents just twist
3    it.  That's my point on this entire slide.
4            Taking e-mails out of context.  Actually I tried
5    to guess one that the government would wave around, and I
6    hit it.  This one was in the government's opening.
7    June 17th, 2015, when Dr. Shih and his brother are
8    submitting the bid to the Canadian Space Agency.
9            Dr. Ishiang Shih is in Canada.  I mean, he's not
10   in China.  He's in Canada.  And Dr. Shih said:  I don't
11   remember if you have two GaN wafers, but hold them until I
12   return to Chengdu.  He wanted to go talk to RML about
13   something.  I don't know, research or whatever it is.  But
14   the government implied this is proof that the wafers are in
15   Chengdu.
16           Here means Canada.  And for the government to
17   argue without evidence a different meaning from an e-mail,
18   like this is proof that the wafers are in Chengdu, is wrong.
19           I have 30 more seconds.  So they're pursuing
20   investors in Canada, and it's just -- obviously RML is
21   researching on many projects with Dr. Shih.  Undisputed.
22   They were doing some research for the foundry at times.
23   They were doing other research for the Canadian Space
24   Agency.
25           It's their colleagues.  They taught classes

1    together or were students of Dr. Shih or worked at UCLA,

2    were visiting professors.  It's all lawful.  It's not

3    evidence that the wafers are in China.

4            Oh, I wanted to emphasize evade versus avoid,

5    because, yes, there are errors in the government's

6    translation.  And there's no better example than their

7    effort to pursue a narrative than they translated the word

8    avoid into evade, which is wrong.

9            Yes.  If Dr. Shih wrote in an e-mail:  I want to

10   evade the law, that would have a completely -- which he

11   didn't.  He just said we ought to avoid getting into export

12   problems on that e-mail back when it was.

13           In other words, you solve this.  I'm not able to.

14   There are export regulations controlling some things, not

15   all things.  We have 75 percent of the foundry built;

16   25 percent is embargoed.  Good luck to you.

17           That's not a crime.  That's the truth.  That's

18   actually a legal opinion that I would provide if I was

19   asked.  I would write the same e-mail and then meet Agent

20   Tropea at 7:00 a.m. the morning after I sent it.

21           It's too much.  Don't let them manufacture a

22   criminal from a scholar.  Dr. Shih has committed no crimes.

23   I've covered the tactics I have time to cover, so I'm going

24   to jump to the end.

25           Justice requires an acquittal on all counts.  You

1  are 12 people of different backgrounds who sat through five

2  weeks of evidence, and you're going to have to reason to a

3  result in this case.  All 12 of you will have to agree on

4  the outcome, and justice in this case requires acquittal.

5  Dr. Shih committed no crimes.

6          Thank you.

7          THE COURT:  Thank you, Mr. Spertus.

8          Mr. Rollins.

9          MR. ROLLINS:  Good afternoon.

10          When you deliberate in this case, remember these

11  three basic points.

12          If the defendant was just doing academic research,

13  then he never would have handed parts off to Air China

14  pilots in random hotels across Los Angeles.

15          If the defendant was simply trying to comply with

16  U.S. export laws, he never would have bragged repeatedly in

17  presentations to Chinese co-conspirators that his business

18  plan was to evade those U.S. laws.

19          And if the defendant was simply developing cell

20  phones, he never would have tried to sell U.S. micro chips

21  to a customer in China that develops missile guidance

22  systems.

23          Was the defendant also a faculty member at UCLA?

24  Of course.

25          Was the defendant also doing some academic

1    research and holding patents during his career?  Of course.

2              Did the defendant also want to make money in the

3    civilian market in China?  Of course.

4              That expertise is exactly why the defendant was so

5    valuable to entities backed by the Chinese government.  But

6    the defendant's highest value in this case, the reason he

7    was being paid millions of dollars by companies like QTC,

8    was to get American-made MMICs and sell them for use in

9    missile guidance systems for a customer in China.

10             There is no innocent explanation for Fei Ye's

11   e-mail to the defendant telling him to bring a package to an

12   Air China pilot in Los Angeles and not to tell the pilot

13   anything about the MMIC.

14             There is no innocent explanation for the fact that

15   the defendant wrote a business plan bragging that his expert

16   team recruited globally overseas could evade U.S. export

17   license control.

18             There is no innocent explanation for the fact that

19   a file on defendant's hard drive here in Los Angeles showed

20   that the customer for the Cree chip was AVIC 607, which you

21   heard develops missiles and missile guidance systems for

22   China.  That's Exhibit 2106A.

23             Now, if that evidence is scary, then ask yourself

24   what was it doing on the defendant's hard drive in

25   Los Angeles.

92

1           I want to take a few minutes to walk through why

2    some of the specific arguments made by defense counsel are

3    not supported by the evidence.

4           You just heard defense counsel spend a lot of time

5    talking about how complicated the export regulations are in

6    this case and how the defendant genuinely tried to comply

7    with those laws.

8           What defendant told you about the law is not

9    controlling.  What the Court instructs you on the law is.

10          Now, can those regulations be confusing for lay

11   people?  Absolutely.  Is the defendant a lay person?

12   Absolutely not.  And I think defense counsel just admitted

13   as much in his closing.  The defendant ran his own

14   microelectronics company.  The defendant took export

15   compliance training at Honeywell.

16          The defendant said that his company had

17   responsibility -- that he had responsibility for his

18   company's export compliance audits and reviews.  And

19   whenever an employee had a question about export compliance,

20   he testified that he asked the defendant about that.

21          More important than all of that, though, really is

22   the proof on defendant's own hard drive that he never

23   intended to use the Cree MMICs for cell phones or to

24   temporarily send them abroad.

25          Exhibit 2106A was found on defendant's hard drive,

93

1    again in Los Angeles.  That file is about the Z5 project,

2    the Cree chip, and it specifically discusses the airborne

3    needs of the 607.

4            Peter Mattis told you what the 607 does.  That

5    file explains that the whole plan for Z5 was to use an

6    overseas high-performance processing line -- that's Cree --

7    to help develop what are called active electronically

8    steered antenna devices.

9            You heard testimony that those are the exact same

10   devices that can be used in electronic warfare and missile

11   guidance.  In other words, the defendant's own hard drive

12   and his e-mails tell you everything you need to know about

13   how the defendant believed that the Cree MMICs would be used

14   in this case.  And you know what?  It had nothing to do with

15   cell phones or research.  None of those exceptions apply.

16           The defense's other argument about MMICs not being

17   controlled until they are tested has zero support in the

18   evidence and testimony that you've heard.

19           No one in this courtroom ever actually testified

20   that the defendant was confused.  No one.  And the licensing

21   officer that did testify told you he believed MMICs could be

22   controlled for export regardless of whether they are tested

23   before they leave the United States.  And you heard

24   Dr. Nordquist tell you that the Cree MMICs in this case

25   performed exactly as they were designed.

94

1          That means that the defendant and the RML

2     engineers he was working with knew exactly what they were

3     doing.  They were making MMICs that, as you heard, tested

4     well above export controlled power levels and frequencies,

5     and they were getting those MMICs from North Carolina.

6          But more importantly than that, use your common

7     sense.  It is not reasonable to believe that you can simply

8     avoid U.S. export law altogether if you just wait to

9     officially test an item until it goes to China; that you can

10    design and build whatever you want here, and as long as you

11    don't officially test it, you can export it.  That view of

12    the law makes no sense.

13         Now, does the United States have a lot of trade

14    with China?  Sure.  But what you don't see the United States

15    selling to China and what there is no evidence of them

16    selling to China in this case are radar systems in the nose

17    cones of F-35s.

18         Of course, in addition to all of the evidence

19    proving that none of those exceptions applied and keeping in

20    mind that the government has the burden of proof in this

21    case, think about what you did not see.  You did not see a

22    single e-mail from the defendant or any of his Chinese

23    co-conspirators discussing the supposed licensing

24    exceptions.

25         If defendant and his Chinese co-conspirators

legitimately believed that those exceptions applied, why
weren't they discussing them?  If the defendant and his
co-conspirators believed that those exceptions applied, then
why not just tell Cree about the exception and say ship this
to China?

        If the defendant intended to comply with export
laws in general, not just in America but anywhere, then why
not ship WIN wafers directly from Taiwan to China?  Why
instead ship WIN wafers all the way to Canada, ask people to
drive those WIN wafers across the border to New York, ship
them back to San Jose and then across the Pacific Ocean,
over Taiwan, and back to China?

        If the defendant genuinely tried to comply with
export laws, why use at least six different people in this
conspiracy to conceal the value of shipments from the United
States to China, to conceal what was inside those shipments
to China, describing them as glass samples, and to confuse
the heck out of anyone who bothered to look at the route of
those shipments?

        Why lie to the FBI about what you're doing?  The
answer to all of these questions is clear beyond a
reasonable doubt, because the defendant knew about U.S.
export laws and he knew that no exceptions applied to what
he was doing.

        You also heard the defense spend a lot of time

1    talking to you about how the defendant was focused on

2    civilian applications for gallium arsenide MMICs and none of

3    the military applications covered by gallium nitride.  Once

4    again that argument is not supported by the evidence.

5           Exhibit 245A.  If the defendant was focused on

6    gallium arsenide, then why is he e-mailing his brother a

7    proposal explaining that China is, quote, strictly locked

8    out of high-end materials by western countries and that the

9    market for GaN wafers includes, quote, military units?

10          Exhibit 2731A.  If the defendant had no intention

11   of working on GaN, then why is he e-mailing Chengdu RML

12   employees about, quote GaN reticle one and GaN reticle two?

13   He would not have warned RML employees to avoid using

14   specific frequency-related words like KU or W.  He included

15   that warning because he knew that that was a signal for

16   export control.

17          And remember, the fact that the defendant also had

18   expertise in gallium arsenide chips and the fact that he

19   also wanted to make money with civilian applications for

20   gallium arsenide chips, gallium arsenide applications,

21   doesn't mean that he didn't want to make even more money

22   with gallium nitride chips for military application.

23          That's exactly what the evidence in this case

24   proves he did.  And it's also exactly why the defendant

25   e-mailed his brother meeting minutes saying that the

1    five-year business plan for Chengdu Ganide included income

2    for things like missile-tip guidance.  That's Exhibit 253A.

3            The evidence in this case also makes clear that

4    defendant was not just engaged with research with RML

5    employees.  If the defendant was just doing research at

6    UCLA, why use a code name for the Cree wafer?  Why call your

7    academic research work with your students the Z5 project?

8    Why turn around and sell the Z5 project to 607?  That's not

9    research.

10            And remember to follow the money.  You heard Agent

11   Tropea explain that the hundreds of thousands of dollars in

12   supposedly generous research grants that defendant was

13   writing to UCLA, that came from front companies linked to

14   the Chinese government.

15            The defendant's work as a researcher and a faculty

16   at UCLA is not mutually exclusive with his guilt in this

17   case.  The defendant had the perfect cover, the perfect

18   research lab in the United States, and Chinese

19   government-backed entities were willing to pay him millions

20   of dollars for that and for that access.

21            Defense counsel also brought up Lilie Chen during

22   his closing.  What he didn't mention about Lilie Chen is

23   what he told you about what happened at meetings in China.

24   Lilie Chen told you he remembered people using the phrase

25   domestic special market and Z5 project at meetings in China,

1    some of which were attended by the defendant and Yaping

2    Chen.

3          He also remembered people discussing using UCLA as

4    a conduit for Cree chips at those meetings in China.  That

5    testimony is supported by the documents in this case.  If

6    you look at Exhibits 2722A and 2723A, for example, you'll

7    see minutes from those meetings that were e-mailed to the

8    defendant.

9          You'll see the topics of discussion included the

10   Z5 chip and that there were two markets that the defendant

11   and his co-conspirator were interested in -- the upward and

12   high-end market and the downward or civil-use market.  The

13   plan was to focus the KU band and the X band on the domestic

14   special market.

15         The phrase domestic special market is code for

16   military.  These minutes are one of the clearest examples in

17   this case that the defendant was not just doing civilian

18   applications.  He was not just doing research.

19         The meeting minutes make clear, too, that the plan

20   was for Jiangsu Pu to go to UCLA and maintain contacts with

21   Cree.  The plan was to make it sound like RML employees in

22   China were going to UCLA to do research instead of having it

23   reflected as product development.  Those are the exact same

24   arguments you just heard from defense counsel in closing.

25         That's why Jiangsu Pu later e-mealed Lilie Chen

1    and told him that he was very worried that the visa

2    interview officer would make inquiries about research at

3    UCLA.

4                Jiangsu Pu asked Lilie Chen what he should say so

5    as to not involve, quote, sensitive information.  That's

6    Exhibit 1661A.  Lilie Chen testified he then forwarded that

7    e-mail to the defendant, and the e-mails back that up.

8                Did Lilie Chen fail to declare income on his

9    taxes?  Yes.  He admitted that in open court.  Did Lilie

10   Chen fail to declare foreign bank accounts?  Yes.  He

11   admitted that in open court.

12               Is everything else that Lilie Chen said about the

13   defendant nevertheless true?  I submit that it is, based on

14   the evidence we just discussed and the documents that

15   support h is testimony.  Remember, Lilie Chen implicated his

16   own father in this conspiracy, too, not just the defendant.

17               Let's next talk about Kiet Mai.  Now, Kiet Mai has

18   signed a cooperation plea agreement with the government, and

19   the Court has instructed you that you should treat his

20   testimony with greater caution than that of other witnesses.

21   And indeed you should.

22               But once again, everything that Kiet Mai told you

23   about what matters in this case is supported by the

24   evidence.  The e-mails and documents show you that Kiet Mai

25   was interacting with Cree at the defendant's request.  The

1    e-mails show you that he delivered the Cree MMICs to

2    defendant or his daughter and that the defendant was

3    interacting with RML employees in China while these Cree

4    MMICs were being designed.

5            The defense also seemed to imply that because Cree

6    cared about profit and was exchanging internal e-mails, no

7    crime was committed in this case.  That is not the law.  The

8    Court will instruct you on the law, and there is no

9    requirement that the government prove that Cree was actually

10   financially harmed in this case.

11           And remember what Dr. Barner said during his

12   testimony about the way that Cree was harmed.  Cree never

13   would have shipped a custom-made MMIC to China.  Cree's

14   clients include the U.S. defense industry.  Cree protects

15   its intellectual property because it has a leg up on the

16   competition and it provides arguably the best process in the

17   world for MMIC design.

18           If China reverse-engineered Cree's MMICs and its

19   design process, you heard Dr. Barner tell you that Cree

20   would be harmed.  So, of course, the defendant and his

21   co-conspirators actually paid for these MMICs.  That was the

22   point.  Pay for the MMICs and get them to China.

23           What's more telling about the defendant's state of

24   mind in this case is the way the defendant arranged to make

25   those payments.  He didn't want to touch them.  That's why

1    he used Kiet Mai to interface with Cree the whole time to

2    pay Cree directly.

3            Defense counsel also mentioned a few contracts.

4    Those had nothing to do with the Cree wafers that are at

5    issue in this case.  First, take a look at the timing on

6    those actual contracts.  They weren't signed during the

7    relevant time frame by any relevant parties.

8            And remember the instruction on co-schemer

9    liability about Kiet Mai.  If the defendant was instructing

10   Kiet Mai to make false representations to Cree, the

11   defendant is liable for those false representations.

12           And none of those contracts mention Chengdu

13   GaStone, RML, or the 607 Institute.  That's where the

14   evidence shows you those Cree wafers were sent in this case.

15           And if the defendant believed that these contracts

16   somehow gave him access to the PDK, once again ask

17   yourselves why wasn't he interfacing with Jeff Barner

18   directly?  Why was all of the interaction done between Kiet

19   Mai and Jeff Barner?

20           Jeff Barner didn't know who the defendant was.  It

21   makes no sense -- when you have the caliber of mind that the

22   defendant has, it makes no sense to put Kiet Mai as your

23   middleman if you believe you can interface directly with

24   Cree and you believe that your conduct is innocent.

25           You also heard defense counsel argue that the

wafers never actually went to China, that the wafers were

just sitting in defendant's office or in Canada the whole

time.

Members of the jury, the defense's own witnesses

have shown you why that doesn't make sense.  Do you really

think that only the defendant or his brother were the ones

who could find wafers that both the United States and

Canadian governments were looking for on January 19th, 2018?

Of course not.  Reason and common sense and the

testimony of FBI agents and a constable from the Royal

Canadian Mounted Police in Montreal have shown you that

agents did search those properties and the Cree wafers were

not inside on January 19th, 2018.

You heard how they executed those searches.  You

know what methods they used when they were looking for small

objects.  And you know that finding those wafers was the

whole point of the search.

Two different witnesses have told you that they

looked in the boxes or in the JYS offices on January 19th,

2018, and they said that they weren't in them.  And the

defense's own witnesses have told you that they have no idea

where the wafers were until they picked those up from the

defendant's brother's office in Montreal or his house months

later.

One witness said that the defendant's brother's

1    lawyer showed up with wafers in the trunk of his car.  But

2    set that aside, because remember what my colleague,

3    Mr. Shobaki, said to you earlier this morning.  Where those

4    wafers are now is entirely irrelevant to what you're being

5    asked to decide in this case, which is where were those

6    wafers in January of 2014?

7         And the proof on those issues is overwhelming.

8    You saw e-mails late in 2013 that defendant picked up the

9    wafers from Kiet Mai and arranged to send Cree wafers to

10   Eric Lin in San Jose.

11        You saw e-mails showing that in January 2014, in

12   response to a question about the Z5 chip arrival, defendant

13   sent the tracking number for the DHL shipment made by Eric

14   Lin to Yuan Ye.  That's Exhibit 2743A.

15        And then you saw an e-mail from defendant on

16   January 15th, 2014, in which he said that, quote, the first

17   C run would be tested at UCLA and, quote, soon at RML,

18   Exhibit 2746A.  Yuan Ye responded that the first C had

19   already been received and that testing was already started.

20   That's Exhibit 2746A.

21        Yuan Ye's travel records, contrary to what the

22   defense just told you, show that he left the United States

23   for China several months earlier.  That's Exhibit 1201.  And

24   don't forget that you saw presentations proving that the

25   Cree wafer was tested at RML, which again is in Chengdu,

China.

In fact, Exhibit 2803A, a presentation sent to
defendant by an RML employee in China, shows one of the
exact same wafers that's in this courtroom.  The key
difference, as we mentioned this morning, is that that wafer
is missing all of the export controlled MMICs that were so
valuable to entities backed by the Chinese government.  And
the evidence has shown you that those MMICs were intended
for sale to the 607 Institute in China.

The defense emphasized repeatedly that the
defendant reported his traditional salary from Chengdu
GaStone and his China CITIC Bank account.  Of course he did.
He had nothing to lose.

You heard defendant's own statements that he wired
money from his employment with Chengdu GaStone Technology
back to the United States into his domestic bank account
from his foreign accounts with CITIC.  So there was a paper
trail.  There was a path connecting him to those particular
accounts.

And if you look at the financial documents, paying
taxes on those actually didn't cost him very much money.
But you saw from Agent Tropea's analysis, on his 2011
federal tax return that he reported a total tax liability of
just under 25,000.

And if defendant had instead reported compensation

1  paid into his Standard Chartered Bank account, his tax

2  liability would have been $129,657.  That's when you start

3  seeing a real difference.  There was a reason he didn't pay

4  or disclose those foreign accounts.  That would have cost

5  him a lot of money.

6          And before I end, I want to take a minute to

7  respond to what the defense said about reasonable doubt.

8  You'll have the instruction in this case.  Reasonable doubt

9  is based on reason and common sense, not speculation.  And

10  it's not beyond all possible doubt.

11          That is a high burden, and it's a burden that the

12  government accepts, we embrace, and we've met in this case.

13  And a lot of the charges turn on the defendant's state of

14  mind.  And so I want to end by reminding you that the best

15  evidence about defendant's state of mind comes from what the

16  defendant himself either had in e-mails or on his computer

17  or hard drives in Los Angeles.

18          The defendant is the one who wrote a business

19  plan, recognizing that the risks to his business were

20  American laws restricting the export of necessary equipment

21  to China.  The defendant is the one who sent documents

22  describing embargoed equipment and writing that his overseas

23  team could evade restrictions.

24          The defendant is the one who sent proposals to his

25  brother explaining that China was, quote, locked out of

1  epitaxy materials because of western countries.

2          The defendant is the one who told engineers to

3  avoid referring to frequency power levels because the

4  defendant is the one who knew MMICs above those levels were

5  controlled for export from the United States.

6          Scary or not, that's what the evidence is in this

7  case.  And there is no innocent explanation for statements

8  like that, all of which show the defendant's involvement in

9  the conspiracy and his consciousness of guilt.

10          The defendant knew what he was doing was illegal,

11  and that's exactly what the evidence proves in this case.

12  You should find him guilty on all 18 counts.

13          THE COURT:  All right.  Thank you, Mr. Rollins.

14          Ladies and gentlemen, I'm going to read you some

15  final instructions as you may remember I said I would do,

16  and after that we will have your deliberations -- the

17  deliberations process will start.  We'll discuss with you or

18  you'll discuss with the bailiff later your planned schedule

19  for today and tomorrow.

20          When you begin your deliberations, elect one

21  member of the jury as your foreperson who will preside over

22  the deliberations and speak for you here in court.

23          You will then discuss the case with your fellow

24  jurors to reach agreement if you can do so.  Your verdict,

25  whether guilty or not guilty, must be unanimous.  Each of

1    you must decide the case for yourself, but you should do so

2    only after you have considered all the evidence, discussed

3    it fully with the other jurors, and listened to the views of

4    your fellow jurors.

5           Do not be afraid to change your opinion if the

6    discussion persuades you that you should, but do not come to

7    a decision simply because other jurors think it is right.

8    It is important that you had attempt to reach a unanimous

9    verdict but of course only if each of you can do so after

10   having made your own conscientious decision.

11          Do not change an honest belief about the weight

12   and effect of the evidence simply to reach a verdict.

13          Perform these duties fairly and impartially.  Do

14   not allow personal likes or dislikes, sympathy, prejudice,

15   fear, or public opinion to influence you.  You should also

16   not be influenced by any person's race, color, religion,

17   national ancestry or gender, sexual orientation, profession,

18   occupation, celebrity, economic orientation, profession --

19   excuse me.  Let me try that again.

20          You should not be influenced by any person's race,

21   color, religion, national ancestry or gender, sexual

22   orientation, profession, occupation, celebrity, economic

23   circumstances, or position in life or in the community.

24          It is your duty as jurors to consult with one

25   another and to deliberate with one another with a view

1    towards reaching an agreement if you can do so.

2            During your deliberations you should not hesitate

3    to reexamine your own views and change your opinion if you

4    become persuaded that it is wrong.

5            Because you must base your verdict only on the

6    evidence received in the case and on these instructions, I

7    remind you that you must not be exposed to any other

8    information about the case or to the issues it involves.

9            Except for discussing the case with your fellow

10   jurors during your deliberations, do not communicate with

11   anyone in any way and do not let anyone else communicate

12   with you in any way about the merits of the case or anything

13   to do with it.

14           This includes discussing the case in person, in

15   writing, by phone or electronic means via e-mail, text

16   messaging, or any internet chat room, blog, website, or

17   other feature.  This applies to communicating with your

18   family members, your employer, the media or press, and the

19   people involved in the trial.

20           If you are asked or approached in any way about

21   your jury service or anything about this case, you must

22   respond that you have been ordered not to discuss the matter

23   and to report the contact to the Court.

24           Do not read, watch, or listen to any news or media

25   accounts or commentary about the case or anything to do with

1    it.  Do not do any research such as consulting dictionaries,

2    searching the internet, or using other reference materials.

3            And do not make any investigation or in any other

4    way try to learn about the case on your own.  The law

5    requires these restrictions to ensure the parties have a

6    fair trial based on the same evidence that each party has

7    had an opportunity to address.

8            A juror who violates these restrictions

9    jeopardizes the fairness of these proceedings, and a

10   mistrial could result that would require the entire trial

11   process to start over.  If any juror is exposed to any

12   outside information, please notify the Court immediately.

13           Some of you have taken notes during the trial.

14   Whether or not you took notes, you should rely on your own

15   memory of what was said.  Notes are only to assist your

16   memory.  You should not be overly influenced by your notes

17   or those of your fellow jurors.

18           The punishment provided by law for these crimes is

19   for the Court to decide.  You may not consider punishment in

20   deciding whether the government has proven its case against

21   the defendant beyond a reasonable doubt.

22           A verdict form has been prepared for you.  After

23   you have reached unanimous agreement on a verdict, your

24   foreperson should complete the verdict form according to

25   your deliberations, sign and date it, and advise the clerk

1    that you are ready to return to the courtroom.

2         If it becomes necessary during your deliberations

3    to communicate with me, you may send a note through the

4    clerk signed by any one or more of you.  No member of the

5    jury should ever attempt to communicate with me except by a

6    signed writing, and I will respond to the jury concerning

7    the case only in writing or here in open court.

8         If you send out a question, I will consult with

9    the lawyers before answering it, which may take some time.

10   You may continue your deliberations while waiting for the

11   answer to any question.

12        Remember that you are not to tell anyone,

13   including me, how the jury stands numerically or otherwise

14   on any question submitted to you, including the question of

15   the guilt of the defendant, until after you have reached a

16   unanimous verdict or have been discharged.

17        Ladies and gentlemen, you will -- the exhibits

18   that have been admitted will also be, as it's been

19   referenced, available to you in the jury room during your

20   deliberation.  Certain exhibits may require electronic

21   equipment.  And if that's the case and you wish to review

22   any of those exhibits, let us know and we will then make the

23   necessary arrangements for you to listen or see those

24   electronically stored exhibits here in the courtroom.

25        Will you please swear the bailiff.

1          (Bailiff sworn)

2          THE CLERK:  Will you please state your name for

3    the record.

4          THE WITNESS:  David Williams.

5          THE COURT:  Thank you.

6          Ladies and gentlemen of the jury, you are

7    committed to the custody of the bailiff to retire and

8    deliberate upon your verdict.  One of the first questions

9    having nothing to do with your deliberations is one of which

10   schedule you would like to have.  That includes for the rest

11   of today and it also includes when you would like to start

12   tomorrow if you haven't finished today.

13         You are free to start tomorrow at any time you

14   choose and stop tomorrow at any time you choose, but you'll

15   discuss that with the bailiff.

16         Thank you.

17         (Jury out for deliberations)

18         THE COURT:  Please be seated.

19         A few things.  First, the exhibits need to be

20   moved into the jury deliberation room, and that will take a

21   little bit of time because there's so many of them.

22         Second, I stated an instruction that was not of a

23   set just concerning the review of exhibits.  That is not

24   something you can read.  You heard me do that.  So if you

25   want that to be reduced to writing, we can do that and

```
 1   provide that to the jury.

 2          What's your preference?

 3          MR. SPERTUS:  The defense defers to the government

 4   on that issue.

 5          MS. HEINZ:  Your Honor, I don't think it needs to

 6   be reduced to writing.

 7          THE COURT:  That's fine.  I just wanted to make

 8   sure they were aware of that.

 9          As soon as we hear from the jurors about what

10   schedule they would like to have today and tomorrow, we'll

11   let you know.  What we need during the deliberations is for

12   a representative from each side to be available on short

13   notice in case there's a question.

14          MR. SPERTUS:  Can you give us some guidance.

15   Short notice is how long?

16          THE COURT:  Fifteen minutes, 20 minutes.  I'd

17   rather not wait.  I'd rather not keep them waiting.

18          MR. SPERTUS:  Be in the courthouse, but we can be

19   in the cafeteria?

20          THE COURT:  That's fine.  And I think -- yes.

21          Is there anything else we need to do at this

22   point?  Oh, we need the verdict form, too.  Do we have it?

23          We have the verdict form.  We have the jury

24   instructions.  And I think we'll just hear about the

25   schedule.
```

1              All right.  Thank you.

2              MR. SPERTUS:  Thank you, Your Honor.

3              MS. HEINZ:  Thank you, Your Honor.

4              MS. SARTORIS:  Thank you, Your Honor.

5                 (Proceedings adjourned at 3:57 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-


*CERTIFICATE*


I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript format is in conformance with the regulations of
the Judicial Conference of the United States.


Date:  July 10, 2019



                              /s/ Lisa M. Gonzalez
                              _____
                              Lisa M. Gonzalez, U.S. Court Reporter
                              CSR No. 5920